# EXHIBIT A

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

## WASHINGTON, D.C.

### IN THE MATTER OF AN ARBITRATION UNDER PARTIES' ARBITRATION AGREEMENT

### BETWEEN:

### RSM PRODUCTION CORPORATION

*Claimant and*
*Respondent to Counterclaim*

### -and-

### GRENADA

*Respondent and*
*Counterclaimant*

### (ICSID CASE NO. ARB/05/14)

---

## AWARD

---

*Members of the Tribunal:*
**Mr V.V.Veeder,** *President*
**Professor Bernard Audit,** *Arbitrator*
**Dr David S. Berry,** *Arbitrator*

*Secretary to the Tribunal:*
**Ms Milanka Kostadinova**

*The Parties' Legal Representatives:*

*Representing the Claimant (RSM):*

*Dewey & LeBoeuf LLP*
*Grand Auzas & Associés*

*Representing the Respondent (Grenada):*

*Freshfields Bruckhaus Deringer LLP*

*Date of Dispatch to the Parties*:  March 13, 2009

*TABLE OF CONTENTS*

| | | |
|---|---|---:|
| ***PART I:*** | ***INTRODUCTION*** | ***04*** |
| | *(01)  **The Parties*** | ***04*** |
| | *(02)  **The Parties' Dispute*** | ***05*** |
| | *(03)  **The Arbitration Agreement*** | ***05*** |
| | *(04)  **Applicable Laws*** | ***07*** |
| | *(05)  **The Arbitration Tribunal*** | ***08*** |
| | *(06)  **The Arbitral Procedure*** | ***09*** |
| | *(07)  **The Parties' Claims for Relief*** | ***11*** |
| | *(08)  **The New York Legal Proceedings*** | ***13*** |
| | *(09)  **Miscellaneous*** | ***13*** |
| ***PART II:*** | ***THE DISPUTE AND PRINCIPAL ISSUES*** | ***15*** |
| | *(01)  **Introduction*** | ***15*** |
| | *(02)  **The Principal Issues*** | ***15*** |
| | *(03)  **Issue A: The Jurisdiction Issue*** | ***15*** |
| | *(04)  **Issue B: Removal of* Force Majeure** | ***20*** |
| | *(05)  **Issue C: Expiry or Termination*** | ***21*** |
| | *(06)  **Issue D: Claimant's Relief*** | ***27*** |
| | *(07)  **Issue E: Misrepresentation*** | ***29*** |
| | *(08)  **Issue F: Licence Application*** | ***31*** |
| | *(09)  **Issue G: Detailed Work Plan*** | ***31*** |
| | *(10)  **Issue H: Unauthorised Research*** | ***32*** |
| | *(11)  **Issue I: Respondent's Relief*** | ***33*** |
| ***PART III:*** | ***THE PRINCIPAL TEXTS*** | ***35*** |
| | *(01)  **Introduction*** | ***35*** |
| | *(02)  **The Parties' Agreement*** | ***35*** |
| | *(03)  **The 1989 Act*** | ***40*** |
| ***PART IV:*** | ***THE PRINCIPAL FACTS*** | ***42*** |
| | *(01)  **Introduction*** | ***42*** |
| | *(02)  **October 1995*** | ***42*** |
| | *(03)  **January 1996*** | ***45*** |
| | *(04)  **April 1996*** | ***46*** |
| | *(05)  **May 1996*** | ***47*** |
| | *(06)  **June 1996*** | ***48*** |
| | *(07)  **July 1996*** | ***48*** |
| | *(08)  **August 1996*** | ***50*** |
| | *(09)  **September 1996 etc.*** | ***50*** |

|            |                                          |      |
|------------|------------------------------------------|------|
| (10)       | *March 1998*                             | *53* |
| (11)       | *September 2000*                         | *53* |
| (12)       | *November 2002 etc.*                     | *54* |
| (13)       | *January 2004*                           | *55* |
| (14)       | *February 2004*                          | *55* |
| (15)       | *April 2004*                             | *59* |
| (16)       | *May 2004*                               | *62* |
| (17)       | *August 2004*                            | *62* |
| (18)       | *July 2005*                              | *63* |
| (19)       | *Miscellaneous*                          | *64* |

*PART V:*    **ISSUE A: JURISDICTION**    *66*

| (01) | *Introduction*                    | *66* |
| (02) | *The Parties' Submissions*        | *67* |
| (03) | *The Tribunal's Analysis*         | *72* |
| (04) | *The Parties' Characterisation*   | *72* |
| (05) | *The Existence of an Investment*  | *74* |
| (06) | *The Tribunal's Conclusion*       | *83* |

*PART VI:*    **ISSUE B: REMOVAL OF FORCE MAJEURE**    *84*

| (01) | *Introduction*                              | *84*  |
| (02) | *Article 24.2 of the Agreement*             | *85*  |
| (03) | *The Relevant Facts*                        | *89*  |
| (04) | *RSM's Agreements to Assist Grenada*        | *92*  |
| (05) | *Mr Grynberg's Expertise*                   | *93*  |
| (06) | *Venezuela*                                 | *94*  |
| (07) | *Conclusion Regarding Venezuela*            | *98*  |
| (08) | *Trinidad & Tobago*                         | *99*  |
| (09) | *Conclusion Regarding Trinidad & Tobago*    | *104* |
| (10) | *Alleged Breach by Grenada*                 | *106* |
| (11) | *The Tribunal's Decision*                   | *109* |
| (12) | *The Tribunal's Overall Conclusion*         | *110* |

*PART VII:*    **ISSUE C: EXPIRY OR TERMINATION**    *111*

| (01) | *Introduction*                  | *111* |
| (02) | *The Relevant Facts*            | *111* |
| (03) | *Legal Application*             | *114* |
| (04) | *The Tribunal's Conclusion*     | *126* |

*PART VIII:*    **ISSUE E: MISREPRESENTATION**    *128*

| (01) | *Introduction*                              | *128* |
| (02) | *The Factual Basis for Misrepresentation*   | *129* |

*(03)*   *Grenadian Law Regarding Misrepresentation*          *137*
*(04)*   *The Tribunal's Decision*                               *140*
*(05)*   *The Tribunal's Conclusion*                             *146*

*PART IX:*     *ISSUE G: DETAILED WORK PLAN*                     *147*

*(01)*   *Introduction*                                          *147*
*(02)*   *The Tribunal's Decision*                               *147*

*PART X:*      *ISSUE H: UNAUTHORISED RESEARCH*                  *148*

*(01)*   *Introduction*                                          *148*
*(02)*   *The Tribunal's Decision*                               *148*

*PART XI:*     *ISSUE I: RESPONDENT'S RELIEF*                    *150*

*PART XII:*    *ISSUE J: LEGAL AND ARBITRATION COSTS*            *151*

*(01)*   *Introduction*                                          *151*
*(02)*   *The Parties' Respective Submissions*                   *151*
*(03)*   *The Tribunal's Analysis*                               *153*
*(04)*   *The Tribunal's Decision*                               *155*

*PART XIII:*   *OPERATIVE PART*                                  *156*

## PART I: INTRODUCTION

### (01) The Parties

1.  *RSM:* The Claimant and Respondent to Counterclaim is RSM Production Corporation, a company organised and existing under the laws of Texas, United States of America, with its principal place of business located at 5299 Prentice Blvd, Suite 500, Greenwood Village, Colorado 80111, USA. Its president and chief executive officer is Mr Jack J. Grynberg, who is also a director of the company. Mr Grynberg has worked as a petroleum engineer for more than thirty years. The company is owned by members of Mr Grynberg's family. (For ease of reference, the Claimant is here referred to as "the Claimant" or "RSM.")

2.  *RSM's Legal Representatives:* In these proceedings, the Claimant was represented by LeBoeuf Lamb Greene & MacRae (London), later Dewey & LeBoeuf, LLP (London office) of 1 Minster Court, Mincing Lane, London EC3R 7YL,  United Kingdom and Grand Auzas & Associés (Paris), of  6 Rue Paul Valéry, 75116 Paris, France.

3.  *Grenada:* The Respondent and Counterclaimant is Grenada. Grenada is an independent State in the south-eastern Caribbean, north-west of Trinidad and Tobago and north of Venezuela, with a population of about 100,000 persons. Grenada is a member of the Commonwealth. (For ease of reference, the Respondent is here referred to as "Grenada" or "the Respondent.")

4.  *Grenada's Legal Representatives:* In these proceedings, Grenada was first represented by DLA Piper Rudnick Gray Cary UK LLP, of 3 Noble Street, London EC2V 7EE, United Kingdom. From November 2005, Grenada was represented by Freshfields Bruckhaus Deringer LLP of Appollolaan 151, 1077 AR Amsterdam, The Netherlands.

### (02)  *The Parties' Dispute*

5.    The Parties' dispute arises from a written agreement made on 4 July 1996 ("the Agreement"). It recorded a contractual arrangement whereby RSM intended to apply for an "Exploration Licence" from Grenada for oil and gas over a designated area in the waters off the islands of  Grenada, Petite Martinique and Carriacou (divided into 42 licence blocks) and, in the event of commercial discovery, to apply for one or more "Development Licences," all such licences being granted by Grenada subject to the Petroleum and Natural Gas Deposits Act 1989 of Grenada ("the 1989 Act") and the terms of the Parties' Agreement.

6.    In April 2004, RSM applied to Grenada for an Exploration Licence under the Agreement and the 1989 Act. Grenada refused to grant this licence to RSM on 27 April 2004; and Grenada terminated the Agreement on 5 July 2005.

7.    The Tribunal addresses further details of the Parties' dispute below, in Part II of this Award.

### (03)  *The Arbitration Agreement*

8.    Article 26, "Arbitration," of the Parties' Agreement provided:

> "*26.1 Any dispute or difference arising between the parties relating to the construction, meaning or effect of this Agreement or the rights or liabilities of the parties hereunder, or any matter arising out of the same or connected therewith shall be resolved amicably by negotiations.*
>
> *26.2 Subject to Clause 26.1 and 26.5 all disputes, differences or questions between the parties to this Agreement with respect to any matter arising out of or relating to this Agreement shall be referred to arbitration pursuant to Clause 26.3.*
>
> *26.3       (a)  Any unresolved dispute or difference aforesaid shall be submitted for settlement by arbitration to the International Centre for the Settlement of Investment Disputes (ICSID) established by the Convention for the Settlement of Investment Disputes between States and Nationals of other States of 16 March 1965 and for this purpose it is agreed that although the Company (as an investor) is a company*

*registered as a foreign company in Grenada, it is controlled by nationals of the United States and shall be treated as a national of that State for the purpose of the Convention.*

*(b) Each dispute submitted by a party to arbitration shall be heard by an Arbitration Board, composed of three arbitrators. Each party shall appoint one arbitrator, and these two shall designate a third arbitrator, who shall chair the Arbitration Board. If the arbitrators named by the parties fail to agree upon a third arbitrator within thirty (30) days after the latter of the two arbitrators has been appointed, or if any party does not appoint an arbitrator within thirty (30) days following appointment of an arbitrator by the other party, such arbitrator shall, at the request of either party, be designated by the Chairman of the Administrative Council of ISCID [sic].*

*(c) If for any reason an arbitrator is unable to perform his functions, a substitute shall be chosen in the same manner as the original arbitrator.*

*(d) Unless otherwise agreed in writing by the parties, the third arbitrator appointed pursuant to paragraph (a) shall not be a national of Grenada or of the country where the parent company of the Company is incorporated.*

*26.4    (a) The said arbitration shall, unless otherwise agreed by the parties, be held in London, England.*

*(b) The award resulting from arbitration shall be final and binding on the parties.*

*26.5 Any matter in dispute between the parties under Clause 8.7, 13.5 and 13.7 shall be referred for determination by a sole expert to be appointed by agreement between the parties hereto and failing such agreement by the Chairman of the Administrative Council of ICSID."*

The word "investor" is not here expressly defined. For ease of reference below, Article 26 of the Agreement is described as the "Arbitration Agreement."

9.    *ICSID Convention:* Both Grenada and the United States of America are Contracting States to the 1965 ICSID Convention  to which the Arbitration Agreement refers (as above), having ratified this treaty in 1991 and 1966, respectively.

10.    Article 25(1) of the ICSID Convention provides:

*"The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State […] and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally."*

The term "investment" is not here expressly defined.

11.    *ICSID Arbitration Rules:* It was common ground between the Parties that the relevant arbitration rules, pursuant to Article 6(1)(c) of the ICSID Convention, were the Rules of Procedure for Arbitration Proceedings, as amended and effective on 1 January 2003.


## *(04) Applicable Laws*


12.    Article 28 of the Parties' Agreement, "Applicable Law," provides:

*"This Agreement shall be governed by, interpreted and construed in accordance with the Laws of Grenada."*

As regards the "Laws of Grenada," it was common ground between the Parties that recourse could be made to English common law; and both Parties did so extensively in these proceedings [D5.205].

13.    *Substantive Law:* It is common ground between the Parties that the Parties' substantive rights and obligations are governed by the laws of Grenada, subject to one issue in regard to the law applicable to the Parties' Arbitration Agreement.

14.    *Arbitration Agreement:* As regards the Arbitration Agreement, RSM contended that Article 26 was governed by the laws of Grenada, pursuant to Article 28 of the Agreement. As submitted by RSM's Counsel at the conclusion of the Main Hearing: "The arbitration clause is part of the contract. I know, of course, we all know the argument about severability, but we are not concerned here with severability as to

whether an arbitration clause is surviving a contract in some way or another, but it is a clause of the contract, like any other, and it follows from that that it has to be interpreted according to the applicable law which the parties have expressly chosen" [D5.205-206].

15.   Grenada submitted by its Counsel, at the conclusion of the Main Hearing, that the Arbitration Agreement's applicable law was public international law: "... the law applicable to the arbitration clause, not because of severability, though severability is recognised in the ICSID Convention, the law applicable to the arbitration clause, because that is the mechanism created by a treaty, is public international law. If that makes a difference or not, I don't know, but that is the principle" [D5.209-210].

16.   Ultimately, it appeared that this difference was not significant to the Parties' respective cases in these arbitration proceedings; and the Tribunal does not consider it significant to its decisions in this Award.


*(05) The Arbitration Tribunal*


17.   The  Arbitral Tribunal was comprised of three members:

(1) Professor Bernard Audit, as Co-Arbitrator, appointed by RSM by letter dated 20 September 2005, of Université de Paris II (Panthéon-Assas), 12 place du Panthéon, 75005 Paris, France;

(2) Dr David S. Berry, as Co-Arbitrator, appointed by Grenada by letter dated 31 October 2005, of the University of the West Indies, Cave Hill Campus, P.O. Box 64, Bridgetown, Barbados; and

(3)  V.V. Veeder Esq, as President, appointed by the two co-arbitrators on 1 December 2005, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2E 3EG, United Kingdom.

Ms Milanka Kostadinova, Senior Counsel, ICSID, was appointed Secretary to the Tribunal.

*(06) The Arbitral Procedure*

18.   *Written Submissions:*   RSM submitted its Memorial (with accompanying materials) on 3 July 2006 [WS1.47] and its Reply on 5 March 2007 [WS2.343].  Grenada submitted its Counter-Memorial on 8 December 2006 [WS1.47] and its Rejoinder on 25 May 2007 [WS2.462].

19.   *Written Testimony*: RSM adduced the following signed written statements from the following factual witnesses: Mr Jack J. Grynberg of 3 July 2006 [WS1.38] and 2 March 2007 [WS2.432]; and Mr James A.L. Bristol of 22 February 2007 [WS2.446].

20.   Grenada adduced signed written statements from the following factual witnesses: Senator Gregory Bowen of 8 December 2006 [WS1.262] and 25 May 2007 [WS2.566]; and Mr John Auguste of 8 December 2006 [WS1.285] and 24 May 2007 [WS2.552]. Grenada also adduced signed expert reports from Lord Mustill of 8 December 2006 [WS1.328] and Mr Paul Tauecchio of 8 December 2006 [WS1.328].

21.   *Procedural Meetings:* The first procedural meeting took place on 16 January 2006 (following which the Tribunal issued written minutes of this session); the second procedural meeting took place by telephone conference-call on 18 December 2006 (following which the Tribunal issued its procedural order dated 21 December 2006); and the third procedural meeting on 26 March 2007 (following which the Tribunal issued its procedural order dated 14 May 2007).

22.   *Procedural Orders:* In addition to those minutes and orders listed above, the Tribunal made procedural orders dated 22 February & 9 May 2007 (in regard to the New York Legal Proceedings); several orders during the Main Hearing; a procedural order of 2 August 2007 modified by the order of the President of the Tribunal dated 3 August 2007 (in respect of the New York Legal Proceedings); a procedural order dated 22 August 2008 (rejecting the Claimant's application to suspend these proceedings). It serves no purpose in setting out the terms of these orders here: all were recorded in

writing or in transcripts which are on file at ICSID with copies in the Parties'
possession.

23.   *Main Hearing:* The Main Hearing took place over five days from Monday, 18 June to
Friday, 22 June 2007, at the IDRC, 70 Fleet Street, London EC4Y 1EU, United
Kingdom.  It was recorded by verbatim transcript.[1]

24.   The Main Hearing was attended, on behalf of RSM, by Arthur Marriot QC, Thomas
Geuther Esq, Zoe Warwick Esq and Joshua Rosenthal Esq (all of LeBoeuf, Lamb,
Greene & MacRae (now Dewey & LeBoeuf LLP)); Me Philippe Auzas (of Grand,
Auzas & Associés); Mr James A.L. Bristol (of Henry, Henry & Bristol); Mr Jack
Grynberg (of RSM) and Mr Richard Ward (also of RSM). It was attended, on behalf of
Grenada , by Jan Paulsson Esq, D. Brian King Esq, Jonathan J. Gass Esq, Laura
Halonen Esq and  Fiona Richardson Esq (all of Freshfields Bruckhaus Deringer LLP);
Senator Gregory Bowen and Mr John Auguste (of the Government of Grenada).

25.    The Parties made oral opening submissions on the Main Hearing's first day [D1.05 and
D1.89 respectively]. The following witnesses then testified orally at the Main Hearing:
for RSM, Mr Bristol (D1.182x, D1.189xx and D1.230xxx) and Mr Grynberg (D2.05x,
D2.23xx, D3.04xx and D3.129xxx); for Grenada, Mr Auguste (D3.155x, D3.165xx and
D3.244xxx) and Senator Bowen (D4.03x, D4.14xx and D4.87xxx). On the Main
Hearing's last day, the Parties made closing oral submissions and reply submissions
[D5.03, D5.90, D5.184 and D5.207].

26.   At the end of the Main Hearing, the Tribunal informally closed the file to the Parties,
save as regards stated exceptions relating to transcript corrections and submissions on
costs to be made later in writing [D5.220-221].

---

[1]  References made to the verbatim transcript below are to the relevant day and page: *e.g.*, "D1.04" indicates
page 4 of the first day (18 June 2007). The bundle references are self-explanatory.

*(07) The Parties' Claims for Relief*

27.   *RSM:* As confirmed at the conclusion of Main Hearing [D5.203-204 & 213-216], RSM
seeks an order from the Tribunal in these terms, as taken from RSM's Memorial,
Section D, "Prayer for Relief,"  paragraphs 98.1 to 98.6 (page 27) and, as re-stated to
like effect in RSM's Reply, Section D, paragraph 168 (page 88), namely:

> "98.1.    *The Agreement remains in full force and effect;*
>
> 98.2.    *The Government must under the Agreement ensure that RSM is granted an
> Exploration License;*
>
> 98.3.    *In the alternative, the Government must pay damages to RSM for the loss it
> has suffered, such damages to be determined following an inquiry as to
> damages;*
>
> 98.4.    *The Government must not proceed with discussions with third parties
> concerning the grant of oil and gas exploration rights within the area subject
> to the Agreement and may not award, promise or issue any exploratory or
> development rights to any  third party which would affect RSM's rights or
> obligations under the Agreement before the Tribunal has issued its award;*
>
> 98.5.    *The Government must pay in full the fees and expenses of the Arbitrators, the
> ICSID administrative expenses and all costs incurred in connection with this
> arbitration by RSM (including without limitation the fees and expenses of all
> experts and all legal fees and expenses); and*
>
> 98.6.    *RSM is entitled to such further relief as is just and equitable in all the
> circumstances of this case."*

As regards the prayer for relief in paragraph 98.4 above, Counsel for RSM
acknowledged at the conclusion of the Main Hearing that it might unnecessarily
duplicate the prayer for relief in paragraph 98.1 [D5.204]. As regards the prayer for
relief in paragraph 98.3, at RSM's request, the Tribunal indicated at the conclusion of
the Main Hearing that, if this relief were granted, the Tribunal would be minded to hold
a further hearing to conduct the requested "inquiry as to damages" [D5.216].

28.   *Grenada:* As confirmed at the conclusion of the Main Hearing [D5.211-212], Grenada
seeks an order from the Tribunal in the following terms, as taken from Grenada's
Counter-Memorial, Section 7, "Request for Relief" (page 183), namely:

*"7.1 For the foregoing reasons, Grenada respectfully requests the Arbitral Tribunal to render an Award:*

(1)   *Declaring that RSM's claims are not within the jurisdiction of the Arbitral Tribunal;*

(2)   *Declaring, alternatively, that Grenada has not breached any of its obligations under the Agreement;*

(3)   *Dismissing all of RSM's claims;*

(4)   *Declaring that RSM fraudulently induced the Government to enter into the Agreement, and/or that RSM breached the Agreement;*

(5)   *Declaring, on the basis of the finding described in (4) above, that the Agreement is rescinded, or alternatively terminated, or lapsed, such that the Government has no further contractual obligations to RSM;*

(6)   *Ordering RSM on the basis of the finding in (4) above to refrain from: (a) interfering in any way in Grenada's foreign policy and relations with other States; (b) representing to any person or entity that it has authority to act as an agent or representative of the Government of Grenada; and (c) asserting to any person or entity that it has any kind of license or other rights in respect of Grenada's offshore territory or EEZ;*

(7)   *Awarding to the Government, on the basis of the finding described in (4) above, the sums of EC$ 391,860.00 and US$1,000.00;*

(8)   *Ordering RSM to pay all costs of this proceeding, including the Government's legal and expert fees and expenses, the fees and expenses of the Arbitral Tribunal and of any experts appointed by the Arbitral Tribunal, as well as the costs charged by ICSID; and*

(9)   *Awarding the Government such other and further relief as the Arbitral Tribunal may consider appropriate."*

29.   Paragraph 7 of this prayer for relief addresses Grenada's counterclaims for damages made earlier in its Counter-Memorial in respect of contractual breaches of the Agreement alleged against RSM, namely: (a) the sum of EC$ 391, 860.00 as Grenada's expense in compensating the fishermen damaged by RSM's unauthorised research committed by the "GSI Admiral," paragraph 6.31 (p. 181); and (b) the sum of US$1,000 nominal damages for RSM's alleged failure to submit a timely application for an Exploration Licence and proceed with its exploration activities, paragraphs 5.19 & 6.32, (pp. 167 & 182).  In regard to paragraphs 4 and 5 of the prayer, Grenada makes no formal claim in damages for tortious misrepresentation.

**(08) The New York Legal Proceedings**

30.   On 1 November 2006, whilst these arbitration proceedings were pending before ICSID, RSM (*inter alios*) filed a complaint in the U. S. District Court for the Southern District of New York against Senator Bowen and three other individuals, raising issues of corruption against each of them and claiming damages in excess of US $500 million. These New York legal proceedings received extensive publicity, including materials from these ICSID proceedings placed in the public domain which do not appear to have originated from Grenada or Senator Bowen.

31.   Given that Senator Bowen was manifestly an important witness for this Tribunal, it was at least unfortunate that he felt himself subjected to this litigation by RSM as a means of placing unfair pressure upon him for one purpose or another. The Tribunal was not in a position to decide, whether Senator Bowen was right or wrong in his concerns, which were more appropriately addressed by the New York Court.

32.   Moreover, Senator Bowen was not a party to these ICSID arbitration proceedings; nor was he separately represented before this Tribunal. Grenada took steps to protect him by several applications to the Tribunal for interim measures, which were the subject of several requests by the Tribunal to the Parties up to August 2007 and in turn several procedural orders and requests made by the Tribunal, as indicated above.

33.   The Tribunal is satisfied that Senator Bowen's testimony was not adversely affected by the New York Legal Proceedings. Given the Tribunal's findings of fact in regard to Senator Bowen below, it would serve no purpose in this Award to set out here anything further in regard to those proceedings.

**(09) Miscellaneous**

34.   At the request of the Tribunal, on 9 July 2007 both Parties filed simultaneously their submissions on costs.

35.   Save for the submissions on costs and transcript corrections, the Tribunal made it clear at the Main Hearing that the record was closed as to the matters before the Tribunal for its decision as regards any further "submissions or evidence or exhibits or legal materials" by any Party, as already noted above [D5.221].

36.   On 3 September 2007, RSM submitted an expert report by Mr Thomas Leslie Reeves. By letter of 6 September 2007, Grenada objected that in view of the Tribunal's ruling at the Main Hearing the report should not be considered by the Tribunal. In all the circumstances, given also the decisions recorded later in this Award, the Tribunal decided that it is neither appropriate nor necessary to refer to RSM's additional materials.

37.   These proceedings were formally closed by the Tribunal under Article 38(1) of the ICSID Rules, by letter dated 15 January 2009 addressed to the Parties.

38.   By letter from RSM's Counsel to the Secretary of the Tribunal dated 4 February 2009, together with Mr Jack J. Grynberg's further communication, signed *per se* and dated 10 February 2009*, RSM applied for the Tribunal's permission to introduce into evidence certain new materials and to re-open these proceedings in accordance with Article 38(2) of the ICSID Rules. Grenada opposed RSM's application by a communication dated 6 February 2009 from Freshfields Bruckhaus Deringer LLP.  By its procedural order of 24 February 2009, the Tribunal rejected RSM's application: the Tribunal considered that the Parties' presentation of their respective cases was fully complete as of 15 January 2009 when the Tribunal declared the proceedings formally closed under Article 38(1); and the Tribunal also considered that, in principle, the re-opening of proceedings under Article 38(2) requires the requesting party to show that the fresh evidence is of such a nature as to constitute a decisive factor in the case or that there is a significant need for clarification on certain specific points.  In all the circumstances of the present case and having considered the Parties' written submissions, the Tribunal did not find that any ground, as envisaged in Article 38(2), had been shown by RSM to exist for the Tribunal to justify the re-opening of these proceedings.

## PART II: THE PARTIES' DISPUTE
## AND THE PRINCIPAL ISSUES

### (01)  Introduction

39.    The Tribunal has considered the full submissions of the Parties in identifying the
principal issues and in arriving at the decisions on those issues in this Award. The
summaries listed below are made for the purpose only of explaining the Tribunal's
approach in this Award and cannot, of course, reproduce the Parties' fuller submissions
made to the Tribunal, both written and oral, during the course of these arbitration
proceedings.

### (02)  The Principal Issues

40.    The following principal issues arise from the Claimant's Claim and the Respondent's
Counterclaim:

### (03)  Issue A: The Jurisdiction Issue

41.    There arises first of all the issue of jurisdiction, which depends on whether this dispute
arises directly from an Ainvestment@ within the meaning of Article 25 of the ICSID
Convention. Subject to this question, there is no dispute that the Arbitration Agreement
is a valid and subsisting agreement to arbitrate under its applicable law or laws,
conferring jurisdiction upon this Tribunal to decide the merits of the Parties' dispute.

*(i) The Claimant's Case*

42. The Claimant advances its case for the Tribunal's jurisdiction upon the Parties'
Arbitration Agreement in the Agreement, as a private law agreement subject to the law
of Grenada. This Arbitration Agreement was consensually negotiated and agreed
between the Parties before other terms of the Agreement, Grenada having put forward
the Commonwealth Fund's model contract which contained an ICSID arbitration clause
and RSM having proposed its draft production sharing contract which also contained an
ICSID arbitration clause.

43. As regards the Respondent's case based on Article 25 of the ICSID Convention, the
Claimant asserts that its "investment" is manifest on the facts of the present case.
Moreover, RSM has already invested approximately US $6 million between 1971 and
1984 (in addition to Mr Grynberg's and RSM's own work and know-how), quite apart
from the assumption of contractual obligations under the Agreement amounting to
further investment.

44. The unreality of Grenada's position is increased by the fact that the Agreement
envisages a 58-year hydrocarbon exploration concession which inevitably becomes a
large infrastructure project in Grenada. If Grenada's oil and natural gas reserves are as
large as RSM believes them to be, the Agreement would result eventually in the largest
investment and infrastructure project in Grenada's history. Since Grenada's annual
gross national income is only US $370 million, Grenada's annual tax revenues and
royalties under the Agreement would result in a massive increase of the Government's
annual income for the benefit of Grenada as a whole. The Agreement would also
provide employment and training for large numbers of Grenadian citizens.

45. Moreover, Article 26.3(a) of the Agreement records Grenada's express acceptance that
RSM is "an investor" and express consent to ICSID arbitration, as invoked in this case.
When the present dispute arose, Grenada reiterated its consent to ICSID arbitration and
confirmed to RSM that it would honour the award of an ICSID tribunal. It is therefore
difficult to imagine a more compelling case for the assertion of jurisdiction by any
ICSID tribunal.

46.   There can therefore be no doubt that the Agreement evidences an investment, rather than an ordinary commercial transaction such as the sale of goods contract in *Joy Mining Machinery Ltd v Egypt*. In that case, the tribunal decided that a global approach should be adopted under Article 25 of the ICSID Convention and accepted that certain classes of activity qualify "beyond doubt" as an investment under Article 25, citing contracts containing express consent to ICSID arbitration and concession contracts (at paragraph 59):

> "*The Tribunal is aware of many ICSID and other arbitral decisions noted above and the fact that they have progressively given a broader meaning to the concept of investment. But in all those cases there was a specific connection to ICSID, either because the activity in question was beyond doubt an investment or because there was an arbitration clause involved. The same holds true of concession contracts in which the investor is called on to perform a public service on behalf of the State.*"

(The Claimant also cited, principally, the decisions in *Joy Mining v Egypt, CSOB v The Slovak Republic* (at paragraphs 63-64, citing the Report of the Executive Directors of the World Bank on the ICSID Convention), and the *ad hoc* Committee decision in *Mitchell v DRC* (at paragraph 30)).[2]

### (ii) The Respondent's Case

47.   The Respondent submits that this jurisdictional issue depends on whether this dispute arises directly from an "investment" within the meaning of Article 25 of the ICSID Convention; and that, if the Tribunal should determine that it has no jurisdiction because there is no such investment on the facts of this case, there would be no need for the Tribunal to resolve any of the substantive issues regarding RSM's claims or Grenada's counterclaims. Given that jurisdiction has here been merged with the merits, this jurisdictional issue requires all relevant facts to be decisively determined on the evidence, with no assumptions in favour of RSM as the Claimant asserting jurisdiction (as might be appropriate at the preliminary stage of ICSID arbitration proceedings).

---

[2] *Joy Mining Machinery Limited v Arab Republic of Egypt* (ICSID Case No ARB/03/11)*; Československa obchodní banka, a.s. v Slovak Republic* (ICSID Case No ARB/97/4); *Patrick Mitchell v Democratic Republic of the Congo* (ICSID Case No ARB/99/7) (*see* published references in note 3, *infra*).

48. The ICSID Convention establishes an objective jurisdictional standard that is either met or not met, on the established facts. Parties cannot by agreement or waiver confer jurisdiction on an ICSID Tribunal outside the scope of Article 25 of the ICSID Convention. The so-called *Salini* factors are well-established requirements for establishing the existence of an "investment" for the purposes of Article 25; and in applying them, the facts of each case must be considered as a whole.

49. As the ICSID award in *MHS v Malaysia* and the *Mitchell v DRC* ICSID annulment decision emphasized, a significant contribution to the host state's economic development is a cardinal feature of an "investment" in light of the purposes and objects of the ICSID Convention. The Respondent relied upon a string of jurisdictional decisions in recent years to such effect, namely: *Salini v Morocco*, *Mihaly v Sri Lanka*, *Joy Mining v Egypt*, *LETCO v Algeria, LESI v Algeria, Mitchell v DRC*, *CSOB v Slovakia, Bayandir v Pakistan, Jan de Nul NV v Egypt, Autopista Concesionada de Venezuela v Venezuela, Nagel v Czech Republic* and *MHS v Malaysia.*[3]

50. RSM's account of what constitutes its "investment" for jurisdictional purposes has varied considerably during these proceedings. One common element among these variations is that RSM's alleged financial contributions are almost entirely unsupported

---

[3]  *Salini Costruttori S.p.A. and Italstrade S.p.A. v Kingdom of Morocco* (ICSID Case No ARB/00/4), Decision on Jurisdiction of 23 July 2001, 42 *ILM* 609 (2003), 6 ICSID Rep 400 (2004); *Mihaly International Corporation v Democratic Socialist Republic of Sri Lanka* (ICSID Case No ARB/00/2), Award of 15 March 2002, 17 ICSID Rev—FILJ 142 (2002), 41 ILM 867 (2002), 6 ICSID Rep 310 (2004); *Joy Mining Machinery Limited v Arab Republic of Egypt* (ICSID Case No ARB/03/11), Award of 6 August 2004, 19 ICSID Rev—FILJ 486 (2004), 13 ICSID Rep 123; *Liberian Eastern Timber Corporation v Republic of Liberia* (ICSID Case No ARB/83/2), Award of 31 March 1986, 26 ILM 647 (1987), 2 ICSID Rep 346 (1994); *Consortium Groupement L.E.S.I. - DIPENTA v People's Democratic Republic of Algeria* (ICSID Case No ARB/03/8), Award of 10 January 2005, [French original] 19 ICSID Rev—FILJ 426 (2004); *Patrick Mitchell v Democratic Republic of the Congo* (ICSID Case No ARB/99/7), Decision on the Application for the Annulment of 1 November 2006; *Československa obchodní banka, a.s. v Slovak Republic* (ICSID Case No ARB/97/4), Decision on Objections to Jurisdiction of 24 May 1999, 14 ICSID Rev—FILJ 251 (1999), 5 ICSID Rep 335 & 358; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v Islamic Republic of Pakistan* (ICSID Case No ARB/03/29), Decision on Jurisdiction of 14 November 2005; *Jan de Nul N.V. and Dredging International N.V. v Arab Republic of Egypt* (ICSID Case No ARB/04/13), Award of 6 November 2008; *Autopista Concesionada de Venezuela, C.A. v Bolivarian Republic of Venezuela* (ICSID Case No ARB/00/5), Decision on Jurisdiction of 27 September 2001 [English original] 16 ICSID Rev—FILJ 469 (2001), 6 ICSID Rep 419 (2004); *Nagel v Czech Republic* (2004) Stockholm Arb Rep 141; *Malaysian Historical Salvors, SDN, BHD v Malaysia* (ICSID Case No ARB/05/10), Award of 17 May 2007.

by documentary evidence. Taking all of RSM's claimed investment activities as a whole, they fail to meet, or at best meet only weakly, the various *Salini* factors.

51.    For example, RSM has taken great care to minimize its financial commitment and to ensure that any significant operations would be undertaken by others without any risk to RSM. Further, RSM's minimal activities did not contribute in any significant way to Grenada's economic development. One category of expenditure claimed by RSM as an "investment" is the alleged expense incurred in undertaking various litigation and arbitration claims for the benefit of Grenada. None of these claims has succeeded; most were undertaken over Grenada's objections; and all were meritless on their face. RSM has also claimed to have acquired and reprocessed seismic data. The amounts claimed to have been spent have not been supported by any documentary evidence; and, in any case, RSM's activity has been *de minimis* in the context of petroleum exploration. Even if the jurisdictional test could be satisfied by what RSM had undertaken to do under the Agreement (rather than by what it has actually done), its obligations under the Agreement would not suffice to qualify as an "investment" under Article 25 of the ICSID Convention: the most that RSM was obliged to do was a trivial amount of work costing US $400,000.

52.    In the words of its Counsel at the Main Hearing, Grenada submitted that: "At the highest, they [RSM] were the putative beneficiary of a preliminary agreement which we submit cannot itself constitute an investment. Did this preliminary investment contain, comport, carry with it, an investment between its signature and the invocation of *force majeure*? That ... is a window of 14 days. Where was the investment during that time frame?" [D1.97].

53.    As noted above, however, it is not Grenada's case that the Arbitration Agreement was invalid or non-existent or otherwise contractually ineffective by itself. As submitted by its Counsel in Grenada's closing oral submissions at the Main Hearing: "In this case, we are not saying that the arbitration clause was an illusion. Our client signed it." [D5.154]. Grenada's case turns only upon the "illusory nature" of RSM's investment under the "self-limiting" Article 25 of the ICSID Convention, as a result of which Article 26 of the Parties' Agreement is "pathological, because you could not use the

ICSID mechanism for what would, in effect, be an issue of the interpretation of a document which is not relevant to an investment. You cannot use ICSID for that." [D5.212].

### (04)   Issue B: Removal of Force Majeure

54.   This issue addresses whether RSM violated Article 4.2 of the Agreement by interfering with the resolution of Grenada's maritime boundaries. Article 4.2 of the Agreement required RSM "to take all reasonable steps to remove the cause" of *force majeure*. It also addresses whether Grenada bore a like obligation towards RSM and, if so, whether Grenada was in breach of this obligation. (Article 4.2 is cited in full below in Part III(2) of this Award).

### (i)       The Respondent's Case

55.   RSM's continuing interference in Grenada's boundary negotiations with its neighbours, in spite of repeated and explicit warnings that RSM's conduct was endangering the prospect of a successful conclusion to such negotiations, violated its obligation to act reasonably to resolve an alleged event of *force majeure* under Article 24.2 of the Agreement. That contractual breach entitled Grenada to terminate the Agreement under the law of Grenada.

### (ii)      The Claimants' Case

56.   RSM did not guarantee that it would succeed in resolving Grenada's boundary disputes with Venezuela and Trinidad & Tobago. Even if, as Grenada asserts, RSM's acts temporarily antagonised Venezuelan officials, RSM's conduct does not mean that resolution of the boundary disputes became impossible or even that such resolution was substantially delayed. Boundary negotiations can be slow and difficult. As Grenada's own Counter-Memorial admits, as regards Venezuela, "the slow progress of the negotiations has been largely due to Venezuela"; and, as regards Trinidad & Tobago, Grenada admits that "the coming into force of UNCLOS in 1994 has apparently put

Trinidad & Tobago in a difficult position, such that it is reluctant to hold substantive discussions regarding the boundary, let alone to agree on a line [with Grenada]."

57.     RSM also relied upon Mr Auguste's testimony where he explained that political events in Venezuela and Trinidad & Tobago were responsible for Grenada's difficulties: the former's attempted coup in 2002 and the latter's constitutional crisis due to the 2000 and 2001 elections resulting a hung parliament [WS2, paragraph 28].

58.     It is therefore impossible, on the evidence, for Grenada to prove that anything which RSM is alleged to have done has caused Grenada to become unable to resolve its boundary disputes. In any event, RSM's efforts to resolve these boundary disputes do not amount to breach of any condition of the Agreement under the law of Grenada. Nor, given Grenada's express admissions as to the reasons for the lack of progress in its boundary negotiations, can Grenada prove that the alleged breaches by RSM caused Grenada to lose "substantially the whole benefit" which Grenada expected under the Agreement. Accordingly, even if there were a breach of the Agreement by RSM, it was inconsequential; and termination of the Agreement by Grenada is not therefore permitted under Grenadian law. To the contrary, Grenada was in breach of its contractual obligation towards RSM.

## (05)  Issue C: Expiry or Termination

59.     This issue addresses the principal claim and counterclaim of the Parties, depending upon the timeliness and effect of RSM's application for an Exploration Licence under Article 3.1 of the Agreement. (Article 3.1 is cited in full below in Part III(2) of this Award).

### (i)      The Claimants' Case

60.     The Agreement gave to RSM the right to receive an Exploration Licence to explore for oil and natural gas throughout Grenada's entire maritime territory. Before signing the

Agreement on 4 July 1996, RSM and Grenada knew that Grenada's boundary disputes with both Venezuela and Trinidad & Tobago would make hydrocarbon exploration and production operations difficult or impossible in the most promising parts of the concession area. Article 24.4 of the Agreement, containing an express 'deeming' provision relating specifically to the boundary disputes, was thus inserted by the Parties into the Agreement to protect RSM's rights and to extend the Agreement by the period required to overcome an existing *force majeure* event at the time the Agreement was made. Both RSM and Grenada then proceeded for eight years on the footing that RSM's obligation to apply for an Exploration Licence had been suspended from 4 July 1996 onwards. During those eight years RSM sought to overcome the *force majeure* event. By early 2004, RSM considered that the risk of serious difficulties arising from exploration operations had been reduced to the point that exploration could begin; and RSM therefore submitted its application for an Exploration Licence under Article 3.1 of the Agreement to Grenada's Ministry of Finance on 13 April 2004.

61.   Instead of issuing an Exploration Licence, in breach of the Agreement, Grenada purported to terminate the Agreement on the basis that RSM's licence application was a few days out of time.

62.   Under Article 24.2 of the Agreement, RSM was required promptly to notify the Government of the *force majeure* event; and it did so by its letter dated 18 July 1996. That does not change the fact that its obligations had already been suspended as of 4 July 1996. RSM's obligations remained suspended from 4 July 1996 until 13 January 2004, upon Grenada's receipt of RSM's letter revoking *force majeure*.

63.   There can be no doubt that Article 24.4 of the Agreement, validly invoked as regards *force majeure* by RSM on 18 July 1996 with the written consent of Grenada, suspended all of RSM's obligations under the Agreement, including its obligation to apply for a Exploration Licence. Grenada's argument to the contrary is wholly at odds with the plain language of Articles 3.1 and 24.4 of the Agreement and with the entirety of the Parties' conduct between 1996 and 2004.

64.   RSM's licence application was received by Grenada on 13 April 2004. Even if this means that RSM's licence application was one or more days late, the presumption under English and Grenadian law, to the effect that contractual time stipulations are generally not of the essence, means that Grenada cannot terminate the Agreement or avoid its contractual duty to grant to RSM an Exploration Licence under the Agreement.

65.   Moreover, the letter in which RSM revoked its *force majeure* declaration is dated 12 January 2004, but RSM's facsimile transmission confirmation form indicates that it was not transmitted to and received by Grenada until 13 January 2004, between 1434 and 1456 hours. The ninetieth day after 13 January 2004 was Monday, 12 April 2004. That day was Easter Monday; and the preceding Friday was Good Friday, on both of which days all Government offices in Grenada were closed (including the weekend). Accordingly, RSM's application was delivered to the appropriate Government officials on the first working day after 12 April 2004 on which delivery could be effected, i.e., 13 April 2004.

66.   Delivery by RSM of the application to the Government by, for example, facsimile transmission on 12 April 2004 would have been futile, because on that Easter Monday the Ministry of Finance's offices were closed, meaning that the Minister of Energy would have been incapable of issuing an Exploration Licence on that day to the Claimant. In such circumstances, where two parties must both do acts on a day on which the acts cannot be done because that day is a public holiday, the relevant time period should be extended until the next business day.

67.   RSM's licence application was therefore made in good time under the Agreement. At the very worst, it was delivered only one day late.

68.   In the alternative, RSM maintains that its first letter withdrawing the *force majeure* declaration dated 12 January 2004 was ineffective because it was sent to the Office of the Prime Minister of Grenada, rather than to the Permanent Secretary of the Ministry of Finance. Under Article 29.1(a) of the Agreement, the correct address for the delivery of notices to the Government was that of the Permanent Secretary of the Ministry of Finance. Accordingly, RSM's *force majeure* declaration was not validly withdrawn

23

until 27 February 2004, when RSM submitted a fresh notice under Article 24.3 of the Agreement correctly addressed, this time, to the Ministry of Finance. The ninety-day period under Article 3.1 therefore began to run again on 27 February 2004 only and did not expire until 26 May 2004. RSM's application for an Exploration Licence, even if not received by Grenada until 14 April 2004 (rather than 13 April 2004), was therefore received in good time under Article 3.1 of the Agreement.

69.     In any event, as already submitted, time was not of the essence under Article 3.1 of the Agreement, as interpreted under the law of Grenada. The Agreement does not provide that compliance with the ninety-day time period for filing a licence application by RSM is a condition or condition precedent to Grenada's duty to grant an Exploration Licence to RSM. RSM and Grenada always knew that RSM's licence application would be submitted much later than ninety days after 4 July 1996 because the two boundary disputes had to be resolved before exploration could begin by RSM; and, therefore, any delay of one, two or even seventeen days by RSM could cause no conceivable prejudice to Grenada.  Such a delay did not permit Grenada to terminate the Agreement or to relieve Grenada of its obligation under Article 3.1 of the Agreement to grant an Exploration Licence to RSM.

### (ii) The Respondent's Case

70.     According to the Respondent, the question here is whether Grenada was contractually obliged in April 2004 to issue an Exploration License to RSM, which raises in turn several sub-issues, namely (a) whether either *force majeure* suspended the running of the ninety-day period under Article 3.1 of the Agreement for RSM to apply for an Exploration License in good time or whether Grenada is estopped from denying that it did not; (b) if neither of these sub-issues is established in RSM's favour (as Grenada submits), whether RSM's application was made late, whether or not the ninety-day limit is considered to be "of the essence" or a condition precedent (as Grenada submits); and (c) if so, whether that delay beyond ninety days relieved Grenada of the contractual obligation to grant a license or entitled Grenada to treat the Agreement as lapsed or terminated (as Grenada also submits).

71.   Article 3.1 of the Agreement required RSM to apply for, and Grenada to grant, an
      Exploration License "as soon as possible, and in no event later than 90 days" after
      signing the Agreement. The only logical interpretation of this contractual wording is
      that RSM must first make the application before Grenada must grant it as a bilateral
      transaction, i.e., that RSM's applying was a condition precedent to Grenada's
      obligation to grant the application. The question is thus whether RSM's making the
      application in timely fashion is part of that condition precedent.

72.   Grenada submits that the express contractual obligation on RSM to apply "in no event
      later than" a date certain should be interpreted as a condition precedent to Grenada's
      obligation to grant the application for an Exploration Licence. The situation is closely
      analogous to the grant of an option, where the grantor has a clear and legitimate interest
      in certainty as to when its property is free of an encumbrance. Moreover, virtually all of
      both Parties' obligations under the Agreement depend upon the grant of this initial
      Exploration License. Accordingly, the fact that the obligation of Grenada to grant such
      license never arose (as a result of the failure of a condition precedent) means that the
      entire Agreement lapsed.

73.   In the alternative, Grenada contends that RSM's breach of its obligation to submit an
      application timeously under Article 3.1 entitled Grenada to terminate the Agreement, as
      it did by letter dated 5 July 2005: in the terminology of the common law (applicable in
      Grenada), the obligation to apply for a license in timely manner was a condition of the
      Agreement.

74.   RSM has proposed various methods for counting the ninety-day period. To try to come
      in within the contractual timetable, RSM has changed its position several times as to the
      dates on which it "revoked *force majeure*" and delivered its application to Grenada. On
      the other hand, Grenada has taken a consistent view as to the proper methodology for
      counting the ninety-day period, commencing with Senator Bowen's letter dated 27
      April 2004 informing RSM that its application had been denied by Grenada as
      untimely. Notwithstanding RSM's varying theories, Grenada has set forth calculations
      showing that, on any plausible view, more than ninety days elapsed before RSM
      submitted its application for an Exploration Licence. Thus, RSM's application was

untimely irrespective of whether *force majeure* suspended the ninety-day period, as RSM claims (including for the fourteen days between the signing of the Agreement and RSM's giving notice of *force majeure*).

75.    In any event, *force majeure* did not suspend the ninety-day period under the Agreement. Article 24 requires that for a party to be excused from performing an obligation, the event of *force majeure* must cause the party to be unable to perform that obligation. This is common sense; and it is also the ordinary understanding of the *force majeure* concept. RSM's contrary argument is based entirely on one sentence in Article 24.4, but that sentence does not say what RSM would have it say. By its terms, it applies only to obligations that arise after an Exploration License has been granted by Grenada; and, by definition, it cannot affect the obligation of RSM to apply for that license.

76.    RSM's interpretation also leads to a number of absurdities. First, according to RSM, if there is boundary uncertainty in any part of Grenada's territory that RSM has already "given up" upon applying for a license renewal, all of RSM's obligations are nonetheless suspended. Next, RSM's case grants to itself the unilateral right to both suspend and reactivate both Parties' obligations whenever RSM wishes to advance or postpone *force majeure* conditions, a power that no rational contracting party would give to its counterparty in this kind of transaction.

77.    Lastly, Grenada is not estopped from insisting on the proper interpretation of the Agreement. The Parties are agreed that estoppel by convention under the law of Grenada, being the equitable doctrine invoked by RSM, requires RSM to establish that the Parties shared a common misunderstanding. RSM has not established, and cannot establish on the evidential materials, that essential element required by the law of Grenada. Moreover, RSM believed it already had a license, a mistaken view never held by the Government of Grenada.

**(06)  *Issue D: The Claimant's Relief***

78.  This issue relates to the claim for relief made by RSM, assuming its application for an Exploration Licence was wrongly refused by Grenada in breach of Article 3.1 of the Agreement. (The relief claimed by RSM is set out above, at paragraph 27 in Part I of this Award.)

**(i) *The Claimants' Case***

79.  RSM estimates its loss in excess of US $500 million. Given Grenada's inability to satisfy a damages award in excess of US $500 million and the unique rights over territory conferred by the Agreement, RSM submits that damages as such would plainly be an inadequate remedy for RSM in this case; that there is therefore a strong presumption in favour of a declaration in lieu of specific performance; and that RSM is entitled to a declaration in lieu of specific performance under the law of Grenada. RSM is not seeking an order for specific performance against Grenada, as RSM's Counsel expressly confirmed during his closing oral submissions at the Main Hearing [D5.79 & 82].

80.  As regards specific performance and declaratory relief, RSM accepts that Grenada's Crown Proceedings Act 1959 (the "1959 Act") governs the Tribunal's remedial powers in this arbitration in regard to the Agreement.

81.  Section 17(1)(a) of the 1959 Act provides as follows:

> *"[W]here in any proceedings against the Crown any such relief is sought as might in proceedings between subjects be granted by way of injunction or specific performance, the court shall not grant any injunction or make an order for specific performance, but may in lieu thereof make an order declaratory of the rights of the parties; ..."*

Accordingly, being thus deprived of the natural remedy of specific performance in this case, RSM claims a declaratory order in lieu of specific performance under the 1959 Act. Grenada's attempt to resist a declaratory order in lieu of specific performance under Section 17(1)(a) of the 1959 Act by reliance on principles of public international law is misconceived, given the Agreement's applicable law. It would mean that RSM's remedies in these ICSID proceedings would be more limited than if RSM were pursuing its claim before a Grenadian state court.

82.    Grenada's further argument that a declaration in lieu of specific performance should not be granted because Grenada is a sovereign state is misconceived. The express purpose of Section 17(1)(a) of the 1959 Act, in furtherance of the fundamental principle under Grenadian constitutional law of equality before the law between the Crown and its subjects, is to place Grenada in the same position as its citizens. Moreover, Grenada's Rejoinder concedes that this Tribunal has the power to make such a declaration.

83.    RSM is accordingly entitled to a declaration that Grenada should comply with the Agreement and grant to RSM an Exploration Licence forthwith.

### (ii) The Respondent's Case

84.    If the Tribunal concludes that Grenada breached the Agreement, Grenada submits that questions regarding causation arise, namely (a) whether, as a matter of law, RSM is required to prove that Grenada's breach caused any harm to RSM; (b) if so, whether RSM has satisfied that burden of proof in this case; and (c) if so, whether RSM should be granted specific performance or a declaratory order in lieu of specific performance, or money damages.

85.    If (which Grenada denies) RSM is entitled to relief for any contractual breach by Grenada, the Tribunal should limit such relief to money damages, if any, that RSM can actually prove on the evidence adduced in these proceedings that it has suffered as a result of such contractual breach. RSM, however, has deliberately declined to adduce in this case any cogent evidence regarding its losses, notwithstanding the Tribunal's procedural orders and other repeated requests by Grenada.

86.   Grenada disputes RSM's entitlement to specific performance, as being impermissible under Section 17(1)(a) of the Crown Proceedings 1959 Act. It notes that no such relief is now being claimed by RSM in this case.

87.   Grenada also disputes RSM's entitlement to any declaration in lieu of specific performance under the 1959 Act, both in principle and as a matter of discretion. It submits that the overwhelming body of international precedent and commentary militates strongly against declaring that a state is obliged to permit a private party to extract the state's natural resources. Indeed, under international law, even if RSM had a right to an Exploration License, Grenada could terminate that right upon payment of compensation for lawful expropriation, i.e., money damages.

88.   Under Grenadian law, the considerations that have guided courts in exercising their equitable discretion whether or not to grant declaratory judgments reinforce the conclusion that such relief would be inappropriate in this case. Such considerations include, for example, public policy, the balance between the utility of the declaration, the inconvenience and embarrassment it would cause and the probability (or improbability) that the declaration will put an end to the dispute.

## (07)  Issue E: Misrepresentation

89.   This issue addresses whether RSM made unlawful misrepresentations that induced Grenada to enter into the Agreement, entitling Grenada to rescind the Agreement under the law of Grenada.

### (i) The Respondent's Case

90.   RSM's post-contractual conduct has made plain that RSM's intentions from the outset were not as RSM had represented them to Grenada before the Agreement. RSM then represented itself as willing, able and eager to carry out exploration and development as

envisaged by the intended Agreement. RSM's plan, to the contrary, was to lock up Grenada's territory until the Agreement could be "farmed out" to another company or companies; and those "farminees" would do all of the work, pay all of the costs and take all of the risk: i.e., they would "carry" RSM's interest. RSM thus induced Grenada to enter into the Agreement on materially false premises, including the presentation of itself as an "operator" experienced in maritime boundary negotiations (with its own financial resources sufficient to fulfil its obligations towards the Respondent) and not a mere "broker"; and Grenada is therefore entitled to rescind the Agreement for fraudulent misrepresentation under the law of Grenada.

### (ii) The Claimant's Case

91.   The Claimant first submits that allegations of misrepresentation and fraud must be particularised and specific in an ICSID arbitration, which is not the case advanced by Grenada. The Claimant contends that Grenada's allegations remain defectively generalised and unduly vague in these arbitration proceedings. Moreover, the Claimant points out that Grenada's allegations of misrepresentation had never been communicated to RSM before receipt of Grenada's Counter-Memorial in December 2006 during these arbitration proceedings, more than ten years after the misrepresentations were allegedly made and allegedly relied on by Grenada. This delay speaks for itself.

92.   Secondly, as to what is pleaded, Grenada alleges that Mr Grynberg stated at one point in the negotiations preceding the Agreement that his children's money would be invested in RSM. Grenada alleges that it was never RSM's intention to invest any meaningful amount of its own money (or even Mr Grynberg's money). These factual premises are false: RSM and its affiliates expended US$ 6 million to acquire and process seismic data for the project; neither RSM nor its agents ever represented to Grenada that RSM would not seek funding from third parties for its activities under the Agreement; nor did they ever represent to Grenada that RSM would not seek to assign its rights under the Agreement.

93.   Indeed, Article 23.1(a) of the Agreement expressly permits RSM to enter into loan agreements to fund its operations; Article 25 expressly permits RSM to assign its rights and obligations under the Agreement, either wholly or in part, provided that Grenada does not have reasonable grounds for withholding consent; and Article 1.1(i) of the Agreement makes it expressly clear that RSM may assign "its participating interest or any part thereof...."  Moreover, before the Agreement's execution, Mr Grynberg informed Grenada that he intended to seek additional partners for the Agreement's performance. As to maritime boundary negotiations, although RSM offered the assistance of Mr Grynberg in Grenada's negotiations with Trinidad & Tobago and Venezuela respectively, such negotiations could not be successfully achieved by any individual acting alone but obviously required the consent of the states concerned; and the primary reason for the failure of Grenada's boundary negotiations resulted from the adverse attitudes of Trinidad & Tobago and Venezuela.

### (08)   *Issue F: Licence Application*

94.   This issue is whether RSM breached its obligation to apply for a license in a timely manner, in violation of Article 3.1 of the Agreement. As already noted, Grenada claims only nominal damages in the sum of US $1,000 under this counterclaim. (Article 3 is cited in full below in Part III(2) of this Award).

95.   The Tribunal addresses this counterclaim as part of the issue relating to the lapse or termination of the Agreement, namely Issue C above.

### (09)   *Issue G: Detailed Work Plan*

96.   The issue, as originally advanced by Grenada, was whether RSM breached its obligation to submit a detailed work plan under Article 6.1 of the Agreement, thereby

entitling Grenada to terminate the Agreement. Grenada's Rejoinder also counterclaims nominal damages if Grenada cannot terminate the Agreement. (Article 6.1 is cited in full below in Part III(2) of this Award).

97.   The Parties' respective cases are succinctly pleaded. RSM denies any breach of the Agreement and any relief to Grenada, even assuming its own contractual breach. Grenada counterclaims liability for a breach by RSM and appropriate relief.

### (10)   Issue H: Unauthorised Research

98.   This issue addresses whether RSM violated Grenadian law and the Agreement in February 2004 by conducting research in Grenada's waters without permission from the Grenadian authorities, in violation of Section 4 of the 1989 Act (cited in full below in Part III(3) of this Award, paragraph 128, page 40).

### (i) The Respondent's Case

99.   RSM deliberately violated Grenadian statutory law and international law in February 2004, when RSM caused a vessel to enter Grenadian waters and conduct seismic research without permission. Such action violated Article 4 of the 1989 Act; and it also breached the Agreement. The obligation for RSM to apply for (and the Government to grant) an Exploration Licence would not make sense if the Agreement permitted RSM to conduct exploration without a license, or at least express permission in accordance with Grenada's legislation. Indeed, RSM had earlier applied and obtained such permission for earlier seismic research; it knew that such permission was required; and it also knew that it had no permission in February 2004.

100.   The damage to the long lines of Grenadian fishermen from this vessel's unauthorised activities was considerable, costing the Grenadian Government EC$ 381,860.00.

### (ii) The Claimant's Case

101.  RSM notes that this allegation had never been communicated by Grenada to RSM before receipt of Grenada's Counter-Memorial in December 2006.

102.  Grenada had granted RSM permission to conduct seismic exploration work on previous occasions. As regards this incident, RSM agrees that it directed the "GSI Admiral" to conduct a seismic survey in Grenadian waters in February 2004. However, contrary to the Grenada's case, Mr Grynberg for RSM notified Mr Auguste for Grenada of this event and obtained his authorisation for the survey work, as confirmed both by Mr Grynberg's letters to Mr Auguste and by Mr Grynberg's testimony in these arbitration proceedings.

103.  In any event, the voyage of the "GSI Admiral" did not amount to breach of any condition of the Agreement under the law of Grenada; nor did it amount to a breach of contract depriving Grenada of substantially the whole benefit of the Agreement. Under the law of Grenada, termination of the Agreement is not permitted even if there was a misunderstanding between Messrs Grynberg and Auguste resulting in a minor breach of the Agreement by RSM.

104.  In any event, even if there was a violation by RSM of the laws of Grenada, such a violation cannot simply be translated into a contractual breach of the Agreement or other civil wrong actionable by Grenada.

### (11) Issue I: Respondent's Relief

105.  If any of the matters alleged by the Respondent in its Counterclaim has been established, this issue addresses what relief should be granted to the Respondent by the Tribunal.

### (i) The Respondent's Case

106.   The Respondent set out its counterclaim for relief in its written pleadings, cited in Part I above (paragraph 28, pages 11-12).

### (ii) The Claimant's Case

107.   The Claimant denies this counterclaimed relief, in contrast to its claimed relief set out in its pleadings, also cited above in Part I (paragraph 27, page 11).

108.   **Relevant Issues:** Apart from the separate issue of legal and arbitration costs (Issue J), the Tribunal has set out above the principal issues comprising the Parties' substantive dispute, briefly summarising their respective cases. As appears below, however, it is not necessary for the Tribunal to decide all these issues in order finally to determine the Parties' dispute. Accordingly, the Tribunal proceeds to consider and decide only the relevant issues for its decisions in this Award.

### PART III: THE PRINCIPAL TEXTS

#### (01)  Introduction

109.   It is necessary here to set out relevant extracts from the two principal texts to which reference is made later below: namely the Parties' Agreement and the 1989 Act.

#### (02) The Parties' Agreement

110.   The Agreement was made on 4 July 1996 between the Claimant as "the Company" represented by Mr Max Flaxman and the Respondent represented by Senator Patrick Bubb, Minister of State in the Ministry of  Finance of the Government of Grenada. The Agreement's effective date was 4 July 1996, being contractually defined as the date on which the Agreement was signed by the Parties: Article 1.1(p).

111.   *Preamble:* The Preamble referred to an area described and shown in Annexes A and B as being subject to "the entire ownership of, and control over, petroleum vested in the Government"; and, after referring to the 1989 Act, it continued:

*"Whereas the Company intends to apply for a Development Licence over the area described in Annex A and shown on the map in Annex B hereof and the Government intends to grant the said licence, and*

*Whereas the Company intends in the event of a commercial discovery to apply for a Development Licence or licences and to develop, produce, process, transport, sell, export or otherwise dispose of the said Petroleum, and*

*Whereas Section 6 of the [1989] Act authorises the Minister to enter into an agreement with any person in respect of the grant of a licence, the condition to be included in a Licence or any matter incidental to or connected with the grant of a Licence under the Act, and*

*Whereas the Company has for the purposes aforesaid the necessary financial capability, technical competence and professional skill."*

112. *Article 1:* Article 1.1 of the Agreement, "Definitions," provided (*inter alia*):

(a) *An 'Affiliate' or 'Affiliated Company', in relation to any person constituting the Company, means any Company holding directly or indirectly a majority of shares in such person or any Company which is controlled directly or indirectly by any such aforesaid company ...*

(i) *The 'Company' means RSM Production Corporation and includes any other person to whom the Company has assigned its participating interest or any part thereof in the Exploration Licence referred to in Article 3 or in any Development Licence granted under Article 8.*

113. *Article 2:* Article 2 of the Agreement provided:

*"This Agreement constitutes an agreement made under Section 6 of the [1989] Act."*

114. *Article 3:* Article 3 of the Agreement, "Exploration Licence," provided:

*"3.1 As soon as possible but in no event later than ninety (90) days after the Effective Date, the Company shall apply for, and the Minister, under and in accordance with the Act, will grant to the Company an Exploration Licence over the area described in Annex A and shown on the map in Annex B.  This Licence shall be substantially in the form of the draft licence set forth in Annex C."*

*"3.2 The Exploration Licence granted pursuant to Article 3 hereof shall be for an initial period of four years commencing from the date of the grant of the License and shall, subject to the Act, on application duly made by the Company, be renewed for two further periods of two years each in accordance with the Act."*

As earlier noted, the "Effective Date" is defined as 4 July 1996. The form of the Draft Exploration Licence to be granted by the Minister was indeed set out in Annex C, a single page with only two dates to be completed together with the signature of the Minister.

115. *"As soon as possible but in no event later than ..."*: As appears later in this Award, these are the crucial words at issue in Article 3.1 of the Agreement requiring interpretation and application by the Tribunal in this arbitration.

116. It was suggested by RSM's Counsel during his closing oral submissions that, to make time of the essence or to create a condition precedent to a timely application for an Exploration Licence, it would be necessary to add expressly: "It is a condition precedent of this agreement that the notice be filed within 90 days" or "it is a condition of this agreement" [D5.76]. As regards the number of days, no distinction is drawn between working days and holidays in the Agreement.

117. *Article 5:* Article 5 provided for the establishment of an Advisory Committee "as soon as possible" after the Effective Date. It was never, in fact, established by the Parties.

118. *Article 6:* Article 6.1 of the Agreement, "Work Programme and Budget," provided:

 *"Within thirty (30) days after the Effective Date or such further period as may be allowed by the Minister, the Company shall prepare and submit to the Minister a detailed work programme and Budget setting forth the Exploration operations which the Company proposes to carry out in the Calendar year in which the Exploration Licence is granted to the Company under Article 3 and the estimated cost thereof."*

119. *Article 9:* Article 9 of the Agreement provided that the Development Licence "shall be granted" for a period of thirty years and "may, on application made by the Company" be renewed for a further period of twenty years.

120. *Article 12:* Article 12 of the Agreement addressed royalties and corporation profits tax.

121. *Article 23:* Article 23.1 of the Agreement granted the right to "the Company" [...] "to enter into loan agreements outside Grenada for the purpose of financing Petroleum Operations hereunder ...."

122. *Article 19:* Article 19 of the Agreement addressed Employment and Training.

123.  *Article 24:* Article 24 of the Parties' Agreement, "Force Majeure," provided (here divided into lettered sub-paragraphs for ease of reference below):

"24.1 [A] Failure on the part of the Company to fulfil any of the terms and conditions of this Agreement shall not be treated as breach of this Agreement in so far as the failure arises from force majeure and [B] if, as a result of force majeure, the fulfilment by the Company of any of the terms or conditions of this Agreement is delayed beyond the period fixed or allowed for its fulfilment, the period of the delay shall be added to the duration of this Agreement and to the period so fixed or allowed."

"24.2 [A] Where the Company seeks to invoke Clause 24.1 it shall promptly notify the Government in writing of the occurrence of conditions of force majeure and shall take all reasonable steps to remove the cause thereof.  [B] The Company shall promptly notify the Government as soon as conditions of force majeure no longer prevent the Company from carrying out its obligations and following such notice shall resume Petroleum Operations as soon as reasonably practicable."

"24.3 Where a force majeure situation continues for more than thirty (30) consecutive days, the parties shall meet forthwith in order to review the situation and to agree on the measures to be taken for the removal of the cause of force majeure and for the resumption, in accordance with the provisions of this Agreement, of the performance of the obligations hereunder."

"24.4 [A] In this Article the expression "force majeure" means any event beyond the reasonable control of the party claiming to be affected by such event which has not been brought about at its instance and which has caused such non-performance or delay in performance, including, without limitation, market prices for Petroleum or the anticipated products of Petroleum which, after taking into account estimated Royalties, corporate profits tax payments, and production, processing, transportation and all other costs of every type and all other costs of every type and nature, would not afford a reasonable profit to the Company;  natural phenomena or calamities; epidemics; fires; wars; invasions; blockades; riots; strikes; insurrections; labour disturbances; acts of God; inevitable accidents; and any adverse claim or dispute as to the Government's ownership of, or control over, the petroleum in any portion of the Agreement Area.  [B] For the avoidance of doubt, an adverse claim or dispute relating to the Government's ownership of or control over the petroleum in any portion of the Agreement Area shall be deemed a force majeure situation as to the entire Agreement Area, thereby excusing performance of all of the Company's obligation under this Agreement and extending the duration of this Agreement and the period allowed for the performance or fulfilment of all such obligations by the period required to establish beyond doubt the Government's ownership of, and control over, all petroleum in the entire area described in Appendix A and shown on the Map in Appendix B."

The Tribunal notes, particularly, the wording in Article 24.4 [B]: this is a clear albeit unstated reference to Grenada's boundary difficulties with Venezuela and Trinidad &

Tobago; and, as here expressed, an adverse claim or dispute as to *any* portion of the area was to qualify as a *force majeure* event as to the *entire* area under the Agreement.

124. *Article 25:* Article 25 of the Agreement, "Assignment," provided (with lettered sub-paragraphs here added for ease of reference below):

> "*[A] The Company may not assign to any person, firm, company or corporation not a party hereto, in whole or in part, any of its rights, privileges, duties or obligations under this Agreement without the prior written consent of the Government, which consent shall not be unreasonably withheld.  [B] However, the Company shall be free to assign, by instrument in writing, its rights, privileges, duties, or obligations under this Agreement to an Affiliate provided that no such assignment shall in any way relieve the assignor of any of its obligations hereunder.*"

The Tribunal notes that Article 25[A] was no absolute bar to RSM's assignment: such assignment was permitted subject to Grenada's prior consent which was not to be unreasonably withheld.

125. *Article 27:* Article 27.1 of the Agreement, "Termination," provided:

> "*If by reasons of expiration, surrender or cancellation the Company no longer holds any Exploration Licence granted pursuant to Article 3 or any Development Licence granted pursuant to Article 8, this Agreement shall be deemed to have been terminated, but save as aforesaid, shall continue in full force and effect so long as the Company continues to hold any of the said Licenses.*

126. *Article 29:* Article 29.1(a) of the Agreement, "Notices," provided:

> "*All notices and other communications to be given under this Agreement shall be given in writing and:*
>
> > (a) *Where the notice is to be given to the Minister or the Government [sic: it] may be delivered or sent by registered post to:*
> >
> > *Permanent Secretary*
> > *Ministry of Finance*
> > *Lagoon Road*
> > *St George's*
> > *Grenada*

*(03) The 1989 Act*

127.   The Petroleum and Natural Gas Deposits Act No 22 of 1989 [LA2.672] repealed and replaced Grenada's earlier Petroleum and Natural Gas Deposits Act No. 14 of 1974.

128.   *Section 4:* Section 4 of the 1989 Act provided that:

> *"4(1) Subject to the provisions of this Act, no person shall carry out operations relating to petroleum exploration or production except under and in accordance with a license granted under this Act.  (2) A person who contravenes subjection (1) shall be guilty of an offence and liable, on summary conviction, to a fine of $50,000 and to imprisonment for two years…."*

129.   *Section 5*: Section 5 of the 1989 Act provided:

> *"5(1) A license may be granted – (a) in the case of an exploration licence, to a company whether incorporated in or outside Grenada; but in the case of a company incorporated outside Grenada, it shall have an established place of business in Grenada and be registered as a foreign company in accordance with the provisions of the Companies Act; (b) in the case of a development licence, to a body corporate which is a company or a corporation incorporated and registered in Grenada."*

130.   *Section 6*: Section 6 of the 1989 Act provided:

> *"The Minister may enter into an agreement (not inconsistent with this Act) with any person with respect to all or any of the following matters, namely – (a) the grant of a licence to that person or to any other person identified in the agreement, including a body corporate yet to be formed; (b) the conditions to be included in a licence granted or renewed; (c) the procedure to be followed by the Minister while exercising any discretion conferred upon him by or under this Act and the manner in which the discretion shall be exercised; (d) any matter incidental to or connected with the foregoing."*

131.   *Section 9*: Section  9 of the 1989 Act provided:

> *"9(1) Unless the licence otherwise provides, an assignment or transfer to another person of the rights acquired or the obligations undertaken thereunder shall be null and void unless previous consent in writing of the Minister has been obtained. (2) An application by the holder of a licence for consent to the assignment or transfer of the*

*licence or any rights or obligations thereunder shall be made to the Minister in the described form."*

132. *Section 29(1):* Section 29 (1) of the 1989 Act provided:

> *"29(1) The Minister may make regulations prescribing matters required or permitted to be prescribed by this Act or necessary or convenient to be prescribed for carrying out or giving effect to this Act."*

There were no such regulations, but there were in existence draft regulations.

# PART IV:  THE PRINCIPAL FACTS

## (01)  Introduction

133.  Inevitably, with the passage of time over the last ten or more years, there are important contemporary documents missing from the Parties' files; and the independent recollections of witnesses are, even at best, not wholly reliable given such time and the controversial history of the Parties' several disputes. The Tribunal here sets out, primarily from the contemporary materials known to both Parties at the relevant time and adduced in evidence, the chronology of principal factual events insofar as relevant to the decisions made in this Award.

## (02)  October 1995

134.  By letter dated 9 October 1995 to Mr Max B. Flaxman (President of Grynberg Resources, Inc. of Cranford, New Jersey), Mr John Auguste, as Energy Conservation Officer (then working within the Ministry of Finance) raised several queries arising from the Grenadian Government's preliminary review of RSM's proposed production sharing arrangement [CB01.291]. In particular, Mr Auguste raised questions about the status of RSM and indicated that RSM's proposal did not appear to take account of the relevant Grenada statute, the Petroleum and Natural Gas Act 1989 with its two stage licence system (first, exploration, and second, development), nor of the "concession type of arrangement" recommended by the Economic and Legal Advisory Services Division (ELAS) of the Commonwealth Secretariat and embodied in ELAS's Model Petroleum Agreement prepared for the Government of Grenada "in January 1993."

135.  Mr Auguste therefore enclosed, with his letter, a computer disk with copies of ELAS' Model Agreement, the 1989 Act and draft Petroleum Regulations to be promulgated under that Act.

136.  This ELAS Model Agreement appears to be a version of the "Draft Petroleum Agreement between the Government of Grenada and ABC Oil Company (Grenada) Limited" dated December 1991 [sic], prepared by the Technical Assistance Group of the Commonwealth Fund for Technical Co-Operation [CB01.102].  This draft refers to the 1989 Act in its preamble and terms [CB01.103, 111 etc.]; its articles included a definition of "Affiliate" [CB01.104]; and it envisaged the ABC Company applying for an Exploration Licence under the 1989 Act "As soon as possible after the Effective Date [...]," with such licence extending for a period of four years with two renewals of two years subject to the 1989 Act [CB01.112].  In the event of petroleum discovery, the Company could obtain, subject to the 1989 Act, an Exploration Licence  for a period of twenty years, renewable for a further period of ten years [CB01.127 & 135].  Article 27 of the draft contained a "Force Majeure" clause [CB01.191]; Article 28 contained a limited "Non-Assignment" clause [CB01.193]; Article 29 was an ICSID arbitration clause with Grenada as the arbitral seat [CB01.194]; and Article 31 provided for the laws of Grenada as the applicable law [CB01.199].  This lengthy Model Agreement is clearly a well-considered legal document, as already suggested by its origin within the Commonwealth.

137.  Mr Auguste's letter included a prescient warning:

"*FF. With reference to the contract area, be advised that the southern portion of the contract area should not include any area under maritime boundaries delimitation negotiations.*"

This was an implicit reference to boundary negotiations between Grenada and Venezuela and Trinidad & Tobago.

138.  By letter dated 16 October 1995 [CB01.293], Mr Grynberg as President of Grynberg Production Corporation, replied to Mr Auguste's letter of 9 October 1995, in place of Mr Flaxman (who was said to be out of the country). Mr Grynberg described RSM as "a new company" formed by him and owned by his three adult children: "The intent is that Grynberg Petroleum will be a guarantor of all expenditures, but in fact, the three children have their own money and it will be their money that will be invested."  Mr Grynberg expressed his agreement to the two-stage system required by the 1989 Act;

and he indicated that he would be arriving in Grenada in November 1995 to pursue further negotiations with the Government of Grenada. It is to be assumed that he did so.

139.   Mr Grynberg's letter also included the following paragraph, referring to Mr Auguste's warning regarding the contract area and boundary negotiations [CB01.294]:

> *"ff) Based on my meeting with Prime Minister Keith Mitchell, Mr Mitchell was anxious to include the areas to median point between Venezuela and Grenada and between Trinidad and Grenada, which would strengthen Grenada's hand in negotiations. The median point is based on the 1954 Geneva Convention [sic: 1958 Geneva Convention] and, in fact, there is a precedence [sic: precedent] in 1985 where the median point between Malta, which as you know is an island, and Libya which is on the African continent, has been reached and agreed upon. ... I would like you to know that I have agreed with the Prime Minister that Grynberg Petroleum will, in fact, pay all the legal costs if it is necessary to argue Grenada's ownership in the International Court of Justice in The Hague, Netherlands."*

Apart from this offer of financial assistance, it is not clear from the evidence adduced in these proceedings what positive contribution for Grenada's benefit RSM and Mr Grynberg could have brought to these maritime boundary negotiations, which had begun before this offer of assistance.

140.   As regards Venezuela and Trinidad & Tobago, their Treaty of 18 April 1990 on the Delimitation of Marine and Submarine Areas had entered into force on 23 July 1991. This 1990 Treaty long preceded even the Parties' first dealings leading to the Parties' Agreement in 1996.

141.   As regards Grenada and Trinidad & Tobago, these two States were (and remain) members of the Commonwealth on friendly diplomatic terms; and both were (and remain) signatories to the 1958 Geneva Convention on the Continental Shelf and the 1982 United Nations Convention on the Law of the Sea [LA2.695]. The first substantive round of negotiations on the delimitation of their maritime boundaries took place in Port-of-Spain, Trinidad, on 19 and 20 November 1992; and a joint report was agreed by the two delegations [CB01.208]. The Grenada delegation included Duke Pollard Esq, an international legal specialist from the Commonwealth Secretariat. As there agreed,  a second substantive round took place in St George's, Grenada, on 29 and 30 July 1993; and the two delegations again agreed a joint report [CB01.215]. The

Grenada delegation included Mr Auguste and Mr Pollard, together with an expert hydrographer.  It was agreed that a third round of meetings would take place at a date to be fixed through diplomatic channels.  (The Tribunal returns to these matters at greater length under Issue B below, in Part VI of this Award.)

142.   Returning to the Agreement in this case, there followed over the next months several drafts of the proposed agreement between RSM and Grenada, apparently exchanged between the Parties. It serves little purpose to recite their terms here, save to note that each draft contained arbitration and applicable law clauses in similar terms. Thus, Article 26 of the undated draft of about November 1995 [CB01.16] contained an ICSID arbitration clause with an English arbitral seat; and Article 28 provided for the application of "the Laws of Grenada" [CB01.44 & 46].  In addition, Article 24 contained a "Force Majeure" clause [CB01.43]; and Article 25 a qualified "Non-Assignment" clause [CB01.44].

*(03) January 1996*

143.   In his budget speech to the House of Representatives in Grenada's legislature on 19 January 1996, the Prime Minister and Finance Minister of Grenada (The Hon Keith Mitchell) indicated that the Grenada Government intended to resume negotiations on maritime boundary delimitation with both Venezuela and Trinidad & Tobago.  As to the latter, an inter-governmental meeting was to take place in St Lucia within the week. The Prime Minister also added:

"*Mr Speaker, talks are now being held with several interested groups to deal with oil exploration issues. Less than two weeks ago a delegation of oil exploration experts and financiers from North America met with top Government officials, including myself, and expressed great interest in oil exploration in Grenada. Mr Speaker, please rest assured that our dealings would be clearly transparent, and that environmental implications will be given the fullest consideration*" [CB1.302].

This was a reference to RSM.

*(04) April 1996*

144.   By letter dated 2 April 1996 [CB01.305], Mr Grynberg replied to a letter dated 1 April 1996 from Mr Auguste to Senator Bowen, the Minister of Works, Communications and Public Utilities  (which is missing from the Parties' files). Mr Grynberg's letter is addressed to the Prime Minister of Grenada (The Hon Keith Mitchell), describing RSM's future work on seismic data "as soon as the boundary problem is settled" and offering RSM's qualified financial assistance "in resolving its boundaries with Venezuela."

145.   Mr Grynberg also made specific points in regard to the current draft agreement apparently  proffered by Mr Auguste, concluding: "We would like to assure you that we very much wish to proceed with the project, which we believe will be of great benefit to Grenada and its people. Although *RSM will bear the entire risk and expense* of this very challenging and expensive exploration project, we believe the potential benefits to all parties justify our undertaking" [emphasis supplied].

146.   By letter dated 15 April 1996 [CB01.310], Mr Grynberg replied to a letter dated 13 April 1996 from Senator Bowen (which is missing from the Parties' files), sent in response to Mr Grynberg's letter of 2 April 1997. It was copied to H.E. Denis Antoine Esq.

147.   It is a long, discursive letter, making detailed drafting points on the current draft agreement, particularly tax matters. Three passages are significant for present purposes. First, Mr Grynberg noted: "... what we are proposing in Grenada is a deep water risky exploration project in an area which has no known oil and gas reserves." Second, subject to the changes proposed by him, RSM was ready "to proceed with the execution of the agreement by Grenada and RSM." Third, the letter concluded: "I will be in London from May 8-17 [1996] to meet colleagues from the oil and gas industry on other matters. It would be helpful if it were possible to receive an executed agreement prior to that time so that I might then seek additional partners for this challenging exploration venture."

148. This reference to "additional partners" could readily be understood, albeit implicitly, as a statement of RSM's intention to 'farm out' or transfer part of its performance of the Agreement, consistent with the Agreement's provisions on assignment (Article 25). It elicited no adverse reaction from the Government of Grenada at the time.

149. Towards the end of April 1996, Grenada's Cabinet approved the final draft of the Agreement. It was not submitted for approval to Parliament; nor was it required to be so approved under Grenada's Constitution or the 1989 Act.

*(05) May 1996*

150. By letter dated 28 May 1996 to Mr Flaxman (as Vice-President of Grynberg Production Corporation), Senator Bowen replied to Mr Flaxman's letter also dated 28 May 1996 (the latter is missing from the Parties' files).

151. Senator Bowen there confirmed (*inter alia*) Grenada's disinclination to agree a *force majeure* clause with no time limit to the period of *force majeure*. It appears that RSM had wanted no time-limit because the cause of delay, namely international border negotiations with its neighbouring states, could be lengthy; and it also appears that, if any time-limit was to be agreed by RSM, RSM was proposing a limit of not less than ten years.

152. By letter dated 29 May 1996 to Senator Bowen [CB1.317], Mr Flaxman offered several terms to be included in a draft side-letter, including assistance to Grenada in its border negotiations "or the International Court of Justice." Mr Flaxman did not here give way to Senator Bowen's concerns over a time-limit to the *force majeure* clause.

*(06) June 1996*

153.  The outstanding negotiations were apparently concluded by telephone on 10 June 1996, as a result of which Mr Auguste summarised the Parties' agreement by letter dated 10 June 1996 to Mr Grynberg [CB01.321]. As regards *force majeure* and the time-limit for the application of the Exploration Licence, it contained the following paragraphs:

> *"B.B With reference to the establishment of a limit for the existing force majeure event, be advised that I am in agreement with Mr Flaxman's suggestion that this matter be held in abeyance for the time being. The three-year limit negates the nature/characteristics and complexities inherent to Maritime Boundaries Delimitation Negotiations.*
>
> *Your attention is hereby drawn to Articles #24.1 and #24.3. I am of the opinion that the afore-mentioned articles take care of the concerns of both parties (RSM and Government of Grenada)."*

> *"DD. Grateful if consideration would be given to an extension of the time period for the issuance of the exploration license from seven (7) days to ninety (90) days. This would allow ample time for the finalisation and promulgation of the Petroleum and Regulations Act, and other institutional arrangements."*

Articles 24.1 and 24.2 of the Agreement, as eventually executed by the Parties [CB01.350], contain no time-limit on the duration of the *force majeure* period. It is to be noted, however, that RSM agreed, as requested by Grenada, to extend the time-limit from seven to ninety days. It follows that the bulk of this time-period was intended by the Parties to be required for Grenada's Government and Civil Service in discharging Grenada's obligation to issue the Exploration Licence, rather than RSM's discharge of its obligation to apply for the Licence to Grenada, in comparison a much simpler task.

*(07) July 1996*

154.  *The Agreement:* The Parties executed the Agreement on 4 July 1996, with Mr Flaxman signing for RSM and Senator Patrick Bubb, Minister of State in the Ministry of Finance, signing for Grenada [Exhibit C-1].

155.  *Force Majeure Letter:* By letter dated 18 July 1996 signed by Mr Flaxman, fourteen days later, addressed to the Permanent Secretary of the Ministry of Finance (being a

recipient designated under Article 29 of the Agreement), RSM gave written notice of *force majeure* under Article 24 of the Agreement [CB02.359; Exhibit C-10]. Given its significance to the Parties' dispute, its terms merit citing in full:

*"In accordance with Article 24 of the Agreement between us dated July 4, 1996, RSM Production Corporation hereby notifies the Government of Grenada of the occurrence of a force majeure event, 'dispute as to the Government [of Grenada]'s ownership of or control over the petroleum in any portion of the Agreement area.'*

*Under Article 24.4, this dispute is deemed 'a force majeure event as to the entire Agreement Area, thereby excusing performance of all the Company's [RSM Production Corporation] obligations under this Agreement and extends the duration of the Agreement and the time allowed for performance or fulfilment of all of such obligations by the period required to establish beyond doubt the Government's ownership of, and control over, all petroleum in this entire area.'*

*In negotiations RSM has agreed to reimburse to this Government such direct costs and expenses, not exceeding US$400,000, as may be incurred by the Government for third party services in establishing its ownership and control of the petroleum in the entire Agreement Area, although RSM has reserved the right to terminate, in its sole discretion, such reimbursements at any time. For its part, the Government of Grenada has agreed vigorously to pursue all appropriate means for establishing its ownership and control of such petroleum, and has further agreed that any reimbursement amounts paid to it by RSM in connection with third party service shall conclusively be deemed proper expenditures in connection with the Initial Exploration Period which shall directly reduce the minimum expenditure required under Article 4.1(a) during the Initial Exploration Period."*

The letter was counter-signed by Senator Bubb for Grenada under the heading "Accepted and Agreed: Government of Grenada," undated.

156. Senator Bubb was not called as a witness by Grenada in these proceedings; and the full surrounding circumstances in which he counter-signed this letter were not adduced in evidence before this Tribunal. He was clearly a material witness in these proceedings; and his conduct is not entirely explained by the submission, made by Grenada's Counsel in his closing oral submissions, that Senator Bubb "was a relatively accommodating person" [D5.207]. The Tribunal was informed by Grenada's Counsel that Senator Bubb is no longer in Grenada, apparently living somewhere in the United States of America not known to the Government of Grenada [D5.175]. It remains the fact, however, that RSM's letter was signed, accepted and agreed by Grenada, as Grenada had signed the Agreement itself, again by Senator Bubb. Accordingly, deprived of any testimony from Senator Bubb in these proceedings, the Tribunal is not

inclined to accept commercial criticisms from Grenada as to the terms of either this letter or the Agreement itself; and for this reason, it takes no account of that part of the expert report of Mr Tauecchio, adduced by Grenada.

157. As regards the letter's third paragraph (cited above), there was no funding of US $400,000 by RSM.

### (08) August 1996

158. On or about 1 August 1996, the Government of Grenada issued a press release briefly reporting the Parties' Agreement, indicating that exploration for oil and gas within Grenada's territorial waters "may begin soon," that discussions were under away, led by Senator Bowen, "toward making out a distinct line to separate Grenada from Venezuela and Grenada from Trinidad" and that once this was done "oil and gas exploration should start soon afterwards." This press release was sent to RSM by the U.S. Embassy in Grenada [CB2.360].

### (09) September 1996 etc.

159.  By letter dated 12 September 1996, Grenada named Mr Grynberg as "a Special Envoy of the Government of Grenada to the Republic of Venezuela for the purpose of discussing issues related to petroleum resources" [CB2.364]. This designation was made for the purpose of including Mr Grynberg as a member of Senator Bowen's team assembling for the forthcoming maritime boundary negotiations between Venezuela and Grenada, taking place later in September in Caracas. (Mr Grynberg later attended a different meeting in Caracas in September 1997, on his own initiative.)  It is convenient here to project forward this part of the chronology.

160. Mr Grynberg was no "team-player" for Grenada; and there were soon complaints within the Government of Grenada that he was pursuing his own commercial objectives, in conflict with the interests of Grenada. As expressed to Senator Bowen by Mr Auguste (now Permanent Secretary and Director General at the Ministry of Finance) by letter dated 15 November 1996: "Maritime Boundaries Delimitation

Negotiations require adequate preparation, knowledge, expertise and experienced personnel, fully cognisant of the relevant issues and good negotiators. It is not a simple commercial negotiation/deal, nor is it dependent on personal contact and overtures, 'wheeling and dealing' etc. Team work is also an essential ingredient/parameter in the formula for success" [CB2.368-369].

161.   By letter dated 15 December 1997, Mr Grynberg released to the Government of Trinidad & Tobago, via his representative Mr Thomas (a former Trinidadian Minister), boundary materials deliberately slanted against Grenada "because I would like a speedy resolution of the boundary demarcation" [CB2.370]. When asked to explain this statement under cross-examination by Grenada's Counsel at the Main Hearing, he testified that his statement was "not correct" and that he wrote it only "because I wanted Rod Thomas to have a point of argument that this is good for Trinidad as well" and "strictly for negotiating purposes" [D3.82-83].  This letter was not copied to Grenada at the time; and mendacity of this nature was never likely to promote good inter-state relations between Grenada and Trinidad & Tobago. It demonstrates Mr Grynberg's pursuit of his own commercial interests (with RSM), at the expense of and in conflict with Grenada's own interests.

162.   When the boundary negotiations between Venezuela and Grenada eventually took place on 19 May 1998 in Grenada, attended by (*inter alios*) Senator Bowen and Mr Auguste for Grenada, Mr Grynberg was not present [CB2.382].  Notwithstanding that he was no longer a member of Grenada's team, Mr Grynberg sought to intervene in these negotiations by letter dated 4 February 1999 to Dr Cervini [CB2.386]. Mr Grynberg there enclosed, in his own words RSM's "license [sic] which RSM Production Corporation, an affiliate of Grynberg Petroleum Company, has offshore Grenada." At that time, RSM had no such licence but only the Agreement.  At the end of his letter, Mr Grynberg concluded: "The Grenada negotiating team is available to come to Caracas on short notice to meet and discuss the subject with appropriate authorities. If you have questions or clarifications are needed [sic], I will be more than happy to do so." Mr Grynberg was not a member of the "Grenada negotiating team"; he was not authorised to negotiate for Grenada; he was intervening as a private person, a foreigner,

in Grenada's inter-state affairs for the purpose of advancing his own commercial interests; and his conduct was improper by any standard of representative diplomacy.

163.   The first substantive round of negotiations between Venezuela and Grenada took place at St George's from 28 February to 2 March 2001. The team leader for Grenada was Senator Bowen, assisted by (*inter alios*) Mr Auguste [CB2.415]. Mr Grynberg was not present. The second and third rounds took place later in 2001, again without Mr Grynberg [CB2.450].

164.   It would serve little purpose to recite here the many further attempts by Mr Grynberg to insert himself, unbidden, into Grenada's diplomatic negotiations with Venezuela and Trinidad & Tobago; and the Tribunal considers the matter more fully under Issue B in Part VI below within its contractual context. In summary, Mr Grynberg's schemes become increasingly outlandish, including another proposal to bring proceedings against Trinidad & Tobago before the International Court of Justice at The Hague [CB2.389 & 398-399]; a proposal that he and Venezuela's representative "as two technical people" sit down and establish the maritime boundary between Grenada and Venezuela "in a day" [CB2.396, 397]; ICSID proceedings against Trinidad & Tobago and Petrotrin, claiming damages in excess of US $100 million, in September 2002 [CB2.462 & 467]; legal proceedings against Trinidad & Tobago and Petrotrin before the UN International Tribunal on the Law of the Sea, in October 2002 [CB2.498], supported by a sworn but incorrect affidavit from Mr Grynberg that "RSM was authorized to represent the Government of Grenada for the purposes of instituting these proceedings" –  RSM had no such authority [CB2.522]; a letter before action to the Prime Minister of Trinidad & Tobago and Petrotrin alleging trespass by Trinidad & Tobago in obtaining seismic and other data from Grenada's maritime area [CB2.536]; legal proceedings in the U.S. District Court in Denver, Colorado against Petróleos de Venezuela S.A, PDVSA Petróleo S.A. and CITGO Petroleum Corporation, in April 2003 [CB2.543, CB3.552, CB3.676]; and a gratuitous personal attack on Senator Bowen by letter dated 28 February 2003 to Grenada's Prime Minister [CB2.538].

165.   Mr Grynberg's conduct was made in the face of Grenada's repeated requests to him not to intervene in its diplomatic and inter-state negotiations with Venezuela and Trinidad

& Tobago. Again, it would serve little purpose in reciting these materials in full here. It suffices to cite Senator Bowen's letter to Mr Grynberg dated 26 January 2001 [CB2.414]: "Any consideration of the request made therein [Mr Grynberg's letter] for the alteration of what are now not even confirmed as being within Grenada's territorial boundaries will jeopardize the negotiations between Grenada and our neighbours. In fact, Venezuela wants no contact or involvement of any person except Grenada Government Officials in the boundary delimitation process with Grenada ...." Similar requests, more strongly worded, were made by Senator Bowen's letters to Mr Grynberg dated 3 and 10 April 2001 [CB2.442 & 445].

### (10) March 1998

166.  In March 1998, RSM executed the Initial Grenada Inter-Company Agreement with Vintage Petroleum Inc., of Delaware [CB2.376; R-17]. Its terms read somewhat oddly with the Parties' Agreement; but it is clear that the overriding condition precedents contained in Article 2 of this agreement were never satisfied, including "the receipt of all necessary approvals by the Government of Grenada." Moreover, the other two named parties never in fact executed this agreement (Premier Consolidated Oilfields plc and Santa Fe Energy Resources Inc). Later, by letter dated 5 December 2002 to Mr Grynberg, Vintage withdrew from this project [CB2.533].

167.  In the Tribunal's view, this agreement can be disregarded for the purpose of Article 25 of the Agreement; it was no assignment of anything; and it cannot therefore amount to any contractual breach by RSM, as alleged by Grenada.

### (11) September 2000

168.  By letter dated 27 September 2000 to Senator Bowen, Mr Grynberg informed Grenada that he had secured the services of a seismic vessel to run two seismic test lines in Grenadian waters, each of approximately fifty kilometres [CB2.402].  He inquired whether "there are any fishing boats in this area because fishing boats may interfere with this program and the seismic ship, of course, will interfere with the fishing operations."

169.  By letter dated 4 October 2000, the Ministry of Works informed Mr Grynberg that the Chief Fisheries Officer had advised that the proposed seismic survey should not pose any adverse effects in the targeted areas" [CB2.405].  By letter dated 29 November 2000 to Mr Auguste [CB2.410], Mr Grynberg sent a "shot point map showing the two lines shot in October."

*(12) November 2002 etc.*

170.  By letter dated 11 November 2002 to Mr Auguste [CB2.527], Mr Grynberg confirmed that he would be undertaking further seismic work offshore Grenada during the winter [CB2.527]. By letter dated 29 January 2003 to Mr Grynberg [CB2.534], Grenada informed Mr Grynberg that, during a review period, it "would not be issuing and [approving] permits for vessels to conduct seismic in Grenadian waters ...."

171.  A later incident took place on 11 February 2004 where the vessel "GSI Admiral" was operating in Grenada's Exclusive Economic Zone about twelve miles offshore and interfered with Grenadian fishing-boats. The Grenada Fisheries Division, Coast Guard, Port Authority and Ministry of Foreign and External Affairs had no prior knowledge of this seismic research, which had been commissioned by RSM.

172.  It is clear from the evidence in these proceedings that RSM had no actual permission or other licence for the activities of the "GSI Admiral," in contrast to the earlier seismic work [CB3.607].  The consequences were serious for Grenadian fisherman: deprived of any warning from the Grenadian Government, their long lines suffered extensive damage for which the Government was obliged to pay them compensation as regards replacement, loss of earnings and loss of use, in the total sum of EC$ 391, 860.00 [CB4.1162].

*(13) January 2004*

173.   *12 & 13.01.2004:* By letter dated 12 January 2004 from Mr Grynberg to the Prime
Minister of Grenada, RSM revoked *force majeure* [CB3.589, 590]: "Because we are
now confident that we can proceed on our license offshore Grenada we are revoking the
*force majeure* and attaching our check #24280 dated January 12, 2004 in the amount of
$19,200.00 for payment of the first year's rental in accordance with the license
agreement terms." Mr Grynberg copied his letter to Senator Bowen, Mr Auguste, and to
the Leader of the Opposition. Although dated 12 January 2004, the fax transmission to
Grenada took place on 13 January 2004.

174.   Insofar as this letter suggests that RSM already had an Exploration Licence, it was of
course mistaken: there was still no licence granted by Grenada, as both Parties knew.
The letter can only be read as foreshadowing a future application by RSM for an
Exploration Licence.

*(14) February 2004*

175.   *19.02.2004:*  There was no response by Grenada to RSM's letter until Senator Bowen's
letter dated 19 February 2004 to Mr Grynberg [CB3.602]. Senator Bowen made two
points: RSM had no licence, contrary to RSM's letter; and RSM's letter had been
passed to the Government's legal department for advice regarding "the effect of Force
Majeure." He also returned RSM's cheque.

176.   *27.02.2004:*  Mr Grynberg signed a letter dated 27 February 2004, revoking *force
majeure*, addressed to the "Permanent Secretary, Ministry of Finance," being an
express addressee for notices under Article 29.1(a) of the Agreement [CB3.604].
Unusually, Mr Grynberg did not copy his letter to any other recipient within the
Government of Grenada, including the Prime Minister, Senator Bowen and Mr
Auguste. This letter was not sent by registered post to the Ministry of Finance; nor by
fax; and it is not clear what method of transmission was actually used by RSM.

177.   In this letter, acknowledging receipt of Senator Bowen's letter dated 19 February 2004, Mr Grynberg wrote that the "dispute concerning ownership of the petroleum in certain portions of the Agreement Area has not been fully resolved, but RSM now believes that there has been sufficient progress on this matter that the dispute no longer prevents it [RSM] from applying for the Exploration Licence …." The Tribunal notes that, as then recognised by RSM, Grenada's unresolved maritime boundary negotiations with its neighbouring states did not preclude RSM from preparing its application for an Exploration Licence under Article 3 of the Agreement.

178.   In addition, Mr Grynberg's letter stated that RSM would proceed with its application for an Exploration Licence:

 *"... no later than May 10, 2004 which reflects our computation of the original 90-day application period, as enlarged by the occurrence of the force majeure event beginning on July 18, 1996. In part, this reflects RSM's determination that its letter to the Prime Minister [i.e. Mr Grynberg's letter dated 12 January 2004] was wholly ineffective as having been sent to the wrong office, and that the force majeure condition is only now lifted by the delivery of this letter. If the Government of Grenada disagrees with our computation, we would very much appreciate your advice, although RSM certainly does not intend to wait until the end of this period. Instead, RSM will apply as soon as reasonably practicable ...."*

RSM included with this letter a cashier's check dated 26 February 2004 in the amount of US $19,200.00.  (It is not apparent from the evidence what happened with such a cheque, if it was received by Grenada).

179.   There was no response from Grenada to Mr Grynberg's letter dated 27 February 2004.

180.   At the time, RSM should have been on guard, given Senator Bowen's letter dated 19 February 2004 (see above), that it should act as prudently as possible as regards the effluxion of time under the ninety-day period, particularly after almost eight years had passed since the Agreement's "Effective Date." Indeed, Mr Grynberg indicated in his letter that RSM would make its application "as soon as reasonably practicable" without waiting any further. RSM did not, in fact, make its application until April 2004, as recited below.

181.  There is no issue that Mr Grynberg's letter dated 27 February 2004 was received by the Ministry of Finance and that this Ministry was a designated recipient for communications from RSM, under Article 29(1)(a) of the Agreement (quoted above, paragraph 126 at p. 39).  However, the question arose between the Parties as to when it was so "delivered" by RSM under Article 29 of the Agreement.

182.  Senator Bowen testified that he himself did not recall seeing this letter at the time: "It is likely that little attention was given to it by the Ministry of Finance, because they had not had any involvement with the communication between the Government and RSM since 1999, when the Energy Unit was transferred out of the Ministry. For years RSM had sent their communications either to me, to Mr Auguste or to the Prime Minister, and the responses were always received either from me or from Mr Auguste.  In the ordinary course, the Ministry of Finance would eventually have forwarded the letter to my Ministry [i.e. the Ministry of Agriculture, Forestry, Lands and Fisheries], although as I have said I do not recall seeing it at the time" [Bowen WS1.46]. There is no evidence that the Prime Minister or Mr Auguste saw Mr Grynberg's letter at the time.

183.  The correspondence registry of the Ministry of Finance, a contemporary document, records the receipt of Mr Grynberg's letter as at 14 April 2004 [Exhibit R-111]. This registry was only seen by Senator Bowen during these proceedings (after his first witness statement); and he confirmed during his oral testimony the significance of this entry as showing that the Ministry of Finance did not receive Mr Grynberg's letter on 27 February but only much later on 14 April 2004 [D4.9 & 74].

184.  Mr Grynberg was cross-examined by Grenada's Counsel as to the sending of his letter dated 27 February 2004 to the Ministry of Finance [D2.126-128].  He could not, of course, give any direct evidence as to the date of its receipt by the Ministry of Finance. In these circumstances, the only question before this Tribunal is when this letter was in fact "delivered" to Grenada within the meaning of Article 29(1)(a) of the Agreement and, depending on that date, what consequences might follow.

185.  In cross-examination by RSM's Counsel, it was suggested to Senator Bowen that, having in fact received Mr Grynberg's letter on or soon after 27 February 2004, Senator Bowen "had simply decided not to reply in detail at all to Mr Grynberg's letter and to

wait and see what happened in regard the 90 days, and if it didn't come in on time you would use that as the basis for not giving the licence" [D4.75]. Senator Bowen testified that this was not so: he had not seen the letter at the time; it was not copied to him; it was not received by the Ministry of Finance before 14 April 2004; and he saw it only later.

186.   Having considered all the evidence, the Tribunal concludes that Mr Grynberg's letter was not delivered to Grenada until 14 April 2004 and, following its receipt by the Ministry of Finance for Grenada, it was only seen by Senator Bowen subsequently. The Tribunal cannot determine from the evidence exactly when it was received by Senator Bowen. However, the Tribunal determines that Senator Bowen did not see Mr Grynberg's letter before 14 April 2004.

187.   The Tribunal also accepts the truth of Senator Bowen's testimony as to the absence of any deliberate decision by Grenada not to respond in a timely manner to Mr Grynberg's letter dated 27 February 2004 before the expiry of the ninety-day period under Article 3.1 of the Agreement, however calculated.

188.   The difference between 27 February and 14 April 2004 was potentially significant for the Parties' cases under Article 3 of the Agreement, because (on the Tribunal's calculations) the ninety-day time limit expired on 28 March 2004. Accordingly, there was still time between 27 February and 28 March 2004 for RSM to make a timely application for an Exploration Licence under Article 3.1 of the Agreement.

189.   If Grenada had deliberately kept silent on 27 February 2004 upon receipt of Mr Grynberg's letter, deciding then not to respond to Mr Grynberg's request for confirmation that RSM's computation was correct as a means of luring RSM into a trap, that would have raised very serious questions not only as regards Grenada's good faith and Senator Bowen's general credibility as a witness, but also whether Grenada's case should prevail under Grenadian law at all.  However, as indicated, the Tribunal determines that Mr Grynberg's letter dated 27 February 2004 was delivered to Grenada after 28 March 2004 (i.e., 14 April 2004) based on the Ministry of Finance's registry. It follows that Grenada could not have kept deliberately silent before 28 March 2004 in response to a letter which it had not yet received; and there could be no bad faith or

other unconscionable conduct by Grenada in not responding to such letter before 28 March 2004. Accordingly, the Tribunal concludes that these issues do not arise for decision by the Tribunal in this case.

### *(15) April 2004*

190. *05.04.2004:* By letter dated 5 April 2004 from Mr Grynberg to the Permanent Secretary, Ministry of Finance [CB3.610], RSM indicated that it would proceed with its application for an Exploration Licence. This letter was copied to (*inter alios*) the Prime Minister and Senator Bowen; and it was received by Grenada on 6 April 2004. The Tribunal infers that this letter was sent by fax directly by RSM to Grenada.

191. *06.04.2004:* By a document dated 6 April 2004 signed by Mr Grynberg [CB3.611], RSM applied to Grenada for an Exploration Licence. Mr Grynberg there noted (*inter alia*) that the *force majeure* event ran from 18 July 1996 until RSM's letter dated 27 February 2004 [CB3.614-615].

192. *13 & 14.04.2004:* The Parties dispute when and how RSM's application was communicated to and received by Grenada. It has been difficult for the Tribunal to determine the precise date of this application, given conflicting testimony and missing contemporary records. For this exercise, it is important to note that Monday, 12 April 2004 was a public holiday in Grenada (the Easter Holiday weekend having begun on Friday, 9 April 2004). Accordingly, the Grenada Government's offices re-opened on Tuesday, 13 April 2004 and were open also on Wednesday, 14 April 2004. It is also important to recall that 2004 was a leap year, with 29 February 2004 as an extra day during that month.

193. It is convenient next to summarise the factual evidence for the two Parties respectively, as found by the Tribunal.

194. *RSM:* According to RSM's eventual case, the application was sent under cover of the letter dated 13 April 2004 from RSM's attorney in Grenada, Mr James Bristol [CB3.626]. There are two versions of this letter. The first has the addressee struck out in manuscript (i.e., the Permanent Secretary, Ministry of Finance) and bears a stamp

dated 14 April 2004 of the Ministry of Agriculture, Forestry and Fisheries [CB3.626: Exhibit R-62]. The second is identical save that the addressee is not struck out; and it bears the stamp receipt of the Ministry of Finance date-stamped "Apr 14 2004," adduced by Grenada at the Main Hearing with the Tribunal's permission ["Exhibit R-111"].

195. Mr Bristol testified, in his witness statement, that he was "confident" that his letter and attached application were delivered by hand to the Ministry of Finance on Tuesday, 13 April 2004, as the first working day after the Easter holidays: paragraphs 3-6 [WS2.446-447]. The Ministry of Finance was a mere five minutes' walk from his chambers. He also referred to a note in his firm's postal record book suggesting that his clerk posted a copy of his letter to RSM on 13 April 2004, which suggested to him that the original letter (with the application) would have been delivered to the Ministry of Finance on that same day.

196. In his oral testimony at the Main Hearing, Mr Bristol broadly confirmed his written testimony [D1.183]. In the Tribunal's view, however, Mr Bristol had no independent recollection of the events of 13 or 14 April 2004; but he was clearly an honest witness, doing his best to reconstruct what probably happened and when, where the most significant element was (in his view) his firm's postal record book.

197. On RSM's application, the Tribunal admitted into evidence the relevant part of that postal record book [Exhibit C-108], together with a copy of Mr Bristol's letter to Mr Grynberg of RSM bearing the date of 13 April 2004 [D1.222]. Both contemporary documents indirectly support Mr Bristol's testimony.

198. Mr Bristol added that the hand-delivery to the Ministry of Finance would have been made by his secretary, Ms Marion Williams; and in accordance with his firm's procedure, Ms Williams would have procured the Ministry's signed receipt in the firm's receipt book [D1.185]. Unfortunately, Mr Bristol's firm could no longer locate that receipt book; and it was not therefore submitted into evidence in these arbitration proceedings.

199.   On 20 April 2004, Senator Bowen met RSM's representative, Mr David Myrick Jr. Senator Bowen expressed concern over certain aspects of RSM's application; but it is common ground that Senator Bowen said nothing about RSM's application being late.

200.   *Grenada:* Grenada's case on lateness was first advanced by letter dated 27 April 2004 from Senator Bowen to Mr Grynberg [CB3.631], contending that RSM's application was contractually out of time and therefore invalid under Article 3.1 of the Agreement. It was there said that the time-limit was ninety days from the "Effective Date" of the Agreement (being 4 July 1996), of which fourteen days were exhausted prior to the *force majeure* period commencing on 18 July 1996, leaving thereafter a period of 76 days. That period began to run again on 12 January 2004, therefore expiring on 28 March 2004.  Accordingly, RSM's application, whether made on 13 or 14 April 2004, was made too late on any view; RSM was therefore too late under the Agreement's time-limit; and the Agreement accordingly lapsed or expired in accordance with its terms and Grenadian law.

201.   At the Main Hearing, as already indicated, Grenada introduced two further documents, as "Exhibit R-111," with the permission of the Tribunal [D1.222]. The first document was the original document received by Grenada's Ministry of Finance, without the addressee's deletion evident from the copy described above, date-stamped by the Ministry on 14 April 2004 [Exhibits R-62, R-111]. The second document was the correspondence register of the Ministry of Finance for 14 April 2004, recording (as the last item on that day) its receipt of a letter from "James A.L. Bristol" with the description "Application for Exploration Licence." In Grenada's closing oral submissions, its Counsel submitted that that all the evidence clearly established that RSM's application was made to Grenada on 14 April and not 13 April 2004 [D5.116].

202.   The Tribunal notes that Mr Grynberg, in his affidavit sworn on 7 May 2007 in the New York Legal Proceedings, testified as follows:

"*16. RSM delivered its application for an oil and natural gas exploration licence to the Permanent Secretary of the Ministry of Finance on April 14, 2004, after a four (4) day holiday.*"

This delivery date of 14 April 2004 accords with the date set out in RSM's letter dated 4 May 2004 (see below); and it was the date first pleaded by RSM in its Request for Arbitration of 31 August 2004 addressed to ICSID: "18. RSM delivered its application for an oil and gas exploration licence a copy of which is attached as Exhibit I, to the Permanent Secretary of the Ministry of Finance on April 14, 2004" [WS1.4].

203.   In conclusion, having considered all the evidence, the Tribunal finds that RSM's application was made to Grenada either on 13 or 14 April 2004.  As appears later below, this difference is legally immaterial to the Parties' dispute.

**(16) May 2004**

204.   By letter dated 4 May 2004 from RSM's General Counsel (Mr Roger A. Jatko) to Senator Bowen [CB3.633], RSM disagreed with Senator Bowen's calculations, contending (*inter alia*) that time ran from 27 February 2004 whereby the application was made timeously. Mr Jatko also contended that, if time ran from 12 January 2004, "... the licence application was filed on April 14, 2004 – the ninetieth day. Thus the license application was timely filed even if the improper notice dated January 12 were used as the triggering event" [CB3.634].

205.   By the summer of 2004, both Parties were advancing irreconcilable arguments; none of their differences were reconciled; legal advisers were acting on both sides; and it would serve no purpose here to recite arguments and counter-arguments which have later formed the Parties' more extensive submissions in these arbitration proceedings.

**(17) August 2004**

206.   In due course, on 31 August 2004, RSM filed its Request for Arbitration against Grenada with ICSID [CB3.663], initiating this arbitration. (ICSID's Acting Secretary-General registered RSM's Request on 5 August 2005 pursuant to Article 36(3) of the ICSID Convention).

*(18) July 2005*

207.  By letter of 5 July 2005 [CB3.771], the senior law officer in the Government of
Grenada, Mr Hugh Wildman, formally notified RSM that Grenada was terminating the
Agreement.  It merits extensive citation, as follows:

*" ... Legal Position*

*The legal position can be shortly stated as follows. Under clause 3.1, the 90 day period
for applying for an exploration licence expired on 2 October 1996.  No application was
made by RSM by that date.  Even if (which is not accepted) RSM's letter of 18 July
1996 concerning force majeure had the effect of suspending the time within which RSM
had to apply for an exploration licence, the 90 day period had resumed at the latest
from 12 January 2004 when you wrote to the Prime Minister that "(B)ecause we are
now confident that we can proceed with our licence offshore Grenada we are revoking
the force majeure..."  Allowing for the 14 days prior to the letter of 18 July 1996, the
remaining period of 76 days would have expired on 28 March 2004.  RSM did not
apply for an exploration licence until 14 April 2004.  It therefore failed to comply with
the strict time limit imposed by clause 3.1.*

*To suggest as you have in correspondence (notably in your letter to us of 4 May 2004)
that the notice contained in your letter to the Prime minister dated 12 January 2004
"could only be effective if directed to the Permanent Secretary of the Ministry of
Finance" is legally untenable, as is the contention elsewhere in the letter that "(I)f,
however, the January 12 letter were viewed as an effective notice, then such notice
must, in accordance with Article 19.1 of the Petroleum Agreement be "delivered or sent
by registered post".  Clause 29 is simply a notice clause which provides that notices or
communications "may" (not "must") be given to the Permanent Secretary of the
Ministry of Finance.  This means that the Permanent Secretary is authorized to receive
the notice.  It does not mean that no-one else is.  Clause 29 is facultative.  The
procedure provided for it is not the only contractually effective method of
communicating with the Government.*

*Even if (which is not accepted) your letter of 12 January 2004 was not legally effective
notice under the Agreement, it is powerful evidence that by that date RSM was in fact
no longer prevented from performing its obligations.   That in itself is enough to bring
an end to the period of suspension.  It is also enough to require RSM to give notice
under clause 24 of the Agreement.  Assuming in your favour that only notice to the
Permanent Secretary of the Ministry of Finance would suffice, RSM was in Breach
[sic] of its obligation under clause 24.2 to give that notice "promptly" by waiting until
27 February 2004 to do so.  As a matter of Grenadian law, RSM cannot rely on its own
breach of clause 24 as extending the period for which, as RSM contends, it was relived
(sic: relieved) of its contractual obligations.*

*Termination of the Agreement*

*By failing to apply for an exploration licence within the 90 day period stipulated under clause 3.1, RSM is in clear breach of the Agreement.  It follows, as Leading English Counsel has confirmed, that the Government is entitled to terminate the Agreement.  Please treat this letter as notification to RSM of that termination.*

*As you know, Clause 26(1) of the Agreement provides that disputes or differences between the parties should, if possible, be "resolved amicably by negotiations".  The Government's position as conveyed in this letter will not be unfamiliar to you.  We have previously communicated it to you, notably in our letter of 27 April 2004.  Your reaction to that letter, and the adversarial steps taken by you subsequently, suggest that there is no realistic prospect of an amicable resolution.  We nevertheless invite you to review the stance that you have taken to date, and to accept that the Government is entitled to terminate the Agreement for the reasons given.*

*Should you decline to do so, the Government would wish the dispute to be resolved by ICSID arbitration as expeditiously as possible.  If the arbitrations' award [sic] shows that we are wrong, we will of course abide by the result.*

*We would appreciate a prompt response to this letter."*

208.   From this point onwards, as already indicated, it serves no purpose to set out in this chronology further events taking place within these arbitration proceedings.


**(19) Miscellaneous**


209.   ***Mr Grynberg:*** Mr Grynberg is a senior figure with a strong character, having lived a full and eventful life. In the disarming words of RSM's Counsel in his closing oral submission: "Grynberg is plainly a litigious man. You may have thought at some points in his evidence that he, if not relished the description, certainly didn't shrink from it" [D5.8].  Mr Grynberg and his companies are certainly no strangers to litigation or the threat of litigation, even measured by the standards of a belligerent industry: Grenada submitted a documented list of 171 cases filed in U.S. Federal Courts and 33 cases filed in U.S. State Courts by Mr Grynberg and his companies as plaintiffs, unrelated to the Parties' present dispute (Appendix to Counter-Memorial).  Mr Grynberg was also subjected to much more severe criticism by Grenada's Counsel during the course of these proceedings, including allegations of deceit, mendacity and manipulation.

210. The Tribunal accepts that Mr Grynberg is a strong and forceful character, has a litigious temperament, displays an aggressive personality, does not shirk from controversy and lacks nothing by way of assertive self-confidence.  None of these attributes, even if they amounted to criticism, are decisive for the Tribunal's decisions in this Award. However, based on his testimony in these proceedings, the Tribunal concludes that Mr Grynberg can, on occasion, say what he wants to believe or have believed with little or no factual foundation for such belief.  The Tribunal does not think it necessary, or appropriate, to accept any further personal criticism from Grenada of Mr Grynberg's general character for the purpose of this Award, save where indicated expressly otherwise below.

211. ***Senator Bowen:*** RSM impugned the honesty and competence of Senator Bowen, both in these arbitration proceedings and, to a much greater extent in formal court documents submitted in the New York Proceedings and supplied to the Tribunal in these proceedings.

212. On all the evidence adduced in these arbitration proceedings, the Tribunal does not accept any of these personal criticisms of Senator Bowen for the purpose of its decisions in this Award. Moreover, after a firm but fair cross-examination of Senator Bowen during the Main Hearing, RSM's Counsel submitted in his closing oral submissions that RSM was not requesting this Tribunal, in these proceedings, to find Senator Bowen "corrupt" or "incompetent" in these arbitration proceedings [D5.50]. Nor does it.

## PART V: ISSUE A – JURISDICTION

### (01)  Introduction

213.  In its Request for Arbitration, the Claimant invoked the Arbitration Agreement (contained in Article 26.2 of the 1996 Agreement, cited above in full).  According to that provision, subject to Article 26.1 (which calls, first, for amicable negotiations in order to solve disputes or differences between the parties), "all disputes with respect to any matter arising out of or relating to the Petroleum Agreement shall be referred to arbitration pursuant to Article 26.3." Article 26.3 then provides that unresolved disputes shall be submitted for settlement by arbitration to ICSID.

214.  In its Memorial, the Claimant added that Grenada, by its senior law officer, reiterated the Grenada Government's consent to ICSID jurisdiction in the letter sent to RSM on 5 July 2005, in which the signatory stated, as more fully cited in Part III above: "[…] the Government would wish the dispute to be resolved by the ICSID arbitration, as expeditiously as possible.  If the arbitration's [sic] award shows that we are wrong, we will of course abide by the result."

215.  The Claimant submits that not only the jurisdiction of the Tribunal is thus established, but that the Respondent has waived any objection to the jurisdiction of ICSID.  The Respondent, however, in its Counter-Memorial, challenged the jurisdiction of ICSID and of this Tribunal.

### *(02) The Parties' Submissions*

216. ***The Respondent's Submissions***: As already summarised above, the Respondent submits that the dispute does not arise out of an "investment" within the meaning of the ICSID Convention because there was no investment on the part of the Claimant. The Respondent contends, contrary to the Claimant's contention, that ICSID jurisdiction is not only a matter of consent: parties cannot by agreement or waiver confer jurisdiction on an ICSID Tribunal outside the scope of Article 25 of the ICSID Convention. Therefore, any notion of 'waiver' of the right to object to jurisdiction is inapposite. Article 25 establishes an objective jurisdictional standard. That standard is either met or not met; and if it is not met, no alleged 'waiver' can cure such defect.

217. That the parties may not elect to submit disputes to the Centre that are not related to an investment has already been recognised in several ICSID awards.[4] A distinction must be drawn between consent to arbitration (on the one hand) and the objective conditions of an investment (on the other); and the existence of the former cannot allow parties to evade the latter. As has been stated, the jurisdiction of ICSID is conferred by the ICSID Convention; and consent to arbitration is little more than the mere agreement to submit to ICSID under the terms of the Convention.[5] If this Tribunal were to decide that the mere signing of an ICSID arbitration clause is a waiver as to the requirements of Article 25, the Respondent submits that this would entail the consequence that the fundamental concept upon which application of the ICSID Convention rests (that of investment) could vary indefinitely and infinitely.

218. Turning to the objective determination of an investment, the Respondent relies on ICSID jurisprudence and on legal doctrine, from which there emerges five hall-marks of an investment: (i) duration, (ii) regularity of profit, (iii) element of risk, (iv)

---

[4] The Respondent relies notably on *CSOB v Slovakia*, *supra* note 3, para. 68, and *Joy Mining Machinery Ltd v Egypt*, *supra* note 3, para. 50. While acknowledging that these cases were brought under bilateral investment treaties, the Respondent notes that the requirements were the same. The Respondent also relies on "pure" ICSID cases, such as *LETCO v Liberia*, *supra* note 3, and *Autopista v Venezuela,* Decision on Jurisdiction, *supra* note 3.
[5] *Mitchell v Democratic Republic of Congo,* Decision on Annulment, *supra* note 3.

substantial commitment and (v) significant contribution to the host state's development.[6]  These hallmarks, so the Respondent states, must be applied cumulatively to the actual activities of the claimant in the respondent state, on the one hand, and the commitment contemplated by the agreement that provides for the parties' consent to arbitration, on the other.[7]

219.  In the present case, the Respondent first denies that the Claimant contributed anything of substance in furtherance of the Agreement; it further contends that even if one were to consider what RSM had undertaken to do in the Agreement (rather than what it actually did), RSM falls short of meeting the above hallmarks.[8]

220.  As regards the *actual expenses* allegedly made by the Claimant in performance of the Agreement, the Respondent argues that they are irrelevant inasmuch as these were incurred in furtherance of what was only a preliminary agreement.  In order to be taken into consideration, any expense allegedly incurred by RSM should have been made after 12 January 2004, the moment when the Claimant revoked *force majeure*; until that date, performance of the Agreement was impossible; and only a putative agreement existed.  Any expenses made, or allegedly made before that time, therefore, were pre-investment expenditures.  It is all the more so, the Respondent notes, in regard to the seismic studies conducted before 1996, as early as 1971.

221.  A preliminary agreement cannot itself constitute or form the basis of an investment, as the Respondent submitted [D1.97].  In the present case, between the preliminary agreement and the declaration of *force majeure*, the Respondent contends that there was a window of only fourteen days; and even the expenses alleged by the Claimant were not made during that period [D1.135].

222.  The Respondent here relies in particular on *Mihaly v Sri Lanka,* where jurisdiction was denied on the tribunal's finding that the intention to create a contractual relationship was lacking. Similarly, so the Respondent states, the Agreement was but a preliminary

---

[6] Counter-Memorial, para. 3.2; *Salini v Morocco*, *supra* note 3, para. 52.
[7] Counter-Memorial, paras. 3.13, 3.27 *et seq*.
[8] "In order to determine whether this case fulfils the jurisdictional criteria in Article 25(1) of the ICSID Convention, one must look at both the actual and the contemplated commitment made by RSM (…) [b]oth of these must amount to an 'investment' in order for the Tribunal to have jurisdiction to hear the present dispute." Counter-Memorial, para. 3.27.

agreement contemplating a license under which the actual operations would be carried out, whether relating to an Exploration or Development Licence [D1.122].

223.  In any event, the Respondent adds, the expenses alleged by the Claimant after the date of the Agreement are far too unsubstantiated to allow this Tribunal to find that an investment was made; in fact, there is no proof of any money spent by the alleged investor and the alleged investments have not been documented.  The brief 2000 seismic trip conducted on behalf of Mr Grynberg was a one-off and fortuitous engagement.  Regarding the litigation against PDVSA and Trinidad & Tobago, not only is there no evidence whatsoever of the monies allegedly spent by RSM but these actions were undertaken without the authority of Grenada and thus constituted an interference with its foreign policy; and any expense so incurred can hardly be regarded as representing a contribution to the host state as an investment within its territory.  In the absence of any substantial contribution by the Claimant, the Respondent adds, no risk whatsoever was incurred by the Claimant as regards any "investment."

224.  Regarding the activities contemplated by the Agreement, the Respondent argues that these likewise fail to fulfil the recognized hallmarks of an investment: RSM never made any substantial commitment, took practically no risk and contributed nothing to Grenada's development.  As the award in *MHS v Malaysia* and the *Mitchell v DRC* annulment decision emphasized, a substantial contribution or commitment is a cardinal feature of an "investment" in light of the purposes and objects of the ICSID Convention.  Although the Agreement contemplated a potential of eight years of exploration and fifty years of exploitation, the Respondent argues that RSM did not even commit itself to pursue exploration according to the Agreement; the Exploration License was for an initial period of four years (Article 3.2), during which RSM was only committed to spend US $400,000 on what would essentially be desktop work; after which, the Exploration License could be renewed for two further periods of two years each on application made by RSM (Article 4).

225.  Based on expert evidence submitted in this case, the Respondent states that a serious drilling and exploration program for an area of the size covered by the Agreement would involve expenses in the vicinity of US $40 million, so that, given the nature of

the industry, the minimal financial commitment undertaken by RSM cannot seriously be considered as an investment.

226. As to further expenses, they were contingent upon the exercise of the option by RSM to pursue exploration work, then development.  RSM was free to make or not to make an application to those ends, and that application had to be consistent in form and substance with Grenada's 1989 Act. The Respondent insists that it cannot suffice to say that oil exploration requires hundreds of millions of dollars to be carried out; what matters is the actual commitment, not what is spoken of.  The Claimant did not in fact promise anything that could be relied on; all it did was to lock up Grenada's national territory indefinitely, putting itself in the position of a broker in search of a more serious operator to bring in the necessary resources [D1.129].

227. The Respondent concludes that any commitment here was at most superficial or speculative, as were risk and duration, not to mention the complete lack of any positive impact on the host state's development (villages, roads, schools etc.).  The Respondent adds that the mechanism of ICSID is being abused by the Claimant in this case; that the Arbitration Agreement is a "pathological arbitration agreement," an arbitration clause that necessarily fails to bestow any jurisdiction upon this Tribunal,[9] because the present claim is a purely contractual claim with no investment.

228. ***The Claimant's Submissions:*** As also summarised above, the Claimant contends that the Respondent expressly consented to the jurisdiction of ICSID in Article 26 of the Agreement, where, in addition, RSM is expressly designated as an investor (see above). In further correspondence with RSM, the Respondent confirmed its commitment to ICSID arbitration as well as its characterisation of the project as an "investment."[10] The Claimant contends that Grenada thereby waived any right to challenge the jurisdiction of the Tribunal, under ICSID Arbitration Rule 41(1).  The Claimant adds that the Parties' acceptance of ICSID's jurisdiction is a recognition that their transaction constituted an investment; or at least it creates a strong presumption that it is an investment, as was found by the Tribunal in *CSOB*.  This is indeed the reason why the drafters of the Washington Convention did not find it necessary to insert a

---

[9] Memorial, para. 3.48.
[10] Letter dated 28 May 1996, cited in the chronology above in Part IV (05).

definition of an investment in the ICSID Convention.  The Claimant submits that only if there is serious doubt about the existence of an investment should a tribunal look further into the matter.

229.  The Claimant does not deny that an investment must meet certain objective characteristics, while adding that the parties have a wide latitude in reaching that objective.  The Claimant states that only where the assertion of jurisdiction would be totally inconsistent with the purpose of the ICSID Convention should jurisdiction be declined by an ICSID tribunal.

230.  In the present case, the Claimant submits that the existence of an investment is so obvious that the Respondent's challenge is tainted with bad faith. Contrary to the Respondent's assertion, the Claimant notes that the five elements identified by commentators and adopted by several ICSID tribunals are not regarded as a mandatory checklist or as true jurisdictional requirements, but as indicative of an investment only. In any event, the Claimant states, concession agreements such as the present Agreement unquestionably meet all the suggested characteristics of an investment, notably due to the expenses involved, the risk undertaken and the major impact on the host state's economy.

231.  Regarding the Agreement, the Claimant notes that a financial commitment is not even necessary, because the provision of services or know-how, not involving a physical transfer of funds, can constitute sufficient commitment to constitute an investment.[11] In any event, RSM's actual commitment under the Agreement was substantial as to the provision of seismic data and of negotiation and litigation expenses incurred in order to resolve Grenada's boundary disputes with Trinidad & Tobago and Venezuela (with Grenada's authorization, at least to a certain point in time).  The further commitment to spend US$ 400,000 was stated as a minimum; and much more would have been expended had RSM been granted the Exploration License and Grenada's ownership over the disputed zone been recognised by its neighbouring States.  A vast amount of technical know-how was also contributed by RSM, through Mr Grynberg's expertise and experience, for instance in finding investors for the development of the project. In

---

[11] Invoking *CSOB v Slovakia*, *supra* note 3, para. 78.

any event, RSM argues, what Mr Grynberg has done or has not done is not the proper approach: ICSID tribunals do not have to evaluate the actual contribution of an investor.  (RSM also points to a contradiction in Grenada's position, blaming RSM for doing nothing in furtherance of the Agreement after having forbidden RSM to collect seismic data when Mr Grynberg asked the permission to do so.)

232.  Even accepting (for argument's sake) the Respondent's analysis as to a "preliminary agreement," the Claimant contends that pre-contractual expenses should not be disregarded by the Tribunal since they are the first stage of the project.  The *Mihaly* decision does not stand for what the Respondent contends, because the tribunal there found that no agreement at all was ever entered into by the parties. Moreover, the tribunal expressly insisted that, in other circumstances, similar expenditure could be described as an investment; and here (in the present case) there was an Agreement amounting to a form of concession between the Parties.


### (03) The Tribunal's Analysis


233.  The Tribunal here first determines to what extent the Parties' execution of an ICSID arbitration clause in the terms of Article 26 of the Agreement establishes the jurisdiction of ICSID, finding that it creates at least a presumption in favour of the existence of an investment.  The Tribunal then decides upon the existence in the present case of an investment, concluding that the Agreement qualifies as such and therefore that this Tribunal has jurisdiction to decide the Parties' dispute on the merits.


### (04) The Parties' Characterisation


234.  The Tribunal first notes that the Parties to the present dispute expressly referred to the project as an investment and to the Claimant as an investor in the Arbitration Agreement, agreed and signed by them; and that by inserting an arbitration clause

referring potential disputes between them to ICSID, they must necessarily be assumed to have intended that such a clause would operate and that RSM's part of the project represented at the time an investment in their own minds.

235.  This Tribunal, however, like several earlier ICSID tribunals, subscribes to the concept that a private party and a state contracting with each other are not at liberty to create their own definition of an investment under the ICSID Convention with the effect of bringing a dispute under the jurisdiction of ICSID even where their operation is clearly not an investment.[12]  There are certain objective elements to an investment which must be present; and it is the duty of this Tribunal to ensure that they are present, lest its assertion of jurisdiction be false and amount to an abuse of power.  As the *ad hoc* Committee decided in *Mitchell*, "before ICSID arbitral tribunals, the Washington Convention has supremacy over an agreement between the parties" (paragraph 31).

236.  The Tribunal, therefore, is required to ascertain the existence of the generally accepted characteristics of an investment, at least inasmuch as they are contested by the Respondent.[13]  The Tribunal, however, is of the opinion that while the parties to an agreement cannot arbitrarily confer jurisdiction upon ICSID by characterizing as an investment a project that lacks all the characteristic features of an investment, their express designation of ICSID as the arbitral forum in which to settle their potential disputes indicates that the parties themselves perceived their agreement as one relating to an investment.[14]  The agreement to the jurisdiction of ICSID in a transaction between a state and a foreign private party thus can be viewed as a presumption that the transaction is indeed an investment.[15]

---

[12] *See, e.g.*, *Salini v Morocco*, *supra* note 3, para. 52; *CSOB v Slovakia*, *supra* note 3, para. 68.

[13] *See Bayindir v Pakistan*, *supra* note 3, para. 133: "Since Pakistan has not contended that the project was not sufficiently extended in time to qualify as an investment, the Tribunal considers that this requirement is met."

[14] Similarly, as one ICSID tribunal noted (while concluding that there was no investment for the purpose of Article 25), "the fact of the registration of [a] case as [an] ICSID Case constitutes an indication that, on the basis of the information contained in the request for arbitration, the dispute is not manifestly outside of the jurisdiction of the Centre." *Mihaly v Sri Lanka*, *supra* note 3, para. 57.

[15] The *CSOB* tribunal arguably meant exactly that when it stated that "[t]he Parties' acceptance of the Centre's jurisdiction with respect to the rights and obligations arising out of their agreement therefore creates a strong presumption that they considered their transaction to be an investment within the meaning of the ICSID Convention." *CSOB v Slovakia*, *supra* note 3, para. 66.  This Tribunal only notes that the "strong presumption" is not so much that the parties "considered" their transaction to be an investment, which they did, but that it is indeed one.  In the present case, the Respondent expressly denied "alleging that the parties' intention plays no role at all in determining whether an investment has been made." Rejoinder, para. 2.16.

237.   Indeed, when acknowledging that the ICSID Convention did not include a definition of the term investment (as recalled above), the Executive Directors of the World Bank added: "... given the essential requirement of consent by the parties."  That qualification is a way of stating that the parties to an agreement know what they are doing when they agree to submit potential disputes between them to a forum dedicated to the adjudication of investment disputes, such as ICSID.

238.   Therefore, the Tribunal does not adhere to the Respondent's repeated argument that what a minister subscribing to an ICSID clause might be deemed to have accepted "does not matter" [D1.117].  The Tribunal is of the opinion that only where the economics of the disputed transaction are clearly lacking one or more of the recognized characteristics of an investment should an ICSID tribunal decline to enforce the parties' will and find that it has no jurisdiction; other than that, the true abuse of power would be to defeat their expectations.  It is in that spirit that the present Tribunal turns to its analysis of the recognized factors of an investment, on the facts of the present case.


*(05) The Existence of an Investment*


239.   As several earlier ICSID tribunals have had occasion to note, there is no express definition of an investment in the ICSID Convention.  Those same tribunals seldom failed to quote from the Report of the Executive Directors of the World Bank, accompanying the ICSID Convention, which expressly acknowledges the lack of any definition.[16]

240.   However, it appears that a broad consensus has since emerged from ICSID awards, as well as from legal doctrine, regarding the characteristics establishing the existence of an investment for the purpose of Article 25 of the ICSID Convention.[17] The Parties in the present case have recognized the validity of those characteristics: the Respondent, by

---

[16] "No attempt was made to define the term 'investment'…" (1 ICSID Rep 28).
[17] A number of those cases, unlike the present, were brought on the basis of a bilateral investment treaty, some of which contained a definition of what was to be considered as an investment for their purposes.  Inasmuch as it refers such cases, the Tribunal is careful to restrict itself to those parts of the decisions which dealt specifically with the requirement of an investment under Article 25 of the ICSID Convention.

arguing that they were missing, a least in part; and the Claimant by affirming their presence. As recalled by the Respondent (see above), those characteristics are: a significant commitment of resources by the private party, an economic risk entailed, a sufficient duration of the operation, a regularity of profit or return and a contribution to the economic and social development of the host state.[18]

241.   The Tribunal recognises the soundness of those general characteristics, while noting that they do not constitute "the jurisdictional criteria in Article 25(1) of the ICSID Convention" or "the Article 25(1) test" as the Respondent refers to them.[19]   Thoroughly absent from Article 25, they are but benchmarks or yardsticks to help a tribunal in assessing the existence of an investment, and their proponents or users rightly insist on the flexibility with which they should be used by a tribunal.

242.   In the Tribunal's view, there is no doubt that if the project between the Parties had reached what was termed in the Agreement the "development" stage (following the "exploration" stage), the recognized conditions of an investment would be fulfilled.  An oil concession granted by a state to a foreign private party is indeed the quintessential investment operation.[20] Under the most commonly accepted notions, an agreement whereby, on the one hand, a state confers upon a private party the right to search for natural resources while, on the other, the private party undertakes to commit the necessary means to that end, is undoubtedly an investment.

243.   There would be no need for actual expenses to have been incurred by the private party, the relevant criterion being the *commitment* to bring in resources toward the performance of such exploration. The Tribunal further notes that not only is an exploration agreement not significantly distinct in nature from the agreement to exploit known resources, but if anything, it is even more of an investment on the part of the private party given the magnitude of the commercial risk involved.  Exploration for oil

---

[18] Christoph Schreuer, *The ICSID Convention: A Commentary* (2001), at pp. 121-134, 140.  The decision on jurisdiction in *Salini v Morocco* endorsed those criteria, while adding: "In reality, these various elements may be interdependent." *Salini v Morocco*, *supra* note 3, para. 52.  The *Salini* decision has been followed on this point, notably in *Bayindir v Pakistan*, *supra* note 3.
[19] Counter-Memorial, paras. 3.27, 3.28.
[20] In contrast, the facts of *Joy Mining*, on which the Respondent relies and where the tribunal found that it lacked jurisdiction, bear little relationship to the present situation; there, the issue was whether a guarantee issued by the claimant to a state-owned company could constitute an investment for the purpose of Article 25(1) of the ICSID Convention.

in maritime areas, as the Respondent points out, requires the commitment of a significant amount of capital.  Had the Exploration Licence been issued, RSM would have been irrevocably committed to bring in, directly or indirectly by turning to other sources, the necessary capital.[21]  If oil was not found, or was not found in sufficient quantities, or was found to lie in locations that did not make exploitation economically viable, that capital would have been spent in vain.[22]

244.   This, the Tribunal notes, shows that the recognized characteristics of an investment need not be met cumulatively.  If the exploration proved unsuccessful, the "regular return" factor would be missing. As to the contribution to the economic and social development of the host State, in the unlikely situation where the exploration expenses themselves would not be sufficient to satisfy it, the condition must be assessed in consideration of a successful adventure.  It is not the actual or the final contribution that matters, precisely because the exploration may not lead to exploitation.

245.   Turning to the State's perspective, it was in Grenada's public interest to ascertain whether the country had commercially viable resources in offshore petroleum. To sum up, even considering the exploration stage only, the subject-matter of the Agreement was a "readily recognizable" investment.[23]

246.   Performance of the Agreement, however, did not reach this exploration stage; and the Respondent argues that whatever the Claimant actually did or promised to do regarding the pre-exploration phase of the Agreement lacked all the recognised characteristics of an investment.  In fact, the Respondent does not only apply the "*Salini* test" to that pre-exploration phase taken in isolation from the rest of the Agreement; it also applies this test to individual actions allegedly taken by the Claimant during that stage (which happened to be extended due to the declaration of *force majeure*), such as the seismic trip and studies in 2000.[24]

---

[21] Article 4 of the Agreement.
[22] *Mitchell v DRC*, *supra* note 3, para. 33.
[23] *See Broches*, quoted by *Schreuer*, as quoted by the *Mitchell ad hoc* Committee.
[24] The Respondent submitted: "One trip, consisting of having someone else's ship run two 50 km 2-D seismic lines when it happened to be  passing next to Granada [sic], cannot constitute an investment in accordance with Article 25(1).  Such a one-off and fortuitous engagement is lacking in all five of the required criteria: duration, risk, regularity of return, commitment and contribution to Grenada's economy" [Counter-Memorial, para. 3.34]. The Respondent expressed agreement with the principle that "a global view should be employed to evaluate RSM's 'overall adventure,'" with "the Salini factors being used to assess the global view" [Rejoinder, para.

247. The Tribunal rejects the Respondent's approach as unduly restrictive and lacking the support of any legal materials or legal logic. Even considering the pre-exploration phase as a whole, the Respondent contends that it lacked duration because it was suspended after fourteen days. The Tribunal finds that, first, the suspension for *force majeure*, which is the operative cause for such a short period, was decided pursuant to an express clause of the Agreement and was not contested but positively agreed in writing between the Parties at the time.[25] For the purpose of identifying an investment, the Tribunal does not therefore think it right to ignore the period of suspension or what the Parties agreed during that period. Second, the Tribunal notes that after *force majeure* was revoked by the Claimant, the Respondent declined to grant to the Claimant its requested Exploration Licence and later terminated the Agreement. The Tribunal therefore decides that the Respondent cannot rely on the short duration of a period to which the Respondent itself put to an end.

248. The Respondent contends that the Claimant did nothing in furtherance of the Agreement. The Tribunal considers first that, that, under the *force majeure* clause (Article 24), it was excused from the performance of its obligations once *force majeure* was declared; second, that, if the pre-license period is separated from the rest of the project (as the Respondent contends), the Claimant had no other obligation during that period other than to apply for an Exploration License, which it did or at least attempted to do (albeit unsuccessfully).

249. The Respondent further contends that even during the pre-licence period, the Claimant did not actually undertake any serious commitment under the Agreement because its only firm obligation (spending US $400,000 during the initial exploration period) was of little significance in view of the nature of the project; and because any further expense depended on the Claimant's option to apply for an extension of the exploration period. On the first point, there seems to be a wide acceptance, in arbitral jurisprudence and doctrine, of the idea that the existence of an investment as a requirement for

---

2.11]. However, the Respondent immediately added that "[e]ach individual act that RSM has performed fails to satisfy the test for an investment under Article 25 [...]" [Rejoinder, para. 2.12].
[25] On the later challenge regarding *force majeure* by the Respondent, see below.

jurisdiction is not dependant on the amounts actually spent by the alleged investor[26]; and that an investment "may be financial or through work," including know-how[27] or industry.[28]  In the present case, RSM's know-how and industry were ostensibly dedicated to the project as soon as the Agreement was signed by the Parties, and both could have been put to use had the Exploration License been issued by Grenada (in addition to the necessary contribution of capital).

250. On the second point, namely the option open to the Claimant after four or six years of the exploration period to pursue the project or not with a Development Licence, it is hardly conceivable that a commercial entity searching for oil deposits could be contractually bound to apply for a further license, let alone an actual exploitation license, if initial studies, or a first drilling operation, showed that there was no prospect of any successful exploitation.  In the converse situation where the exploration work disclosed the promise of profitable exploitation, it is equally hard to imagine that a commercial entity (such as RSM) would deliberately abstain from applying for a Development License, thereby renouncing any opportunity to recoup its exploration expenses and to achieve its principal aim in the whole project; and that the Claimant would not be careful to make an application consistent in form and substance with all statutory and contractual requirements.

251. Referring to the detailed provisions of Article 8 of the Agreement ("Discovery of Petroleum and Development"), the Tribunal notes that the risk was rather for the Claimant that its application for a Development License be turned down by the Government as not meeting the requirements there enumerated.

252. The Tribunal therefore concludes that the Agreement did include commitments undertaken by the Claimant relating to the exploration period that qualified as an investment, for the purpose of Article 25 of the ICSID Convention.

253. The Respondent also maintains that, beyond the fact that the Agreement lacked the essential features of an investment, it was but a preliminary or preparatory agreement,

---

[26] *Mihaly v Sri Lanka*, *supra* note 3, para. 51: "[T]he question whether an expenditure constitutes an investment or not is hardly to be governed by whether or not the expenditure is large or small."
[27] *Bayindir v Pakistan*, *supra* note 3, para. 31; *Mitchell v DRC*, *supra* note 3, para. 27.
[28] *Salini v Morocco*, *supra* note 3, para. 53.

not susceptible by itself to constitute an investment for ICSID jurisdictional purposes. While the Arbitration Agreement would have been enforceable once a Development License was issued (although not the Exploration License), the contention is that this Arbitration Agreement had no application pending the grant of that licence.

254. This argument, the Tribunal notes, rests on a strict separation within the Agreement between that part which relates to the phase leading to the application for the Exploration License and the further parts relating respectively to the exploration and development periods; so that the Arbitration Agreement would apply to disputes relating to the third (and possibly second) periods, but not the first.  The Tribunal finds that such separation is inconsistent with both the letter and spirit of the Agreement. It is indeed commercially absurd, an intention not to be attributed to the Parties without very clear contractual language (which is entirely missing in this case); and it is not consonant with the purposes of the ICSID Convention.

255. Even if the Agreement's provisions relating to the grant of an Exploration License were to constitute only a "preliminary agreement" within the Agreement, the Tribunal considers that they were a fundamental part of an overall project.  As the Tribunal in the *CSOB* case stated:

> "*An investment is frequently a rather complex operation, composed of various interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment.  Hence, a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms an integral part of an overall operation that qualifies as an investment.*"[29]

The Tribunal agrees with this juridical approach.

256. In the present case, the first phase resulting from the organization of the project under the Agreement can hardly be dissociated from the rest of the transaction. In fact, one does not find in the Agreement any formal separation between the terms relating respectively to the pre-exploration period, the exploration period and the development

---

[29] *CSOB*, *supra* note 3, para. 72 (relying also on *Fedax N.V. v Republic of Venezuela* (ICSID Case ARB/96/3), Decision on Objections to Jurisdiction of 11 July 1997, 37 ILM 1378 (1998), 5 ICSID Rep 186).

period: they all form a single and overall agreement.  The exploration and development periods merely represented two phases of one project; their distinction came about not because the Parties regarded the Agreement as tentative, provisional or even preparatory but, quite understandably, because of the uncertainty regarding the existence of oil deposits in sufficient quantity in Grenadian waters.

257.   Therefore, the Tribunal cannot subscribe to the Respondent's statement that: "RSM has failed to point to any larger transaction of which [the actions taken by RSM] form part, and which would itself constitute an 'investment.'"[30]  The Agreement spells out in detail all the undertakings of the Parties from its signature to the end of the projected exploitation, so that it cannot be termed in any sense a "preliminary agreement."[31]  And there is no indication whatsoever that that the Parties intended to isolate the period of no more than ninety days that was to separate the execution of the Agreement from RSM's application for an Exploration License under Article 3.1 (had not *force majeure* been declared) as a specific period during which the Arbitration Agreement would not apply; or that, if a dispute arose as to the timeliness of the application for the Exploration License, as actually happened here, that the dispute would not fall under the Arbitration Agreement that ostensibly covered the entire Agreement.

258.   Moreover, even following the Respondent's invitation to distinguish a series of separate agreements within the Agreement regarding, first, the ninety-day (at most) period, then the exploration period, then the development period, such piecemeal agreements were by no means tentative agreements with each Party retaining total liberty not to enter into a contractual relationship; the Parties were already committed under the same Agreement. As was decided in *Mihaly*: "Ultimately, it is always a matter for the parties to determine at what point in their negotiations they wish to engage the provisions of the Convention by engaging into an investment."[32]

259.   There is nothing in the evidential materials before this Tribunal to indicate that in the Parties' minds the situation immediately resulting from the execution of the Agreement

---

[30] Rejoinder, para. 2.12.
[31] Regarding the development period, see notably Articles 12 ("Royalty and corporate profits tax" on the petroleum produced), 13 ("Valuation of crude oil"), 14 ("Natural gas"), 15 ("Tax matters" regarding income derived from petroleum operations), 15 ("Audits and accounts") and 17 ("Records and reports").
[32] *Mihaly v Sri Lanka, supra* note 3, para. 51.

was so distinct from that which would result from the grant of a licence (be it the Exploration Licence or a Development Licence) that they were to be separated out as regards the manner of resolving their possible disputes and differences in regard to their Arbitration Agreement.

260. In particular, the Respondent has not suggested that it had no intention to submit itself to the jurisdiction of an ICSID tribunal should a dispute arise regarding the grant or non-grant of an Exploration License or any other incident related to that early period. The present situation is thus plainly distinct from that in the *Mihaly* case, where the tribunal emphasised the fact that the respondent state "clearly signalled, in the various documents which are relied upon by the Claimant, that it was not until the execution of a contract that it was willing to accept that contractual relations had been entered into and that an investment had been made."[33]  In the present case, the Respondent's conduct from the moment when difficulties arose between the Parties until its Counter-Memorial in the present arbitration evinces its conviction that the ICSID arbitration clause was fully applicable from the moment the Agreement was executed and that it was applicable to the whole of the relationship between the Parties.

261. Additionally, the basis of the Claimant's claim here is that the Respondent wrongly refused to issue the Exploration License that would have allowed the Claimant to carry out the project as contemplated by the Agreement.  Irrespective of the merits of that assertion, that allegation is sufficient for the Tribunal designated to arbitrate disputes between the Parties (had a license been issued) to assume jurisdiction over such dispute.  To decide otherwise would permit a party to paralyze an arbitration clause by refusing to perform a complex agreement from the outset. Specifically, the state party could retreat from an overall agreement immediately after it was signed, as the ink was drying on its contractual promises, and renege on an otherwise valid and subsisting ICSID arbitration clause.  Such a consequence does not run only against all legal and business logic; it runs contrary to the whole object and purpose of the ICSID Convention.

---

[33] *Mihaly v  Sri Lanka*, *supra* note 3, para. 51.

262. The Preamble to the ICSID Convention states that the Convention was entered into by the Contracting States "considering the need for international cooperation for economic development." A major aspect of such cooperation was the establishment of a neutral forum, as an encouragement to foreign investment. Denying the application of an ICSID arbitration clause, in a situation such as the present case, would undermine the legal certainty and predictability attaching to such clauses without satisfying any discernable purpose, even to the benefit of host states in general. Indeed, it would most likely operate to their detriment by discouraging a number of potential investors. Only where the enforcement of an agreed arbitration clause would, in the particular circumstances, defeat the legitimate expectation of the state party should the clause be treated as "pathological."

263. The Tribunal does not find that this is the case here, where, in particular, the Respondent did not challenge the jurisdiction of ICSID until almost three years after the Claimant filed a request for arbitration pursuant to the Arbitration Agreement.

264. In summary, the Tribunal considers that the project embodied in the Agreement was an "overall adventure" from the execution of the instrument by the Parties; and there is no need even to give a broad meaning to the concept of investment (as certain ICSID awards and decisions have done) to find that RSM's part of the project was from the outset an investment under Article 25 of the ICSID Convention.  Therefore, the period leading to the award of the Exploration License should not be separated out from the rest of the Agreement for jurisdictional purposes, unless the Parties clearly intended otherwise.  There is no trace in the Agreement of any such intention.

265. In arriving at its decision, the Tribunal is conscious that it has differed from the result reached by the distinguished ICSID tribunal in *MHS v Malaysia*, on which the Respondent relied so heavily. However, every case is potentially different; the issue of an investment's existence is materially fact-specific under Article 25 of the ICSID Convention; and the case before this Tribunal is indeed different. It is not therefore necessary for this Tribunal to consider whether it is also possible that that ICSID tribunal's decision was erroneous.

*(06)*  ***The Tribunal's Conclusion***

266.   For all these reasons, the Tribunal rejects the Respondent's jurisdictional challenge and declares that all claims made by the Claimant lie within ICSID's jurisdiction and the competence of this Tribunal, as also all the Respondent's counterclaims, under the Parties' Arbitration Agreement and Article 25 of the ICSID Convention.  In these circumstances, therefore, the Tribunal decides this Issue A in favour of the Claimant and against the Respondent.

### PART VI: ISSUE B – REMOVAL OF FORCE MAJEURE

#### (01) Introduction

267.   The Claimant and the Respondent each allege that the other violated its contractual obligations under the Agreement to remove the conditions of *force majeure* that suspended the Agreement for nearly seven and a half years, from 1996 to 2004. This Issue B turns, as already indicated above, upon the contractual interpretation of Article 24.2[A] of the Agreement, as legally applied to the facts found by the Tribunal.

268.   The *force majeure* event, according to the Claimant, was the "dispute as to the Government [of Grenada]'s ownership of or control over the petroleum in any portion of the Agreement Area."[34]   Under Article 24.2, RSM had an obligation during this period to "take all reasonable steps to remove the cause" of the *force majeure*, an obligation that RSM expressly acknowledges.[35] RSM submits that it fulfilled its obligations under Article 24.2 by assisting Grenada with its maritime boundary negotiations. RSM also argues that Grenada's refusal to endorse its litigation strategies amounted to a violation of Article 24.2 of the Agreement by Grenada.

269.   Grenada in contrast argues that RSM's actions in relation to Trinidad & Tobago and Venezuela were severely detrimental to the resolution of Grenada's negotiations on maritime boundaries, so much so that RSM "breached Article 24.2, entitling the Government to terminate the Agreement and claim damages."[36]

---

[34] RSM's letter dated 18 July 1996, countersigned by Grenada.
[35] *See, e.g.*, para. 121 of RSM's Reply to Grenada's Counter-Memorial.
[36] Counter-Memorial, para. 5.23.

270.   The Parties both seek damages for breach of Article 24.2, but the Respondent also
relies upon the breach alleged against RSM as a ground for terminating the Agreement.

*(02)   Article 24.2 of the Agreement*

271.   Article 24 sets out the grounds on which RSM can invoke *force majeure* to excuse
performance of the Agreement.  The potential breadth of Article 24.1 is striking.  It
could be interpreted as excusing performance of all obligations by RSM, indefinitely.[37]
As a result the obligation to correct the *force majeure* situation imposed by Article 24.2
[A] would appear to be fundamental to the Agreement.

272.   Yet several features of Article 24 and other provisions of the Agreement lead the
Tribunal to conclude that the relevant obligation, although important, is not a condition
or condition precedent of the Agreement. Moreover, given the use of the phrase "take
all reasonable steps," Article 24.2[A] does not impose an absolute obligation on RSM
but only an obligation to use its best efforts to remove the cause of such *force majeure*.

273.   First, the potential of Article 24.2 to be considered a condition is substantially
diminished by the fact that Article 24 as a whole does not include any agreed time limit
for the duration of a *force majeure* period in regard to the Agreement's efficacy.  The
Parties have not here provided that the Agreement should lapse if the *force majeure*
situation persists beyond a certain period of time. This was no oversight by the Parties
but the deliberate result of their negotiations, as summarised in Part IV above. The
quality of the obligation on RSM to remove the cause of a *force majeure* is likewise
substantially weakened by the nature of *force majeure* itself.  By its general nature,
*force majeure* lies outside the parties' control and their power to remove it. Rather,
Article 24.3 requires the Parties to meet where "a *force majeure* situation continues for
more than thirty (30) consecutive days […] in order to review the situation and to agree

---

[37] According to paragraph 77 of the Claimant's Memorial, the boundary 'disputes' between Grenada and
Trinidad & Tobago and Venezuela were so crucial to its ability to perform the Agreement that their continuation
allowed RSM to be excused from *all* of its obligations under the Agreement.  *See also* the Second Witness
Statement of Mr Grynberg, para. 18.

on the measures to be taken for the removal of the cause of *force majeure* and for the resumption, in accordance with the provisions of this Agreement, of the performance of the obligations hereunder." Article 24.3 is limited, however, by that fact that no provision is made for a situation where the Parties cannot agree on the measures to be taken. Nor does Article 24.3 establish any time limit for the resumption of performance of the Agreement. As a result, Article 24 itself does not expressly prevent a *force majeure* situation from continuing indefinitely under the Agreement.

274. Second, the wording of Article 24 does not provide any express ground for the unilateral termination of the Agreement, either alone or in conjunction with any other provision of the Agreement. Thus, Article 27, which sets out grounds for termination of the Agreement, does not include any of the *force majeure* events identified in Article 24. Rather, Article 27.1 deems the Agreement to have been terminated if "by reason of expiration, surrender or cancellation the Company no longer holds any Exploration Licence … or any Development Licence." By using the operative words "no longer," this provision could not apply to a situation where RSM can no longer receive an initial Exploration Licence (as alleged by Grenada in this case). Article 27.2 allows the Minister to terminate the Agreement (a) if an order has been made winding up the affairs of RSM, (b) if RSM is "In Default" under Section 10 of the 1989 Act, or (c) if RSM fails to comply with a final award made as a result of arbitration proceedings pursuant to Article 29 of the Agreement. None of these circumstances has arisen in the present case.

275. Third, the obligation imposed under Article 24.2 to "take all reasonable steps to remove the cause" of *force majeure* events cannot be meaningful in relation to several of the events contemplated in Article 24. RSM could not be expected realistically to correct global market prices for petroleum products, nor could it remove the cause of "natural phenomena or calamities; epidemics; fires; wars; invasions; blockades; riots; strikes; insurrections; labour disturbances; acts of God; [and] inevitable accidents." In such circumstances, it is difficult to consider the obligation imposed by Article 24.2 as amounting to a condition, at least in relation to *all* of the *force majeure* events contemplated in the Agreement.

276. Fourth, the Tribunal notes that RSM's actual obligation under Article 24.2 in the present case, namely, taking all reasonable steps to remove the obstacle of unresolved maritime boundaries and adverse claims over petroleum resources, could not have been achieved unilaterally by RSM.  Even if RSM had done everything within its power in funding the "border delineation process," reimbursing Grenada for costs incurred for "third party services in establishing its ownership and control of the petroleum in the entire Agreement Area," and in "supply[ing] personnel, legal team and contacts to obtain the best benefits for Grenada either through negotiation or the International Court of Justice," it would not necessarily have been able to *resolve* Grenada's maritime boundaries.[38]  To the contrary, maritime boundary delimitation requires the agreement of sovereign states, not individuals or companies.  Thus the obligation imposed upon RSM by Article 24.2 itself depended inherently upon inter-state cooperation between Grenada on the one hand and, on the other, Trinidad & Tobago or Venezuela for its successful fulfilment.  Further, it must be noted that Grenada's maritime boundaries could have been resolved *without* any assistance from RSM, making the performance of the Article 24.2 obligation potentially extraneous to the boundary delimitation.

277. Lastly, the Tribunal notes the qualifying word "reasonable." This introduces a significant measure of appreciation, dependent upon the circumstances of the particular conditions of *force majeure* and other matters.

278. These five factors are supported by evidence that RSM's fulfilment of its Article 24.2 obligation was unnecessary for the future performance of the Agreement.  As accepted by both Parties, the *force majeure* situation may have excused non-performance by RSM, but it did not *prevent* performance, for example as regards areas in Annex A and Annex B not affected by maritime boundary negotiations with Venezuela and Trinidad & Tobago.

---

[38] These phrases are found in RSM's letter dated 29 May 1996 and RSM's letter dated 18 July 1996, countersigned by Senator Bubb: see the chronology in Part IV above.

279.  As the Respondent itself recognises, performance of the Agreement was not conditional upon the resolution of Grenada's maritime boundaries.  From the Respondent's viewpoint, RSM's agreement to fund and assist boundary delimitations was not essential to Grenada's acceptance of the *force majeure* clause without a clearly stipulated time limit, since the *force majeure* clause requires a causal connection between the *force majeure* event and RSM's inability to perform the Agreement.[39]  In this way, the Respondent argues that the *force majeure* clause could not operate to remove *all* of the obligations on the part of the Claimant.  Some of these obligations could have been performed even without fully resolved maritime boundaries.  The Agreement provides for exploration and exploitation of oil and gas in *all* of Grenada's potential maritime territory, not only the contested areas close to Venezuela and Trinidad and Tobago.  In the Tribunal's view, therefore, the Claimant could have performed its full range of obligations under the Agreement in non-contested areas within Grenada's maritime territory.  It is significant that RSM claims to have in fact performed several of its obligations under the Agreement in spite of the *force majeure* period.[40]

280.  Finally, although the Respondent may have initially relied upon Mr Grynberg's expertise in relation to maritime boundary negotiations, it recognises that the failures in the maritime boundary negotiations were based upon the attitudes and entrenched negotiating positions of Trinidad & Tobago and Venezuela.

281.  It is uncontested that to a large extent this lack of resolution stems from the negotiating positions of Trinidad & Tobago and Venezuela, both of whom rely upon the principle of the natural prolongation of the continental shelf and do not accept a median line position as the starting point for delimitation.  The natural prolongation principle is termed the "continental shelf principle" by Mr Auguste, and described in his first witness statement in paragraphs 50-51, as follows: "... Venezuela has historically asserted that the starting point of any negotiations on the maritime boundary should be the continental shelf principle.  Grenada sits on the continental shelf that extends from

---

[39] *See, e.g.*, First Witness Statement of Mr Auguste, paras. 28-33; and Second Witness Statement of Mr Auguste, para. 17.
[40] This point was expressly conceded by Mr Grynberg during his oral testimony [D2.95].

the coast of Venezuela. Venezuela considers the shelf to be part of its 'patrimonial rights' – a kind of heritage that cannot be given up. This has made negotiations extremely difficult, because agreeing to the delimitation method proposed by Venezuela as a starting point would mean in practice that the negotiations would begin with the presumption that the maritime boundary runs quite close to the Grenadian coast [...]. This having remained the Venezuelan position to this date, the assertion made by Mr Grynberg in his Witness Statement that 'Venezuela has no intention to assert itself beyond the mid-point line' is certainly wrong."

282. For all these reasons, the Tribunal determines that the Agreement does not support the conclusion that the Article 24.2 obligation was a condition precedent to the Parties' further performance of the Agreement; and it manifestly does not impose a sufficiently precise, clear and complete obligation on the part of RSM so as to amount to a condition under the law of Grenada, any breach of which would entitle Grenada to terminate the Agreement. Accordingly, whilst a breach of this obligation could sound in damages, it would require a serious breach, undermining the whole Agreement, to justify the Agreement's termination as counterclaimed by Grenada.

## *(03)  The Relevant Facts*

283. In assessing RSM's performance of its Article 24.2 obligations it is necessary to review (i) the oral and written agreements of RSM in relation to maritime boundary negotiations, (ii) the conflicting evidence of Mr Grynberg's expertise in the area, and (iii) the actual actions and statements made by Mr Grynberg for the purpose of obtaining maritime boundary agreements.

284. As a preliminary matter, however, in order to place these events in their proper context, the Tribunal must highlight how uncommon it is to have a private commercial party, such as RSM, directly involved in maritime boundary negotiations between sovereign

states.  Private, foreign oil companies are rarely involved in sensitive and delicate matters such as maritime boundary negotiations because of the high potential for conflicts of interest.

285.  Mr Paul Tauecchio's Expert Report, adduced by Grenada, states (at page 9):

*"... Finally, it is highly unusual that a company is allowed - much less obliged - 'to take all reasonable steps to remove the cause of the force majeure', when the force majeure is a human-controlled factor such as international boundary delimitation. This can only lead to a conflict of interest, because the operator's commercial interests will almost inevitably differ from the host government's political and diplomatic interests. In any case, where boundary delimitation is concerned, the involvement of a foreign company will almost surely - as it apparently proved in this case - be unacceptable to the other parties to the boundary delimitation process.*

*I have been involved in offshore exploration and development throughout the world, and it is not uncommon to find that maritime boundaries have not been established between two states. I have never seen a situation in which a representative of a private oil company, particularly one from a third country with a commercial interest in the disputed zone, has been directly involved in the bilateral negotiations on boundary delimitation. I understand that the Government has taken the position in this case that RSM advised the Government that RSM, or Mr Grynberg personally, could be of significant assistance in establishing international boundaries between Grenada and both Venezuela and Trinidad & Tobago. If that position is correct, I would regard such advice as having been unreasonable and, to the extent relied upon by the Government, misleading and counterproductive. Certainly, if what RSM had in mind when it allegedly so advised the Government was legal proceedings of the kind RSM eventually undertook (purportedly on the Government's behalf) against PDVSA, Petrotrin and Trinidad & Tobago, RSM should have known that this was an unprecedented approach without any significant likelihood of contributing to a quicker resolution of the boundaries."*

The Tribunal accepts this expert evidence.

286.   The Tribunal concludes that maritime boundary negotiations are held between sovereign states; that such negotiations tend to be strictly confidential and formal in character; and that they are conducted by high level diplomatic delegations and specialised negotiating teams.  They also can take considerable periods of time.  Mr

Auguste, for example, offers a useful description of maritime boundary negotiations in his first witness statement (paragraphs 43 & 44):

> *"43. In my experience, there is a certain protocol that governs boundary negotiations. They start with political agreement between the heads of state on the commencement of negotiations, followed by an exchange of diplomatic notes expressing interest and setting up a time for the negotiations to begin.  This will then lead to negotiating teams being set up and a first session being held.*
>
> *44. There is little point in getting into the technical details, such as engaging hydrographers to try to establish a defensible boundary, before there is broad agreement on the method of delimitation.  For example, Venezuela is holding out on the ratification of the United Nations Convention on the Law of the Sea (UNCLOS), because it wants to use the continental shelf theory to delimit its maritime boundary with Grenada, whereas UNCLOS, which Grenada has ratified and is therefore bound by, specifies the median line as the basic point of departure for maritime boundary delimitation negotiations."*

The Tribunal accepts this evidence.

287.  As a result, any involvement by RSM in such processes, as a private party pursuing its own commercial interests, must be regarded as  highly unusual by any ordinary state practice in boundary delimitation negotiations.

288.  The Tribunal also notes that any negotiations related to territory or natural resources are of necessity negotiations concerning the vital sovereign interests of states.  Territorial sovereignty is one of the most fundamental characteristics of statehood.[41]  Further, under international law, it is well established that states are recognised as having permanent sovereignty over their natural resources.[42]

---

[41] The Montevideo Convention on Rights and Duties of States (1933) 163 *LNTS* 19, provides in Article 1: "The State as a person of international law should possess the following qualifications: (a) a permanent population; (b) a defined territory; (c) government; and (d) capacity to enter into relations with other states."  *See also Military and Paramilitary Activities Case* (Nicaragua v USA), Merits (1986) I.C.J. Rep. 14, 76 ILR 349 at 445, para. 212.

[42] For example, the Declaration on Permanent Sovereignty Over Natural Resources (1962), U.N.G.A. Res. 1803, G.A.O.R., 17th Sess., Supp. No. 17 (A/5217), p. 15, *reproduced in* 57 *A.J.I.L.* 710-12 (1963); *cf. Shahin Shaine Ebrahami, et al v The Government of the Islamic Republic of Iran,* Final Award No. 560-44/46/47-3 (12 October 1994), 30 Iran-US CTR 170.

**(04)   RSM's Agreements to Assist Grenada**

289.   As a first step in fulfilling its Article 24.2 obligation the Claimant agreed, verbally and in writing, both before and at the same time as RSM's notification of the *force majeure* event, to assist the Government of Grenada with its maritime boundary negotiations. Mr Flaxman, on behalf of RSM, wrote to the Government by letter dated 29 May 1996:

> "*We have suggested that up to $400,000 of the initial exploration commitment may be used to reimburse the Government and our expenditures in the border delineation process, subject to the terms and conditions set forth in our written offer to the Government dated December 29, 1995, a copy of which is attached hereto. In addition, we verbally agreed that we would supply personnel, legal team and contacts to obtain the best benefits for Grenada either through negotiation or the International Court of Justice.  We can add this paragraph to the attached side letter dated December 29, 1995. We know, however, from the experience of other countries, and from your own experience with Trinidad and Tobago, that border delineation is a very lengthy process.  We also know that Grenada and the other concerned States have complete control over both the timing and cost of securing a final border agreement, which would make any third party agreement to fund all costs to completion extremely unwise.*"

290.   Two weeks after signing the Agreement, Mr Flaxman formally reiterated RSM's commitment to assist in Grenada's maritime boundary delimitations in his '*force majeure*' letter of 18 July 1996, addressed to the Permanent Secretary of the Ministry of Finance, in the following terms:

> "*In negotiations RSM has agreed to reimburse to the Government such direct costs and expenses, not exceeding US $400,000, as may be incurred by the Government for third party services in establishing its ownership and control of the petroleum in the entire Agreement Area, although RSM has reserved the right to terminate, in its sole discretion, such reimbursements at any time.  For its part, the Government of Grenada has agreed vigorously to pursue all appropriate means for establishing its ownership and control of such petroleum, and has further agreed that any reimbursement amounts paid to it by RSM in connection with third party services shall conclusively be deemed proper expenditures in connection with the Initial Exploration Period which shall*

92

*directly reduce the minimum expenditure required under Article 4.1(a) during the Initial Exploration period."*

It will be recalled that this letter was accepted, agreed and signed by Senator Bubb for Grenada.

291. Both of these statements committed RSM to assist Grenada with its maritime boundary delimitation processes. Yet neither 'agreement' reveals a firm and unequivocal commitment on the part of RSM to assist Grenada.  The first statement suggests that RSM's funding will be limited; and the second that it may be terminated at any time. That was promising with one hand but removing the promise with other.

### (05)  Mr Grynberg's Expertise

292. Substantial evidence was adduced by both Parties on the alleged expertise or lack of expertise of Mr Grynberg in the specialist area of maritime boundary delimitation. Much argument and evidence were also led by the Parties on the nature and effect of the actions that RSM (with Mr Grynberg) undertook in relation to both Venezuela and Trinidad & Tobago.

293. Regarding expertise, the Claimant submits that Mr Grynberg was greatly experienced in matters of maritime boundary negotiation, having "earlier assumed such a role on behalf of Panama."[43]  Mr Grynberg himself states at paragraph 29 of  his second witness statement:

*"29. It was always agreed that I would assist Grenada in resolving the disputes with Trinidad & Tobago and Venezuela. I have a great deal of experience in resolving such disputes in the past, and am still actively involved in boundary resolutions around the world. The Government agreed to appoint me as its Special Envoy for negotiations with Venezuela. However, when Mr Bowen became involved he withdrew this status and refused to allow me to play any part in the negotiations with Venezuela. Prime Minister*

---

[43] Counter-Memorial, para. 2.43.

*Mitchell verbally agreed that RSM should fund the costs of negotiations and litigation in resolving the boundary disputes. This agreement was confirmed in writing. I had agreed with Senator Bubb that if necessary RSM would fund and manage international litigation before the International Court of Justice or the International Tribunal for the Law of the Sea, in order to help resolve the boundary disputes. Senator Bubb agreed with this suggestion and was happy for us to do this as it was clearly in Grenada's best interests – especially as we had agreed to fund the litigation. Yet, when we commenced such proceedings against Trinidad & Tobago before ITLOS, Mr Bowen refused to give the Government's consent, once again frustrating our efforts to get the disputes resolved."*

294.   The Respondent, in contrast, strongly contests Mr Grynberg's expertise.  As summarised by Mr Auguste in his second witness statement:

*"20.  At the time he began his involvement with Grenada and its boundary delimitation exercise, Mr Grynberg was unaware of the technical issues involved, or how the whole process was institutionalised and formalised.  Although he had experience and know-how in geology, and was given "special envoy" status "for the purpose of discussing issues related to petroleum resources" on this basis, at the time he appeared to be entirely unfamiliar with the basic concepts involved in boundary delimitation, such as what the median line or the continental shelf theory as a starting point meant, the history and substance of Venezuela's approach on these issues, and that Venezuela had not ratified the UNCLOS."*

295.   In light of this disagreement, the Tribunal next reviews the nature of Mr Grynberg's actions in relation to negotiations with Venezuela and with Trinidad & Tobago.

*(06) Venezuela*

296.   Following the signing of the Agreement and RSM's letter invoking *force majeure*, the Government of Grenada appointed Mr Grynberg "Special Envoy of the Government of Grenada to the Republic of Venezuela, for the purpose of discussing issues related to petroleum resources." Mr Grynberg also was appointed "Adviser to [the Grenada] Maritime Boundary Negotiations Team, for talks with the Republic of Venezuela."

297.   In his capacity as special envoy, Mr Grynberg participated in one preliminary meeting with Venezuelan officials in Caracas in September 1996, together with Grenada's

Ambassador Mr Fabian Redhead. It is accepted by both Parties that this meeting left the maritime boundaries between the two states unresolved.

298.  Following this meeting, Mr Grynberg sought to negotiate with Venezuela unilaterally, without express authorisation from Grenada. Fearing negative repercussions, internal correspondence was sent by Mr Auguste to Senator Bowen on 15 November 1996, indicating that such initiatives could not be condoned by Grenada and that Mr Grynberg must function within the Grenadian team.  Specifically, Mr Auguste wrote that: "Maritime Boundaries Delimitation Negotiations require adequate preparation, knowledge, expertise and experienced personnel, fully cognisant of the relevant issues and good negotiators.  It is not a simple commercial negotiation/deal, nor is it dependent on personal contact and overtures, "wheeling and dealing" etc.  Team work is also an essential ingredient/parameter in the formula for success."[44]

299.  Nevertheless, in 1998, Grenada put forward Mr Grynberg's name as a member of the Grenadian negotiation team. This appointment was not viewed favourably by Venezuela.  Venezuela objected to his inclusion on the team, expressing concern that Mr Grynberg was attempting to involve the USA in the negotiation process.

300.  Because of the delicate nature of Venezuelan-USA relations, Senator Bowen subsequently wrote to Mr Grynberg several times in 2001 specifically requesting him not to involve himself or the U.S. Government further in the Grenada-Venezuela maritime boundary negotiations.  Senator Bowen's second letter of 3 April 2001, expressly stated: "Let me reiterate that one condition for facilitating the boundary delimitation process is that there should be no involvement of any other national or country besides Venezuela and Grenada in the negotiations.  Specifically the Republic of Venezuela is well aware of your trying to influence the process through certain channels and has exceedingly strong objections to your or any other participation."

---

[44] Exhibit R-16, Letter from Ministry of Finance (Permanent Secretary) to Ministry of Communication & Works (Senator Bowen), dated 15 November 1996.

301.  Mr Grynberg did not comply with Senator Bowen's requests. This much is clear from the further letter written by Senator Bowen to Mr Grynberg on 10 April 2001, in which the Minister warned: "It appears that you still have not accepted the fact that your actions could lead to the discontinuation of negotiations.  I do hope that we can impress upon you the seriousness of the situation."

302.  In early 2003, Mr Grynberg again unilaterally attempted to resolve the Grenada-Venezuela maritime boundary, this time by negotiating directly with Petróleos De Venezuela (PDVSA), the Venezuelan state oil company.  These negotiations were unauthorised and unsuccessful.

303.  Mr Grynberg then unilaterally commenced a lawsuit against PDVSA in the U.S. District Court for the District of Colorado in April 2003 in an attempt to pressure PDVSA and the Government of Venezuela into a maritime boundary settlement with Grenada. Following the dismissal of the lawsuit by the US Court of Appeals for the Tenth Circuit, Mr Grynberg wrote a letter to Prime Minister Mitchell in which he suggested that the litigation had produced a concession on the part of PDVSA in favour of Grenada's ownership of the maritime territory.  Mr Grynberg wrote that he had received "an indication that PDVSA wants to settle the lawsuit by declaring that they have no claim on the offshore territory of Grenada including in the RSM license." This was, at best, wishful thinking by Mr Grynberg.

304.  Mr Grynberg testified that his negotiations in relation to maritime boundaries with Petrotrin and PDVSA, two state owned oil companies, were equivalent to, or even more effective than, negotiations with the two Governments.  For example, in paragraphs 30-31 of his second witness Statement, Mr Grynberg states:

> "30. ... *Trinidad & Tobago later backed down from its earlier stance by stating that it has no interest or rights in Block 21, and this was due to my efforts and at my full expense. It is ridiculous for the Government to draw a distinction between Petrotrin and the Government of Trinidad & Tobago. Petrotrin is wholly owned by the Government. It is effectively just a branch of the Government and it acts in issuing oil and natural gas concessions.*

*31. PDVSA, the Venezuelan state-owned oil company, also later backed down from its previous claims to parts of Grenada's territory. Before I decided to halt the litigation in the US District Court against PDVSA, they informed my legal counsel that although Venezuela could not publicly back down from the boundary dispute, it would not object to RSM's oil exploration and development operations in the Agreement Area closest to Venezuela. I have never said that this resulted in a formal agreement on delimitation of the boundary. But that is irrelevant. What I did was to resolve the dispute to the extent that RSM can now go forwards with its exploration and production activities. Again, PDVSA is wholly owned by the Venezuelan Government. Grenada's claim that it is somehow independent and that its statements for practical purposes are not those of the Government of Venezuela is nonsense [Citing: Exhibit C-16, Letter from Petrotrin, Petroleum Company of Trinidad and Tobago to Mr Graven, Counsel of RSM of 5 November 2002]."*

305.   The Respondent strongly disputed the suggestion by Mr Grynberg, which was repeated during oral testimony at the Main Hearing, that this U.S. domestic litigation, or even an informal agreement by an oil company such as PDVSA, could resolve the maritime boundaries between Grenada and Venezuela.  As Mr Auguste testified in his first witness statement (para. 55), in relation to similar claims about settlement by Petrotrin on behalf of Trinidad & Tobago (in the first witness statement of Mr Grynberg, para. 12): "The issue of setting [sic: settling] a maritime boundary is a matter between sovereign states.  Mr Grynberg's reference to Petrotrin's letter disclaiming any interest in the area near the median line between Grenada and Trinidad and Tobago is of no relevance to the issue of the maritime boundary between the two states."

306.   The Respondent emphasises that PDVSA, as a state-owned oil corporation, simply did not possess the necessary competence under international law to resolve maritime boundaries between two states.  Maritime boundary resolution requires the formal approval of Venezuela itself and Grenada.[45]

---

[45] Counter-Memorial, paras. 2.122-2.123.

*(07)*   ***Conclusion Regarding Venezuela***

307.   In light of this evidence, the Tribunal concludes that Mr Grynberg's actions in relation to the Grenada-Venezuela maritime boundary negotiations constituted a breach of RSM's obligations under Article 24.2 of the Agreement.

308.   RSM was contractually obliged to take all reasonable steps to remove the cause of the *force majeure*; and it was thus obliged to assist in resolving these state's maritime boundaries relevant to the Agreement; but RSM, acting by Mr Grynberg, did not act reasonably.   Instead, Mr Grynberg's actions substantially hindered Grenada's negotiations with Venezuela.   Mr Grynberg's unilateral attempts to negotiate with Venezuela, despite several express communications to the contrary by Grenada, together with his U.S. lawsuit against PDVSA, did not assist in the resolution of maritime boundaries between the two states.   Rather, as evidenced by the express rejection by Venezuela of his involvement in the Grenadian negotiating team, Mr Grynberg provoked outright hostility.   In addition there is no evidence to support Mr Grynberg's interpretation of PDVSA as having conceded Grenadian ownership of any maritime territory, either with respect to itself or on behalf of the Government of Venezuela.   Nor could it have done so as a matter of international law without the express authorisation of the Government of Venezuela.   As summarised by Senator Bowen, "any claim that Venezuela has agreed to a median line is sadly mistaken."[46]

309.   The question remains what effect was caused by RSM's contractual breach. On the evidence adduced before the Tribunal, it cannot be said to have deprived the Respondent of substantially the whole benefit of the Agreement.   RSM argues, and Grenada concedes, that the slow progress in maritime boundary negotiations with Venezuela "has been largely due to Venezuela."[47]   Further, the Respondent accepts that, overall, Mr Grynberg's role in the boundary negotiations has been minimal: "If Mr

---

[46] First Witness Statement of Senator Bowen, para. 30.
[47] Counter-Memorial, para. 2.97 (as noted by RSM in its Reply, para. 126).

Grynberg's antics have played *any* role, it has not been a helpful one" (emphasis supplied).[48]  Thus, whilst there was certainly embarrassment and diplomatic difficulties for Grenada, no cogent evidence was adduced of any injury to Grenada measurable in money damages to compensate it for RSM's contractual breach.

### (08)   *Trinidad & Tobago*

310.   Mr Grynberg also participated in Grenada's maritime boundary negotiations with Trinidad & Tobago.

311.   As a first step, RSM "appointed engineers to give specialist technical advice" including Mr Kirk Hindley, a geological engineer, who made a "delineation" in relation to the boundary with Trinidad and Tobago.  Evidence regarding this delineation, however, suggests that it was both counterproductive and amounted to a clear breach of RSM's Article 24.2 obligation.

312.   Mr Grynberg stated in his letter of 15 December 1997 to Mr Gene Thomas, a former Minister in Trinidad & Tobago, that he had instructed Mr Hindley "that when preparing the boundaries, if there was any question in his mind, *to lean towards Trinidad and Tobago* because I would like a speedy resolution of the boundary demarcation."  In other words, Mr Grynberg had instructed Mr Hindley to draw the line in favour of Trinidad & Tobago rather than Grenada, on whose behalf and in whose interests he purported to be acting.

313.   The Respondent of course emphasises that Mr Grynberg had no approval for pursuing such a position so adverse to Grenada.  The Tribunal has already noted, in the chronology in Part IV above, that Mr Grynberg testified at the Main Hearing that his instruction was a deliberate inaccuracy used to confuse Trinidad & Tobago.  Even if this were the case, there is no evidence to suggest that this curious 'strategy' was communicated to the Respondent, on whose behalf Mr Grynberg purported to be

---

[48] Counter-Memorial, para. 2.92.

acting. Again, this interpretation by Mr Grynberg of his own conduct is unduly generous in the Tribunal's view, as already expressed above.

314. In 2000 and 2001, as part of his proposed negotiating strategy, Mr Grynberg recommended that the Government of Grenada expand the Agreement Area so as to encroach upon the potential territory of Trinidad & Tobago. This suggestion was couched in terms of strengthening Grenada's negotiating position.[49] Grenada did not adopt this position. It was highly likely to have had negative implications for maritime boundary negotiations between the two states, if not more serious diplomatic repercussions between friendly countries.

315. Then, on 16 August 2002, Mr Grynberg wrote to Prime Minister Mitchell stating that RSM intended to commence an ICSID arbitration against Trinidad & Tobago. RSM's intention in doing so was to pressure Trinidad & Tobago into resolving their maritime boundaries with Grenada. In his letter Mr Grynberg provided the Grenadian Prime Minister with two options in relation to the intended arbitration, namely, that it either: (i) join RSM in bringing a claim against Trinidad & Tobago, or (ii) itself be subject to the same ICSID claim – as a defendant. In other words, under the second option presented to Grenada, RSM was expressly threatening to bring a claim against both Trinidad & Tobago and Grenada.[50] In the same letter Mr Grynberg wrote that if Grenada did not join him in the first option then "Grenada will have to bear all of the costs." In September 2002, RSM prepared a "Statement of Claim" intended for ICSID arbitration proceedings to be brought by Grenada & RSM as claimants against Trinidad & Tobago as respondent (without Grenada's authority), copies of which were sent to Grenada, Trinidad & Tobago, the U.S. State Department (amongst 12 addresses in all). In the light of such an aggressive approach, it is not surprising that the Government of Grenada did not approve of RSM's initiatives in regard to ICSID arbitration proceedings against Trinidad & Tobago.

---

[49] Counter-Memorial, para. 2.109.
[50] Letter from GPC (Mr Grynberg) to the Government, 16 August 2002. *See also* Exhibit R 44, Letter from GPC (Mr Grynberg) to the Government, 28 August 2002.

316.   But RSM did not stop here.  Mr Grynberg then wrote to Grenada, by letter dated 4 September 2002, designating its two members for the Advisory Committee prescribed under Article 5 of the Agreement. He indicated, if the Government did not appoint its Committee members, that "RSM will deem that your silence is your approval and RSM shall have the right under Section 5.4 of the License Agreement to proceed" with the ICSID claim against Trinidad & Tobago. On 11 September 2002, without receiving any response from the Government, RSM filed an ICSID "Statement of Claim" on behalf of the Government of Grenada, RSM and Mr Grynberg against Trinidad and Tobago and Petrotrin.[51]  This Statement of Claim appears to have been later withdrawn, since it was not registered by ICSID's Secretary-General. RSM had no authorisation from Grenada to file any such claim.

317.   Shortly thereafter, RSM prepared a "boundary resolution complaint with the International Tribunal for the Law of the Sea ('ITLOS')" against Trinidad & Tobago.[52] This claim also was unauthorised by Grenada,[53] although Mr Grynberg swore in an affidavit filed with the ITLOS application that "RSM is authorized to represent the Government of Grenada for the purpose of instituting proceedings pursuant to [UNCLOS] before any judicial, tribunal, arbitration or other dispute resolution forum permitted by the UNCLOS concerning a maritime dispute between the Government of Grenada and The Republic of Trinidad and Tobago including all matters and disputes that are reasonably related to and/or otherwise arise from the maritime disputes." This sworn statement was materially inaccurate.

318.   Following queries from ITLOS about his authority to represent Grenada (which were not satisfactorily answered), Mr Grynberg sought express authorisation from Grenada.[54]  Grenada did not authorise the ITLOS Application; and it was never registered with ITLOS.

---

[51] This ICSID claim is reproduced at Exhibit R 46, *The Government of Grenada et al. v the Republic of Trinidad & Tobago et al.*, Statement of Claim, 11 September 2002.
[52] The ITLOS Application is reproduced in Exhibit R 48, *The Government of Grenada v the Republic of Trinidad & Tobago*, Application for Special Arbitration pursuant to Annex VII United Nations Convention [on the] Law of the Sea, 9 October 2002.
[53] First Witness Statement of Senator Bowen, paras. 32 and 33; First Witness Statement of Mr Auguste, para. 48; Second Witness Statement of Senator Bowen, para. 18.
[54] Memorial, para. 45.

319. In relation to these ITLOS proceedings, as with the proceedings against PDVSA in the U.S. courts, RSM claimed that they were terminated following receipt of a letter from Petrotrin which stated that "Petrotrin has no interest/right/claim with respect to Block 21." RSM interpreted this letter as amounting to a formal concession by Trinidad & Tobago (through Petrotrin, which Mr Grynberg equated with the state) that the area fell within Grenadian maritime territory.[55]  Mr Grynberg, for example, testified that the Petrotrin letter proved that he had *resolved* the maritime boundary dispute with Trinidad and Tobago.[56] This testimony was materially inaccurate.

320. Grenada firmly denies that the letter could have any such effect, as did Mr Auguste (cited above).  Rather than amounting to any sort of concession on the part of Petrotrin, Grenada submits that because Petrotrin never claimed ownership over Block 21, its response simply amounted to a query as to the reason for Petrotrin's inclusion in the ITLOS Application.  As a result, according to the Respondent, the letter was never meant to be – nor could it have been – any form of settlement or concession by Trinidad & Tobago in favour of Grenada.[57] The Tribunal accepts this interpretation of Petrotrin's letter.

321. In any event, RSM's view about the status of the Trinidadian boundary resolution is contradicted by its own subsequent actions.  In early 2003 RSM directly challenged Trinidad & Tobago for allegedly violating Grenada's sovereignty over its maritime territory.  On 31 January 2003, RSM wrote to the Prime Minister of Trinidad & Tobago and to the Executive Manager of Petrotrin in order to protest Petrotrin's trespass into "Grenada's maritime area" and its obtaining "seismic and other geological information

---

[55] During oral testimony Mr Grynberg went so far as to indicate that Petrotrin and PDVSA could bind their Governments in relation to maritime boundaries, and that Petrotrin had actually given up part of the potential territory of Trinidad and Tobago (on the Trinidadian side of the median line), in favour of Grenada.  See D3.87-88 and 91. The Tribunal does not accept the accuracy of this evidence.
[56]  First Witness Statement of Mr Grynberg, para. 9: "Trinidad and Tobago recognized those principles [of the 1958 Geneva Convention] and *accepted my boundary delineation*" [emphasis added];  para. 12: "Petrotrin sent us a letter stating that they have no claim beyond *the boundary which was established* through my efforts" [emphasis added].   *See also* Mr Grynberg's oral testimony to the same effect at D3. 83-84.
[57] The Respondent quotes in support the sentence following the above-quoted Petrotrin statement, which says: "We are of the view therefore that Petrotrin was *wrongly named as a Party* to [the ITLOS] proceedings." Counter-Memorial, para. 2.149-2.150 [emphasis added].

and data covering Grenada's maritime area."[58]  RSM purported to be acting on behalf
of Grenada in this letter, which it distributed widely, including distribution to several
foreign diplomatic and government officials and the US State Department.[59]

322.  RSM's letter was also riddled with serious inaccuracies.  Mr Graven, writing on behalf
of RSM, incorrectly stated that (i) the "Country of Grenada granted to RSM an
exclusive offshore license to explore, develop, produce and market oil and/or gas and
associated products," (ii) that the provisions of the Agreement "authorize RSM to take
necessary action for the benefit of Grenada to protect its maritime areas," (iii) that
"Petrotrin has trespassed into Grenada's maritime area," and (iv) that the "seismic and
other geological information and data covering Grenada's maritime area" must be
"delivered to the undersigned" [RSM] at the "earliest opportunity."[60]  Contrary to these
statements, no license had been issued to RSM (which had yet to apply for any licence),
and RSM did not possess any right to protect Grenada's maritime areas.  In fact,
Grenada's maritime territory had not been subject to delimitation and therefore
Petrotrin could not have 'trespassed' on Grenadian territory under international law.
Further, the seismic and other data mentioned in the letter had not been claimed by
Grenada; nor had Grenada authorized RSM to receive that data on its behalf.

323.  Mr Auguste described this letter as "causing the Government of Grenada serious
political and diplomatic embarrassment," noting that "[n]o State should have to tolerate
such interference with its foreign affairs."[61]

324.  All these actions by RSM were alleged by Grenada to have the "foreseeable effect of
hindering the Government's negotiations with Trinidad and Tobago."[62]  According to

---

[58]  Letter from RSM to the Prime Minister of Trinidad & Tobago and Petrotrin, dated 31 January 2003 (Exhibit
R-53).
[59] The letter was copied by RSM to: (1) Dr. Keith Mitchell, Prime Minister of Grenada, (2) Nadia Tangour,
Charge de Affairs of the U.S. Embassy in Grenada, (3) Matt McManus, Chief, Oil and Gas Division, U.S.
Department of State, (4) Dr. Roy L. Austin, Ambassador, U.S. Embassy in Trinidad and Tobago, (5)
Ambassador Earl Huntley, St. Lucia Permanent Missions to the United Nations, and (6) Ambassador Margaret
Hughes Ferrari, Permanent Representative to the United Nations of St. Vincent & the Grenadines.
[60] Letter from RSM to the Prime Minister of Trinidad & Tobago and Petrotrin, dated 31 January 2003 (Exhibit
R-53) [emphasis in the original omitted].
[61] First Witness Statement of Mr Auguste, para. 60.
[62] Counter-Memorial, para. 2.155.

Mr Auguste, one of the consequences of RSM's litigious activity was that Trinidad & Tobago imposed as a condition to its entering into "the 2003 negotiations on joint use of resources" that "Trinidad and Tobago would only agree, if Mr Grynberg would *not be involved* in such joint activities."[63] This pre-condition speaks for itself.

### (09)    *Conclusion Regarding Trinidad & Tobago*

325.  In light of all this evidence, the Tribunal concludes that Mr Grynberg's actions on behalf of RSM in relation to the Grenada-Trinidad & Tobago maritime boundary negotiations also breached RSM's obligation under Article 24.2 of the Agreement.

326.  Under Article 24.2 RSM was obliged to take all reasonable steps to remove the cause of the *force majeure* – to assist in resolving the maritime boundaries.  Instead, RSM's actions substantially hindered such resolution.  RSM authorised false maps that purportedly favoured Trinidad & Tobago as part of this negotiating process; and RSM then suggested that the Agreement Area be enlarged deliberately to provoke Trinidad & Tobago, a friendly neighbouring State.  Mr Grynberg aggressively pursued unilateral legal proceedings before ICSID and ITLOS, even threatening Grenada in the process if it would not join him in this strategy.  Then RSM wrote a threatening letter directly to the Prime Minister of Trinidad & Tobago, riddled with misleading statements, which was widely disseminated by RSM to foreign diplomatic and government officials causing significant embarrassment to Grenada. In addition to the traditionally friendly relations between Grenada and Trinidad & Tobago, it is necessary to recall that after Grenada had suffered severe hurricane-damage only a few years previously, its large neighbour had generously assisted Grenada's population with emergency and other substantial aid.

327.  Overall RSM's secretive, unilateral, unauthorised, crude 'horse-trading' approach, backed up with wild threats and vexatious litigation if unsuccessful, contradicted the essential principles of maritime boundary negotiations between states, as Mr Auguste

---

[63] First Witness Statement of Mr Auguste, para. 49 [emphasis added].

testified. Mr Auguste also testified that: "Mr Grynberg was completely unaware of these issues, and how a boundary delimitation exercise should be undertaken. He liked to talk to people who [sic] he considered to have influence, and to cut deals. This was very unhelpful to our negotiation efforts. He seemed unable to understand that there were complex issues at play."[64]

328.   Even though the lack of success in boundary negotiations cannot be ascribed to RSM on the evidence before this Tribunal, the adverse risk to good foreign relations between Grenada and its neighbours caused by Mr Grynberg's actions cannot by any stretch of the imagination fall under the category of taking "reasonable steps to remove the cause" of the *force majeure* under the Agreement. An indication of the level of annoyance caused by Mr Grynberg is the fact that both Venezuela and Trinidad & Tobago expressly asked for him not to be involved in further inter-state negotiations.[65] All of these actions amounted to breaches of RSM's contractual obligation under Article 24.2 of the Agreement.

329.   Nevertheless, as acknowledged by the Respondent, Mr Grynberg's participation in Grenada's maritime boundary negotiations was not the proximate cause of their failure. Rather, Trinidad & Tobago's position of espousing a continental shelf approach to maritime boundary delimitation prevented any early agreement between the two states, as Mr Auguste testified.[66] As a result, the actions of RSM, although amounting to breaches of Article 24.2 cannot be said to have deprived the Respondent of substantially the whole benefit of the Agreement. As was the case with Venezuela, if Grenada and Trinidad and Tobago had been ready to resolve their maritime boundaries, they could have done so in spite of Mr Grynberg's behaviour. Nor did RSM cause Grenada any loss measurable in money damages to compensate for its contractual breach under the law of Grenada.

---

[64] Second Witness Statement of Mr Auguste, para. 21; First Witness Statement, para. 45.
[65] First Witness Statement of Mr Auguste, para. 49.
[66] Mr Auguste describes this position in his First Witness Statement, at para. 54.

330. The Tribunal concludes that RSM's actions in relation to the maritime boundary negotiations with both Venezuela and Trinidad & Tobago violated its obligation under Article 24.2 of the Agreement. However RSM's breach did not deprive Grenada of substantially the whole benefit of the Agreement; thus its breach did not entitle Grenada to terminate the Agreement; and Grenada has not proven any loss caused by RSM's breach entitling it to recover damages from RSM.

### *(10) Alleged Breach by Grenada*

331. RSM in turn alleges that the Respondent, through Senator Bowen, breached its obligation under Article 24.2 of the Agreement by failing to cooperate in resolving Grenada's maritime boundaries.[67] The Claimant contends, for example, that Grenada's refusal to give consent to the ITLOS claim against Trinidad & Tobago amounted to a breach of its obligation: "Proceedings before an international tribunal under the United Nations Convention on the Law of the Sea could have resulted in a binding ruling delimiting the boundary between Grenada and Trinidad & Tobago. Grenada was obliged to cooperate with RSM and to permit RSM to comply with its obligation under Article 24.2 to use all reasonable steps to remove the *force majeure* event. Grenada's, and in particular Mr Bowen's, frustration of RSM's efforts to resolve the boundary dispute amounted to a clear breach by Grenada of its obligation to cooperate."[68]

332. The Claimant takes a similar position in relation to resolving Grenada's boundaries with Venezuela.[69] RSM suggests that "aggressive steps to bring Venezuela before a court or international tribunal or to secure the involvement of the U.S. Government were and are the only option for settling the boundary between Grenada and Venezuela in the near future."[70]

---

[67] Reply, paras. 118 and 122.
[68] Reply, para. 123 (citation omitted).
[69] Reply, para. 124.
[70] Reply, para. 125.

333. This position is contested by the Respondent, which alleges that RSM breached Article 24.2 by not desisting from its interference in Grenada's maritime boundary negotiations, after having been instructed to do so.[71]  The Respondent also contests the Claimant's position on other grounds, emphasizing that litigation was not an appropriate course of action and that, moreover, "joining in RSM's legally incoherent cases would have been unthinkable even had litigation been an appropriate course of action."[72] Grenada points to the severe inadequacies of the legal positions RSM adopted in both the ICSID and ITLOS arbitrations against Trinidad & Tobago.[73] ICSID Tribunals are not empowered to delimit maritime boundaries.  Further, as explained by the Respondent: "… even if the ITLOS complaint had been properly drafted, Grenada had many good reasons not to litigate against Trinidad & Tobago. Mr Auguste and Minister Bowen detail some of the many ways in which Grenada's people depend on the friendly relations between the two states.  RSM showed no appreciation of the many competing and overlapping policy objectives that a government simply must take into account in dealing with matters as complex and sensitive as foreign relations, interstate litigation and boundary delimitation."[74]

334. With respect to Venezuela, Grenada points out that litigation simply was not an option: Venezuela is not a party to UNCLOS, nor had it ratified the Optional Protocol to the 1958 Geneva Conventions on the Law of the Sea, nor had it accepted the jurisdiction of the International Court of Justice.[75]  Thus no litigation strategy could have been successful against Venezuela.

335. Finally, even if litigation could have been useful in either case, the Respondent strenuously argues that entrusting Mr Grynberg to handle these vital matters would not have been advisable.[76]  Senator Bowen, in his Second Witness Statement, summarises the position as follows:

---

[71] Rejoinder, paras. 4.15-4.28.
[72] Rejoinder, para. 4.17.
[73] Rejoinder, para. 4.18.
[74] Rejoinder, para. 4.18.
[75] Rejoinder, para. 4.19.
[76] Rejoinder, para. 4.120.

*"20.  More generally, I believe that for several reasons it would have been unwise for Grenada to have participated even in a properly-formulated application for arbitration (which the application filed by RSM was not) against Trinidad and Tobago in 2002. First, Trinidad is an important trading partner for Grenada, with trade (especially agricultural) between our countries being significant for the livelihood of a substantial number of Grenada's people.  In order not to risk unnecessarily this important economic benefit, any dispute resolution mechanism we might pursue with Trinidad should be consensually agreed and as non-adversarial as possible. Given Mr Grynberg's method of operation – which was becoming increasingly apparent to us by 2002 – having him in charge of the proceeding plainly would have been an unacceptable risk.  Furthermore, RSM never undertook definitively to pay the full costs of the proposed ITLOS proceeding.  Had we endorsed the ITLOS case, there would have been a substantial risk that at some point we would be left holding the bag, saddled with a proceeding we could not afford to pursue and with great economic damage having been done to us through the souring of our trading relationship with Trinidad and Tobago."*[77]

336.  Also, put bluntly, the Respondent considered that RSM was simply incompetent to handle maritime boundary litigation. The Respondent submitted that even if litigation against its neighbours had been both advisable and feasible, Grenada certainly could not have entrusted such vital matters to RSM and Mr Grynberg. As submitted in its Rejoinder: "Consider RSM's repeated demonstrations that it knew little or nothing about either jurisdiction or substance in boundary matters. RSM's Reply refers to a 1996 promise made by RSM 'to obtain the best benefits for Grenada either through negotiations or the International Court of Justice.' This statement confirms that RSM had no idea what it was doing, as RSM can still offer no explanation of how either state was to be brought before the ICJ. Actually, at least as of 2003, Mr Grynberg believed that he *was* before the ICJ, writing to a deputy leader of a Grenadian opposition party that he had sued Trinidad & Tobago at ITLOS, a 'part of the International Court of Justice.'"[78]

337.  In conclusion, Grenada submits that litigation was not an option with respect to Venezuela, was inappropriate in the context of its relations with Trinidad and Tobago, and that in any event RSM was demonstrably incompetent to pursue such litigation.

---

[77] Second Witness Statement of Senator Bowen, para. 20.
[78] Rejoinder, para. 4.120.

### (11)  The Tribunal's Decision

338.  The Tribunal notes that on a textual basis no obligation on the part of Grenada to cooperate with RSM's maritime boundary efforts could arise under Article 24.2, since it is addressed entirely to the Claimant.  But such an obligation might arise as a result of Article 24.3 which imposes a duty on both parties, after the specified time period, "to review the situation and to agree on the measures to be taken for the removal of the cause of *force majeure*."  Although there does not appear to have been any express 'agreement' between the two Parties under Article 24.3 as to the appropriate measures for the removal of the *force majeure*, an implied duty on the part of Grenada to take reasonable steps to resolve the *force majeure* situation might arise; and it is appropriate here to assume that it did.

339.  Nevertheless, even assuming such a duty, its exercise by Grenada could not extend to the measures contemplated by RSM.  Even if Grenada had an obligation to cooperate in the delimitation of maritime boundaries between itself and Venezuela and Trinidad & Tobago, the Respondent is correct in asserting that a sovereign state is not required by international law to undertake litigation or arbitration for such purposes. Moreover, in the Tribunal's view, a sovereign state cannot commit itself to a foreign, private person to undertake such litigation or arbitration; nor or can a state be required to act unreasonably or in bad faith.

340.  In all these circumstances, the Tribunal concludes that there has been no breach of Article 24.2 or Article 24.3 on the part of the Respondent.

*(12)   The Tribunal's Overall Conclusion*

341.   Accordingly, for the reasons set out above, the Tribunal decides this issue overall against both the Claimant and the Respondent. The Tribunal upholds in material part the respective defences of the Respondent and the Claimant (as respondent to counterclaim) to this claim and counterclaim respectively. It follows, on different grounds, that neither Party is entitled to any damages for breach of Article 24.2 of the Agreement, as here alleged; and it also follows that the Respondent is not entitled to terminate the Agreement for contractual breaches by the Claimant, as here alleged.

## *PART VII: CLAIM ISSUE C – EXPIRY OR TERMINATION*

### *(01)  Introduction*

342.  This Issue C turns, as already indicated above, upon the contractual interpretation of
Article 3.1 of the Agreement under Grenadian law, as legally applied to the facts of the
case found by the Tribunal in Part IV of this Award. (Article 3.1 is cited in Part III,
paragraph 114 above.)

### *(02)  The Relevant Facts*

343.  In Grenada's closing oral submissions at the Main Hearing, the arithmetic of the ninety-
day period under Article 3.1 was said to work as follows: time began to run under the
ninety-day period from the Agreement's Effective Date of 4 July to 18 July 1996, being
then suspended by RSM's "*force majeure*" letter of that date; time then resumed on 13
January 2004 (upon Grenada's 's receipt of  RSM's first letter of 12 January 2004
revoking *force majeure*) running up to 28 March 2004 – being the ninetieth day of the
period of ninety days [D5.133-134]. Accordingly, whether RSM's application was
made on 13 or 14 April 2004, it was made too late under Article 3.1 of the Agreement.

344.  According to RSM, discounting the period of fourteen days from 4 July to 18 July
1996, the application was made timeously within the ninety-day period, allowing for
the closure of the Government's offices over the Easter holiday period. Even if these
fourteen days were counted as part of the ninety days, the same result follows, as
submitted by RSM, if the effective date of  RSM's revocation of *force majeure* is taken
as the date of its second letter dated 27 February 2004 (as opposed to its first letter
dated 12 January 2004). Accordingly, RSM submits that no issue arises as regards
lateness. In any event, a delay of one or even a few days is *de minimis*, being
commercially insignificant taking all relevant circumstances into account.

111

345. As explained below, the Tribunal accepts the approach of the Respondent: the ninety-day period began to run on 4 July 1996 and (allowing for the *force majeure* period under Article 24.1[B] of the Agreement) it expired on 28 March 2004. Accordingly, RSM's application was made to Grenada after the expiry of the ninety-day period, whether made on 13 or 14 April 2004. It was therefore made contractually late under Article 3.1 of the Agreement.

346. The Tribunal rejects RSM's submission that the ninety-day period did not begin to run on 4 July 1996, the date of the Agreement, for the following reasons.

347. Under Article 24.2[A] of the Agreement, cited above, RSM was required "promptly" to notify Grenada of the occurrence of *force majeure* conditions; and it did so by Mr Flaxman's letter dated 18 July 1996 to Senator Bubb.  RSM did not make any such notification on 4 July 1996.  The Tribunal does not consider it appropriate to advance the period of *force majeure* (in favour of RSM) from 18 July to 4 July 1996 by assuming that RSM was in contractual breach of its obligation under Article 24.2[A]. RSM's submission flies in the face of both Mr Flaxman's letter dated 18 July 2006 triggering the *force majeure* suspension (as agreed with Senator Bubb at that time) and Mr Grynberg's letter dated 5 April 2004 where he asserted that the *force majeure* event began on 18 July 1996 (and not 4 July 1996).

348. The Tribunal acknowledges that Monday, 12 April 2004 was a public holiday in Grenada, with the Government's offices closed for the Easter holiday period from Friday, 9 April 2004.  However, Easter holidays are an annual event, publicly well-known in advance; and with a ninety-day period, there is no reason, as a matter of contractual interpretation or otherwise, to extend the ninety-day period to a longer period because one or more of the last days are well-known public holidays. As already indicated above, the Agreement does not distinguish for the running of the ninety-day period between working days, week-ends and holidays. It might be different if the period was much shorter or limited to one fixed day being a public holiday; but that is not this case.  Article 3.1 imposed an obligation on RSM to make its application "as soon as possible" and the ninety-day period was clearly a maximum, given that Grenada was also required to grant the licence within the same ninety-day period.

349.  The Tribunal also bears in mind that the original period proposed by RSM was a period of seven days which was only extended to ninety days in the Agreement at Grenada's request for its own internal purposes (see paragraph 153 in Part IV (06) above).  As already found by the Tribunal, this longer period was agreed at the request and for the benefit of Grenada, not RSM. It remains impossible for the Tribunal to understand, from all the evidence adduced in these legal proceedings, why RSM could not have made its application well within the ninety-day period: it required little paperwork. Moreover, even on its own calculations, RSM had indicated to Grenada that it would make its application "as soon as reasonably practicable" without waiting to the end of the ninety-day period in its letter dated 27 February 2004; and it could therefore have done so before 28 March 2004 without any practical or other difficulties.

350.  The Tribunal has also borne in mind RSM's letter dated 27 February 2004 in regard to the calculation of the ninety-day period under Article 24.2 of the Agreement. Even if (contrary to the Tribunal's determination above) this letter was delivered to Grenada on 27 February 2004, the Tribunal does not accept RSM's submission that time resumed under the ninety-day period only upon receipt of this letter by Grenada because RSM's earlier letter dated 12 January 2004 had been sent to the 'wrong' person not expressly designated as the agent for notices to Grenada under Article 29(1)(a) of the Agreement.

351.  First, in the Tribunal's view, it is clear from this contractual wording that the notice provision is only permissive ("may"); and the Agreement does not preclude a written notice or other communication being sent by RSM to another effective addressee for Grenada, including its Prime Minister (as was the letter dated 12 January 2004).

352.  Second, Article 24.2[B], cited above, required RSM "promptly [to] notify the Government as soon as conditions of *force majeure* no longer prevent [RSM] from carrying out its obligations ...." Accordingly, given the same absence of any material *force majeure* conditions prevailing as at the dates of RSM's two letters, RSM was required to notify Grenada "promptly" as of 12 January 2004; and RSM could not properly delay its notice to a later date without violating the Agreement. Thus, delaying its notice to 27 February 2004 would be a breach of its contractual obligation under Article 24.2[B] of the Agreement.  Likewise, the Tribunal does consider it appropriate

to postpone the effective date of RSM's notice (in favour of RSM) from 12 January to 27 February 2004 by assuming a deliberate breach by RSM of its legal obligation.

353. The Tribunal concludes that time under the ninety-day period resumed on 13 January 2004, upon Grenada's receipt of RSM's letter dated 12 January 2004.

354. Accordingly, the Tribunal decides that the ninety-day period expired on 28 March 2004.

355. It is next necessary to consider the legal effect of RSM's late application, on 13 or 14 April 2004 after 28 March 2004, under the Agreement and the law of Grenada as the applicable law chosen by the Parties by Article 28 of the Agreement, as mandated by Article 42(1) of the ICSID Convention.[79]

### *(03)   Legal Application*

356.  It is here necessary for the Tribunal to address the legal materials advanced by the Parties as a matter of English law, said to be directly applicable as Grenadian law to this case. In a series of submissions, written and oral, both Parties cited a mass of English legal authorities said to be decisive on the legal effect of Article 3.1 of the Agreement. It is however possible for the Tribunal to address these legal materials within a relatively short compass.

357. Grenada relied on the expert evidence of Lord Mustill of Pateley Bridge FBA. Lord Mustill testified as follows in his written opinion; and rather than summarise its effect in the Tribunal's own words, it is more appropriate here to quote the relevant passage at some length [WS1.302, 313]:

---

[79]  Article 42(1) of the ICSID Convention provides: "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable." Schreuer notes that Article 42(1) "proceeds from the basic freedom of the parties to choose the law they consider most appropriate for their relationship." *Schreuer*, *supra* note 18, *at* p. 558.

"*31. ... As might be expected, the classification of contractual terms is a question of the interpretation of the contract itself and English law does not lay down prescriptive or systematic rules in this regard save in particular contexts [Fn 13: A notable example being the Sale of Goods Act 1979]. Nonetheless a particular approach has been adopted in relation to contractual time stipulations which present their own special features. This approach is very much evident from the leading case on the classification of such stipulation, Bunge Corporation v Tradax Export SA [Fn 14 [1981] 1 WLR 711]. In this case, the party in breach of a time stipulation, the purchaser under an fob contract sought to establish that a provision requiring notice to be given within a specified time of the probable readiness of the carrying vessel was an intermediate obligation; with the consequence (so it was maintained) that although the notice was given five days out of time the seller was not entitled to terminate as it could not show that the breach had deprived it of substantially the whole benefit for which it had contracted. The House of Lords disagreed: the time stipulation ... was properly to be regarded as a condition of the contract, so that the magnitude and effect of the breach were irrelevant. There are several strands to the reasoning in the judgments but the most important is that the question of classification is one of the proper interpretation of the contract, a principle best expressed by an oft-cited passage in the judgement of Bowen LJ in Bensten [sic: Bentsen] v. Taylor [Fn 15: [1893] 2 QB 274]:"There is no way of deciding that question except by looking at the contract in the light of the surrounding circumstances, and then making up one's mind whether the intention of the parties, as gathered from the instrument itself, will best be carried out by treating the promise as a warranty sounding only in damages or as condition precedent by the failure to perform which the other party is relieved of liability."*

*32. I would summarise the relevant principles of English law as follows:-*

(1) *The question as to whether a time stipulation is properly to be regarded as a condition of the contract is one of the interpretation of the provision in question in the context of the contract as a whole and the relevant surrounding circumstances. In suitable cases the courts should not be reluctant to hold that a particular provision as to time is a condition, indeed "they should usually do so in the case of time clauses in mercantile contracts". [Fn 16: Bunge Corporation (supra) per Lord Wilberforce at page 716].*

(2) *A particular clause is generally to be construed as a condition of the contract where compliance with it was a precondition of performance of the contract by the other party. Thus in Bunge itself, Lord Roskill regarded it as "the most important single factor" in favor [sic] of the sellers' argument that they could not nominate the loading port until they had received from the buyers the notice of the probable readiness of the vessel [Fn 17: Page 729F-H]. As Lord Roskill put it: "I agree with Mr Staughton [Leading Counsel for the sellers] that in a mercantile contract when a term has to be performed by one party as a condition precedent to the ability of the other party to perform another term, especially an essential term such as the nomination of a single loading port, the term as to the time for the*

*performance for the former obligation will in general fall to be treated as a condition."*

(3) *As Lord Wilberforce explained in Bunge Corporation, the danger in applying an approach based on "gravity of the breach" reasoning is that it tends to detract from certainty "the most indispensable quality of mercantile contracts".  In relation to a time stipulation there was only one kind of breach possible, to be late, and the questions which had to be asked were (i) what importance have the parties expressly ascribed to this consequence and (ii) in the absence of an expressed agreement, what consequences ought to be attached to it having regard to the contract as a whole [Fn 18: Page 715 and see also Lord Roskill at page 725].  As Lord Roskill observed, there are many reported cases where the innocent party was entitled to terminate the contract for breach of condition even though he had not been deprived of substantially the whole benefit of the contracted performance [Fn 19: Pages 724G-725D].  Inquiring as to the "gravity of breach" only became relevant when it had been concluded that the particular term in question was not, on the proper construction of the contract, a condition at all. [Fn 20: Page 726B-D].*

(4) *A stipulation which relates to the grant, renewal or termination of a proprietary interest is likely to be regarded as a condition. [Fn 21: see United Scientific Holdings Ltd v Burnley Borough Council [1978] AC 904 per Lord Diplock at pages 928G-929G].*

(5) *A conceptually different approach, which the tribunal may decide is relevant to Article 3 of the Agreement, involves asking whether the stipulation constitutes a unilateral offer the acceptance of which will bring into existence a new legal relationship between the parties.  A unilateral offer of this kind is only capable of acceptance strictly in accordance with its terms and a non-conforming purported acceptance is at best a counter-offer which the grantor of the option is under no obligation to accept. [Fn 22: A possibility canvassed in United Scientific Holdings (supra)].*

*33. Returning to the present dispute, whilst many modern forms of clause solve the problem at the outset by expressly stipulating that for the performance of a particular stipulation time will be of the essence, no such stipulation is present here but when considering whether time was impliedly made of the essence and as part of this adjudication weighing the importance attached to timeliness, the Tribunal will I believe wish to take into account the words "in no event later than" in Article 3.1."*

358. It is clear from Lord Mustill's legal opinion, together with the legal materials there cited, that a contractual term does not have to contain expressly the words "condition" or "condition precedent" or "time of the essence" to qualify as a condition or condition

precedent under English law. As regards the last of these concepts, contrary to RSM's submission made at the main hearing, the Tribunal concludes that the wording of a contractual term can impliedly produce that result (making time of the essence) without expressly so stating, as a matter of Grenadian law.

359. Although RSM's conclusions were different from those of Grenada (including the point decided immediately above), RSM's legal submissions as to English law were not materially dissimilar from Lord Mustill's general approach. In its Reply, RSM first submitted that "the relevant [English] authorities indicate that the 90 day time limit was not in fact of the essence – it was neither a condition nor a condition precedent" (paragraph 92).  Applying these authorities to the present case, RSM concluded by raising the question particular to the present case: "objectively speaking, did the parties intend strict compliance [by RSM] to be essential?" *(ibid)*.  RSM answered that question in the negative.

360. As regards the first submission, the Tribunal accepts the juridical force of the several English judgments cited by RSM, particularly the decisions of the House of Lords *United Scientific Holdings v Burnley* [1978] AC 904, per Lord Diplock and Lord Simon (at pp. 932 & 944) and *Bunge Corporation v Tradax*  [1981] 1 WLR 711, per Lord Wilberforce (p. 716) and Lord Lowry (p. 720). (Both cases were also cited by Lord Mustill.)

361. As these English judgments make clear, the equitable rule has displaced the common law rule under English law with the result that time stipulations in a contract are not now generally classified as making time of the essence, subject to certain exceptions. The first exception is where the parties' contractual wording is interpreted as making time of the essence; and the second is where the court or arbitrator infers from the nature of the contract or its surrounding circumstances that the parties intended their time stipulation to have that effect.

362. In certain commercial contracts, given their nature, the English courts have readily inferred that time stipulations were of the essence: see the historical list in *Chitty on Contracts*, (30th ed.) Vol. 1, para. 12-037.  (This edition is materially similar to the previous edition cited to the Tribunal by the Parties). There is however no legal or

factual presumption that time is of the essence in a commercial contract; and a time stipulation in such a contract may be determined to be no condition precedent or no condition but merely an intermediate term or warranty.

363. The Tribunal thus accepts RSM's first submission as to English law; and it applies these English decisions as part of the law of Grenada to the concluding question raised by RSM. The Tribunal also accepts, as submitted by RSM, that the answer to this question must be found in the actual wording of the Parties' Agreement, interpreted with the pre-contractual circumstances in which this Agreement was made by these Parties. The Tribunal does not understand Lord Mustill, as regards general principle, to have contradicted this part of RSM's case in his legal opinion.

364. The Tribunal begins this exercise with three preliminary comments.

365. First, Grenada submitted that this Agreement was a major investment contract which could be classified as a mercantile or commercial contract under English law. RSM submitted that the Agreement could not be so classified under English law. The Tribunal recognises that a major investment contract made between an investor and a state may be somewhat *sui generis* and should not be equated, for this purpose, with traditional commercial contracts between private parties, such as FOB sale contracts, voyage charterparties or other mercantile contracts, as listed in *Chitty* (*supra*). That list does not include any investment contract. The Tribunal therefore accepts RSM's submission; and it does not therefore base its decision on the "nature" of the Agreement.

366. Second, the Tribunal accepts that the Agreement was a major transaction freely negotiated between two parties of relatively equal bargaining power, with access to professional legal advice. The Agreement is not therefore a contract of adhesion or a standard form imposed by a stronger party upon a weaker party; and it is not, of course, a consumer contract. There is therefore no cause to refer to different legal principles applicable to such different situations. In this case, the Tribunal is required under Grenadian law to apply the true interpretation of the Parties' own consensual wording in accordance with well-established legal principles. The Tribunal did not understand either Party to have submitted otherwise.

367.  Third, the Tribunal does not accept that Article 3 of the Agreement amounts to a true legal option or offer (as suggested by Grenada) because RSM bore an obligation and not a choice to apply for an Exploration Licence (timeously). However, as suggested by Lord Mustill, an application by RSM was intended to produce an Exploration Licence granted by Grenada, namely a legal instrument bearing a special and different legal status under the 1989 Act than the Agreement itself (which by itself was not any form of licence). In that sense, RSM's obligation was directed at something more than a mere bilateral contractual result and akin to a proprietary interest or interest *in rem*. This factor, whilst not determinative of the issue under consideration, has been taken into account by the Tribunal in assessing the importance of the need for certainty in the workings of Article 3 in regard to an Exploration Licence.

368.  The Tribunal returns to the actual wording of Article 3 of the Agreement. As already noted, Article 3.1 contains three significant phrases regarding the timeliness of RSM's application for an Exploration Licence: (i) "As soon as possible ..."; (ii) "but in no event later than ninety (90) days after the Effective Date"; and "[RSM] shall apply for ...." As indicated above, the Tribunal bases its analysis on the Parties' own choice of contractual wording and its ordinary meaning in the English language, taking into account the Agreement as a whole, together with its relevant circumstances, under the rules of contractual interpretation provided by the law of Grenada.

369.  In the Tribunal's view, as a matter of ordinary language, this contractual terminology unambiguously imposes upon RSM an obligation to apply timeously for an Exploration Licence within a generous time-period of ninety days where that period is the maximum time allowed.  There is no other reasonable interpretation of the phrase: "but in no event later than."  This was not therefore a time-period which was vague or imprecise; and it stipulated not a single day, e.g., the ninetieth day, but a lengthy period ending on the ninetieth day.

370.  This interpretation is confirmed by other terms of the Agreement and the factual matrix or circumstances in which the Agreement was agreed by the Parties.

371. First, it is significant that the ninety-day period is objectively predictable and certain under Article 3.1 of the Agreement. Its starting date is the Agreement's "Effective Date," defined as 4 July 1996 under Article 1.1(p). The ninety-day period then runs continuously, subject to the operation of suspension by *force majeure* under Article 24 of the Agreement.  Under Article 24.1, RSM was required to (a) "promptly to notify" Grenada of conditions of *force majeure* and (b) "promptly to notify" Grenada when such conditions ceased. These notices therefore provided the beginning and end of the suspension period; and being given by RSM and received by Grenada, these provisions were clearly intended to make the calculation of the ninety-day period, even if suspended by *force majeure*, readily calculable by both Parties.

372. Second, it is significant that RSM is to be the sole master of its own application's timing under Article 3.1, within the ninety-day period. This application depends upon its will alone; and it can choose when to make its application within the time period without any dependence on Grenada under the Agreement or the 1989 Act.  It can make its application on the first day of the ninety-day period: it did not need to wait until the end of this period.

373. Third, RSM's preparation of its application was not thwarted by *force majeure* under Article 24: the draft application could have been prepared by RSM before 13 January 2004 and made immediately thereafter. There was thus no reason to delay the application to the end of the time period.

374. Fourth, the application for an Exploration Licence was not a difficult, complicated or time-consuming document for RSM to draft: it was a relatively small task. It did not require a day's work, still less ninety days, and still less so after suspension by *force majeure* lasting more than seven years, from 18 July 1996 to 13 January 2004. (It may be contrasted with the substantial exercise required, under the Agreement and the 1989 Act, in regard to an application for a Development Licence).

375. Fifth, in contrast to RSM's application, Grenada could not issue the Exploration Licence under Article 3 without first receiving that application by RSM, albeit that having received RSM's application, Grenada was required to issue the licence within the same ninety-day period. It therefore makes little sense to construe Article 3.1 as

permitting RSM more than the ninety-day period when its delay beyond ninety days necessarily entails non-compliance by Grenada with its own obligations under Article 3.1. It is also absurd to do so in the present case, given that the extension from seven to ninety days was made at the request and for the benefit of Grenada, as established by the Parties' pre-contractual dealings (see above). Indeed, the greater task under Article 3.1 was for Grenada to respond timeously to RSM's application within the ninety-day period, as the Government and Civil Service (subject to Grenada's Constitution and the 1989 Act) could require more time to issue the Exploration Licence than RSM to apply for it.

376.  In the Tribunal's view, it is manifestly clear from the terms of the Agreement that the timeliness of RSM's application was intended to be an important factor for the further performance of both Parties' obligations under the Agreement. It was the pre-requisite to Grenada's own obligation to grant a licence within the same ninety-day period, i.e. Grenada could not grant an Exploration License to RSM unless and until RSM has previously applied for such a licence to Grenada. It is also clear in this case that the time-period was agreed in order to provide an element of commercial and political predictability and certainty as to whether or not the Parties would be required to perform their further obligations under the Agreement. It was not imposed to provide a remedy in damages to Grenada; and indeed there might not be any or any immediate economic loss to Grenada if RSM delayed improperly its application for an Exploration Licence. Damages for breach of contract are thus not the natural remedy to Grenada for such a breach by RSM.

377.  For all these reasons, having considered the terms of the Agreement as a whole in its surrounding circumstances, the Tribunal decides, as a matter of contractual interpretation under the laws of Grenada, that the obligation on RSM to make a timely application for an Exploration Licence under Article 3.1 is a "condition" and a "condition precedent" of the Agreement in the legal sense that RSM's failure to act timeously within the ninety-day period relieves Grenada from any correlative obligation to proceed with further performance of its substantive obligations under the Agreement in regard to an Exploration Licence and also entitles Grenada to terminate the Agreement under Grenadian law. The Tribunal does not accept that RSM's obligation under Article 3.1 is a mere "warranty," "intermediate" or "innominate" term,

the breach of which would sound only in damages or only entitle termination by Grenada if RSM's breach deprived Grenada of substantially the whole benefit of the Agreement.

378. *Estoppel:* As regards RSM's reliance on estoppels under the law of Grenada, the Tribunal considers that none of the essential factual prerequisites has been established by RSM on the evidence adduced in these proceedings. There was no unequivocal representation by Grenada, nor any common assumption by the Parties; and there was in any event no proven reliance by RSM. Accordingly, Grenada is not estopped from relying upon the true interpretation of Article 3.1 of the Agreement, as here determined by the Tribunal.

379. *International Law:* The Agreement is a private or civil law agreement between a state and a legal person which is not a state; these Parties expressly agreed a national system of law as the law applicable to their Agreement; the Agreement is not a treaty; and there is no question that the 1969 Vienna Convention on the Law of Treaties does not apply to the Agreement's interpretation by this Tribunal. There is of course nothing untoward in these arrangements; and as a basic exercise in party autonomy, it is the Tribunal's duty to respect the Parties' choice fully, as required by Article 42(1) of the ICSID Convention. Nevertheless, lest it be thought that the practical effect of the Parties' choice leads in this case to any unnatural or idiosyncratic interpretation, it may be useful to test the issue by reference also to international law, by analogy

380.  As is well known, in international law there are three principal methods to establish the meaning under a treaty: (1) the textual method, (2) the subjective method and (3) the teleological, or purposive, method.

381.  *Textual Method:* Under the textual method, as codified in Article 31(1) of the 1969 Vienna Convention on the Law of Treaties,[80] the ordinary meaning of the text is to be upheld: "A treaty shall be interpreted in good faith in accordance with the ordinary

---

[80]  Article 31 also reflects a rule of customary international law: *Territorial Dispute* (Libyan Arab Jamahiriya v Chad), I.C.J. Reports 1994, p. 6, at pp. 21-22 (para. 41); *LaGrand* (Germany v United States of America), I.C.J. Reports 2001, p. 466, at p. 501 (para. 99).

meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

382.   The International Law Commission's Final Draft Articles and Commentary to the Vienna Convention [the "Final Draft Articles"] makes clear that the original draft of Article 31 (then numbered "Article 27") consciously established the primacy of textual interpretation.[81]   The International Law Commission, at page 687, commented: "(11) The article as already indicated is based on the view that the text must be presumed to be the authentic expression of the intentions of the parties; and that, in consequence, the starting point of interpretation is the elucidation of the meaning of the text, not an investigation *ab initio* into the intentions of the parties.   The Institute of International Law adopted this textual approach to treaty interpretation.   The objections to giving too large a place to the intentions of the parties as an independent basis of interpretation find expression in the proceedings of the Institute. The textual approach, on the other hand, commends itself by the fact that, as one authority [128] has put it, "le texte signé est, sauf de rares exceptions, la seule et la plus récente expression de la volonté commune des parties." Moreover, the jurisprudence of the International Court of Justice contains many pronouncements from which it is permissible to conclude that the textual approach to treaty interpretation is regarded as well established.   In particular, the Court has more than once stressed that it is not the function of interpretation to revise treaties or to read into them what they do not, expressly or by implication, contain.[129]»[82]

383.   This strict textual approach, i.e., going no further than the ordinary meaning of the text of the treaty, is regarded as fundamental in international law.   Even though the International Law Commission, in its Final Draft Articles (at page 685), suggested that the "process of interpretation is a unity and that the provisions of the article [now Article 31] form a single, closely integrated rule," nevertheless, the article itself indicates a clear, logical interpretive order in which textual interpretation is primary.[83]

---

[81]   International Law Commission's "Final Draft Articles and Commentary to the Vienna Convention on the Law of Treaties," *Yearbook of the International Law Commission* (18th Session, 1966), Vol. II, p. 177, as reproduced in Sir Arthur Watts, *The International Law Commission, 1949-1998*, Vol.II: The Treaties, Part II (1999), p. 619 *et seq.*

[82]   The Commission cites, respectively: [128.] *Annuaire de l'Institut de droit international*, vol. 44, tome 1 (1952), p. 199; [129.] *E.g.*, in the *United States Nationals in Morocco* case, I.C.J. Reports 1952, pp. 196 and 199.

[83]   International Law Commission, "Final Draft Articles and Commentary to the Vienna Convention on the Law of Treaties," *Yearbook of the International Law Commission* (18th Session, 1966), Vol. II, p. 177, as reproduced

Article 31, when read in conjunction with Articles 32 and 33 of the Vienna Convention reveals an interpretive structure in which subsequent practice and the other two methods of treaty interpretation, subjective and teleological, are supplementary in nature. They are to be used to assist in the interpretation when the textual method is insufficient.

384. Applying the textual method, the text is clear: the ninety-day period is important and is a condition precedent of Article 3.1 of the Agreement. (No subsequent practice by the Parties demonstrates any agreement to vary the terms of Article 3.1 of the Agreement under Article 31(3)(a) and (b) of the Vienna Convention.)

385. In addition, again by analogy, the two other methods of treaty interpretation, the subjective and teleological ones, both being secondary in nature, would not change the result in the present case.

386. *Subjective Method:*  The subjective method, supported by Article 32 of the Vienna Convention, looks to the intention of drafters of the treaty.  However, as made clear in Article 32 itself, the subjective method is a supplementary means of treaty interpretation.  It is to be employed to either confirm or determine the meaning of the text itself, and only where the textual method of interpretation either (a) leaves the meaning ambiguous or obscure, or (b) leads to a result which is manifestly absurd or unreasonable.  Because the subjective method only serves this limited role, international tribunals have often decided that the clear text of a treaty obviates the need to examine the drafting records, or *travaux préparatoires*, of that treaty.[84]

387. The Tribunal here simply notes that the evidence regarding the pre-contractual dealings of the Parties does not demonstrate any intention to treat the ninety-day period as a matter that could be unilaterally waived by either Party, or as something inessential to the Parties.  Moreover, initially, the provision was added to the Agreement at the request of the Claimant; and the extension of time from seven to ninety days made it even easier for the Claimant to comply with the contractual time-limit.  Lastly, the

---

in Sir Arthur Watts, *The International Law Commission, 1949-1998*, Vol. II: The Treaties, Part II (1999), p. 619 *et seq.*.

[84] *E.g.*, *LaGrand* (Germany/United States of America)*, Judgment*, I.C.J. Reports 2001, p. 466, at p. 503 (para. 104).

negotiated agreement upon the ninety-period evinces a common intention by the Parties for clarity and certainty as regards the effluxion of time by which an Exploration Licence would have to be applied for by RSM and, if applied for, granted by Grenada.

388. *Teleological Method:*  The final, teleological method, sometimes called the "purposive approach," aims to interpret the treaty so as best to fulfil its overall object and purpose. It finds some support in Articles 31(1) and 33(4) of the Vienna Convention, although in each of these provisions it serves as a 'last-resort' method of interpretation: it is either to be used to confirm the textual interpretation, or used only when both the textual and subjective methods of interpretation fail, as in Article 33(4).  The wording of Articles 31(1) and 33(4) show that the object and purpose of the treaty can only be used as a guide to the interpretation of, not as a replacement for, the text itself.  The interpreter is to examine the text of the treaty "in the light of" or "having regard to" its object and purpose (rather than, for example, "in accordance with" its object and purpose).  In fact, when the International Law Commission drafted the 1969 Vienna Convention it specifically linked the object and purpose to the textual context (rather than placing it in a separate article), precisely to avoid the excesses of the teleological method.

389. According to T.O. Elias, in *The Modern Law of Treaties* (at page 83): "The Commission has deliberately referred to the object and purpose of the treaty as the most important part of the context, not as an independent element, since the latter course may lead to distorted interpretations, and open the door to the teleological method that might result in a subjective and self-interested approach."[85]

390. Where the text of a treaty is clear, the meaning of this text must be applied; and further subjective and teleological interpretation is not necessary.  As established by the International Court of Justice in the *Competence of the General Assembly* advisory opinion: "[T]he first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur.  If the relevant words in their natural and ordinary meaning make sense in their context, that is the end of the

---

[85]  T.O. Elias, *The Modern Law of Treaties* (1974), at p. 8 (citing U.N. Conference on the Law of Treaties, First Session, Official Records, p. 170).

matter."[86]  Similarly, in the case concerning the *Territorial Dispute* (Libyan Arab Jamahiriya v Chad), the International Court of Justice expressly stated (at paragraph 41), that "[i]nterpretation must be based above all upon the text of the treaty."[87]

391.  Examining the Agreement here in terms of its overall purpose, the Tribunal cannot conclude that the ninety-day period established in Article 3.1 was inessential to the purpose.  In fact, when placed in the context of other provisions of the Agreement, especially the *force majeure* provision in Article 24, the ninety-day period provided the certainty needed to prevent the Agreement from becoming an open-ended 'option' exercisable at the whim of the Claimant.  In this context, it must be remembered that according to the Claimant's case, it was provided with the ability to suspend unilaterally all its obligations indefinitely, under the Agreement, and that the *force majeure* period could be unilaterally terminated by the Claimant at any point, regardless of whether the *force majeure* event had in fact ended.

392.  In summary, the same result under the law of Grenada (as under English law) would apply if the Agreement were a treaty subject to international law: the same clear meaning of the text of Article 3.1 of the Agreement would be upheld; and it is not contradicted by any evidence of either the subjective intentions of the Parties, or the object and purpose of the Agreement itself.

*(04)  The Tribunal's Conclusion*

393.  For these reasons, the Tribunal concludes this Issue C in favour of Grenada and against RSM. It follows that the Agreement either lapsed on 28 March 2004 upon the expiry of the ninety-day period under Article 3.1 of the Agreement or terminated upon RSM's receipt of Grenada's letter dated 5 July 2005 terminating the Agreement. It matters not which for the purpose of Grenada's claim and Grenada's defence in these proceedings. In either event, Grenada was not contractually required to grant an Exploration Licence to RSM; and the Agreement thus came to an end, imposing no further substantive obligations on Grenada.

---

[86]  *Competence of the General Assembly Regarding Admission to the United Nations*, Advisory Opinion, I.C.J. Reports 1950, p. 4, at p. 8.
[87]  *Territorial Dispute* (Libyan Arab Jamahiriya/Chad), I.C.J. Reports 1994, p. 6, at p. 22 (para. 41).

394. This result may seem technical. It might be so if RSM were a consumer or a small investor confronted by a powerful state. It is neither: this not a case of David and Goliath.  Moreover, RSM (with its legal and other advisers, together with Mr Grynberg) freely agreed contractual wording and an applicable national law giving effect to such wording in an important transaction where certainty was an important factor for both Parties, particularly for Grenada. RSM, as already indicated, was the master of its timetable; and there is no good or necessary reason why it chose to wait until the end of the ninety-day period to make its application for a licence. It is not the function of this Tribunal here to re-write the Parties' contractual bargain or to introduce an extra-legal mitigating factor which, whilst benefiting one party, would materially disadvantage the other party; and it could not do so without manifestly violating its duty under Article 42(1) of the ICSID Convention. Indeed, this Tribunal was not invited to do so by RSM.

395. As regards Issue F, it follows from the Tribunal's decision that RSM breached its contractual obligation to apply timeously for an Exploration Licence under Article 3.1 of the Agreement for which Grenada claims nominal damages in the sum of US $1,000. The Tribunal considers that Grenada suffered no loss from such breach; and it rejects this counterclaim for damages.

396. The Tribunal's decision on this Issue C renders unnecessary any decision on Issue D.

## PART VIII: ISSUE E – MISREPRESENTATION

### (01)  Introduction

397.  The Respondent advances the counterclaim of unlawful misrepresentation as a ground for rescinding the Agreement under Grenadian law, as summarised below.  The Respondent argues that RSM's intentions from the outset, before the Agreement of 4 July 1996, were in fact materially different from those expressed to Grenada.  The Respondent alleges that it was led to believe that RSM was willing and able to carry out the exploration and development to be envisaged in the Agreement, as well as the expertise to assist with negotiating on maritime boundary delimitations.  But the reality, according to the Respondent, was that RSM had no such maritime boundary expertise and that it planned to lock up Grenada's territory until the Agreement could be 'farmed out' to other companies, who would do all of the work, pay all of the costs, and take all of the risks, thereby 'carrying' RSM's interest.

398.  The Claimant denies the existence of any misrepresentation. In the alternative the Claimant argues that Grenada affirmed the Agreement under Grenadian law, thus barring any actionable misrepresentation by Grenada in these arbitration proceedings.

399.  The Tribunal decides Grenada's counterclaim, both as a claim and defence, on the facts of this case as appears below. The Tribunal thereby avoids certain difficulties in assessing inconsistent parts of Grenada's case, i.e., whether it advanced its case only for fraudulent misrepresentation or also for innocent misrepresentation (both giving rise to the remedy of rescission at common law); and, as regards the latter, whether it was also advancing a claim for negligent (innocent) misrepresentation under the United Kingdom's Misrepresentation Act 1967, enacted as a statute under English law but not forming part of the common law in England or Grenada.  In any event, as appears

128

below, given the Tribunal's decision on the facts relating to this Issue E, these difficulties required, ultimately, no resolution by the Tribunal for the purpose of this Award.

### (02)   The Factual Basis for Misrepresentation

400.  *Grenada's Case:*  Grenada contends that RSM misrepresented its intentions and several important facts that were relied upon by Grenada when deciding to enter into the Agreement, namely (a) that RSM had sufficient financial resources to fulfil its intended obligations under the Agreement; (b) that RSM intended to commence work under the Agreement immediately after its entry into force, (c) that RSM by itself would perform its Agreement obligations rather than 'farm out' all financial risks and contractual commitments to other entities; and (d) that Mr Grynberg had expertise as a negotiator in maritime boundary delimitations.

401.  *(A)  Financial Resources*: Regarding the first misrepresentation, the Respondent submits that RSM does not, and never did, possess the human or financial resources that were indicated in its communications during the negotiations leading up to the Agreement.  The Respondent points out that RSM did not even exist at the beginning of the negotiations and that even after it was created (on 11 January 1996), RSM was not provided with sufficient assets or corporate backing to allow it to perform its obligations under the Agreement.[88]  Rather, RSM's shareholders (Mr Grynberg's three children, their initials being "R," "S" and "M"), injected little, if any, capital into the new company.[89]  The Respondent submits that the 'negligible and even inconsistent evidence' provided by the Claimant regarding its assets does not reveal any serious financial resources on the part of RSM.  According to the Respondent, "the evidence

---

[88] Counter-Memorial, para. 2.24 [WS1.65].
[89] Counter-Memorial, para. 2.24 [WS1.65]; First Witness Statement of Mr Auguste, para. 18 [WS1.289].

indicates that RSM is a tiny operation, with a turnover of barely US$ 2 million, capitalization of US$ 1,000 and no more than 20 employees."[90]

402. Moreover the Respondent submits, on the evidence, that the financial resources that may have existed, both at the negotiating stage and at the time that RSM applied for the license in 2004, were those of Grynberg Production Corporation ("GPC"), another company owned by Mr Grynberg which had no legal relationship to RSM nor any obligation, or intention, to capitalize RSM.[91]   The banker's statement attached to the licence application described the *combined* assets of GPC and RSM.[92]   Further, the personal guarantee was made by Mr Grynberg himself, who the Respondent argues is unreliable as a guarantor given his history of avoiding creditors.[93]

403. Finally, during his testimony at the oral hearing Mr Grynberg revealed that GPC's financial resources were in the form of credit, rather than revenue, and that such credit was already committed to development [D2.27-28].

404. (*B*) *Commencement Time:* Regarding the second misrepresentation, the Respondent contends that RSM's statements about expeditious commencement of the exploration programme, once the Agreement was signed, were misleading.   RSM suggested in a number of documents and communications that they would commence work under the Agreement shortly after it was signed.[94]

405. Mr Auguste, for example, testifies in his Second Witness Statement, at paragraph 8 [WS2.554], that RSM represented that exploration would commence immediately after the signing of the Agreement: "Mr Flaxman said that Mr Grynberg wanted to secure a

---

[90] Counter-Memorial, para. 2.161 [WS1.127].
[91] Counter-Memorial, para. 2.162 [WS1.128].
[92] Letter dated 6 April 2004 [CB03.621].   The statement of assets and liabilities also attached in the same Annex is with respect to "Grynberg Petroleum Company and Family-Related Affiliates" [CB03.622-624].   No indication is provided of RSM's individual assets and liabilities.
[93] Counter-Memorial, para. 2.162 [WS1.128].
[94] *See, e.g.*, First Witness Statement of Senator Bowen, paras. 11 & 55 [WS1.266 & 279]; and Second Witness Statement of Mr Auguste, para. 17 [WS2.557].

license (or a production sharing agreement, as he had originally wanted) to commence exploration in Grenadian waters immediately."[95]

406.  *(C) Farm-Outs:* In relation to the third misrepresentation, the Respondent contends that RSM never had the intention of assuming any financial risk or of carrying out any of its obligations under the Agreement.  Rather, RSM intended to 'farm out' all its risks and obligations to larger entities who were capable of performing the Agreement.  The Respondent denies any knowledge of this intention on the part of RSM, either prior to conclusion of the Agreement or for years afterwards.

407.  Mr Auguste states at paragraph 9 of his Second Witness Statement [WS2.554-555]: "Neither gentleman [Mr Flaxman or Mr Grynberg] ever mentioned farm-outs or farm-ins during the negotiations.  The Government would not have been averse to financial partners, as we understood that oil exploration is expensive.  We were, however, entering into an agreement with RSM, and we did not expect them to hand over the exploration and development process to someone else.  They said that they had the necessary financial resources and expertise, which is the reason why we consented to enter into the Agreement with them.  I thought RSM would engage contractors for parts of the work, but that RSM itself would take responsibility and be in charge."[96]

408.  Regarding RSM's 'farm out' strategy, the Respondent refers to a 'secret' farm-out agreement concluded by RSM in 1998, the "Initial Grenada Inter-Company Agreement" (also called the "Vintage Petroleum Agreement").  The other parties to this agreement were Vintage Petroleum, Inc. of Oklahoma, Premier Oil plc of England and Santa Fe Energy Resources, Inc. of Texas (Devon Energy Corporation later succeeded to Santa Fe's interest).[97]  The Respondent submits that this Vintage Petroleum Agreement provided an arrangement whereby the parties would find a large and experienced oil company (called a "Bell Cow") to fulfil RSM's obligations and to carry

---

[95] In his First Witness Statement Mr Auguste states, at para. 32 [WS1.292-293]: "Mr Flaxman certainly gave me the impression during the negotiations that RSM was eager to start with the exploration as soon as possible."
[96] *See also*, *ibid*., para. 11 (Grenada's lack of knowledge until years later about the Vintage Petroleum potential farm-out).
[97] Counter-Memorial, paras. 2.165-166 [WS1.130].  The Vintage Petroleum Agreement is attached as Exhibit R 17 [CB02.376-381].

all RSM's risks and costs.[98]  The Respondent also points to evidence of a similar farm-out arrangement that RSM attempted to conclude in 2002 with Petro-Canada, under which Petro-Canada was to assume all of RSM's financial risks.[99]  Grenada asserts that RSM eventually found its "Bell Cow," the Shanghai Offshore Oil Group (SOOG), in October 2005, after both RSM's commencement of this ICSID arbitration and Grenada's termination of the present Agreement.[100]

409.  Senator Bowen indicates that the Government was surprised when it found out about the Vintage Petroleum Agreement.  At paragraph 15 of his Second Witness Statement [WS2.571], Mr Bowen testifies: "[W]e were shocked when we heard (in or about 2003) that RSM had "farmed out" rights under the Agreement to Devon Energy, in a deal that, as we now know, provided that RSM would be fully "carried" by Devon and other companies – i.e., that it would spend no money and do no work itself.  (We later heard that RSM was negotiating farm-outs to other companies, and I understand our lawyers asked RSM to provide documents on this.) The news about Devon Energy was completely contrary to RSM's representations in 1996, and it increased our apprehension that – in words I recall the Prime Minister using – we had been "sold a bill of goods" by RSM."

410.  This Vintage Petroleum Agreement ended in litigation without the creation of a further operating agreement,[101] when RSM began a law suit against the other parties in US courts.[102]  Nevertheless the Respondent alleges that RSM continued its efforts at farming out its rights and obligations under the Agreement with Petro-Canada.[103]

411.  The Respondent argues that such an intention to farm-out all of its risks and obligations on the part of RSM amounted to fraudulent misrepresentation by RSM.

---

[98] Counter-Memorial, paras. 2.167-170 [WS1.130-132].
[99] As indicated at para. 4.7 of the Rejoinder [WS2.518-519].
[100] Counter-Memorial, para. 2.173-174 [WS1.133-134].
[101] In order for performance to commence under the Vintage Petroleum Agreement, a further operating agreement was required; but Mr Grynberg testified that no such operating agreement had been concluded [D2.139].
[102] Counter-Memorial, para. 2.172 [WS1.133].
[103] Counter-Memorial, para. 2.175 [WS1.134].  Mr Grynberg testified that he or his companies would be meeting PetroCanada contemporaneously with the main hearing [D2.147].

412. As summarised by Mr Auguste, Grenada would not have entered into the Agreement with RSM if it had known it was merely a broker or speculator: "I do not think the Government would have, or should have, entered into the Agreement with RSM if it had known at the time that RSM was a speculator – as I now understand it to be – simply looking at assigning Grenadian maritime territory to other companies, and taking a cut of the proceeds, without investing its own money, carrying out work itself or using its alleged expertise for the benefit of the project.  RSM was not supposed to be a broker, but an operator; or at least that is what Messrs Grynberg and Flaxman represented RSM to be."[104]

413. In addition, the Respondent contends that if RSM's 'farm-out' strategy proved unsuccessful the Claimant's intention was to pursue a litigation strategy against the companies with which it had 'farm-out' arrangements, or against Grenada if it tried to free itself from the Agreement.  The Respondent argues that the *modus operandi* of RSM and Mr Grynberg's other companies is contractually to 'lock up' vast territories with potentially lucrative oil resources and then to profit from litigation when their partners (corporate and government), wish to develop those resources or end the relevant contractual relationship.[105]

414. At paragraph 2.163 of its Counter-Memorial, the Respondent described  RSM's *modus operandi* as follows [WS1.129]: "The first step in this *modus operandi* is to "lock up" large, and often disputed, territories for long periods of time with agreements that require little or nothing from Mr Grynberg (frequently because of immediate *force majeure* notices).  He appears to target governments that lack experience in the oil and gas business, using a combination of slick salesmanship, glowing promises and economic threats to procure such agreements.  Then, when the time and market conditions are right, he either "farms out" his contracts to serious players; and/or sues everyone in sight. [Citations omitted.]"

---

[104] Mr Auguste's Second Witness Statement, para. 12 [WS2.555-556]; *see also* Counter-Memorial, para. 5.11 [WS1.215].
[105] Counter-Memorial, paras. 2.26-2.27 [WS1.66-67].

133

415.  In support of its case Grenada refers to the "hundreds of cases" in US courts in which RSM and Mr Grynberg's other companies have been involved, a partial overview of which it presented in the Appendix to its Counter-Memorial.[106]  The Respondent also refers to the five lawsuits filed by Mr Grynberg in relation to the present proceedings: three in US courts, one before ICSID and one before the International Tribunal for the Law of the Sea.[107]  These proceedings, according to Grenada, have proved very profitable to Mr Grynberg, "who earlier this year claimed to have made US$ 60 million from a series of cases he brought against United States energy companies."[108]

416.  The Respondent acknowledges that speculative petroleum exploration and development agreements of the kind entered into by RSM are not inherently illegitimate or illegal.[109]  However such an arrangement was not disclosed to the Government of Grenada during the negotiation of the Agreement.  The Respondent concludes: "Besides agreeing to a non-assignment clause, they deliberately led the Government to believe that RSM could and would quickly commence exploration, with development ideally to follow in short order."[110]

417.  *(D) Maritime Boundary Negotiations:* Regarding RSM's fourth misrepresentation as to Mr Grynberg's expertise in maritime boundary negotiations, the Respondent submits that such alleged expertise was "a key representation" because it led to Grenada's increasing the size of the Agreement Area.[111]  However the Respondent indicates that Mr Grynberg has no such expertise whatsoever and that he was – and remains – incompetent to perform any such functions.

418.  *RSM's Response:* As to the facts, the Claimant denies any form of misrepresentation in relation to the Agreement.

---

[106] Counter-Memorial, para. 2.25 [WS1.65], and Appendix to the Counter-Memorial [WS1.246-61].
[107] Counter-Memorial, para. 2.25 [WS1.65].
[108] Counter-Memorial, para. 2.28 [WS1.67].
[109] Counter-Memorial, para. 2.164 [WS1.129-130].
[110] *Ibid*.
[111] Submission of Mr King, Counsel for Grenada [D5.137].

419. *(A) Financial Resources:* RSM contends that it had and has the financial resources necessary to carry out its obligations under the Agreement.  The Claimant points to the expenditures incurred by RSM and its affiliates in acquiring and processing seismic data, together with the significant expenditures by Mr Grynberg in his previous oil exploration projects.[112]

420. *(B) Commencement Time*: Regarding the timing of commencement of activities under the Agreement, RSM contends that there was a clear understanding on the part of both Parties that a *force majeure* situation existed prior to the signing of the Agreement[113] and that the Agreement could not be performed until Grenada's maritime boundaries were resolved.[114]

421. Mr Grynberg, for example, in his Second Witness Statement, at paragraph 20 [WS2.437-38], indicates that the Government of Grenada understood and agreed that the Agreement would be suspended in its entirety upon execution: "Senator Bubb and I discussed the *force majeure* provisions and the existence of the boundary disputes and were agreed that the Agreement would be suspended in its entirety from the date of signing. We agreed that the Agreement would be signed, that RSM would then invoke *force majeure*, and that we would then move as quickly as possible to delimit the boundaries. Senator Bubb also countersigned the letter which we sent on 18 July 1996 formally notifying the Government of the existence of the *force majeure* event. There is no question that the remaining Government officials were already aware of the existence of the boundary disputes and the *force majeure* event under the Agreement; the letter was merely written acknowledgement of this. Senator Bubb's signature of this letter acted as formal confirmation to us that the *force majeure* event suspended all of our obligations. We relied on this confirmation. If the *force majeure* event had not existed there is no question that we would have applied for the Exploration Licence immediately."[115]

---

[112] *E.g.*, Reply, para. 108 [WS2.401-402].
[113] Reply, para. 111 [WS2.403-404].
[114] *Ibid*.
[115] *See also* Second Witness Statement of Mr Grynberg, paras. 18-19 [WS2.437-38].

422.   *(C) Farm-Outs:* RSM denies any representation that it would not engage in farm-out agreements, which it states are "an absolutely standard business practice in the international oil industry."[116]

423.   RSM also submits that the Agreement specifically permits RSM to enter into loan agreements (Article 23.1(a)), as well as to assign its rights and obligations, either wholly or in part, provided that Grenada gives its consent (Article 25). In fact the term "Company" is specifically defined in Article 1.1(i) of the Agreement as including not only RSM but also any other person to whom the Company has assigned an interest. (These articles are cited above in Part III of this Award, at pp. 36, 37 & 39.)

424.   In addition, Mr Grynberg states in his Second Witness Statement, at paragraph 25 [WS2.439], that RSM discussed its intention to enter into farm-out arrangements with the Government: "We also told the Government before entering into the Agreement that RSM would be farming-out part of its obligations under the Agreement. This is usual practice in the industry and all oil companies do this – even super-majors like Shell Oil. I specifically discussed this with both Senator Bubb and Prime Minister Mitchell. I told them that I always spread my risks – as any sensible businessman always does. The Agreement expressly allows for RSM to assign our obligations."

425.   *(D) Maritime Boundary Negotiations:* Finally, the Claimant stands by its assertion that Mr Grynberg does have the relevant expertise in maritime boundary delimitations.  In response, Mr Grynberg offered several examples in his oral testimony of cases in which he had successfully resolved maritime boundaries between states, according to him.[117]

---

[116] Reply, para. 110 [WS2.402-403].
[117] For example, Mr Grynberg testified [D2.157-159] that he had "established a boundary between Barbados and St. Lucia" and a "floating boundary" between Martinique and St. Lucia. He also indicated that he had been a "mediator between countries … between Azerbaijan and Turkmenistan, between Greece and Turkey."  Further, Mr Grynberg testified [D3.21-22] that the reason Venezuela did not want him involved in the maritime boundary negotiations on the Grenadian team was because he was too skilled in both the technical and legal aspects of maritime boundary delimitation. This testimony was not corroborated by other evidence in these proceedings to the Tribunal's satisfaction.

### (03)  Grenadian Law Regarding Misrepresentation

426. It is possible here to address the relevant legal principles succinctly, without much elaboration. At common law (here including equity), a pre-contractual misrepresentation which induces the representee to enter into the contract with the representor gives to the representee the legal right to rescind the contract, subject to certain conditions. Both forms of misrepresentation at common law, i.e. fraudulent and innocent misrepresentation, give the right of rescission to the representee.

427.  As a defence to RSM's claim, Grenada pleads rescission based upon RSM's alleged fraudulent misrepresentation: see its relief above, at paragraph 27, page 11.

428. As already noted above, there were times when, in argument, Grenada appeared to advance its case more broadly by reference to English statutory law, namely a claim for negligent (innocent) misrepresentation under Section 2 of the United Kingdom's Misrepresentation Act 1967 or even a claim for the separate tort of negligent misstatement under a pre-contractual duty of care allegedly owed by RSM to Grenada. However, the Respondent cited the Misrepresentation Act 1967[118] without demonstrating that it had been extended to Grenada prior to independence and (if it had) survived as existing law in Grenada.[119]  Nor was it submitted that any equivalent statute was enacted in Grenada subsequent to independence, as occurred in other Commonwealth states of the Caribbean.[120]  As a result, the Tribunal construes these references by Grenada's Counsel in argument as a forensic exercise only, without suggesting that the 1967 Act somehow formed part of Grenadian law or was otherwise relevant to this case. In any event, the 1967 Act does not affect any common law rule as to what constitutes an unlawful misrepresentation giving the right to rescind a contract;

---

[118] See references above.

[119] Grenada obtained independence from the United Kingdom in 1974: Counter-Memorial, para. 2.7 [WS1.57]. The constitutional arrangements saved existing laws upon independence: Constitution of Grenada 1973, Statutory Instrument 1973 No. 2155, The Grenada Constitution Order 1973 (19 December 1973; in force 7 February 1974), Schedule 2 to the Order.

[120] See, e.g., Trinidad and Tobago's Misrepresentation Act (20 October 1986), Laws of Trinidad and Tobago, Revised Edition, Chap. 82:35, Act No. 12 of 1983.

and it leaves intact the representee's right to rescind a contract for fraudulent misrepresentation.

(It is only in the case of innocent misrepresentation where Section 2 of the 1967 Act grants to the English court or arbitrator the discretion to limit the representee's remedy to statutory damages in place of rescission; and damages were not pleaded by Grenada as a defence to RSM's claim, as already noted above. Moreover, a negligent statement or other breach of a duty of care might give rise to damages but not rescission, as here claimed by Grenada.)

429.   At common law, as correctly summarised by the Respondent, misrepresentation first requires proof of a statement of fact that is materially false which induces the representee to enter into the contract.[121]   There must be such a statement by the representor; there must be inducement by the representee; and the statement must be false; or Grenada's counterclaim must fail against RSM as a matter of Grenadian law.

430.   The traditional rule is that neither a statement of opinion which proves to have been unfounded, nor a statement of intention which is not put into effect, would be treated as a misrepresentation.[122]   However in certain circumstances a statement of intention can be classified as a statement of fact, and therefore as a ground for rescinding the contract if, at the time when it was made, the statement was false and it can be proved that the person expressing the intention did not have that intention.[123]   For present purposes, the Tribunal is content to apply this approach.

431.   The burden of proof also falls upon the representee to prove the representation and the falsity of the representation and, as regards fraudulent misrepresentation, its fraudulent character. Under English and Grenadian law, a fraudulent misrepresentation is almost invariably also a criminal offence. (It is therefore not to be equated with the lesser "fraud" as a civil wrong under many of the state laws of the United States of America.)

---

[121] Counter-Memorial, para. 5.3.  *See, e.g.*, Professor Beale, ed., *Chitty on Contracts*, 30th ed., Vol. I (London: Sweet & Maxwell, 2008) [hereafter "*Chitty on Contracts*, 30th ed."], para. 6-006.
[122] *See, e.g.*, *Chitty on Contracts*, 30th ed., para.  6-006.
[123] *See, e.g.*, *Chitty on Contracts*, 30th ed., para.  6-007.

432.   Under Grenadian law, a representation is false if it is materially inaccurate; and a false misrepresentation is fraudulent if it is made either "(1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false" (*Derry v Peek* (1889)).[124]   A false statement will not be fraudulent, however, if the representor had an honest belief in its truth.[125]

433.   The representee must also prove that the representation affected his state of mind and that it induced him to enter the contract.[126]   If it is proved that a false statement was made that was likely to induce the contract and that the representee entered into the contract, an inference may be drawn that he was influenced by the representation.[127] This is particularly so in the case of fraudulent misrepresentation. Moreover the misrepresentation need not be the only cause inducing the representee to make the contract: it suffices if it was one of the causes.[128] As explained by Lord Hoffman in *Standard Chartered Bank v Pakistan National Shipping Corporation and Others (No. 2)* [2003] 1 Lloyd's Rep. 227, even if the representee held some other negligent or irrational belief, so long as the fraudulent representation was relied upon, the defendant will be liable: "15.   This case seems to me to show that if a fraudulent representation is relied upon, in the sense that the claimant would not have parted with his money if he had known it was false, it does not matter that he also held some other negligent or irrational belief about another matter and, but for that belief, would not have parted with his money either.   The law simply ignores the other reasons why he paid."[129]

---

[124] *Chitty on Contracts*, 30th ed., para. 6-045.
[125] *Derry et al v Peek* (1889) 14 App. Cas. 337, p. 374, per Lord Herschell [LA.1723]; *Chitty on Contracts*, 30th ed., para. 6-043.
[126] *See, e.g.*, *Chitty on Contracts*, 30th ed., para.  6-032.
[127] *Cf. Chitty on Contracts*, 30th ed., para. 6-036.
[128] *Chitty on Contracts*, 30th ed., para. 6-034.
[129] LA.1678.

### *(04)   The Tribunal's Decision*

434.   In determining the factual basis for the four categories (a) to (d) of alleged misrepresentation above, the Tribunal notes that all were allegedly made by RSM  in the course of the bilateral negotiations for the Agreement between October 1995 and July 1996 by the Parties' legal representatives, including (*inter alios*), Mr Grynberg, Mr Auguste and  Senator Bubb.

435.   (*A) Financial Resources:* The question of RSM's financial resources was material to Grenada's consent to the Agreement, as was known to Mr Grynberg for RSM at the time.  As acknowledged by Mr Grynberg during his oral testimony, Grenada did not itself have the resources to develop its own oil and natural gas resources.[130]  Grenada was reliant upon RSM for both technical and financial resources under the Agreement.[131]

436.   The evidence demonstrates that RSM's statements regarding financial resources at least partly induced Grenada to enter into the Agreement. During the negotiations, RSM led the Government of Grenada to believe that it was a serious oil company, capable of undertaking the financial and technical obligations envisaged under the intended Agreement. RSM made several statements in response to queries about its assets that led Grenada to believe that these assets included, or were backed by, the assets of Mr Grynberg and his other companies.

437.   For example, in response to a request by Mr Auguste for an indication of the relationship between RSM and Mr Grynberg's other companies,[132] Mr Grynberg stated that: "RSM is a new company I have formed which is owned by my three grown children, Rachel, Stephen and Miriam.  The intent is that Grynberg Petroleum will be a

---

[130] Testimony of Mr Grynberg: D2.35-37.
[131] *Ibid*.
[132] Letter from Mr Auguste to Grynberg Resources, Inc. (Mr Flaxman) dated 9 October 1995, para. AA [CB01.291].

guarantor of all expenditures, but in fact, the three children have their own money and it will be their money that will be invested."[133]

438. Regarding actual assets held by RSM, Mr Grynberg responded to questions from the Government by indicating that: "One must rely on the accounts of the Grynberg family companies...."[134]  The necessary implication of such statements is that RSM represented itself as having access to the financial resources required to fulfil its obligations, as envisaged for the Agreement.

439. However the question is not whether RSM represented itself to have access to financial resources.  The question is whether RSM, as alleged by Grenada, represented itself as possessing such resources independently of other financial resources – in other words, was RSM representing itself as being capable single-handedly of funding the obligations of the Agreement by itself?

440. On the evidence, no such representation has been established by Grenada.  Rather, Mr Grynberg and representatives of RSM consistently offered vague, ambiguous and sometimes contradictory statements about RSM's financial resources; and RSM provided no concrete materials about its own, independent financial status.  These statements referred to the collective resources of the Grynberg family of companies, including Mr Grynberg.  Such statements implied a connection between RSM and other Grynberg companies, but the precise nature of the connection and its consequences for financing were left ambiguous during the Parties' pre-contractual negotiations.

441. Likewise, during the main hearing, Mr Grynberg remained less than clear when cross-examined on the precise financial relationship between RSM and GPC. He testified that GPC runs RSM, he (Mr Grynberg) is the Chief Executive of RSM, he and his wife solely own GPC, his three children solely own RSM, GPC is not a shareholder of RSM,

---

[133] Letter from GPC (Mr Grynberg) to Mr Auguste dated 16 October 1995, para. aa [CB01.293].
[134] Ibid., para. bb [CB01.293].

nor RSM a shareholder of GPC, but RSM had access to the finances necessary to perform the Agreement.[135]

442.  Accordingly, on the evidence, the Tribunal determines that Mr Grynberg intended that RSM should use the resources of his family of companies and third parties to fulfil its future financial obligations under the Agreement.  That statement was made to Grenada in different forms at different times. It was not materially false.

443.  There is insufficient evidence of any clear representation that RSM alone would finance the entire Agreement, without recourse to outside financial resources. Without such a representation, this first part of Grenada's case fails on the facts at the first hurdle. As a result there is no unlawful misrepresentation on the part of RSM related to financing which can justify rescission of the Agreement.

444.  *(B) Commencement Time:* The evidence is contradictory in relation to the representations made by RSM about the commencement of its obligations under the Agreement. There were several early indications that RSM would commence work soon; but it was well understood on both sides that the resolution of maritime boundaries with Grenada's neighbours was necessary before the Agreement could be performed in full by RSM. Indeed, that was the reason for the Parties' choice of wording as regards *force majeure* in Article 24 of the Agreement.

445.  In light of such evidence, the Tribunal determines that Grenada has not established any sufficiently clear representation by RSM for its counterclaim. Accordingly, this second part of Grenada's case also fails on the facts at the first hurdle; and there is no unlawful misrepresentation on the part of RSM related to commencement time which can justify rescission of the Agreement.

446.  *(C) Farm-Outs:* It is clear from the evidence that RSM led Grenada to believe that it could carry out the Agreement.  If it had represented that it could do so alone, this representation would have been false, to Mr Grynberg's own knowledge.

---

[135] Testimony of Mr Grynberg [D2.40-41].

447.   RSM made one representation that it intended to bear *all* of the expenses under the
Agreement.  Mr Grynberg wrote in his letter to the Prime Minister of 2 April 1996:
"We would like to assure you that we very much wish to proceed with the project,
which we believe will be of great benefit to Grenada and its people.  Although *RSM
will bear the entire risk and expense* of this challenging and expensive exploration
project, we believe the potential benefits to all parties justify our undertaking"[136]
(emphasis supplied).

448.   However other statements, also made by Mr Grynberg, qualified this statement.  Only a
few weeks' later, for example, Mr Grynberg indicated in his letter to Senator Bowen of
15 April 1996, that RSM intended to fulfil its obligations under the Agreement in
'partnership' with other companies: "I will be in London from May 8-17 to meet
colleagues from the oil and gas industry on other matters.  It would be helpful if it were
possible to receive an executed agreement prior to that time so that I might then *seek
additional partners for this challenging exploration venture"* [emphasis supplied].[137]
That statement, cannot reasonably be understood by Grenada as indicating that RSM
still intended (if it ever did) to assume "the entire risk and expense" of the project.

(According to Mr Auguste, the Government did not then understand Mr Grynberg's
reference to "partners" as changing RSM's role under the intended Agreement, as
"operator and manager" [D3.206].  The Tribunal does not accept Grenada's case on this
point: such 'an operator and manager' could still conclude 'farm-out' and other
arrangements; and, moreover, the Government's understanding must be assessed also in
the light of its consent to the Agreement's express provisions regarding assignment,
namely Article 25 and its definition of the term "Company," as discussed immediately
below.)

449.   The Agreement, in Articles 1.1(i) and 25, expressly permits RSM to assign its interests.
In Article 1.1(i) of the Agreement the term "Company" is defined as including "any

---

[136] Letter from Mr Grynberg, dated 2 April 1996, pp. 3-4 [CB01.307-308].
[137] Letter from Mr Grynberg, dated 15 April 1996, p. 3 [CB01.312].

other person to whom the Company has assigned its participating interest or any part thereof" (page 36 above). Article 25 of the Agreement, although being phrased in the negative, permits RSM, with "the prior written consent of the Government, which consent shall not be unreasonably withheld" to assign "in whole or in part, any of its rights, privileges, duties or obligations under this Agreement" (page 39 above).

450.  In the Tribunal's view, these terms are fatal to Grenada's factual case on misrepresentation. By 4 July 1996, the Respondent was aware, both from RSM's pre-contractual communication (about seeking potential 'partnerships') but also from the plain text of the Agreement itself (the result of its own negotiations and agreement), that RSM could engage in farm-outs and like assignments, even if RSM did not then disclose the full extent of its intentions with respect to such transactions with third persons.

451.  As a result, the Tribunal decides that RSM did not prove any clear representation in relation to farm-outs. Accordingly, the Tribunal concludes that this third part of Grenada's case fails; and there is no unlawful misrepresentation on the part of RSM relating to farm-outs which can justify rescission of the Agreement.

452.  *(D) Maritime Boundary Negotiations:* Before July 1996, Mr Grynberg represented himself as having expertise as a negotiator in maritime boundary delimitations.

453.  However, as established by the Tribunal, the expertise offered by Mr Grynberg simply did not exist in fact.  As already noted, Mr Grynberg had no relevant expertise in the area of maritime boundary delimitation; and his actual contribution to any diplomatic negotiations was likely to be ineffective, as it in fact turned out to be.

454.  The Tribunal determines that Mr Grynberg's representation was false. The next question is whether Grenada has proved, as a fact, that it was made fraudulently by RSM.

144

455.  In the Tribunal's view, Mr Grynberg did not commit fraud. In his testimony adduced in these proceedings, it is plain that Mr Grynberg believes strongly that he has the necessary expertise and experience to be a successful negotiator for maritime boundary delimitations.  After considering all the evidence, including his oral testimony tested under cross-examination by Grenada's Counsel, the Tribunal concludes that Mr Grynberg honestly believed in the truth of his statements during the pre-contractual negotiations. In such factual circumstances, fraudulent misrepresentation cannot be established under Grenadian law.

456.  The next question is whether Grenada has proved, as a fact, innocent non-fraudulent misrepresentation justifying rescission at common law. The question there arises whether Grenada has proved the necessary inducement as regards Mr Grynberg's misrepresentation.

457.  After reviewing all the evidence, the Tribunal determines that even though Mr Grynberg's offers of assistance with maritime boundary negotiations may have influenced Grenada to enter into negotiations with Mr Grynberg (for RSM) at an early date, it is not sufficiently demonstrated that those offers later induced Grenada's entry into the Agreement.  Nor can Mr Grynberg's offers be characterised as material to Grenada's acceptance of the Agreement as a whole, in light of Grenada's clear knowledge that maritime boundary negotiations required the agreement and consent of the sovereign states concerned and could not be concluded single-handedly by a technical expert, however skilled or experienced, who was a foreigner manifestly self-interested in the outcome of those negotiations.

458.  On this question, in particular, it would have been useful to hear the testimony of Senator Bubb, who might have contributed much to the Tribunal's appreciation of Grenada's case. As recorded above, however, Senator Bubb was not made available to this Tribunal as a factual witness by Grenada; and in those circumstances the Tribunal is left to decide this question on the evidence without his contribution.

459.  Accordingly, for these cumulative reasons, the Tribunal concludes that this fourth part of Grenada's case also fails; and there is no unlawful misrepresentation on the part of RSM, whether fraudulent or innocent, which can justify rescission of the Agreement.

## (05)  The Tribunal's Conclusion

460.  For all these reasons, the Tribunal concludes that the Respondent's counterclaim for unlawful misrepresentation fails on the facts, as established on the evidence adduced in these proceedings. Accordingly, it is not here necessary to address RSM's separate defence of affirmation.

461.   Accordingly, the Tribunal determines this Issue E against Grenada and in favour of RSM; and the Tribunal rejects Grenada's' defence and counterclaim for rescission of the Agreement.

## *PART IX: ISSUE G – DETAILED WORK PLAN*

### *(01)  Introduction*

462.   It is a fact that RSM did not submit any detailed work plan to the Minister, as required by Article 6.1 of the Agreement, within thirty days after the Agreement's Effective Date of 4 July 1996.

463.   Given the operation of *force majeure* from 18 July 1996 to 13 January 2004, the delay from 29 January 2004 to 28 March 2004 (equating to the full "30 days" after the Effective Date) amounts to sixty days.

464.   Grenada submits that RSM's breach justifies its termination of the Agreement; and it also claims nominal damages.

### *(02)  The Tribunal's Decision*

465.   In the circumstances, it is appropriate to decide this Issue G shortly. First, the Tribunal does not consider Article 6.1 to be a condition of the Agreement under the laws of Grenada, entitling Grenada to terminate the Agreement for any breach, however minor. Second, this breach was minor; and it could not justify Grenada's termination of the Agreement. Third, Grenada has not established that it suffered any loss from RSM's contractual breach; and the Tribunal is not inclined to order nominal damages.

466.   Accordingly, the Tribunal decides this Issue G in favour of RSM and against Grenada.

## PART X: ISSUE H – UNAUTHORISED RESEARCH

### (01)  Introduction

467.  The Tribunal assumes, for present purposes, that RSM undertook unauthorised research in February 2004, with the operations of the "GSI Admiral" in Grenadian waters in criminal violation of Section 4 of the 1989 Act, cited in Part III(03) above (paragraph 128, page 40).

468.  The question is whether this criminal violation was also a contractual breach of the Agreement or a tort under the law of Grenada, sounding in damages as claimed by Grenada in the sum of  EC$ 391,860.00.

### (02)  The Tribunal's Decision

469.  As regards a contractual breach, Grenada submits that the Agreement "expressly incorporates" the 1989 Act (paragraph 4.32 of its Rejoinder (page 65)). The pleaded reference is there made to Article 2 of the Agreement, which states only that the Agreement constitutes an agreement made under Section 6 of the 1989 Act.

470.  These are not words of contractual incorporation; and, in any event, these words cannot incorporate as a contractual term the provisions of Section 4 of the 1989 Act. (The Tribunal takes no account of the draft Regulations prepared under the 1989 Act because these regulations remained in draft, were never promulgated, had not acquired the force of law in Grenada and were not, as such, incorporated into the Agreement by Article 1.1(w) of the Agreement.)

471. The Tribunal does not accept Grenada's submission that, implicitly, RSM bore a like contractual obligation to that imposed by statute under Grenada's criminal law. Such a broad implied term in the Agreement has no legal basis under Grenadian law. If it were possible for Grenada to formulate a different implied contractual term to like effect, it is significant that Grenada has failed to do so in these proceedings.

472. Nor does the Tribunal accept Grenada's alternative argument that a violation of the 1989 Act equates with a tort under Grenada law. A crime may also be a tort; but it is not necessarily so; and Grenada has not established to the Tribunal's satisfaction, in this case, that a violation of Section 4 of the 1989 Act is a tort committed against Grenada sounding in damages.

473. Accordingly, this Issue H is decided by the Tribunal in favour of RSM and against Grenada.

### PART XI: ISSUE I – RESPONDENT'S RELIEF

474.   The Tribunal here addresses the remedies counterclaimed by Grenada, in the light of the Tribunal's several decisions recorded above and Grenada's prayer for relief, set out in nine sub-paragraphs in Part I above (paragraph 28, at pages 11-12).

475.   As regards the Arbitration Agreement and sub-paragraph 1, the Tribunal dismisses this counterclaim for a declaration that the Tribunal has no jurisdiction to decide RSM's claims.

476.   As regards the Agreement and sub-paragraphs 2, 3 and 5, the Tribunal decides and declares that Grenada has not breached any term of the Agreement; that all RSM's claims (save costs) are dismissed; and that Grenada's obligation to issue any Exploration Licence lapsed and the Agreement was terminated, such that Grenada has no further contractual obligations to RSM.

477.   As regards sub-paragraph 4, the Tribunal dismisses the Respondent's counterclaim for misrepresentation.

478.   The Tribunal does not think it appropriate or necessary to grant the further relief counterclaimed in sub-paragraph 6. The operative part of this Award should suffice to produce an equivalent result without requiring any intervention by this Tribunal, itself a procedural impossibility after this Award and the final discharge of this Tribunal's jurisdiction.

479.   The Tribunal dismisses the counterclaims for damages in sub-paragraph 7.

480.   As regards legal and arbitration costs, being claimed by RSM and counterclaimed by Grenada in sub-paragraphs 8 and 9, these are considered separately in Part XII below, under Issue J.

### PART XII: ISSUE J –  LEGAL AND ARBITRATION COSTS

#### (01)   Introduction

481.  The Tribunal's power to award costs in these proceedings derives from Article 61(2) of the ICSID Convention.  It provides as follows: "… the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid.  Such decision shall form part of the award." ICSID Arbitration Rule 47(1)(j) also requires that the award shall contain any decision of the Tribunal regarding the cost of the proceeding.

482.  There is no agreement otherwise by the Parties; and accordingly, the Tribunal is required to exercise its discretion as regards the three separate categories of costs: (i) the apportionment and assessment of the Parties' own legal costs; (ii) the apportionment of the fees and expenses of the Tribunal's three members; and (iii) the apportionment of ICSID's own charges.

#### (02)   The Parties' Respective Submissions

483.  *The Claimant:*  In its Memorial, the Claimant requested the Tribunal to make a declaration that " the Government must pay in full the fees and expenses of the Arbitrators, the ICSID administrative expenses and all costs incurred in connection with this arbitration by RSM (including without limitation the fees and expenses of all

151

experts and all legal fees and expenses)."[138]   Such request was reiterated in the Claimants' Reply.

484.   In the Claimant's final submissions on costs dated 9 July 2007, the Claimant quantified its claim in regard to its own legal costs in the total sum of US $1,881,316.66, in addition to any sums paid or payable by the Claimant to ICSID in respect of the Tribunal and ICSID itself. Its own costs comprised of UK £706,235.03 for Dewey LeBoeuf, €148,481.08 for Grand Auzas & Associés and US $259,850 for miscellaneous expenses incurred by the Claimant, including expenses of its witnesses.

485.   ***The Respondent:*** In its Counter-Memorial dated 8 December 2006, the Government requested the Tribunal to render an award "ordering RSM to pay all costs of this proceeding, including the Government's legal expert and expert fees and expenses, the fees and expenses of the Arbitral Tribunal and to any experts appointed by the Arbitral Tribunal, as well as the costs charged by ICSID." Such request was reiterated by reference in the Respondent's Rejoinder dated 25 May 2007.[139]

486.   In the Respondent's final submissions on costs dated 9 July 2007, the Respondent quantified its claim in regard to its own legal costs in the total sum of UK £896,728.14, likewise in addition to any sums paid or payable by the Claimant to ICSID in respect of the Tribunal and ICSID itself. Its own costs comprised of UK £130,000 for DLA Piper, UK £766, 728.14 for Freshfields Bruckhaus Deringer LLP (including Lord Mustill) and UK £22,160.00 for miscellaneous expenses incurred by the Respondent, including the costs and other expenses of its witnesses.

---

[138] Claimant's Memorial, para. 98.5.
[139] Respondent's Rejoinder, para. 6.

*(03)   The Tribunal's Analysis*

487. It is appropriate initially to consider the Parties' respective claims for their own legal costs.

488. First, the Tribunal considers that the Parties' claims are reasonable in amount. Indeed the amounts are comparable for both sides, by itself an indication that neither Party incurred expenditure at an excessive level.

489. Second, the Tribunal considers that such costs were reasonably incurred by each Party. Commercial parties and States do not usually waste money on legal costs when it remains a distinct possibility that such costs may be borne by them exclusively. This case was no exception. (The Tribunal addresses separately below the Respondent's complaint directed at the Claimant's conduct in these arbitration proceedings.)

490. The third issue relates to allocation or apportionment of legal costs as between the Parties. Neither the ICSID Convention nor the ICSID Arbitration Rules contains any express provision concerning the apportionment of costs between the parties. The Tribunal therefore turns to the general practices followed in international arbitration, recognising that such practices do not represent any uniform rule applicable in all cases.

491. Under an increasingly predominant practice, tribunals apportion costs on the basis of the success of the winning party in the arbitration, the rationale for such cost-shifting being the justification (or non-justification) of the time spent by a party in defeating the other's case and by the Tribunal in order to adjudicate upon that case: "the costs follow the event approach."

492. Under an equally predominant practice, tribunals may take into account the merits of each issue presented by the parties, regardless of the overall award: "the issue-based approach." Accordingly, even though a claim may succeed overall, the losing party may have prevailed under one or more important issues representing a major part of the arbitration as to time and expense.

493.  There is a further practice whereby tribunals make a broader assessment of the reasonableness of the unsuccessful party: it may have had valid reasons to believe that the claim was ill-founded; and conversely, an apparently well-founded claim may fail but the unsuccessful party may have had valid reasons to believe that it would succeed.

494.  These approaches demonstrate generally that, subject to applicable laws and arbitration rules, tribunals generally enjoy a broad discretion in making decisions on costs to fit the particular circumstances of the particular case.  As regards ICSID tribunals, this is especially evident from the wording of Article 61(2) of the ICSID Convention, together with the well-known commentaries: see *Schreuer (supra)*, pp. 1223 to 1238 and Gotanda, *Supplemental Damages in Private International Law* (1998), p. 177.

495.  In applying the Tribunal's discretion to the present case, it is significant that the Claimant has failed on its substantive claim, namely that the Respondent be ordered to pay it substantial damages. The Claimant is therefore, on this basis, the losing party. The Respondent, however, has failed on most of its counterclaims and, more, significantly, its jurisdictional challenge. It too, therefore, on the same basis can be regarded as a losing party.

496.  In this case, therefore, it is more appropriate to apply an issue-based approach.  As to the number of issues, there is a broad equivalence between the Parties as to jurisdiction and heads of liability for claims and counterclaims. In addition, it is also appropriate for the Tribunal to note that the Claimant's principal claim in damages, as regards liability, was a relatively close call.  In the Tribunal's view, it was responsibly pleaded and reasonably presented before the Tribunal by the Claimant's Counsel with a large degree of persuasiveness, which pays tribute not only to Counsel but also to the Claimants' case itself. The same can be said of the Respondent's Counsel on the jurisdictional challenge and the Respondent's failed counterclaims.  In short, this case was not easy or obvious; and it was far from the simple, straightforward exercise forensically suggested by both Parties at the main hearing (albeit to contrary effect).  It would be inappropriate to say more.

497.   The Tribunal has considered the Respondent's several complaints against the Claimant's conduct during these arbitration proceedings. It is certainly correct that the Claimant did not make this case procedurally easy for the Respondent or, at times, for the Tribunal. The Tribunal nonetheless concludes that no relevant criticism attaches to the Claimant for present purposes: its conduct was not motivated by bad faith; this was an important case for the Claimant (as it was for the Respondent); and given Mr Grynberg's litigious nature (as described above), it may be thought that the Claimant conducted itself in a relatively mild manner overall, influenced by its Counsel. In any event, the Tribunal rejects the Respondent's criticisms as a relevant factor in the exercise of its discretion on costs.

### *(04)   The Tribunal's Decision*

498.   Accordingly, for the reasons set out above and in the exercise of its discretion under Article 61(2) of the ICSID Convention, the Tribunal decides that the Claimant and the Respondent should each bear their own costs, without any recourse to the other.

499.   For the same reasons, the Tribunal decides that the Parties should each bear 50% of the Tribunal's fees and expenses and ICSID's charges.

## PART XIII: THE OPERATIVE PART

500.  **For the reasons set out above, the Tribunal finally awards as follows:**

501.  **The Tribunal rejects the Respondent's jurisdictional challenge and declares that all claims made by the Claimant lie within the jurisdiction of the International Centre for Settlement of Investment Disputes (ICSID) and the competence of this Tribunal, as also all the Respondent's counterclaims;**

502.  **The Tribunal dismisses all substantive claims made by the Claimant, including any claim for interest;**

503.  **The Tribunal declares that the Respondent did not breach any of its obligations towards the Claimant under their Agreement of 4 July 1996 in failing to issue an Exploration Licence to the Claimant, such obligation having lapsed on 28 March 2004 and the Agreement having been lawfully terminated on 5 July 2005 so that the Respondent had thereafter no further substantive contractual obligations to RSM;**

504.  **Save as aforesaid, the Tribunal dismisses all substantive counterclaims made by the Respondent, including any claim for interest;**

505.  **The Tribunal decides that the Claimant and the Respondent should each bear their own costs in full, without any recourse to the other; and**

506. **The Tribunal decides that the Parties should each bear fifty per cent of the Tribunal's fees and expenses and ICSID's charges, as separately notified by ICSID.**

**Made on    [13 March]        2009**

**ICSID, Washington D.C.**

[*Signed*]                                    [*Signed*]                                    [*Signed*]

**Bernard Audit**                    **V.V.Veeder**                    **David S. Berry**

[5 March 2009]                    [6 March 2009]                    [11 March, 2009]

157