# EXHIBIT B

Daniel L. Abrams (DA 7258)
2 Pennsylvania Plaza
Suite 1910
New York, New York 10121
(212) 292-5663
Attorney For Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 06 Civ. 11512 (EJW)

RSM PRODUCTION CORPORATION,
JACK J. GRYNBERG, and
GRYNBERG PETROLEUM COMPANY,

Plaintiffs,

v.

MIKHAIL FRIDMAN, LEN BLAVATNIK,
LEV KORCHAGIN, LEV MODEL,
GLOBAL PETROLEUM GROUP, LTD.,
TNK-BP LIMITED, LORD JOHN BROWNE,
BP, p.l.c., GREGORY BOWEN and JOHN DOES 1-5

Defendants.

## THIRD AMENDED COMPLAINT

Plaintiffs, RSM Production Corporation ("RSM"), Jack J. Grynberg

individually, and Jack J. Grynberg d/b/a Grynberg Petroleum Company (collectively

"Grynberg"), and file their Amended Complaint against the Defendants Mikhail

1

Fridman, Len Blavatnik, Lev Korchagin, Lev Model, Global Petroleum Group, TNK-BP, Gregory Bowen Lord John Browne and BP, p.l.c. and for grounds allege:

## PARTIES

1.      Plaintiff RSM Production Corporation is a corporation incorporated in the State of Texas, whose address was 5000 S. Quebec Street, Suite 500, Denver, Colorado 80237, and later 5299 DTC Boulevard, Suite 500, Greenwood Village, Colorado 80111.  Plaintiff Jack J. Grynberg is a resident and citizen of the State of Colorado, whose address is c/o Grynberg Petroleum Company, 5299 DTC Boulevard, Suite 500, Greenwood Village, Colorado 80111.

2.      Defendant Mikhail Fridman is Chairman of the Board of Directors of TNK-BP.  Fridman at relevant times has been President of the Russian Jewish Congress and its principal donor.  TNK-BP is a Russian oil company, established in September 2003 as a result of the merger of Russian companies TNK (Tyumen Oil Co.) and SIDANCO with the majority of BP's Russian oil assets.  The company is 50% owned by BP (British Petroleum Company, p.l.c.) and 50% by a group of prominent Russian investors: Alfa Group, Access Industries and Renova (AAR). Defendant Fridman is Chairman of the Board of Directors of the Alfa Group Consortium, and Chairman of the Board of Directors of Alfa-Bank, which has offices at 540 Madison Avenue, 30th floor, in New York, New York 10022.  Upon information and belief Defendant Fridman, with no knowledge of the Caribbean geology and geophysics, is acting both individually and as an agent for TNK-BP and

2

BP, which has vast oil and natural gas production, liquefied natural gas (LNG) operations exploration development and vast production across the border in offshore Trinidad and Tobago.  BP is a giant British international and U.S. domestic integrated oil and energy company.  BP is incorporated in the United Kingdom (England).

    3.     Defendant Len Blavatnik is a member of the Board of Directors of TNK-BP.  TNK-BP is a Russian oil company, established in September 2003 as a result of the merger of Russian companies TNK (Tyumen Oil Co.) and SIDANCO with the majority of BP's Russian oil assets.  The company is 50% owned by BP and 50% by a group of prominent Russian investors: Alfa Group, Access Industries and Renova (AAR).  Upon information and belief Defendant Blavatnik maintains a residence in New York at 2 East 63rd Street, 10021, and conducts business affairs through his company Access Industries, at 730 5th Avenue, New York, New York, 10019.  Upon information and belief Defendant Blavatnik, with no knowledge of the Caribbean geology and geophysics, is acting both individually and as an agent for TNK-BP and BP, which has vast oil and natural gas production, liquefied natural gas (LNG) operations development across the border in offshore Trinidad and Tobago.  BP is a giant British international and U.S. domestic integrated oil and energy company.  Blavatnik is a member of the board of directors of the American Jewish Congress.

3

4.      Defendant Lev Korchagin is an attorney in Russia and the legal and business advisor for, and conspirator with, the Defendants in their tortious activities against the Plaintiffs. Defendant Korchagin has called Grynberg in 2005 on the phone several times at the Grynberg offices in Colorado. Defendant Korchagin's business mailing address in Moscow is 123182, Moscow, Russia, Ulitsa Aviatsionnaya, 24, Building 1 Lawyers Bureau "ICA". Defendant Korchagin's telephone number is +011-7 495 755-8666. Defendant Korchagin is on the Board of Directors of Global Petroleum Group. Ltd., with a mailing address of P.O. Box 346, St. George's, Grenada.

5.      Defendant Gregory Bowen is a key co-conspirator in as much as he was a recipient of bribe monies provided directly, and in some cases indirectly, from the other Defendants. Bowen is and at all relevant times was Deputy Prime Minister of the Government of Grenada, as well as Grenada's Minister of Energy.

6.      Defendant Lev Model is a former Russian National who is a resident of Brooklyn, New York. He has on information and belief split his time in recent years between Grenada, New York, New Jersey and Ireland. Mr. Model is a Director of Global Petroleum Group, Ltd. His address in Grenada is Westerhall, St. David's, Grenada. On Information and belief, Mr. Model is the Chairman of Global Petroleum Group, Ltd. Mr. Model is presently in default in this case for failing to respond to the Second Amended Complaint despite being duly served.

4

7.     Defendant Global Petroleum Group, Ltd. is a Grenadian Company founded in 2003 by defendants Model and Korchagin as well as Eduaro Vasilev, who on information and belief is a Russian.  The formation was approximately four months after the official creation of TNK-BP.  The primary purpose of Global Petroleum Group is to facilitate the payment of monies to Grenadian officials as well as to the Government of Grenada, and to act as a front for defendants Blavatnik, Fridman, TNK-BP, and BP.  Global Petroleum Group's mailing address is P.O. Box 346, St. George's, Grenada.  Global Petroleum Group, Ltd. is presently in default in this case for failing to respond to the Second Amended Complaint despite being duly served.

8.     Defendant TNK-BP Limited ("TNK-BP") is a company organized under the laws of the British Virgin Islands.  TNK-BP is a joint venture in which BP owns 50%, Fridman's Alfa Group owns 25% and Blavatnik's Access Industries together with a large Russian conglomerate called Renova owns the other 25%.  TNK-BP was created in 2003, and ownership of TNK International, Ltd., formerly OAO Tyumen Oil Company (collectively, "TNK") was transferred to TNK-BP at that time.

9.     Defendant Lord John Browne is a British resident and national.  He was Group Chief Executive of BP, p.l.c. until he stepped down on May 1, 2007.

10.     Defendant BP, p.l.c. ("BP") is the free world's second largest oil and energy company and is a company organized under the laws of the  United Kingdom.  BP does business in the United States as BP Corporation North America,

Inc., and maintains an investor relations office at 535 Madison Avenue, 22nd Floor, New York, New York 10022.

11.     Defendants John Doe 1-5 are individuals or entities which are affiliated with some or all of the named Defendants, and which, upon further investigation or discovery, may be added as defendants for their role in the scheme described herein. These defendants may include Peter Sutherland, who is Chairman of BP.

## BACKGROUND INFORMATION

12.     RSM and the nation of Grenada signed an exclusive Petroleum Agreement in July 1996. The Petroleum Agreement was to have resulted in an oil and natural gas exploration, development and production license being issued as a matter of routine by Grenada to RSM. Grynberg worked, and works, on behalf of RSM in efforts to explore, discover and develop oil and natural gas reserves in offshore Grenada, for the benefit of the people of Grenada, the United States of America, as well as the free world.

13.     Jack J. Grynberg is 75 years old. He is president and co-owner of Grynberg Petroleum Company. Grynberg is a citizen of the United States and a resident of the State of Colorado. He is a graduate and a trustee emeritus of the Colorado School of Mines. Grynberg has been actively involved in oil and natural gas research, exploration, development and production for more than fifty (50) years and is responsible for numerous oil and natural gas field discoveries and extensions

6

in the United States and overseas.  He is a Registered Professional Engineer in good standing in the States of Colorado, South Dakota, Oklahoma and Texas, is a member of many professional and trade associations, author of numerous publications and holder of a U.S. patent for the application of laser beams for the continuous detection and identification of hydrocarbons in the mud stream coming out of a bore hole while drilling.  He was appointed by President Ford and reappointed by President Carter to the Committee on Nuclear and Alternate Energy of the National Academy of Sciences.  He was appointed by President Clinton to participate in the presidential mission to Russia in March 1994 headed by the late Secretary of Commerce Ron Brown representing the United States oil and gas industry.  He has been a speaker at the 5th, 6th and 7th United Nations sponsored conference on African Oil, Gas and Finance, where he represented the United States at the 7th conference.  For the past several years he has been a speaker at oil and natural gas international conferences in London, England, Cape Town, South Africa, Rio de Janeiro, Brazil, Houston, Texas, Barcelona, Spain, Lille, France and Hamburg, Germany.  A copy of H.R. 435, a proposed Congressional bill Mr. Grynberg has championed, related press releases and Mr. Grynberg's resume is attached hereto as Exhibit A.

14.     In late January 1999, Mr. Grynberg made a presentation to Robin Morris, Esq. the General Counsel of BPX (British Petroleum Exploration Company, which at relevant times was a wholly-owned exploration, development and

production subsidiary of BP, with Defendant John Browne at the time serving as

the Chief Executive Officer of BPX) in Denver, Colorado, on the giant oil and

natural gas potential of offshore Grenada. Mr. Grynberg gave Mr. Morris extremely

valuable confidential, exclusive, geologic, geophysical and economic information of

the vast oil and natural gas potential of offshore Grenada, with the understanding

that Mr. Morris was going to take this information with him to London, and present

it and give it directly to John Browne. Mr. Morris later informed Mr. Grynberg that

he in fact presented the information and gave it to John Browne. Mr. Grynberg

provided this information as part of his efforts to perform RSM's side of the contract

with Grenada, and to maximize the value of Grenada's vast offshore hydrocarbon

(oil and natural gas) reserves. Grynberg offered BPX an invitation to join RSM in

its giant exploration, development and production project in offshore Grenada. This

followed a strained relationship between Grynberg and BP, the tension of which

had recently eased, causing Grynberg to believe he could again trust and do

business with BP and John Browne, as he had done before, going back to 1973. To

this date Grynberg has natural gas production with BP in the USA. BP had

resources that could assist RSM in implementing the project, and was active in

offshore Northeastern Venezuela and Trinidad and Tobago to the south, which are

areas neighboring Grenada both geographically and geologically. BPX kept the

copies of the paper and computer information for approximately a month and, on

information and belief, made copies of the valuable confidential information. BPX

8

turned down the opportunity a few months later, but apparently is now trying to

capitalize on its previously-acquired knowledge.

15.    In September 1996, in Grenada, Gregory Bowen, who is Deputy Prime

Minister in charge of Grenada's Energy affairs, advised Jack Grynberg that he

expected significant bribe payments from RSM and Grynberg in order for RSM and

Grynberg to do business in Grenada.   After the refusal of RSM and Grynberg to pay

bribes to Bowen, Bowen obstructed, harassed and intimidated RSM and Grynberg

in their efforts to explore, develop and produce Grenada's oil and natural gas

resources, including, but not, limited to: rescinding the Special Envoy to Venezuela

status of Jack Grynberg, which he was using to attempt to resolve boundary

disputes between Grenada and Venezuela, refusing to participate in a case in the

International Court of Justice between Grenada and Trinidad and Tobago to resolve

the undetermined boundaries, filed at great expense by RSM, which boundaries

Grynberg successfully resolved with Trinidad and Tobago, to the benefit of

Grenada, granting illegal permission to other parties to perform seismic work on

exclusive license area of the Plaintiffs, and taking no steps to preserve Grenada's

United Nations seismic data after Grynberg offered to preserve and reprocess the

data at no cost to the Grenadian government, with a copy to be delivered free of

charge to Grenada. That Seismic data, which was stored in an open garage in

Barbados, is now destroyed due to humidity.   RSM also spent over $170,000 to

litigate in Federal District Court against Petroleos de Venezuela (PDVSA), the

Venezuelan government oil company to prevent PDVSA from trespassing in a manner which violated RSM's Grenadian offshore exclusive exploration and development contract. RSM at its own expense has utilized its technical, scientific and economic knowledge to resolve boundary disputes in spite of obstacles created by Gregory Bowen. RSM is additionally incurring the large costs of an arbitration with Grenada before the International Centre for Settlement of Investment Disputes (ICSID) of the World Bank in London, England, to remove these artificial, bogus and fraudulent obstacles created by Bowen.

16.     Defendants have conspired to interfere with the existing Petroleum Agreement between RSM and Grenada and the issuance of the oil and natural gas exploration, development and production license by Grenada to RSM, pursuant to an active, valid and exclusive contract agreement, with the issuance being a mere formality. Defendants, each in their own way, are attempting and have attempted to profit from the vast potential for exploration, development and production of Grenada's oil and natural gas, in total disregard and in contempt for Plaintiffs' contractual rights, pursuant to the existing exclusive RSM Petroleum Agreement. These efforts are in direct violation of the Foreign Corrupt Practices Act and the 1997 Organisation for Economic Cooperation and Development ("OECD") Convention on Bribery of Foreign Public Officials in International Business Transactions. These actions are also in contravention of Transparency International's ongoing efforts to lead a global coalition against corruption.

## BACKGROUND BEFORE THE SCHEME

17.    In 2003, TNK-BP was formed. This reflected a joint venture between BP on the one hand and several Russian oil companies owned or controlled by defendants Blavatnik and Fridman on the other hand. It also represented the coming together of entities which had previously had several well-publicized conflicts with one another.

18.    By way of brief background, BP had an approximately $200 million investment, representing a 10% stake in a Russian Oil Company named the Siberian Far Eastern Oil Company ("Sidanco"). TNK. stripped the assets of this company, engendering well-documented animosity between Lord John Browne, BP's C.E.O. at the time, and Fridman who effectively controlled TNK. On November 15, 1999, TNK acquired a Sidanco subsidiary, Chernogorneft, in what BP maintained was a rigged bankruptcy auction, for about $176m, or a tenth of what Russian analysts estimated to be the value of that company. This happened despite a letter-writing campaign initiated by BP, who asked then-British Prime Minister Tony Blair to write Russian President Vladimir Putin, complaining that "BP fears that what is and could be a healthy and profitable company will be manipulated into bankruptcy and collapse."

19.    BP was not the only western investor being burned. As Sidanco was apparently being looted with the assistance of TNK, Blavatnik and Fridman, TPT

11

Ltd., which was a group of American and international investors including the

George Soros Funds and Harvard University's endowment, with interests in

Sidanco, hired the law firm of Latham & Watkins and brought suit in New York

against, *inter alia*, Blavatnik and companies owned by Blavatnik and Fridman. <u>See</u>

TPT Ltd. v. Blavatnik 99/605295 (NY. County, Exhibit B hereto).

20.    The TPT complaint alleged, *inter alia*, Sidanco is being victimized by

"one of the most bizarre and brazen acts of corporate theft in recent memory." The

complaint detailed how defendants bought and used corrupt judges, corrupt

regional officials, and a corrupt bankruptcy trustee to obtain two of Sidanco's most

valuable assets at bargain basement prices.

21.    As was known by BP at the time, Blavatnik and Fridman had a

reputation for corrupt business practices. A 1999 Washington Post article observed:

> ...Political connections are crucial in Russia's new capitalism,
> so Blavatnik and his partners placed local Siberian politicians –
> including the governor of the Tyumen region -- on their
> company's board.

Exh. B at ¶ 11.

22.    The TPT Complaint also alleged that TNK, at the time largely owned

and controlled by Fridman, had improper relationships with many judges, and

noted that the Russian press was "replete" with stories concerning the improper

relationship between TNK and these judges. Exh. B at ¶ 31. The TPT Complaint

further documented numerous press reports of TNK allegedly resorting to violence

12

when judges or other local officials did not cooperate.  Exh. B at ¶¶ 32-33.

According to one Russian press report:

> one of the (Russian) judges was beaten "unmercifully"
> in the street after she was "imprudent" enough to support
> an adversary of TNK in court proceedings.

Exh. B at ¶ 32.

23.     On information and belief, prior to the TNK-BP joint venture, TNK

and/or its affiliates engaged in criminal and corrupt practices in obtaining other

major Russian oil assets, including Niznevartovsk Nefte Gaz, Kondpetroleum, and

Yugraneft.  And in February of 2002, a victimized company named Norex Petroleum

brought suit in this District against, *inter alia*, Blavatnik, Blavatnik's Access

Industries, and Fridman's Alfa Group.  This complaint implicates Blavatnik,

Fridman's company, and TNK in no less than five separate Russian criminal

bribery scandals.  It concludes that TNK and the other Defendants were essentially

bribing their way to control of a substantial portion of the Russian oil industry.

Moreover, Norex alleges that both TNK and Fridman's Alfa Group were major

players in the well-known criminal "Oil-For-Food" scandal involving post-Gulf War

Iraq and Saddam Hussein.  The Complaint was amended after the TNK-BP merger

to, *inter alia*, name TNK-BP, BP and Lord John Browne as Defendants.  The

Amended Complaint filed by Norex Petroleum is attached hereto as Exhibit C.  It

alleges not only bribery, but resort to physical threats to obtain the valuable assets

of the Russian oil company Yugraneft.  Id. at 29-32.

13

24. BP and Lord John Browne were no doubt aware of TNK's extensive reputation for bribery and corruption at the time BP agreed to join forces with TNK. And BP has its own history of corruption. BP, led by Lord John Browne at all relevant times until earlier this year, has recently been alleged by one of its own former top executives to have bribed Azeri (i.e., Azerbaijan) officials in the early-1990's to secure giant petroleum rights in the Offshore Caspian Sea. An article detailing the scheme and related misconduct is attached hereto as Exhibit D. Mr. Browne has also recently been found to have committed a criminal contempt of court for lying to a UK High Court Judge during an attempt to cover up a newspaper story concerning claims of wrongdoing by a former boyfriend. Thus, while BP had been burned by TNK's criminal corruption in the past, it had no moral qualms about doing business with the likes of TNK, Fridman and/or Blavatnik. On information and belief, BP entered into a joint venture with TNK so that they could profit from TNK's corrupt and criminal business practices. Thus, despite having been a victim of TNK's corruption and criminality, and an outspoken critic of that corruption, BP agreed to become a 50% partner and joint venturer with TNK. The collaborative efforts started in 2002, when BP and TNK settled their differences, pursuant to which TNK allowed BP to share in the spoils of their corruption and criminal activity. To settle the dispute, TNK transferred assets to BP-managed Sidanco, assets which on information and belief were previously stolen from

14

Chernogorneft and Kondpetroleum, for the benefit of BP but to the detriment of other defrauded western investors.

## THE SCHEME BEGINS

25.     In December of 2003, just months after the creation of the TNK-BP joint venture, Lev Model formally created a Grenadian company called Global Petroleum Group.  The incorporation documents were prepared by a Grenadian attorney with close ties to Prime Minister Mitchell and the ruling party.  Other directors of Global Petroleum Group include Defendant Lev Korchagin and Eduaro Vasilev, who on information and belief is a Russian national.

26.     On information and belief, Mr. Model is the same "Lev Model" that is a convicted criminal.  Back in 1991, when Mr. Model was a resident of Englewood Cliffs, New Jersey, he stole at least $1.2 million from a Soviet oil company.  A New York Times article describing the theft and the resulting guilty plea is attached hereto as Exhibit E.  In a nutshell, Model was given millions of dollars by a Soviet oil company, and was supposed to provide household appliances for the company to sell to its workers.  Instead, Model stole and pocketed most of the money.

27.     Mr. Model served 28 months in federal prison.  On information and belief, his enormous and brazen theft from a Russian oil company made him a well-known thief in Russian petroleum circles.  And this is the individual who defendants Fridman, Blavatnik, and TNK-BP selected to lead their efforts in Grenada, to organize Global Petroleum Group and to transfer millions of dollars to

15

Grenadian officials in criminal violation of the Foreign Corrupt Practices Act and the 1997 OECD Convention on Bribery of Foreign Public Officials in International Business Transactions.

28.    On information and belief, Model and Global Petroleum Group serve as fronts for Fridman's, Blavatnik's, BP's and TNK-BP's efforts to bribe Grenadian officials, and thereby acquire rights to explore, develop and produce the Grenadian offshore areas believed to contain very promising vast.recoverable reserves of petroleum hydrocarbons.  From at least the time of the August 2003 creation of TNK-BP, on information and belief, Fridman, Blavatnik and TNK-BP were all aware of RSM's exclusive contract with the Government of Grenada.  And BP and Lord John Browne were aware of RSM's contract with Grenada at all times subsequent to Mr. Grynberg's January 1999 disclosure of the same to BP, and Mr. Morris' subsequent sharing of the information with Lord John Browne.  Indeed, BP and Browne personally possessed RSM's confidential, proprietary and exclusive geologic, geophysical and economic information on the giant oil and natural gas potential of offshore Grenada.  Nevertheless, on information and belief, BP and Browne have used this information, and have acted on it by conspiring to bribe Grenadian officials in clear violation of the US Foreign Corrupt Practices Act and Act and the 1997 OECD Convention on Bribery of Foreign Public Officials in International Business Transactions.  Defendants have consequently interfered with RSM's contract and economic relationship with Grenada.

16

## THE SCHEME IS IMPLEMENTED

29.     Within months after the formation of Global Petroleum Group,
in 2003 Grenada took active steps to get out of its exclusive contract with RSM.
RSM and Grenada were previously honoring their 1996 contract. This despite a
*force majeure* period necessitated by boundary disputes. By letter dated July 18,
1996, RSM provided notice to the Government of Grenada, which was accepted, and
agreed to, by Grenada through the countersignature of the then Minister of State,
Ministry of Finance, Senator Patrick Bubb. In the nearly eight (8) years that
followed, both Grenada and RSM worked on resolving the necessary boundary
issues, in spite of many uncalled for obstacles created by Gregory Bowen personally,
and directed at RSM.

30.     In reliance upon Grenada's contractual promise that an
exploration license would be issued upon RSM's application, RSM made substantial
multi-million dollar investments during this eight-year period in acquiring new, and
reprocessing older, seismic and geophysical exploration data and other subsurface
geologic data obtained from Venezuelan (and other) sources by RSM pertaining to
all the offshore waters of Grenada.

31.     By preliminary letter dated January 12, 2004, RSM wrote to the

Prime Minister of Grenada, advising him that RSM believed that sufficient progress had been made to allow it to proceed and that it was in the process of revoking the *force majeure*.

32.    By letter dated February 19, 2004, the Honorable Gregory Bowen, Grenada's Minister for Agriculture, Lands, Forestry, Fisheries, Public Utilities and the Marketing and National Importing Board, wrote to RSM, advising it that the January 12th letter had been passed to his legal department for advice on the agreement and the effect of the *force majeure*. RSM delivered its application for an oil and natural gas exploration license to the Permanent Secretary of the Ministry of Finance on April 14, 2004, after a four (4) day holiday, in compliance with the contract.

33.    RSM, not having received any communication from Grenada of any type since Mr. Bowen's letter of February 29, 2004, sent its agent, David Myrick, Jr., to meet personally with government officials at a Caribbean conference in Tobago, an island of Trinidad and Tobago near the island of Grenada. On April 20, 2004, Mr. Myrick met with Minister Bowen, who expressed his frivolous concerns that the exploration license application did not contain audited financial statements and that a corporate surety bond had not been provided to cover the cost of the first exploration well. Minister Bowen's comments did not indicate a rejection of the application, but rather concerns over certain portions of its contents relating to financial assurance. None of these financial terms urged by Bowen were required

18

by the exclusive contract between Grenada and RSM, and Minister Bowen's request was both frivolous and a typical harassment.  This exclusive contract was freely negotiated with the Prime Minister of Grenada, who utilized strong advice from experts in the Oil and Gas offices of the Commonwealth Advisory Service in London, Great Britain.

34.    By letter dated April 27, 2004, Minister Bowen advised RSM for the first time of his position that the RSM exploration license application had been untimely filed.

35.    By letter dated May 4, 2004, RSM explained to Minster Bowen its computation of the arbitrary 90-day application period and requested guidance as to how the dispute might amicably be settled.

36.    By letter dated May 21, 2004, Minister Bowen stated that the Government of Grenada was not in agreement with RSM.

37.    By letter dated June 16, 2004, RSM again sought an amicable resolution of the dispute.

38.    By letter dated July 1, 2004, Minister Bowen rebuffed RSM's efforts to resolve these issues, indicating that all future correspondence would be from Grenada's legal team.

39.    From July 1, 2004 to August 31, 2004, no correspondence or other communications were received by RSM from Grenada's legal team or any other representative of Grenada.

19

40.     RSM filed a Request for Arbitration with the International Centre For Settlement Of Investment Disputes ("ICSID"), on or about August 31, 2004. The Arbitration between RSM and Grenada is now pending with ICSID, at great expense to RSM, with Grenada's legal expenses, on information and belief, being covered entirely by the Defendants. Indeed, Grenada first took its ICSID case against RSM to the law firm of DLA Piper Rudnik Gray Cary, a law firm with close ties to Blavatnik and BP. Blavatnik has at relevant times served as the Vice Chair of the Keenan Council, and the board members have included Theodore C. Jonas of the DLA Piper firm, James C. Langdon, Jr., who is an Akin Gump attorney who has represented Fridman, and Richard Herold of BP. And Grenada's present counsel is Freshfields Bruckhaus Deringer, a firm in which Defendant John Browne served on its international advisory board at the same time he was Chairman of BP.

## GRENADA'S REPUTATION FOR CORRUPTION

41.     Prior to the formation of either Global Petroleum Group or TNK-BP, the government of Grenada, which has existed in largely its present form under the rule of Prime Minister Mitchell since 1995, had a well-known reputation for criminal bribery and corruption. It also had a reputation for consorting with known felons.

42.     One example is Prime Minister Mitchell's relationship with Viktor Kozeny a/k/a "the Pirate of Prague." Kozeny is a fraudster and mega-thief who has been implicated in numerous securities fraud and bribery scandals

involving Eastern Europe and the former Soviet Union. Mitchell named Kozeny

"Honorary Counsul" from Grenada to the Bahamas, where Kozeny was fighting off

extradition attempts on the part of the United States and United Kingdom.

Mitchell is reported to have taken many rides on Kozeny's private jet. Mitchell also

received much negative press for allowing Kozeny to buy the car Mitchell rides to

official government functions. Kozeny threw expensive parties for Grenadian

officials on his yacht and on information and belief secured a diplomatic Grenadian

passport which, pursuant to international law, may have complicated the United

States' and United Kingdom's efforts to have Kozeny extradited. On information

and belief, Mr. Kozeny has been released on bail from a Bahamian Prison pending

appeal of an order that he be extradited to the United States to face corruption

charges in New York related to accusations that he paid millions of dollars of bribes

to Azeri (Azerbaijan) officials as part of a failed effort to gain control of the state-run

oil company (SOCAR), which he never did. It is expected that Kozeny will be

extradited to the United States soon.

      43.     Another example involves convicted securities fraudster Eric

Resteiner. According to Timothy Bass, who was Mr. Resteiner's security director at

relevant times, Bass videotaped a meeting in June of 2000 whereby Mr. Mitchell

accepted, and Mr. Resteiner provided, $500,000 in $100 bills to Mr. Mitchell. In

exchange, Mr. Resteiner was reportedly provided Grenadian citizenship and was

named Ambassador At Large from Grenada. Mr. Bass has also testified to another

exchange of $500,000 from Resteiner to Mitchell that was not videotaped. A copy of the transcript of Mr. Bass's pertinent testimony is attached hereto as Exhibit F. Mr. Resteiner confirmed the existence of the bribery videotape in his request for leniency prior to being sentenced, on May 16, 2007, to 87 months in a Federal Prison. See Exhibit G.

44. Ironically enough, it was another of Mr. Mitchell's foreign "honorary" ambassadors which led to RSM's discovery of the criminal scheme to interfere with its exclusive contract.

## RSM DISCOVERS THE ILLEGAL SCHEME

45. At the early stages of the still-pending RSM/Grenada arbitration, two individuals reached out to Jack Grynberg in an effort to settle the dispute. One is Defendant Lev Korchagin, who called Mr. Grynberg on several occasions in or around August of 2005. Than, later in 2005 and early 2006, Mr. Michael Melnicke, a New York business person who is Grenada's "Ambassador-At-Large" reached out to Mr. Grynberg. Melnicke also serves with Blavatnik as a Director of the American Jewish Congress.

46. Around August 2005 Grynberg received an unsolicited call from a Lev Korchagin, from Moscow, Russia. Mr. Korchagin represented himself as being an attorney as well as the Director of Global Petroleum, a Grenadian oil & gas company. Mr. Korchagin suggested that he and Grynberg meet in London, England, to resolve any problems RSM has in Grenada, which he, and the people he

22

represents could be instrumental in resolving. When Grynberg inquired as to why he would not come to the U.S. if he is willing to go all the way to London, Mr. Korchagin explained that he needed to have a "neutral" site and not a location which is subject to American jurisdiction. Korchagin further explained that if his group could participate as a partner in RSM's offshore Grenada license, his group would work everything out. Mr. Korchagin assured Mr. Grynberg of a positive outcome because he claimed that his group "owns" the Government of Grenada. At which point Grynberg sensed a violation of the U.S. Foreign Corrupt Practices Act, and told Korchagin to "have a good day," and that he had no interest in meeting him in London or anywhere else.

47. Thereafter, Mr. Melnicke called Mr. Grynberg to discuss brokering a deal between RSM and Grenada. There were many conversations between Grynberg and Melnicke, as well as correspondences from Melnicke to Grynberg, covering the contractual dispute between RSM in Grenada, and spanning late 2005 and early 2006.

48. Melnicke represented himself to be an American ambassador to Grenada, a representation that Grynberg later discovered was false. Instead, much like Kozeny and Resteiner, Melnicke was an "Ambassador At Large" of Grenada, appointed by Prime Minister Mitchell.

49. Melnicke offered to be a peacemaker who could resolve the dispute between Grenada and RSM. He asked that, as compensation for his efforts,

he receive a substantial overriding royalty based on the amount of oil and natural gas that was ultimately produced pursuant to the exclusive RSM/Grenada contract. Melnicke had a Colorado attorney named Barry Specter draft several revisions of a proposed contract for RSM to sign.  Drafts of the agreements prepared by Melnicke's Counsel are attached hereto as Exhibit H.  RSM refused to sign any of these agreements in light of the apparent Foreign Corrupt Practices Act implications and potential violations.

50.     In the course of trying to negotiate this agreement, Melnicke revealed to Grynberg in early 2006 that Blavatnik and Fridman had bribed Gregory Bowen so that their group could develop the vast petroleum reserves believed to exist in the offshore Grenadian territory.  Melnicke further revealed that Blavatnik and Fridman had promised additional bribes to Grenadian government officials in the future, and had promised to pay all of Grenada's legal fees in connection with the arbitration between RSM and Grenada.  According to Melnicke, at least one of the meetings designed to discuss the scheme occurred in New York, with Blavatnik, Fridman and Bowen all in attendance.  Melnicke also told Grynberg that he had arranged a fundraiser in New York for Prime Minister Mitchell's re-election effort.

51.     On October 31, 2006, plaintiffs herein brought this case.

### FACTS LEARNED SINCE THE FILING OF THE INITIAL COMPLAINT

52.     On June 21, 2007, Gregory Bowen provided testimony in the arbitration pending between RSM and Grenada in London, England.  For the first

24

time, a Grenadian official gave testimony under oath concerning the organizational structure of the Global Petroleum Group. RSM now understands what it had already suspected, which is that Global Petroleum Group is a front group for multiple large companies, including on information and belief TNK-BP and BP. According to Mr. Bowen, Global Petroleum Group is affiliated with a company that is "one of the biggest....seismic scientific investment company and that they did work in the US and the UK and (sic) China." He further noted that the "group" of companies was active "nearly all over the world," including the Middle East and Russia. On information and belief, given the small number of companies that could fit this profile, BP's knowledge of the Grenadian opportunity, plus Blavatnik's and Fridman's apparent involvement, Mr. Bowen was alluding to defendants BP and TNK-BP and perhaps affiliated entities.

53.    In June and July of 2007, minutes of certain official Grenadian Government proceedings were made public. These proceedings in conjunction with other documentation show that Global Petroleum Group has invested over $4 million (and quite possibly much more) into the legal defense of the Government of Grenada in the arbitration against RSM. A check showing a wire transfer payment of $1,899.975 dated May 25, 2006 is attached hereto as Exhibit I. On information and belief, Defendants decided to document these payments since they were for the benefit of the government and would need to be accounted for, but there are also

substantial·other payments that went directly to Bowen and other Grenadian officials.

54.     Additional documentation discovered after the filing of the initial complaint indicate that there is an agreement between Global Petroleum Group and Grenada covering legal expenses to be employed against RSM, and that Lev Model purported to *personally* advance the first $2.5 million in October of 2005 of money to cover Grenada's legal expenses. This led to RSM's investigation of Mr. Model and uncovering of his apparent criminal conviction and a separate civil judgment. On information and belief, based in part on garnishment proceedings involving Mr. Model in New Jersey, Mr. Model had no ability to pay this money personally, but was acting as a front person for Defendants Blavatnik, Fridman, TNK-BP and BP.

55.     RSM has also recently learned that Lev Model paid the college tuition of Gregory Bowen's daughter. This was learned through Michaele Rose, a woman who worked for the Call Centres of Grenada ("CCG") in 2004-2005, who heard both Mr. Model and Mr. Bowen's daughter confirm the same. CCG was a Call Centre owned by the Grenadian Government and run by Mr. Model. Michaele Rose was the number two person at CCG. Ms. Rose's Declaration is attached hereto as Exhibit J. Mr. Model has also paid the salaries of hundreds of other Grenadian government workers.   On information and belief, based in part on garnishment proceedings involving Mr. Model in New Jersey, Mr. Model had no ability to pay

this money personally, but was acting as a front person for Defendants Blavatnik, Fridman, TNK-BP and BP.

56.     Thus Plaintiffs claim against Defendants, for conspiracy and intentional tortious interference with a significant and excellent prospective business advantage, which will in addition supply the badly needed oil and natural gas demand of the United States and enhance the National Security of the United States of America.

## JURISDICTION AND VENUE

57.     Subject matter jurisdiction is appropriate in this action pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship. Jurisdiction is also appropriate as to Gregory Bowen pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603, 1605, and the jurisdictional provisions contained at 28 U.S.C. § 1330.

58.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FIRST CAUSE OF ACTION – INTENTIONAL TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGES (Against All Defendants, With the Exception of Gregory Bowen)

59.     Plaintiffs fully incorporate paragraphs 1-58 above, and claim against Defendants for damages for intentional tortious and illegal interference with prospective business advantages.

60.     The Defendants have conspired to finance Grenada's legal defense of the non-issuance of the exclusive oil and natural gas exploration,

27

development and production license to RSM, and have persuaded Grenada to not issue such an oil and natural gas license to RSM as required by an exclusive existing contract, for highly technical, insignificant and flimsy reasons. The issuance of the license was originally intended to be, and should be, a mere formality. There is nothing to the contrary in Grenada law, nor in the contract.

61. The Defendants have conspired to tortiously interfere with the issuance of an oil and natural gas exploration, development and production license by Grenada to Plaintiffs. The Defendants are financing Grenada's defense in ICSID and are supporting a corrupt Grenada Minister who solicited a bribe from Grynberg, which was refused, and thereby have illegally interfered with a vast and very significant prospective business advantage of the Plaintiffs, as well as of Grenada, its People and the United States, which badly needs nearby oil and natural gas supplies independent of the turbulent Middle East in a world with diminishing oil and natural gas supplies and reserves. Minister Bowen informed Jack J. Grynberg in September 1996, in Grenada that the Minister expected significant bribes from RSM and Jack J. Grynberg in order for RSM to do business in Grenada. Minister Bowen stated that his Ministry salary was too small for he and his family to live on. The People of Grenada have suffered greatly after its devastating hurricane of 2004, and are entitled to the fruits of its natural resources, which is being delayed unnecessarily and sabotaged by the actions of these Defendants. Each individual Defendant are and were at all relevant times actually

28

aware of the exclusive contract and economic relationship between RSM and
Grenada.

62.    The Defendants have intentionally, improperly, illegally and
tortiously interfered with Plaintiffs' ongoing, transparent and active business
relationship with Grenada, and Plaintiffs' prospective business advantages arising
out of the issuance of an oil and natural gas exploration, development and
production license by Grenada to Plaintiffs, as required by the exclusive July 1996
contract.  On information and belief, the wrongful conduct has included criminal
violations of the US Foreign Corrupt Practices Act, the 1997 OECD Convention on
Bribery of Foreign Public Officials in International Business Transactions, and the
US Travel Act.  Moreover, as alleged herein on information and belief, BP and
Browne have misappropriated and stolen Plaintiffs' proprietary, confidential and
very valuable geologic, geophysical and economic information concerning offshore
Grenada in furtherance of the scheme to substitute Defendants' group for RSM as
the exclusive oil and natural gas exploration development and production group in
the offshore Grenadian territory.

63.    The Defendants' criminal and tortious actions have prevented
Plaintiffs from developing oil and natural gas reserves in Grenadian offshore
territory, resulting in enormous damage, the precise amount of which will be
determined at trial but is believed to be no less (and possibly considerably more)
then $500 million.  On information and belief, each individual and corporate

Defendant, in its own way is an integral part of the deliberate scheme to interfere with RSM's exclusive contract and economic relationship with Grenada, and therefore a cause-in-fact and proximate cause of Plaintiffs' damages.  If Defendants had not interfered with RSM's contract and business expectancy by bribing Bowen, promising more bribes in the future, and funding Grenada's legal defense in the ICSID case, Grenada (a very poor country that all would agree should be developing its awesome offshore petroleum potential) would not be fighting tooth-and-nail to worm out of its contractual obligations with RSM in favor of Defendants' group. Each Defendant herein is jointly and severally liable for all damages.

## SECOND CAUSE OF ACTION -- TORTIOUS INTERFERENCE WITH CONTRACT (Against All Defendants, With the Exception of Gregory Bowen)

64.    Plaintiffs repeat and re-allege paragraphs 1 through 63 as if fully set forth herein.

65.    RSM and Grenada have and at relevant times had a valid and enforceable exclusive contract.

66.    Through the criminal actions alleged herein, Defendants intentionally, illegally, tortiously, criminally and without justification interfered with RSM's exclusive contract with Grenada.

67.    The Defendants' actions have prevented Plaintiffs from developing the giant oil and natural gas potential and recoverable reserves in the Grenadian offshore territory, for the benefit of the people of Grenada, the USA and

30

the free world, resulting in enormous damage, the precise amount of which will be
determined at trial but is believed to be no less (and possibly considerably more)
then $500 million.  On information and belief, each individual and corporate
Defendant, in its own way, has been a cause-in-fact and a proximate cause of
Plaintiffs' damages, because each defendant is n integral part of the deliberate
scheme to interfere with RSM's exclusive contract with Grenada.  Each Defendant
herein is jointly and severally liable for all damages.

## THIRD CAUSE OF ACTION – CIVIL CONSPIRACY (Against All Defendants)

68.     Plaintiffs repeat and reallege paragraphs 1 through 67 as if
fully set forth herein.

69.     Each of the defendants herein were participants with each other
and quite possibly additional not-yet-known individuals or entities, in an illegal,
criminal conspiracy.  The common purpose of this conspiracy was to divert
extremely valuable American petroleum rights that rightfully belong to RSM, a
Texas Corporation, to the Global Petroleum Group, which is essentially a front
group for defendants Blavatnik, Fridman, TNK-BP, and BP.

70.     Each defendant understood this common purpose.

71.     Unlawful overt acts included, on information and belief (1)
repeated instances of criminal bribery in violation of the Foreign Corrupt Practices
Act, and (2) violations of the Travel Act in which certain defendants (including

apparent convicted felon Lev Model) traveled from the United States and elsewhere to Grenada to provide significant illegal bribe monies.

72.   As a proximate result of the civil conspiracy alleged herein, RSM has been damaged in an amount to be determined at trial, but believed to be no less (and possibly considerably more) than $500 million.  Each Defendant herein is jointly and severally liable for all damages.

WHEREFORE, Plaintiffs claim for judgment against Defendants, jointly and severally such that each is potentially liable to Plaintiffs for the entire damage award, for damages in excess of five hundred million dollars ($500,000,000.00), for costs, expenses, attorney fees, plus punitive damages, interest, and for such further and other relief as may be ordered by this Court.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE BY A DULY CONSTITUTED JURY.

Dated:  February 25, 2008

Respectfully submitted,

Daniel L. Abrams
Law Office of Daniel L. Abrams, PLLC
2 Penn Plaza, Suite 1910
New York, NY 10121
Phone:  (212) 292-5663
Fax:  (646) 536-8905
Dan@LawyerQuality.com
Attorneys for Plaintiffs

Roger Jatko, Esq.
Samuel Yahn, Esq.
Grynberg Petroleum Company
Prentice Point, Suite 500
5299 DTC Boulevard
Greenwood Village, CO 80111-3321
Telephone:  (303) 850-7490
Facsimile:  (303) 850-7498
Counsel To Plaintiffs