**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action No. 10 Civ. 457 (EGS)

**[ORAL ARGUMENT REQUESTED]**

RSM PRODUCTION CORPORATION (3600 S. Yosemite Street, Suite 900 Denver, CO 80237),

Plaintiff,

v.

FRESHFIELDS BRUCKHAUS DERINGER US LLP (701 Pennsylvania Ave. NW, Suite 600 Washington, DC), JAN PAULSSON (2 rue Cézanne 75008, Paris, France) and BRIAN KING (520 Madison Avenue, New York, NY 10022)

Defendants.

_____

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
_____

### TABLE OF CONTENTS

BACKGROUND AND STATEMENT OF FACTS .............................................................. 4

A.   Bowen's Corrupt Personal Deal With Global Petroleum Group, Ltd. ....................... 6

B.   The Need For A Law Firm In The Conspiracy ........................................................ 7

C.   Freshfields Joins The Conspiracy ......................................................................... 8

D.   Events Reported In Public Sources Since The Filing Of The Complaint ............... 12

ARGUMENT ................................................................................................................. 13

I.   THE COMPLAINT STATES A CLAIM FOR RICO CONSPIRACY ......................... 14

A.   Applicable Pleading Standards ............................................................................ 175

B.   RSM Alleges Facts Sufficient to Make Plausible The Inference That Freshfields Knew That Bowen And Global Petroleum Committed Acts Of Racketeering ................ 17

2.   Freshfields Knew That Global Petroleum's Chairman Had A Criminal Conviction For Grand Larceny ...................................................................................................... 21

3.   Freshfields Knew About Grenada's Reputation For Bribery And Corruption .......... 22

4.   *Arguendo* To The Extent Freshfields Claims That It Did Not Know About The Criminal Bribery Scheme In August Of 2005 They Certainly Became Aware Of It By The End Of 2007, Yet They Stayed In The Conspiracy ......................................................... 23

5.   Arguendo, Even If Freshfields Lacked Actual Knowledge Of The Bribery Scheme, It Still Possessed The Requisite *Mens Rea* For RICO Conspiracy Liability ..................... 24

6.   RSM Alleges Facts Sufficient To Render Plausible That Freshfields Agreed To The Commission of The Alleged Bribery Scheme ............................................................... 24

C.   RSM Alleges That Freshfields Was Aware Its Co-Conspirators Were Engaged In A Pattern Of Racketeering Activity ............................................................................. 26

II.   RES JUDICATA DOES NOT APPLY ................................................................... 29

III.   DEFENDANTS ARE NOT ENTITLED TO ICSID IMMUNITY ............................. 33

A.   Articles 21 and 22 of the ICSID Convention Are Not Domestic Law Of the United States ................................................................................................................... 373

B.   Even If Articles 21 and 22 Of The ICSID Convention Were Applicable, Freshfields Would Still Lack Immunity From Suit............................................................................ 37

IV.      THE RICO CONSPIRACY CLAIM IS NOT TIME-BARRED .............................. 38

V.   IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED ................ 41

CONCLUSION ............................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**

*Abourezk v. Reagan*, 785 F.2d 1043, 1054 (DC Cir. 1986) .......................................... 35

*Aetna Cas. Surety Co. v. P&B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994)* .............. 16

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 15 (D.C.Cir.2008) .. 13

*Andreo v. Friedlander, Gains, Cohen, etc.*, 660 F.Supp 1362, 1372 ............................. 16

*Apotex, Inc. v. FDA,* 393 F. 3d 210, 217 (D.C. Cir. 2004) ........................................... 30

*\*Ashcroft v. Iqbal--- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009*) ....................... 13

*\*Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672 (DC Cir. 2009) ........... 14

*\*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102-05 (2d. Cir. 1988) ..................... 40

*Beck v. Prupis*, 529 U.S. 494, 501 (2000); *Salinas*, 522 U.S. at 63 ............................... 25

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 n. 3, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ................................................................................................................. 13

*\*Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 965 (7th Cir. 2000)* ....... 16, 26

*Brzak v. United Nations*, 597 F.3d 107, 111 (2d Cir. 2010) ........................................... 36

*Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (DC Cir. 1980) .............. 34

*Capital Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490-92 (DC Cir. 2009) ..................................................................................................... 32

*Chalabi v. Hashemite Kingdom of Jordan*, 503 FSupp.2d 267 (D.D.C. 2007) ............... 39

*\*DeShazo v. Nations Energy Co., Ltd., 286 Fed. Appx. 110, 117 (5th Cir. 2008)* ......... 40

*Diggs v. Richardson*, 555 F.2d 848 (D.C. Cir. 1976) .................................................... 36

*Doe v. Allied-Signal, Inc.*, 985 F.2d 908 (7th Cir. 1993) ................................................ 33

*Doe v. State of Israel,* 400 F.Supp.2d 86, 120 (D.D.C. 2005) ........................................ 18

*Drake v. FAA,* 291 F.3d 59, 66 (D.C. Cir. 2002) ............................................................ 30

*Edelin,* 128 F.Supp.2d at 37 (D.D.C.2001) .................................................................... 25

*Edmundson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260 (D.C. Cir. 1997) ........................................................................................................................... 29

*Empress Casino Joliet Corp. v. Blagojevich,* 674 F.Supp.2d 993, 1001 (N.D.Ill 2009) 29

*Environmental Tectronics v. W.S. Kirkpatrick Inc.,* 847 F.2d 1052, 1063 (3rd Cir. 1988) ........................................................................................................................... 17

*Fortney v. Kuipers,* 1999 WL 102772 (N.D. Ill. 1999) .................................................... 26

*Gambocz v. Yelencsis,* 468 F.2d 837, 841-42 (3d Cir. 1972) ........................................ 32

*Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968 (4th Cir. 1992) ............... 34

*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893 (1989) ............. 27

*Hallock v. Bonner,* 387 F.3d 147 (2d Cir. 2004) ............................................................ 31

*Hamdi v. Rumsfeld,* 316 F.3d 450 (4th Cir. 2003) ......................................................... 34

*Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n.4 (2d Cir. 1990) ............. 16

*Igartua-De La Rosa v. United States,* 417 F.3d 145, 150 (1st Cir. 2005) ...................... 34

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1028 (D.C. Cir. 1997) ........................................................................................................................... 38

*Klehr v. A.O. Smith Corp.,* 521 U.S. 179 (1997) ............................................................ 39

*Krieger v. Fadely,* 211 F.3d 134, 136 (D.C.Cir.2000) .................................................... 13

Leary v. United States, 395 U.S. 6, n. 93 (1969) ............................................................ 24

*Lewis v. Sprock,* 612 F. Supp. 1316, 1324 (N.D. Cal. 1985) ......................................... 16

*McCool v. Strata Oil Co., 972 F.2d 1452, 1464-65 (7th Cir. 1992)* ............................... 40

*McKesson Corp. v. Islamic Rep. of Iran,* 539 F.3d 485, 489 (D.C. Cir. 2008) .............. 37

*McLaughlin v. Bradlee*, 599 F.Supp. 839 (D.D.C. 1984) ................................................. 31

*Mendaro v. World Bank*, 717 F.2d 610 (DC Cir. 1983) .................................................... 36

*Miller v. Insulation Contractors, Inc.,* 608 F.Supp.2d 97, 106 (D.D.C.2009) ................. 13

*Negron-Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 10 (1st. Cir. 2008).......... 32

*Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946) ............................................... 25

*Polak v. International Monetary Fund*, 657 F.Supp.2d 116, 119-20 (D.D.C. 2009) ....... 36

*Polk County v. Dodson*, 454 U.S. 312, 321 (1981) ......................................................... 20

*Prakash v. American University*, 727 F.2d 1174, 1181 (D.C. Cir. 1984) ........................ 31

*Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (DC Cir. 1991)..... 28

*Rose v. Bartle,* 871 F.2d 331, 356 n.33 (3d Cir. 1989) .................................................... 16

*Rotella v. Wood*, 528 U.S. 549, 557 (2000) .............................................................. 39, 40

*RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 406 (S.D.N.Y. 2009) ........ 32, 33

*Salinas v. United States, 522 U.S. 52, 63-64 (1997)* ............................................... 16, 25

*Samantar v. Yousef*, 2010 WL 2160785 (U.S. June 1, 2010) ......................................... 30

*Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1181 (4th Cir. 1989) ................................. 30

*\*Sinochem v. Bonner*, 549 U.S. 422, 430-31 (2007) ..................................................... 30

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) .................................................................... 15

*State Farm v. Ammann*, 828 F.2d 4, 5 (9th Cir. 1987) .................................................... 40

*Sun Savings and Loan Association v. Dierdorff*, 825 F.2d 187, 194 n.5 (9th Cir. 1987) ................................................................................................................................ 28, 29

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ....................................................................................................................................... 13

*Tooley v. Napolitano,* 586 F.3d 1006, 1007 (D.C.Cir.2009) ........................................... 13

*United States v. Bourke*, 08 Cr 00518 (SDNY, May 29, 2009 ....................................... 22

*United States v. Bridgeman,* 523 F.2d 1099, 1108 (D.C.Cir.1975)............................... 16

*United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991)* ...................................... 28

*\*United States v. Edelin,* 128 F.Supp.2d 23, 37 (D.D.C.2001) ..................................... 16

United States v. Feola, 420 U.S. 671, 688 (1975).......................................................... 24

*United States v. Frega*, 179 F.3d 793 (9th Cir. 1999)..................................................... 26

*\*United States v. Glecier*, 923 F.2d 496, 499-500 (7th Cir. 1991) ................................. 25

*United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986)*........................................... 16

United States v. Kozeny. 664 F.Supp2d 369 (S.D.N.Y. 2009) ........................................ 7

*United States v. Phillip Morris*, 327 F.Supp.2d 13, 19 (D.D.C. 2001) ........................... 16

*\*United States v. Salinas*, 522 U.S. 53, 118 S.Ct. 469, 139 L. Ed, 2d 352 (1997)... 14, 16

*United States v. Wilson*, 605 F.3d 985, 1019 (DC Cir. 2010) ....................................... 15

*Vitamins Antitrust Litig.*, 2000 WL 1475705 (D.D.C. 2000)........................................... 40

*\*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union*, 883 F.2d 132 (DC Cir. 1989)................................................................................................................. 28

**Statutes**

*22 U.S.C. § 1650(a) ................................................................................................... 35

*28 U.S.C. § 286 ......................................................................................................... 36

*RICO............................................................................................................... 15, 16

**Other Authorities**

Article 21 and 22 of the ICSID Convention............................................................ 33, 34

Foreign Sovereign Immunities Act ............................................................................... 30

Foreign Corrupt Practices Act ........................................................................... 5

*International Organizations Immunities Act.................................................... 35

Restatement (Third) of Foreign Relations Law of the United *States, §* 907................... 34

Steinitz, *Whose Claim Is It Anyway?  Third Party Litigation Funding,* 95 Minnesota L. Rev. (forthcoming 2010), at *42 ................................................................. 19

**Rules**

5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, at 94 (3d ed. 2004) .. 13

ABA Model Rule 1.8(f)............................................................................... 20

ABA Model Rule 1.8(f)(2) .......................................................................... 20

Federal Rule of Civil Procedure 8(a)(2)........................................................ 13

Federal Rule Civil Procedure 9(b) ............................................................... 16

Plaintiff, RSM Production Corporation ("RSM") respectfully submits the following Memorandum of Points and Authorities in Opposition to the Motion to Dismiss the Complaint against Defendant Freshfields Bruckhaus Deringer US LLP ("Freshfields"), Brian King, and Jan Paulsson (collectively, the "Freshfields Defendants"), and specifically in opposition to Freshfields' Memorandum of Points and Authorities in Support of the Motion to Dismiss, dated June 1, 2010 ("Freshfields Brief").

## PRELIMINARY STATEMENT

In essence, Freshfields' Brief says "there is nothing to see here; just a law firm providing routine legal services."  Perhaps in the hope that the Court will not actually reach the merits of what happened here, Freshfields spends much of its brief trying to sell three purportedly threshold defenses – each of these arguments are creative, but on the alleged facts there is absolutely no authority to dismiss this case on any of the articulated grounds.  To wit:

- *Res judicata* does not apply since the New York Lawsuit involved no fact finding, completely different legal claims, and no findings on the merits pertaining to either Freshfields or any of their alleged co-conspirators.  All the New York lawsuit did was resolve (pending appeal) the sufficiency of common law legal claims -- all of which are substantively different than the RICO claim herein, and none of which have been asserted here -- against parties who are not Defendants or alleged co-conspirators.  In fact, the parties who received judgments on the merits in New York did so primarily because ***they were able to distance themselves from these allegations***.  The three alleged co-conspirators who were parties in New York all achieved technical dismissals which were not

1

on the merits.  This case raises new claims and new factual allegations against Freshfields, King and Paulsson, all brand new parties who could not have been sued at the time the New York case was commenced;

- Lawyers who join a criminal conspiracy, and in that capacity also serve as counsel in an ICSID proceeding, do not receive "ICSID Immunity" from federal court lawsuits.  The enabling legislation for the ICSID Convention Treaty does not provide any immunity for advocates in ICSID proceedings, and there is neither precedent nor a common sense rationale for such immunity;

- The RICO Statute of Limitations did not begin to run until 2009 when the alleged conspiracy achieved its core goal of defeating RSM's claim to the exclusive exploration license, or at the very earliest 2008, when, on the eve of national elections which threatened his power, Gregory Bowen, the Deputy Prime Minister and Minister of Energy, provisionally caused Grenada to grant RSM's license to his bribe-giver, Global Petroleum.  Freshfields' reading of the applicable statute of limitations law is not supported by their case cites, and in any event is inconsistent with RICO's goal of combating criminal activity extending over a substantial period of time.

When the subject turns to the sufficiency of the RICO allegations, Freshfields uses euphemism and evasion to avoid dealing with the serious issues in this case.  Here we have a law firm that agreed to represent Grenada, a small impoverished country governed at the time by a regime with one of the world's worst reputations for demanding and accepting bribes and engaging in other criminal corruption.  Freshfields received legal fees not from the Government

of Grenada (which could not afford such fees) or some independent funding company, but from a company -- run by a convicted felon -- that was looking to acquire RSM's exclusive rights to obtain a license in offshore Grenada.  All of this Freshfields readily admits, and there is therefore no argument on this subject, at least for purposes of this motion.

Freshfields' primary RICO-based defenses boil down to their assertion that they lacked requisite knowledge – knowledge that their fees emanated from a corrupt source or that this corruption was part of an agreed-upon RICO conspiracy (Freshfields Brief at 32).  But the Defendants are sophisticated and experienced international attorneys.  Freshfields' own website trumpets their expertise in international arbitrations as well as the painstaking process which they go through before accepting new clients.  The only plausible inference is that Freshfields knew that it was being asked to assist with a legal representation that had all the hallmarks of being in furtherance of a criminal bribery scheme.  Any routine search of "Grenada" in Nexis or a similar database would have revealed a myriad of articles showing the Government of Grenada's reputation for corruption and bribery during the tenure of the previous administration.  A compendium of such articles, most appearing prior to August of 2005, are attached to the accompanying Declaration of Daniel L. Abrams.  Abrams Decl. at Exh. A.  A Nexis search of "Lev Model," Global Petroleum's Chairman who ended up personally fronting millions of dollars of legal fees, would have revealed his well-publicized criminal conviction for stealing over $1.2 million from a Soviet oil company while purporting to run an import/export business, and his incarceration which ended just a few years before he surfaced as the founder and leader of a company looking to explore and drill in offshore Grenada.  Id. at Exh. B.  Similar basic searching would have revealed that Model had no background in the oil and gas business, no

ability fund an exploration and drilling operation in deep water offshore Grenada, and no ability to pay millions of dollars in legal fees.  Id.; *See Also* Cpt. at ¶ 46.

In short, if *arguendo* Freshfields did not know it was assisting in a criminal bribery scheme, and that their fees were being generated from a corrupt criminal source, it is only because they studiously sought to avoid knowing so that they could rack up massive legal fees. Applicable law does not allow these attorneys to bury their head in the sand – the prisons are full of far less sophisticated people who have not been able to convince fact-finders that they unwittingly aided in a criminal conspiracy.

Freshfields also argues that the conspiracy itself does not constitute a "pattern" of racketeering activity.  This argument ignores the multi-year bribery conspiracy, and the inherently continuing nature of the licensing agreements and political bribery schemes in general.  But for the 2008 defeat of the bribe-taker's political party at the Grenadian polls, the pattern of bribery activity which predominated from at least 2004-2008 was likely to continue. Given the long-standing nature of the scheme plus its threat of continuation which was interrupted only because of an election, the Complaint satisfies the pattern element of RICO.

## BACKGROUND AND STATEMENT OF FACTS

RSM signed an exclusive exploration contract (the "Petroleum Agreement") with the Government of Grenada ("Grenada") in 1996.  Cpt. ¶ 10, Exh. A.  The Petroleum Agreement was to have resulted in an oil and natural gas exploration, development and production license being issued as a matter of routine performance by Grenada to RSM.  Id.  Almost immediately thereafter, boundary disputes over waters that RSM wished to explore forced RSM to invoke the Petroleum Agreement's force majeure clause.  Grenada agreed in writing to the force majeure

Cpt. ¶ 18.  Also in 1996, Grenada's Minister of Energy Gregory Bowen ("Bowen") demanded that RSM's principal, Jack J. Grynberg ("Grynberg") give Bowen a $2 million bribe as a condition of continuing to do business with Grenada.  Grynberg turned down this request and at all times has refused to bribe Bowen or anybody else.  Cpt. ¶ 12.[1]

From 1996 to 2003, Bowen repeatedly harassed and intimidated RSM as RSM continued its efforts to explore develop and produce Grenada's vast offshore oil and natural gas resources. Cpt. ¶ 12.  Notwithstanding the obstacles put forward by Bowen, specifics of which are set forth in the Complaint, RSM continued to work with other individual officials in the Grenadian government and various third parties towards its goal of implementing the Petroleum Agreement and applying for an exploration license.  Id.  For example, RSM, through Grynberg was instrumental in resolving a boundary dispute between Grenada and Trinidad and Tobago.  Id. RSM also made multi-million dollar investments in acquiring new (and re-processing old) offshore seismic and geophysical subsurface data.  Id. at ¶ 19.

By early 2004, RSM rescinded the invocation of the force majeure clause.  Cpt. at ¶ 20. In April 2004 RSM applied for an exploration license.  Id. at ¶ 21.  Bowen first expressed frivolous concerns about the financial terms of the license, but eventually Bowen took the position that the application was untimely.  Id. at ¶ 23.  This gave rise to RSM's Request For Arbitration, filed in late August of 2004. Id. at ¶ 29.  The Petroleum Agreement called for arbitration in the International Centre for the Settlement of Investment Disputes ("ICSID"), and accordingly RSM submitted the dispute to ICSID.

---

[1]      Grynberg has an impeccable history in the oil and gas business as never bribing government officials and of crusading to clean up the industry.  For example, many of the litigations which Freshfields bemoans have actually been successful efforts to expose corruption in the oil and gas industry.  *Cf.* Abrams Decl. at Exh. C.  Affidavit of Robert Pelo.

**A.      Bowen's Corrupt Personal Deal With Global Petroleum Group, Ltd.**

In December of 2003, a convicted criminal named Lev Model created a Grenadian company called Global Petroleum Group, Ltd. ("Global Petroleum")  Cpt. at ¶ 14.   The incorporation documents were prepared by a Grenadian attorney with close ties to the government.  Id.  Mr. Model had been out of jail only a few years after serving twenty-eight months in federal prison for stealing at least $1.2 million from a Soviet Russian oil company while purporting to run an import-export business in New Jersey.  Id. at ¶ 15.  This thievery took place in the early 1990's just as the Soviet Union, and the oil industry in particular, was transitioning to capitalism.  His criminal conviction was well-publicized, as articles appeared in *inter alia* the New York Times, Dow Jones Newswires, and Associated Press.  Abrams Decl. at Exh. B.  Model's conviction was particularly newsworthy because, in the waning days of the Cold War, Model's company was the American partner in the very first joint venture between a Soviet government entity and a U.S. Company in which the American partner retained a majority interest.  Id. (L.A. Times Article).

Model and Global Petroleum bribed Bowen to obtain Bowen's support for replacing RSM with Global Petroleum.  Model paid the college tuition of Bowen's daughter, an allegation that is supported by sworn testimony.  Cpt. at ¶ 47, Exh. D.  Lev Korchagin, a Moscow-based attorney who like Model was a principal of Global Petroleum, bragged to Grynberg in August of 2005 that his group "owns" the Government of Grenada.  Id. at ¶ 37.  This was part of Global Petroleum's efforts to reach a settlement with RSM that would permit Global Petroleum to obtain the exploration license.  Another effort to settle with RSM was launched by Michael

6

Melnicke, a Grenadian "Ambassador at Large,[2]" who proposed that RSM pay an "overriding royalty" (i.e., percentage of gross oil production) payment that would have presumably made its way to Bowen and possibly other individual Grenadian Government officials.  Id. at ¶¶ 35-36, 38-40.  Drafts of this proposed "overriding royalty" agreement, which was categorically turned down by RSM due to the obvious Foreign Corrupt Practices Act ("FCPA") implications, are attached to the Complaint as Exhibit B thereto.

### B.      The Need For A Law Firm In The Conspiracy

Even before RSM filed its ICSID case, it was clear that RSM's rights needed to be addressed before Global Petroleum Group could obtain any license.  In early 2004, John Auguste, who was a Senior Energy Officer of Grenada who reported to Bowen, met with Model and two other individuals affiliated with Global Petroleum.  Cpt. at ¶ 23.  Auguste told Model and the others that Grenada was "in a situation" with RSM and that Grenada was not in a position to enter into any agreements concerning Grenada's offshore petroleum assets until the "situation" with RSM was resolved.  Id.  It was therefore clear to Grenada, Bowen and Global Petroleum that Global Petroleum's bribery was not enough to secure the license since it was RSM who had the exclusive rights to obtain the license.

There were two ways to possibly achieve this – (1) RSM had to either be cut into the deal, or (2) RSM's legal rights had to be defeated.  As detailed *supra*, efforts to secure a deal

---

[2]      Other Grenadian "Ambassadors at Large" appointed by former Prime Minister Keith Mitchell included Eric Resteiner, a convicted securities fraud felon who Prime Minister Mitchell stands accused of accepting a videotaped $500,000 bribe, transmitted in a suitcase of $100 bills (Cpt. at ¶ 33), and Viktor Kozeny, the infamous "Pirate of Prague" who is presently a fugitive living in the Bahamas and fighting extradition requests from both the United States and the Czech Republic.  Cpt. at ¶ 32.  Kozeny's co-conspirator Frederic Bourke was convicted in the Southern District of New York for a Foreign Corrupt Practices Act violation based on the jury finding that Bourke knew or consciously avoided knowing that Kozeny was using Bourke's money to bribe officials of Azerbaijan in connection with a scheme to privatize Azerbaijan's oil company.  See United States v. Kozeny. 664 F.Supp2d 369 (S.D.N.Y. 2009).

with RSM failed, as RSM was not willing to join any arrangement that would have made it a party to a criminal bribery scheme.  The only other alternative was to defeat RSM's rights in a judicial proceeding.  Bowen and Global Petroleum sought out a high-end law firm with extensive ICSID experience.

First, Bowen and Global Petroleum Group approached the law firm of DLA Piper who on information and belief as a matter of routine due diligence became aware of the fact that either Grenada did not have funds adequate to pay its bills, and/or that their bills would have to be funded by a corrupt criminal conspiracy.  Cpt. at ¶ 30.  After DLA Piper turned down the representation, Bowen and Global Petroleum Group approached Freshfields.

### C.     Freshfields Joins The Conspiracy

In August of 2005, Freshfields, acting through King and Paulsson, agreed to accept "Grenada" as a client.  Before taking on any client, Freshfields undertakes extensive due diligence.  According to its website:

> As leaders in our profession, we have a responsibility to maintain the highest standards expected not only by clients but also by society at large in all jurisdictions in which we practice.  Our approach to managing risks in this environment reflects these expectations and our high demands of ourselves. We have global risk management personnel…that continually monitors the risks we face (e.g., money laundering, conflicts of interest, insider dealing and economic sanctions)….**The firm has policies and practices in place to ensure thorough and appropriate verification is conducted before accepting a new client.  The firm considers such processes to be rigorous.**

Abrams Decl. Exh. D (emphasis added).  These policies are particularly important to a United Kingdom-based law firm like Freshfields, because of the UK's strong anti-money laundering laws.  Cpt. at ¶ 51.

Even cursory due diligence in considering the possibility of representing "Grenada" in August of 2005 against RSM would have revealed the following.

- Grenada is a poor country (per capita GDP under $4,000) of roughly 108,000 people (i.e., smaller than the combined populations of Bethesda and Rockville, Maryland) Abrams Decl. Exh. E;

- The small, impoverished country had little prospect of paying its own fees;

- Grenada's government under the leadership of Former Prime Minister Keith Mitchell had one of the worst reputations in the world for corruption and bribery – attached are over thirty (30) articles published by major newswires or publications, most of which were published between 1995 and August of 2005 which concern allegations of corruption within Grenada's leadership in the Mitchell era, Abrams Decl. Exh. A;

- Grenada was placed on a blacklist by the International Financial Action Task Force for being non-cooperative in the global fight against money laundering and terrorist financing in 2001 and remained there until 2003, Id. (last page of Exhibit);

- In the Summer of 2005, Prime Minister Mitchell was being investigated by an independent prosecutor over allegations that he received a $500,000 bribe in a suitcase full of $100 bills from Eric Resteiner, a man who was subsequently convicted of a massive securities fraud in the United States. Id.; *See also* Cpt. ¶ 33.[3]

- Viktor Kozeny was made an Ambassador at Large to the Government of Grenada even while facing extradition to the United States related to a well-publicized $500 million

---

[3]    Mr. Resteiner is presently serving a seven (7) year prison term in a federal prison in west Texas.

scam to bribe officials of the Republic of Azerbaijan, a former Soviet Republic.  Abrams Decl. at Exh. F.

Since Grenada was obviously unable to pay Freshfields' legal fees (which turned out to be over $10 million (Cpt. at ¶ 48)) the only plausible inference is that Freshfields, both as a matter of common business practice and to ensure compliance with the United Kingdom's Proceeds of Crime Act, inquired as to the source of the payment. At this point Freshfields learned that Global Petroleum would pay these fees in the hopes to Global Petroleum would eventually obtain the offshore oil and natural gas license.  Freshfields essentially admits as much in its Motion papers.  (Freshfields Brief at 33).

Given Freshfields' "rigorous" process for accepting new clients, and the fact that it was required by British Law to ensure that it was not receiving money from a corrupt source (Cpt. at ¶ 51), Freshfields must have researched Global Petroleum before agreeing to accept its many millions.  Global Petroleum had no record of business activity, its principals had no expertise or track record, and its Chairman Lev Model in particular had no experience in the oil and gas industry.   However, Model had a well-publicized criminal conviction for stealing over $1.2 million from a Soviet Oil Company while purporting to run an import-export business in the United States. Abrams Decl. at Exh. B.  Freshfields nevertheless agreed to accept "Grenada" as a client with the understanding that Global Petroleum was responsible for the bills.  The most plausible inference is that Freshfields knowingly joined the criminal conspiracy, either with actual knowledge of the conspiracy's objectives or by consciously avoiding such knowledge.

Global Petroleum Group financed the entire arbitration on behalf of "Grenada."  Cpt. ¶¶ 44-46.  They did so pursuant to a "Funding Agreement" dated in September of 2005.  Id. at ¶ 44.

Given the August 2005 retention of Freshfields, it is a fair inference that Freshfields knew of the Funding Agreement (indeed, Freshfields may have insisted on it and/or drafted it). By July of 2007, Global Petroleum had invested over $4 million with Freshfields to fund "Grenada's" legal defense. Id. at ¶ 47. By September of 2009, this number was over $10 million. Id. at ¶ 48.

From 2005-2009, Freshfields became aware of additional information tending to show a criminal conspiracy, but at no time did Freshfields withdraw from the conflicted representation of "Grenada" or otherwise choose to get out of the conspiracy. For example, by 2007 published reports confirmed that Lev Model was a convicted felon. Cpt. at ¶ 50. Freshfields also can be presumed to have been aware of Michaela Rose's October 2007 sworn testimony that Lev Model was paying the college tuition of Gregory Bowen's daughter. Id. Freshfields was also aware of the allegations in the New York case, including the fact that another Global Petroleum founder had bragged that his group "owns" the Government of Grenada, that a Grenadian "Ambassador at Large" had sought in writing a bribe in the form of an "overriding royalty" from Grynberg, and that Bowen had traveled to New York to receive bribe monies. Id.

By March of 2009, the fruits of Freshfields' labor in furtherance of the conspiracy finally paid off. Freshfields Brief, Exhibit 8. The ISCID Panel ruled that RSM's license application was untimely because it was filed one day late. This decision is presently being reviewed under Article 52(1) of the ICSID Convention by an ICSID annulment panel.[4] There is also a new

---

[4] Freshfields makes extended gratuitous reference to inapposite litigations in which RSM or Mr. Grynberg is a party. Freshfields Brief at 3-4, n. 4, Exhibit C. This is a thinly-disguised effort to poison the well, perhaps in the hope that the Court will choose not to look too carefully at the allegations in the Complaint since Grynberg is "a litigious man" who has been subject to some negative rulings and commentaries by some courts. The reality is that Grynberg has a considerable record of success as a litigant. See Accompanying Affidavit of Robert Pelo, Abrams Decl. Exh. C.

ICSID Arbitration pending which has been brought by the owners of RSM as permitted by ICSID regulations.

Just prior to the 2008 Grenadian national elections, the Mitchell Government issued the Grenada Offshore License to Global Petroleum.  Cpt. at ¶ 49.  The opposing party won that election handily, and is now investigating the circumstances in which Global Petroleum obtained the License.  *Id.*

      **D.**     **Events Reported In Public Sources Since The Filing Of The Complaint**

Subsequent to the March 17 filing of this Complaint, it has been reported in the Grenadian Press that the present Grenadian Government has specifically refused to honor the license the prior Government had purported to grant Global Petroleum, and that Grenada's current Finance and Energy Minister Nazim Burke (who replaced Bowen) has complained that the contracts with Global Petroleum Group and Grenada were done "privately" by high-level Ministers without the knowledge and input of the relevant public servants.  Abrams Decl. Exh. G.  Mr. Burke also gave a radio interview on April 5, 2010 where he lambasted the prior government's "secret agreements, that were locked away in the cabinets of some of these ministers…".  Id. An April 8, 2010 article reports that Mr. Burke and his spouse have received e-mail threats related to Grenada's possibly foray into oil and gas exploration.  While the source of these threats is not known, the article reports that the internet protocol addresses for at least some of the threats have been found to have been Russian, which is the nationality of all the original[5] Global Petroleum principals.  *Id*.

---

[5]     Recently, a Venezuelan named Marco Angeli who was previously the public relations manager for a subsidiary of Hugo Chavez's government-run energy company, has become a spokesperson for Global Petroleum, but it is not clear precisely what his role or interest is.

## ARGUMENT

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a)(2). There is ordinarily no need for a plaintiff to plead detailed factual allegations, as the rule simply " 'contemplate[s][a] statement of circumstances, occurrences, and events in support of the claim presented [.]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 n. 3, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)  (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, at 94 (3d ed. 2004) ). A plaintiff is not required to plead in his complaint all elements of a prima facie case, or "plead law or match facts to every element of a legal theory." *Miller v. Insulation Contractors, Inc.,* 608 F.Supp.2d 97, 106 (D.D.C.2009)  (quoting *Krieger v. Fadely,* 211 F.3d 134, 136 (D.C.Cir.2000)  and citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)) (internal quotation marks and citation omitted).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 550 U.S. at 563, 127 S.Ct. 1955. *Accord, Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 15 (D.C.Cir.2008) . *But see Tooley v. Napolitano,* 586 F.3d 1006, 1007 (D.C.Cir.2009)  (declining to reject or address the government's argument that *Ashcroft v. Iqbal--- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)*, invalidated *Aktieselskabet* ). A complaint should contain enough factual heft to show an entitlement to relief. *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955. That is, a complaint needs to plead "only enough facts to [nudge] a claim to relief ... across the line from conceivable to plausible[.]" *Id.* at 570, 127 S.Ct. 1955. "

The District of Columbia Circuit has stressed that under *Iqbal* the plausibility test is not a probability test.  *See Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672 (DC Cir. 2009).  Determining whether a complaint states a plausible claim for relief will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.  In other words, *Iqbal* directs Federal District Court Judges to employ its own experience and common sense when evaluating the plausibility of factual inferences, while accepting the truth of the pleaded facts themselves.  Because this case involves alleged misconduct within the legal profession in which all Federal Judges belong, and a top international law firm's denial of knowledge which could have been obtained through simple due diligence, it is especially well-suited for the application of judicial common sense.

## I.      THE COMPLAINT STATES A CLAIM FOR RICO CONSPIRACY

Freshfields starts its argument by noting that "RICO is a complex statute."  Freshfields Brief at 26.  As if to prove the complexity of RICO, Freshfields then launches into a discussion about how to prove a *substantive RICO* violation (which is not alleged here).  Freshfields Brief at 27-28.  Contrary to Freshfields' insinuation, a defendant can be liable for RICO conspiracy even absent culpability for substantive RICO.  And while the entire Federal RICO statute is indeed complex, pleading a RICO Conspiracy is relatively simple.

The leading RICO Conspiracy case is *United States v. Salinas*, 522 U.S. 53, 118 S.Ct. 469, 139 L. Ed, 2d 352 (1997) (Freshfields Brief at 27).  In *Salinas,* the defendant was acquitted of a substantive RICO violation (§1962(c)), but convicted of RICO conspiracy pursuant to § 1962(d) *Id.* at 63. The case involved a Sheriff's deputy who was involved tangentially in a bribe scheme at a county jail, having on occasion accepted material gifts for facilitating extraordinary

jail visits. *Id.* at 55. The real bribe recipient was the Sheriff himself, who accepted monthly payments over a sustained period. *Id.* at 55. The Supreme Court rejected Salinas' argument that, as to the RICO conspiracy charge, it mattered whether he had either committed or even agreed to commit multiple predicate acts. As the Court put it: "It makes no difference that the substantive offense under *§ 1962(c)* requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Id.* at 65.

Thus, the Court held that "even if Salinas did not accept or agree to accept two bribes, there was ample evidence that he conspired to violate subsection (c). The evidence showed that Marmolejo [the Sheriff] committed at least two acts of racketeering activity ... and that Salinas knew about and agreed to facilitate the scheme. This is sufficient to support a conviction under § 1962(d)." *Id.* at 66. From this it is clear that a defendant need not commit a predicate act to be held liable for RICO conspiracy. *Id. See Also, Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). Nor does a defendant need to operate or control a RICO enterprise in order to be liable for RICO conspiracy. *United States v. Wilson*, 605 F.3d 985, 1019 (DC Cir. 2010).

### A.    **Applicable Pleading Standards**

Under *Salinas* and its progeny, proving a RICO conspiracy requires the plaintiff establish that (1) two or more people agreed to commit a substantive RICO offense, and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. *Salinas*, 522 U.S. at 63; *United States v. Phillip Morris*, 327 F.Supp.2d 13, 19 (D.D.C. 2001) Based on this test, liability for RICO Conspiracy may arise "even where a defendant joined the conspiracy after it

began, did not participate in all acts of the conspiracy, and where acts in furtherance of the conspiracy took place prior to and after the defendant joined the conspiracy." *United States v. Edelin,* 128 F.Supp.2d 23, 37 (D.D.C.2001)  (citing *Salinas,* 522 U.S. at 63, 118 S.Ct. 469, 139 L.Ed.2d 352; *United States v. Bridgeman,* 523 F.2d 1099, 1108 (D.C.Cir.1975) , *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976).  It is not necessary that Freshfields have personally committed the predicate acts or any other overt act at all for them to have conspiracy liability under RICO.[6]

Moreover particularity in pleading is not required to plead civil RICO conspiracy.  . *Andreo v. Friedlander, Gains, Cohen, etc.*, 660 F.Supp 1362, 1372 (D. Conn. 1987) (claims under § 1962(d) need not be pleaded with particularity under FRCP 9(b) ”); *Lewis v. Sprock,* 612 F. Supp. 1316, 1324 (N.D. Cal. 1985) (“[I]f the racketeering acts are not frauds, the general principles of pleading embodied in Ruly 8 apply.”).  *See also Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n.4 (2d Cir. 1990) ; *Rose v. Bartle,* 871 F.2d 331, 356 n.33 (3d Cir. 1989) (same).  There is no requirement that the specific dates, times, and details of each incident of bribery or money laundering be spelled out in the Complaint.

Here, there is no dispute that a sufficient underlying RICO Enterprise has been alleged as to Global Petroleum, its officers Lev Model and Lev Korchagin, and Grenadian officials Gregory Bowen and Michael Melnicke.  In a nutshell, this Enterprise commenced its work in late 2003

---

[6]     *United States v. Joseph, 781 F.2d 549, 554 (6th Cir. 1986)*  (“it is not necessary to prove that the defendant agreed to personally commit the requisite acts, but only that he agreed that another violate § 1962(c)  by committing two acts of racketeering activity”); *Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 965 (7th Cir. 2000)*  (“one does not need to agree personally to commit the predicate acts”); *Aetna Cas. Surety Co. v. P&B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994)*  (“it is enough to prove that a defendant agreed with one or more others that two predicate offenses be committed”). *See also Salinas v. United States, 522 U.S. 52, 63-64 (1997) :*

when Model set up Global Petroleum for the specific purpose of bribing Gregory Bowen so that Global Petroleum could eventually obtain the license that, pursuant to the Petroleum Agreement, rightfully belonged to RSM. By early 2004, it was apparent that the Enterprise needed to employ the services of a law firm to deal with the RSM "situation." In August of 2005, Freshfields agreed to join the conspiracy, finally and successfully dealing with the RSM "situation" when ISCID invalidated RSM's rights in March of 2009. This is precisely the type of multi-year international bribery scheme that implicates RICO. *See Environmental Tectronics v. W.S. Kirkpatrick Inc.*, 847 F.2d 1052, 1063 (3rd Cir. 1988) *cert. granted* (limited to act of state question) 492 U.S. 905, *aff'd* 493 U.S. 400, 110 S.Ct. 701 (Racketeering activity alleged where "[I]f appellant's allegations are true a European conglomerate, and two American corporations successfully and over a two year period organized to influence a foreign country's award of a procurement contract by illegal means.").

The only question remaining is whether the facts alleged are sufficient to make plausible the inference that Freshfields joined the conspiracy.

### B. RSM Alleges Facts Sufficient To Make Plausible The Inference That Freshfields Knew That Bowen And Global Petroleum Committed Acts Of Racketeering

Freshfields argues at pages 32-35 of its brief that the facts alleged in the Complaint do not support the inference that Freshfields knew "the alleged co-conspirators had supposedly committed multiple acts of bribery" Freshfields Brief at 33. They than go on to separately assess each allegation as if the individual allegation transpired in a vacuum. The problem with this approach (besides the fact that the cases Freshfields cites do not support it) is that the allegations have a cumulative effect tending to show Freshfields' knowledge of the racketeering

activity.  Taken together, and employing the *Iqbal* Court's directive to use common sense when assessing the plausibility of Complaints, it becomes clear that Freshfields knew it was agreeing[7] to facilitate the core objective of a criminal bribery scheme.

      **1.**      **Freshfields Knew That Global Petroleum Was Funding The ICSID Arbitration With The Hope That It Could Win The Exploration License For Itself**

The Complaint plainly alleges that Freshfields was aware of the fact that Global Petroleum was responsible for paying the legal fees of "Grenada's" representation.  Cpt. at ¶ 50. Grenada itself was unable to pay these fees.  (Abrams Decl. Exh. E).  Rule number one of private legal practice is to know who is paying the bills.  Freshfields begrudgingly admits that "at most" they can be alleged to have known that Global Petroleum was funding the legal fees "with the hope that it could win the exploration license for itself."  Freshfields Brief at 33.  The significance of this admission cannot be understated.  Freshfields admits that it took on the representation of "Grenada," a small impoverished country with a reputation for corruption, knowing that it would be paid by a party with no track record in the oil and gas industry that was nevertheless interested in securing RSM's petroleum license.

Freshfields relies primarily on a forthcoming and not-yet-published Minnesota Law Review Article in their attempt to white-wash the significance of the fact that they took on a representation in the name of "Grenada" for the benefit of Global Petroleum, a private oil company with no track record looking to sever the relationship between Grenada and RSM.

---

[7]      Freshfields relies on *Doe v. State of Israel,* 400 F.Supp.2d 86, 120 (D.D.C. 2005) for the notion that courts will not rely on conclusory assertions of "agreements" in order to plead RICO conspiracy.  *Doe* was a politically motivated lawsuit alleging "an amalgam of personal anecdotes" describing the plaintiffs' alleged suffering as the result of what they characterized as human rights violations in the West Bank or on Israeli soil.  *Id.* at 97.  The case was thrown out primarily on Act of State and immunity grounds, and on its facts is inapposite herein.

According to Freshfields, the fact that Global Petroleum was paying their fees in the hope that they could replace RSM:

> "is entirely innocuous on its face.  It is not uncommon and not at all inappropriate or suspect for third parties to pay the legal fees for litigation in which they have an actual or potential interest….Parties to international arbitrations, and sovereigns in particular, routinely use third-party funding agreements to fund their disputes."

Freshfields Brief at 34, citing Steinitz, *Whose Claim Is It Anyway?  Third Party Litigation Funding,* 95 Minnesota L. Rev. (forthcoming 2010), at *42.  Freshfields apparently hopes that by providing a cite to a forthcoming law review article with "Third Party Litigation Funding" in its title, it can convince this Court that its representation of "Grenada" with Global Petroleum's money was normal.  But Freshfields does not provide the forthcoming Minnesota Law Review Article, which is attached to the Abrams Declaration as Exhibit H.  And even a casual glance at the Article underscores the highly irregular nature of Freshfields' representation.

For starters, the very first sentence of the Article makes it clear that third party litigation funders are "institutional investors" who provide finance for a contingency in the recovery.  Id. at 1.   The Article refers to sovereigns possibly benefiting from institutional investors "specializing in international arbitrations."  Id. at 43.  Moreover, it is clear from the Article that the vast majority of litigation funding is on the Plaintiffs' side, and that "[C]orporate defense is the only form of defense-side funding currently carried out or contemplated by the litigation funding industry."   Id. at 46.   "Corporate defense" finance essentially allows a corporate defendant to hedge against the loss of a case by pooling its risk with a finance company.  Id. But this case has *nothing* to do with the litigation funding industry or the ways in which parties and their counsel sometimes legitimately arrange to have a third-party pay legal fees.

19

Even more puzzling is Freshfields' cite to ABA Model Rule 1.8(f), which requires a law firm to assure itself that there is no conflict of interest and to receive informed client consent before accepting compensation from a third party.  This cite only underscores the fact that Freshfields could not have possibly complied with the Model Rules without uncovering the bribery scheme.  The duty to provide clients undivided loyalty ordinarily prevents lawyers from compromising the quality of their representation or the independence of their judgment based upon who is paying the fee. *See, e.g.*, ABA Model Rule 1.8(f)(2) (a lawyer may not accept compensation from a third party for representing a client unless "there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship"); *Cf. Polk County v. Dodson*, 454 U.S. 312, 321 (1981) (lawyer must exercise independent judgment regardless of pressures from third party who "recommends, employs, or pays him to render legal services to another").

Here, there is obviously a conflict of interest between Global Petroleum, who's sole motivation for funding the ICSID case was to obtain RSM's license, and Grenada, who was represented by bribe-induced public officials from 2005-2008, and even putting aside this inconvenient truth would have had an entirely different set of interests.  Freshfields could not have possibly concluded that there was no conflict unless it independently investigated the *bona fides* of Global Petroleum Group and its principals.  The very fact that such investigation was required would have forced Freshfields to investigate Grenada, Global Petroleum, and its Chairman Lev Model, and would have led Freshfields to the inevitable conclusion that they were being asked to participate in a longstanding criminal bribery scheme.  Founded in 2003 as a Grenadian Company specifically to obtain RSM's license rights, Global Petroleum had no record

of business activity whatsoever to speak of.  None of its principals have any record of business activity, much less accomplishment in the industry.

>      2.      **Freshfields Knew That Global Petroleum's Chairman Had A Criminal Conviction For Grand Larceny**

As revealed in the aforementioned section, it is implausible that Freshfields would have agreed to represent Grenada with Global Petroleum paying the bills without investigating Global Petroleum.  In this context the Court should consider Freshfields' sophistication and its own exacting standards of due diligence for client retentions.  Abrams Decl. Exh. D (Freshfields' Web Page). It is perfectly reasonable to assume that a top international law firm who admits to having "rigorous" client selection and risk management standards would have done at least some due diligence on Global Petroleum before agreeing to take millions of dollars from it in connection with representing "Grenada."

At the risk of belabouring the point, Global Petroleum was founded as a Grenadian Company specifically to obtain RSM's license rights, and had no track record whatsoever for Freshfields to investigate.  But its Chairman and Founder Lev Model had a well-publicized criminal conviction for stealing over $1.2 million from a Soviet oil company.  His conviction was publicized in, *inter alia,* the New York Times, the Dow Jones Newswires, and the Associated Press.  Abrams Decl. at Exh. B.  Freshfields was required by law and by its own "rigorous" standards to conduct due diligence with regards to Global Petroleum, and it is an inescapable inference that Freshfields found out about this conviction.

Freshfields again attempts to white-wash the pertinent allegation, claiming that the Complaint shows "at most" that "an individual associated with Global Petroleum was previously convicted of an unrelated criminal offense."  Freshfields Brief at 33.  But Lev Model was not

merely "an individual associated with Global Petroleum" – **he was the Founder and Chairman.**
And Mr. Model's "unrelated criminal offense" of stealing over $1.2 million from a Soviet oil
company and getting out of prison just a few years before surfacing in Grenada to lead an oil
company with no track record that was looking to obtain an offshore drilling license should have
prompted Freshfields to inquire as to where and how Mr. Model was getting millions of dollars
to pay Grenada's legal bills.  In fact, Freshfields was required to do so.  Cpt. at ¶ 51 (discussing
UK's Crime Proceeds Act).

> **3.** **Freshfields Knew About Grenada's Reputation For Bribery And
> Corruption**

Just as Freshfields can be trusted to have done simple due diligence on the individual and
entity promising to pay it millions of dollars in legal fees, it is fair to presume that Freshfields
would have investigated its putative client, Grenada.   And if these sophisticated international
attorneys did not already know of Grenada's shameful and well-deserved reputation for criminal
bribery and corruption under the rule of Former Prime Minister Keith Mitchell, there were no
shortage of articles that any cursory search would have revealed.  Abrams Declaration Exh. A;
*supra* at 5-7.

Grenada's reputation plus the sophistication and means of the Freshfields' Defendants is
critical to the analysis of the RICO conspiracy.  In *United States v. Bourke*, 08 Cr 00518 (SDNY,
May 29, 2009 (Docket Entry #206) the Court ruled that expert evidence of Azerbaijan's
reputation for corruption could be used to show "that a person of Bourke's means, who was
considering making a large investment in a venture in Azerbaijan, would have at least been
aware of the high probability that bribes were being paid."  Id. at 10.  RSM intends to introduce
evidence of Grenada's reputation for corruption at trial to help prove precisely the same point,

that a law firm with the means and sophistication of Freshfields would not have taken on "Grenada" as a client without being aware of its reputation for criminal bribery and corruption, particularly when it was being paid by a third party with no legitimate track record and a Chairman with a serious, relatively recent felony conviction.

        4.        ***Arguendo* To The Extent Freshfields Claims That It Did Not Know About The Criminal Bribery Scheme In August Of 2005 They Certainly Became Aware Of It By The End Of 2007, Yet They Stayed In The Conspiracy**

Freshfields argues that "[R]eports of misconduct published after commencement of the representation, the reliability of which are not alleged and are by no means assured…do not constitute a basis to infer 'knowledge' that bribes have been paid."  Freshfields Brief at 35. Freshfields in essence starts from the implausible assumption that it did not know about any bribery in August of 2005 when it assumed the representation, and concludes that this professed ignorance means that it could shut its eyes forever without being implicated for conspiracy.  This reflects a basic misunderstanding of RICO Conspiracy law.  It is no defense to a RICO conspiracy allegation to claim that one only learned of the conspiracy's existence in the middle of the conspiracy.  *See Edelin*, 128 F.Supp.2d at 37.  Even if true this does not somehow permit Freshfields to continue to provide ongoing services to the conspiracy.

Freshfields thus must be presumed to know what it discovered in 2007 (if not earlier). This includes the sworn testimony concerning Lev Model's payment of the college tuition of Gregory Bowen's daughter (Cpt. at ¶ 47), the allegations in the New York Case that Bowen traveled to New York in furtherance of the bribery scheme (Cpt. at ¶¶ 42-43), and the written evidence showing that Grenada's "Ambassador-at-large" sought an apparent bribe from RSM (Cpt. Exh. B).

5.      **Arguendo, Even If Freshfields Lacked Actual Knowledge Of The Bribery Scheme, It Still Possessed The Requisite *Mens Rea* For RICO Conspiracy Liability**

Freshfields' brief largely claims actual ignorance of any criminal bribery scheme despite compelling public evidence to the contrary.  But under well-settled principles of criminal law, "in addition to actual knowledge, a defendant can also be said to know a fact if he "is aware of a high probability of its existence, unless he actually believes it does not exist." Leary v. United States, 395 U.S. 6, n. 93 (1969); See also United States v. Feola, 420 U.S. 671, 688 (1975) (Supreme Court has repeatedly "declined to require a greater degree of intent for conspiratorial responsibility than for responsibility for the underlying substantive offense.").

Here, it is not uncommon for members of a conspiracy to disclaim knowledge of the conspiratorial objectives.  RSM will ask the Court to provide an appropriate jury instruction at trial on the level of *mens rea* necessary to support the RICO Conspiracy claim, but for pleading purposes RSM has plainly alleged Freshfields' actual knowledge, and in the alternative, Freshfields was certainly aware of the "high probability" that it was assisting a criminal bribery scheme by representing "Grenada" in the ICSID Arbitration.

6.      **RSM Alleges Facts Sufficient To Render Plausible That Freshfields Agreed To The Commission of The Alleged Bribery Scheme**

Freshfields next asserts that the "alleged bribes took place before RSM and Grynberg commenced the ICSID action" and that Freshfields "could not have agreed that the bribes should be paid because the firm had no role at all until a much later date." Freshfields Brief at 35.  This once again evidences a misunderstanding of substantive conspiracy law.

24

The Supreme Court has definitively construed the RICO statute as a whole – and the civil provisions in particular, to incorporate preexisting conspiracy law. *Beck v. Prupis*, 529 U.S. 494, 501 (2000); *Salinas*, 522 U.S. at 63.  The rule is that where a conspiracy is already in progress, a late comer who knowingly joins it takes it as he finds it and may be held responsible for acts committed in furtherance of the conspiracy before he joined it.  RICO conspiracy liability may arise "even where a defendant joined the conspiracy after it began…and where acts in furtherance of the conspiracy took place prior to and after the defendant joined the conspiracy." *Edelin,* 128 F.Supp.2d at 37 (D.D.C.2001)  (citation omitted).  As in traditional conspiracy law, each RICO co-conspirator is liable for the acts of all other co-conspirators undertaken in furtherance of the conspiracy, even if the conspirator did not participate in, or was unaware of, such acts.  *See Salinas* 522 U.S. at 63-64; *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946).

Moreover, a RICO pleading may, but need not, specify the types of racketeering acts that the defendant agreed would be committed by some member of the conspiracy in furtherance of the conduct of the affairs of the enterprise.  Rather, it is sufficient to allege that it was agreed that multiple violations of a specific statutory provision which qualifies as a RICO racketeering act would be committed.  *See United States v. Glecier*, 923 F.2d 496, 499-500 (7th Cir. 1991) (dealing with the sufficiency of a criminal indictment alleging RICO conspiracy).  The RICO conspiracy claimant need not show the defendant committed a racketeering act, or even an overt act.  *See Salinas*, 522 U.S. at 63.

Freshfields is left to argue that lawyers providing "legitimate" legal services may not be held liable under RICO.  Freshfields Brief at 36.  But lawyers providing even ostensibly routine

legal services may be held liable under RICO conspiracy, even if they do not manage or control a corrupt enterprise nor personally commit any predicate acts.  Lawyers are liable under RICO Conspiracy if they knowingly facilitate the illicit activities of those who do manage or operate such an enterprise.  *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (2000), cert. denied, 120 S. Ct. 2688 (2000).  For RICO conspiracy liability to attach, one must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, "not to operate or manage the enterprise, but personally to facilitate the activities of those who do." Id.

Stated another way, lawyers are not allowed to become ongoing legal advisors to organized criminal activity.  Lawyers -- just like other service providers -- are liable where they knowingly agree to assist others actively in the commission of unlawful acts*. See also Fortney v. Kuipers*, 1999 WL 102772 (N.D. Ill. 1999) (finding attorney liable for RICO conspiracy when he advised client how to transfer assets so that they could not be reached by a judgment creditor, even though he did not operate or manage the enterprise); *United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) (lawyers who conspired to engage in bribing California state court judges to rule favorably for their clients were convicted of violating RICO).

**C.     RSM Alleges That Freshfields Was Aware Its Co-Conspirators Were
Engaged In A Pattern Of Racketeering Activity**

Freshfields argues that "at most" the Complaint alleges that "Freshfields had speculative reasons to suspect the alleged bribery scheme" (Freshfields Brief at 38).  Freshfields than asserts that the alleged scheme "was directed at a single goal--to obtain a single exploration license for a

single entity, Global Petroleum." Id.  This, according to Freshfields, does not constitute a pattern of racketeering activity under RICO.  Freshfields is again mistaken.

The leading RICO "pattern" case is *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893 (1989) a case with similar facts to this one.  In *H.J.,* plaintiffs alleged that during a six year period, Northwestern Bell attempted to, or did, bribe commissioners of the Minnesota Public Utilities Commission through a variety of methods.  Acts of bribery described in the complaint included bribes involving payments made to commissioners through a middleman, payments made to a former commissioner in "consulting fees," and payments for parties, gifts and meals for commissioners.  The Supreme Court found that this bribery scheme was adequate to show a "pattern" of racketeering activity, particualry given the longstanding nature of the scheme.  The Court articulated RICO's "pattern" requirement as follows:

> [T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity

*H.J.* at 239.  "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition .  A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.  *Id. 492 U.S. at 239-242; Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (DC Cir. 1991).

However, when there exists the reasonable threat of prospective racketeering, predicate acts occurring even days apart will suffice.  *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs &*

*Helpers Local Union*, 883 F.2d 132 (DC Cir. 1989) (continuity prong of RICO satisfied based upon four acts of racketeering involving a union's destruction of employer's property during a strike, over a four day period); *Sun Savings and Loan Association v. Dierdorff*, 825 F.2d 187, 194 n.5 (9th Cir. 1987) ("As long as a threat of continuing activity exists at some point during the racketeering activity, the continuity requirement is satisfied."). The issue is whether the threat existed at any point in time, not what actually transpired.

This case shows a threat of continuing criminal activity. While the precise timing of the bribes cannot be pled at this stage, the bribery scheme spanned at least from 2004 to 2008, interrupted only when Bowen and his political party lost power. (Cpt. ¶¶ 36-47). The predicate acts and the bribes threatened continued criminal activity of a similar nature. But for the defeat of Bowen's political party at the polls, this pattern of activity would have likely continued to repeat as the conspirators implemented the licensing agreement, and the agreement eventually came up for renewal.

Courts will not dismiss a RICO case premised on a failure to show a "pattern" when the only reason the scheme has been interrupted is a fortuitous event. *United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991)* ("The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by arrest, indictment or guilty verdict."); *Sun Savings and Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 n.5 (9th Cir. 1987) ("As long as a threat of continuing activity exists at some point during the racketeering activity, the continuity requirement is satisfied"). Political corruption cases in particular tend to threaten continued criminal activity given the mis-use of sovereign power especially where, as here, there is systematic evidence of corruption. *See Empress Casino Joliet*

28

*Corp. v. Blagojevich*, 674 F.Supp.2d 993, 1001 (N.D.Ill 2009) (rejecting former Illinois Governer Blagojevich's assertion that bribery scheme had a "built-in end point" where there was a reasonable inference that bribery would have continued given Blagojevich's alleged systematic solicitation of payments from persons and entities seeking benefits from Illinois state government); Abrams Decl. Exh. A (articles detailing corruption in Grenada).

Freshfields relies primarily on *Edmundson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260 (D.C. Cir. 1997) for the proposition that "a single scheme to accomplish one discrete goal, directed at one individual with no potential to extend to other persons or entities" will not support a pattern of racketeering activity. Freshfields' Brief at 38-39. *Edmundson & Gallagher* involved a solitary scheme designed to prevent or delay sale of an apartment building, or alternatively to secure ransom for allowing the sale to proceed. There were no allegations tending to show that this conduct was likely to proceed past the sale of the building, so the only evidence of any threat that the conduct would continue is the notion that "once a RICO violator, always a RICO violator," a construction which would "deprive the pattern requirement of all meaning." *Id.* at 1264. For reasons noted above, the very nature of the bribery scheme in this case is far different from the solitary scheme alleged in *Edmundson & Gallagher*.

## II.     RES JUDICATA DOES NOT APPLY

Under *res judicata* a judgment on the merits in a prior suit bars a second suit involving identical parties based on the same cause of action. *Apotex, Inc. v. FDA,* 393 F. 3d. 210, 217 (D.C. Cir. 2004) , *citing Drake v. FAA,* 291 F.3d 59, 66 (D.C. Cir. 2002) . Freshfields' argument has three dispositive flaws. <u>First</u>, there was no "judgment on the merits" against Freshfields, or

any of its privies.  <u>Second</u>, Freshfields was not a party to the New York case.  And <u>third</u>, this case alleges RICO conspiracy, a different cause of action than the common law claims which were pursued in the New York case.

Most fundamentally, there was no judgment on the merits against Freshfields or anyone in privity with Freshfields.  While alleged co-conspirator Gregory Bowen was sued in the New York case, he was dismissed -- pending appeal -- because Judge Wallach ruled that Bowen was entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA").  In *Samantar v. Yousef*, 2010 WL 2160785 (U.S. June 1, 2010), the Supreme Court found that individual foreign officials are not entitled to protection under the Foreign Sovereign Immunities Act.  This decision prompted the Second Circuit to invite RSM and Mr. Bowen to submit letters concerning the relevance *vel non* of *Samantar* in the pending appeal.  The Second Circuit's Order inviting comment plus RSM's letter to the Second Circuit is attached to the accompanying Abrams as Exhibit I.  This Letter makes clear that *Samantar* compels a remand.

In any event, even assuming that Bowen's dismissal for jack of jurisdiction stands, there can be no "judgment on the merits" until jurisdiction has been established.  Dismissals "for want of jurisdiction are paradigms of non-merits adjudication."  *Shoup v. Bell &  Howell Co.*, 872 F.2d 1178, 1181 (4th Cir. 1989); *Sinochem v. Bonner*, 549 U.S. 422, 430-31 (2007) ("Jurisdiction is vital…if the court proposes to issue a judgment on the merits."); *Prakash v. American University*, 727 F.2d 1174, 1181 (D.C. Cir. 1984) ("A dismissal for lack of subject matter jurisdiction, on the other hand, is not a disposition on the merits"); *Hallock v. Bonner*, 387 F.3d 147 (2d Cir. 2004) (lack of subject matter jurisdiction is not a judgment on the merits).  Thus, courts must determine jurisdiction before it determines the merits.  And Bowen was dismissed

before any merits-based determination.  Similarly, there was no judgment on the merits as it pertains to Lev Model or Global Petroleum – these defendants in New York never appeared, and the New York Court purported to exercise its discretion (pending appeal) in denying default judgments against them, but did not grant them a judgment on the merits.  And in the case of Lev Korchagin, the Moscow-based director of Global Petroleum who claimed that his group "owns" the Government of Grenada," RSM was never able to serve him process in the New York Case, and for this reason acquiesced in his dismissal for lack of service.

Against this backdrop Freshfields argues that a dismissal against co-conspirators in another case should preclude this one, but Freshfields' case cites involve at best situations where there was a definitive judgment on the merits in the prior lawsuit against co-conspirators in or near privity with the defendant in the second lawsuit.  *See McLaughlin v. Bradlee*, 599 F.Supp. 839 (D.D.C. 1984) (applying *res judicata* where the plaintiffs' prior case resulted in a five-week trial, an adverse directed verdict on several counts, and an adverse jury verdict on remaining counts); *In re Teltronics*, (applying *res judicata* where dismissed co-conspirator was in privity with defendant, and where dismissal was after full summary judgment briefing and on the merits).  In each case, claim preclusion was applied following some kind of decision on the merits, but never after a dismissal for lack of jurisdiction.  The reason, of course, is that dismissal for lack of jurisdiction does not give rise to claim preclusion.

To the extent Freshfields is arguing that the New York dismissals against defendants like Fridman, Blavatnik, and BP should apply to this case, the argument must fail because these defendants obtained dismissals precisely because *they were able to distance themselves from Grenada, Bowen, Global Petroleum and Lev Model*.  As Freshfields' cite to *Negron-Fuentes v.*

*UPS Supply Chain Solutions*, 532 F.3d 1, 10 (1st. Cir. 2008) shows, only a party in privity with or otherwise closely related to the original defendant can claim the benefits of *res judicata*. Freshfields also cites to *Gambocz v. Yelencsis*, 468 F.2d 837, 841-42 (3d Cir. 1972), where a governmental entity was unsuccessfully sued first, and the subsequent lawsuit was premised on the exact same theory against officers in their personal capacities.   This fact pattern is far removed from this case.   Even further removed from being useful precedent is Freshfields' cite to *Capital Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490-92 (DC Cir. 2009), where the DC Circuit upheld a ruling precluding a subsequent legal malpractice claim where there had been legal fee litigation in the bankruptcy proceeding between the exact same parties.

Freshfields does not claim it was in privity with any of the Defendants who actually received dismissals on the merits in the New York case.   In fact, the New York Defendants which obtained merits-based dismissals successfully argued that the New York Complaint did not adequately link them with Grenada, Bowen, Model or Global Petroleum.   *See e.g., RSM Production Corp. v. Fridman*, 643 F.Supp.2d 382, 406 (S.D.N.Y. 2009) ("dismissing Fridman and Blavatnik in part because of "specific allegation, that it was Global Petroleum that furnished payment for Grenada's legal defense…(not) Fridman and Blavatnik who did so.").   Indeed, throughout the course of the New York litigation, the defendants who ultimately obtained dismissals on the merits continuously insisted that they had nothing to do with Bowen, Global Petroleum or even Grenada.   *See Generally RSM v. Fridman*, 06 Civ. 11512 (Docket). Freshfields of course represented Grenada and took Global Petroleum's money while doing so, so it does not and cannot make similar arguments.

An independent reason why this case is not precluded is the fact that this case sounds in RICO conspiracy, not the state common law claims which were asserted in New York.  The New York case involved no factual findings, just a legal determination that the claims asserted therein were not adequately pled.  Moreover, many of the facts leading to the institution of this lawsuit were discovered long after the 2006 commencement of the New York lawsuit, including Lev Model's criminal conviction, Lev Model's payment of the college tuition of Gregory Bowen's daughter, and Bowen's June 2007 sworn testimony confirming Global Petroleum's payment of Grenada's legal fees. Cpt. at ¶50.  While the New York plaintiffs could have made a motion to amend the complaint to add Freshfields as a party, there were not required to do so on pain of res judicata implications.  *Doe v. Allied-Signal, Inc.*, 985 F.2d 908 (7th Cir. 1993) (plaintiffs did not need to amend original complaint to avoid res judicata).

### III.     DEFENDANTS ARE NOT ENTITLED TO ICSID IMMUNITY

#### A. Articles 21 and 22 of the ICSID Convention Are Not Domestic Law Of the United States

Freshfields argues that this case is barred by ICSID Immunity.  The argument relies on the language of Articles 21 and 22 of the ICSID Convention which was signed and ratified by the United States.  See Generally Freshfields Brief at 19.  They further argue without any cites to either the ICSID Convention or domestic caselaw that Article 21 and 22 of the ICSID Convention are "self-executing and therefore the domestic law of the United States."  Id. at 22-23.  RSM disagrees, and because under applicable precedents Articles 21 and 22 of the ICSID Convention are not "self-executing," they are not the domestic law of the United States and do not provide the Freshfields' defendants any immunity here.

In general, international treaties "are not presumed to create rights that are privately enforceable." *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992).  Even when treaties are self-executing in the sense that they create federal law, the background presumption is that "[i]international agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." 2 Restatement (Third) of Foreign Relations Law of the United *States, §* 907, Comment a, p. 395 (1986); *See also Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (DC Cir. 1980). In order for a treaty to be privately enforceable, it must be self-executing, and it is only self-executing when it specifically "evidences an intent to provide a private right of action." *Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir. 2003); *Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc) (treaties "are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing' and is ratified on those terms."

Here, Congress has enacted enabling legislation which makes certain provisions of the ICSID treaty domestic law, but excludes Articles 21 and 22 of the ICSID Convention and says nothing about providing "counsel" in ICSID arbitrations immunity.  See 22 U.S.C. § 1650(a).[8] The fact that this enabling legislation was necessary shows that the ICSID Convention was not in fact a self-executing treaty which automatically created domestic law.   Had the ICSID convention been self-executing the enabling legislation would have been unnecessary and redundant, a construction this Court should avoid.  Principles of construction caution that a Court should not interpret governing law in such a way as to make part of it meaningless.  *Abourezk v.*

---

[8]     The statute refers to Chapter IV of the ICSID Convention, which includes Articles 36 through 55. No enabling legislation was ever passed adopting the other Articles.

*Reagan*, 785 F.2d 1043, 1054 (DC Cir. 1986).   Thus, the ICSID Convention was not self-executing, requiring Congress to pass enabling legislation.   The resulting legislation does not cover Articles 21 and 22, meaning that Freshfields may not cite these articles as domestic law that provides them any immunity.

Freshfields' observation that subsequent federal regulations have designated ICSID as a public international organization entitled to all immunities conferred by the International Organizations Immunities Act ("IOIA") lends further support to RSM's position.   Freshfields' Brief at 20, N. 24; citing IOIA, 28 U.S.C. §§ 288a-288b.   The fact that a 1977 Executive Order was needed to clarify the immunity of the ICSID Centre itself under a federal statute makes clear that the ICSID Convention itself was not self-executing.   And nowhere in either the IOIA or the Executive Order cited by Freshfields is there any mention of private attorneys in ICSID proceedings being immunized, or otherwise being considered "international organizations" for purposes of IOIA.

Freshfields' case citations where treaties have led to immunity from suit all arise where treaties have made specific reference to changing domestic law, or there is separate domestic enabling legislation that creates the immunity.   Freshfields places principal reliance on *Brzak v. United Nations*, 597 F.3d 107, 111 (2d Cir. 2010) (Freshfields' Brief at 20, 22), where the Second Circuit was faced with whether the UN and high-level UN officers could be sued.   The Second Circuit relied on three facts leaning towards immunity, none of which exist here.   <u>First</u>, the executive branch specifically intervened in *Brzak* to suggest immunity.   Here there is no evidence that the executive branch cares whether or not Freshfields is sued for being part of an illegal criminal conspiracy.   <u>Second</u>, the applicable treaty in *Brzak* made a specific reference to

35

ratifying countries changing "its own law" to reflect the treaty.  Id. No such language is in the

ICSID Convention Treaty.   Third, the *Brzak* court observed that there was legislative history

supporting the self-executing nature of the UN treaty.  Id. (citing the Congressional Statement of

John R. Stevenson, Legal Advisor to the Department of State, that "the convention is self-

executing and no implementing legislation is necessary.").   No such legislative history exists

herein.

Similarly, in *Polak v. International Monetary Fund*, 657 F.Supp.2d 116, 119-20 (D.D.C.

2009), the Court cited to specific language in the treaty which indicated that the treaty "shall

have full force and effect in the United States," as well as enabling legislation that specified the

immunity of the defendant International Monetary Fund.   And in *Mendaro v. World Bank*, 717

F.2d 610 (DC Cir. 1983), the source of immunity was enabling legislation that permits

international organizations such as the World Bank to claim the same immunities as a foreign

government.  See 28 U.S.C. § 286.

Freshfields also cites to *Diggs v. Richardson*, 555 F.2d 848 (D.C. Cir. 1976), a curious

cite because the *Diggs* court found that the applicable treaty was not self-executing, noting that

the absence of a specific directive addressed to the judiciary.  The *Diggs* court also noted that

absence of any executive position that the treaty was self-executing, as well as an absence of

"domestic legislation evincing an intention for judicial enforcement."   Id. at 852; *accord*

*McKesson Corp. v. Islamic Rep. of Iran*, 539 F.3d 485, 489 (D.C. Cir. 2008) (foreign treaty does

not create rights enforceable in federal court absent a specific directive in the treaty).

Freshfields' claim of immunity suffers from these same problems.

Even further afield is where Freshfields discusses the immunities afforded judges and prosecutors, and analogizes itself to a prosecutor or a judge.   Freshfields' Brief at 23. Prosecutors and judges are public officials and the rationales for providing them immunity from almost every suit is well-entrenched.   But Freshfields is a private law firm who took on this representation to secure millions of dollars in legal fees.   Private law firms are plainly not immune from a lawsuit when they commit torts or crimes in their quest for profit.   The creation of such immunity -- by foreign treaty or otherwise -- ought to be clearly stated by either the treaty itself of in domestic enabling legislation.

### B. Even If Articles 21 and 22 Of The ICSID Convention Were Applicable, Freshfields Would Still Lack Immunity From Suit

Because Freshfields' assertion of "ICSID Immunity" is an entirely novel one, there is no caselaw delineating the scope of the purported immunity afforded counsel under Articles 21 and 22 of the ICSID Convention.   However, it cannot be credibly maintained that Freshfields -- a private law firm -- discharges any authorized function, much less one that is protected by an international treaty, when it agrees to enter into a corrupt criminal conspiracy.   This simple fact distinguishes this lawsuit from the cases in Freshfields' brief immunizing international organizations such as the World Bank, United Nations and the International Monetary Fund. The DC Circuit has been reluctant to extend immunities to parties alleged to have participated in corrupt bargains like the ones alleged against Freshfields herein.   *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) (foreign official alleged to have paid accident victim to not cooperate with a government investigation into an accident in exchange for government benefits is not entitled to protections of the Foreign Sovereign Immunities Act).

### IV.    THE RICO CONSPIRACY CLAIM IS NOT TIME-BARRED

The parties agree that a four year statute of limitations applies, but disagree as to when the four year clock began to run.  Freshfields urges an August 2004 accrual date for Plaintiffs' RICO Conspiracy claim, despite the fact that the alleged conspiracy persisted until 2008, and the injuries caused by the conspiracy continue.  Freshfields Brief at 24.  According to Freshfields, the claim against them accrued even before they got involved because Plaintiffs were already aware that others wished to deny them a license.  Once again, Freshfields mis-comprehends both the allegations in the Complaint and the applicable law.

The Complaint makes clear that in 2004 the conspirators did not intend to cause anybody other than RSM to obtain any license to explore the offshore Grenadian waters until the "situation" with RSM was dealt with.  Cpt. at ¶ 23.  This would entail either working out a settlement with RSM or litigating the ICSID case to its conclusion.  RSM's rights to a license in 2004 could only be said to be delayed, not defeated.  No efforts to actually steer the license to Global Petroleum occurred until July of 2008, in the waning days of Prime Minister Mitchell's administration when Gregory Bowen, faced with the prospect of losing power, desperately purported to grant license rights to Global Petroleum.  Cpt. at ¶ 49.  And Freshfields' litigation of license issue was primarily within the limitations period (including the 2007 ICSID hearing) and did not obtain any tangible result until March of 2009.  Both the July 2008 grant of the license and the March 2009 ruling were caused by overt acts taking place within the limitations period, and caused RSM to incur separate injuries for purposes of the statute of limitations.  *See Generally* Cpt. ¶¶ 46-52.

Freshfields' case cites involve situations where both the injury and the conspiracy itself were complete outside of the limitations period.  In *Rotella v. Wood*, 528 U.S. 549, 557 (2000), Rotella was a psychiatric patient discharged in 1986.  Eight years later he learned facts leading him to conclude there was a RICO conspiracy designed to keep him at the hospital for the financial benefit of the conspirators.  Thus, while his knowledge of the facts was relatively new when he decided to file suit, the RICO conspiracy itself had indisputably ended eleven years before any suit was filed, and plainttiff did not "deny that he knew of his injury…when it occurred, or that his civil RICO claim was complete and subject to suit"  Id.  The Court specifically reserved for another day how it would deal with a case where new injuries had occurred within the four year limitations period.  *Id.* at 559, n.4.  Freshfields also relies on *Chalabi v. Hashemite Kingdom of Jordan*, 503 FSupp.2d 267 (D.D.C. 2007), a case where the allegedly wrongful act was the Kingdom of Jordan's seizure of a bank outside of the limitations period.  Freshfields' reliance on *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) fares no better, as *Klehr* found that an action filed in 1993 for the purchase of a defective silo in 1974 was time-barred.

What Freshfields does not address is how courts treat RICO conspiracies which may have started outside of the limitations period but continue to commit overt acts and cause separate injuries within the limitations period.  "The rule is that a cause of action accures when new overt acts occur within the limitations period, even if a conspiracy was formed and other acts were committed outside the limitations period."  *State Farm v. Ammann*, 828 F.2d 4, 5 (9th Cir. 1987) (Kennedy, J. concurring).  Each time plaintiff suffers an injury caused by a violation of the RICO statute, a cause of action to recover damages based on that injury accrues to plaintiff at the time

he discovered or should have discovered the injury. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102-05 (2d. Cir. 1988). *See also DeShazo v. Nations Energy Co., Ltd., 286 Fed. Appx. 110, 117 (5th Cir. 2008)* ("The Fifth Circuit has adopted a 'separate accrual' rule for civil RICO claims, which 'allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury.' "); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D.D.C. 2000).[9]

Freshfields is essentially arguing that once RSM knew that Gregory Bowen and others were conspiring to deny its license, the four-year clock starts to run not only against Bowen but against anybody else who later joins the conspiracy. This is an absurd result not in any way supported by Freshfields' authorities. The purposes of the RICO statute are to compensate victims, and to "eliminat [e] racketeering activity." *Rotella,* 528 U.S. at 557. Defendants' argument would prevent prosecution not only of past wrongs but also of future wrongs, and runs directly against the stated purpose of the RICO statute. And it does not advance the purpose of the RICO statute of limitations. The purpose of the four year limitation is to encourage litigation "while evidence is still fresh and promote certainty and repose concerning past wrongs. See *Rotella* 528 U.S. at 555. It is not to grant blanket immunity to commit future wrongs to those defendants who join a longstanding RICO conspiracy mid-stream. For this reason most courts who have considered the issue have concluded that each new injury creates a separate claim. This rule accommodates the purposes of statute of limitations without sacrificing RICO's purpose and without creating the absurd result to which Freshfields' argument leads.

---

[9]     The District of Columbia Circuit Court of Appeals has not squarely addressed this issue. But Courts within the Circuit and a majority of other Circuits support the separate accrual rule. *See McCool v. Strata Oil Co., 972 F.2d 1452, 1464-65 (7th Cir. 1992)* ("Following the First, Second, Eighth, Ninth, Tenth and Eleventh Circuits, we also apply a 'separate accrual' rule to civil RICO claims.")

## V.      IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED

Freshfields' Motion to Dismiss argues that RSM has not pled sufficient facts to state a claim.  RSM disagrees and believes the facts alleged along with the evidence they will present at trial after the benefit of discovery will establish these claims.  However, should this Court find the Complaint wanting, RSM requests leave to file an amended complaint to make additional allegations.

## CONCLUSION

For the foregoing reasons, RSM respectfully requests that the motion to dismiss be denied.

Dated: July 6, 2010

<div style="margin-left: 40%;">

Respectfully submitted,


LAW OFFICE OF DANIEL L. ABRAMS, PLLC


_____
Daniel L. Abrams
2 Penn Plaza, Suite 1500
New York, New York 10121
(212) 292-5663
Admitted *Pro Hac Vice*

Kelly Pride Hebron
Pride Law Office
1300 Merchantile Lane, Suite 139ii
Largo, MD 20774
(301) 583-4633

</div>