DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

# WHOSE CLAIM IS THIS ANYWAY? THIRD PARTY LITIGATION FUNDING

**Dr. Maya Steinitz**[*]
**Associate-in-Law**
**Columbia Law School**

*Third party litigation funding, or litigation finance, is a new industry composed of institutional investors who invest in litigation by providing finance in return for an ownership stake in a legal claim and a contingency in the recovery. Its emergence has been recognized as one of the most significant developments in civil litigation today. It will transform access to justice, and affect numerous areas of the law including corporate law, torts, intellectual property, environmental law, employment law and international law. Hailing from the U.K. and Australia, the practice is de facto prohibited in the U.S., largely through ethical rules disallowing champerty and fee-sharing among lawyers and non-lawyers. But market forces, including pressure exerted on U.S. law firms by overseas competitors with access to funding, are propelling the penetration of the industry into the U.S.*

*The article addresses litigation finance by institutional investors in the U.S. It describes the empirical reality of the industry; addresses the emergence of a secondary market in legal claims and the prospect of securitization of legal claims; discusses third party funding of international arbitration and; applies a bargaining analysis to understanding the systemic effects of the practice. Specifically, the article asks what happens when, through litigation funding, litigation ceases to be expensive and uncertain and when parties "bargain in the shadow of financing." Using bargaining theory the article offers a three-step argument for **a move away from a prohibition of litigation funding towards nuanced regulation of the industry**. First, it argues that the desirability of litigation funding cannot be assessed if viewed monolithically. Therefore, a taxonomy of funded litigations is offered. Second, applying **a bargaining analysis to each type of funded litigation, the article argues that the practice could radically alter the social function of courts by systemically equalizing the ability of society's "have-nots" to use the courts to affect rule change via litigation.** This is in contrast to the court system serving (unwittingly, perhaps) as the guardian of the status quo in favor of society's "haves." Third, the bargaining analysis reveals the agency problems that may arise due to the development of secondary markets in legal claims as well as other features of litigation finance and which should be addressed through regulation. The article concludes with a five-pronged framework for the suggested regulatory regime that regulators, legislators and the Bench can devise and contract design features parties seeking litigation funding and their lawyers can employ.*

---

[*] Maya Steinitz (LL.B., LL.M., J.S.D.) is an Associate-in-Law at Columbia Law School. I am very grateful for the comments of Katharina Pistor, Bill Simon, Shmuel Leshem, Cathrine Kessedjian, John Coffee, Avery Katz, Wasim Salimi, Nathan Miller and the participants of Columbia Law School's Associates and Fellows workshop. I am also grateful for the research assistance of Jonathan Strauss. The author can be reached at mstein1@law.columbia.edu .

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

I.   INTRODUCTION ................................................................................................ 3
II.  THE RISE OF LITIGATION FINANCE ................................................................. 8
   A. Litigation Finance Defined ..................................................................... 9
   B. Global Economic Market Forces Propelling the Rise of Litigation Finance .................. 11
      1. Competitive Pressures from litigation funding in foreign jurisdictions ................ 11
      2. Creation of a secondary market in legal claims ...................................... 15
      3. Effects of the global recession on the rising demand for litigation funding ......... 16
III. A PROHIBITION ON LITIGATION FINANCE: HISTORICAL ANTECEDENTS AND
     CONTEMPORARY EFFECTS ............................................................................ 18
   A. Maintenance and Champerty .................................................................... 19
   B. The Prohibition on Fee-Sharing with Non-Lawyers ............................................ 24
   C. Permissible litigation funding and claim transfer ......................................... 26
   D. Systemic effects of the prohibition on litigation finance ................................. 33
IV.  LITIGATION FINANCING CHANGING THE GAME: WHEN LITIGATION CEASES TO BE
     EXPENSIVE AND UNCERTAIN .......................................................................... 36
   A. A Note on Taxonomy ........................................................................... 36
   B. Parties' Ability to "Play for Rules" ...................................................... 37
      1. Individual, Class, and Sovereign Plaintiffs as Modified Repeat Players ............... 39
      2. Corporate Defendants as Modified Repeat Players ...................................... 46
   C. Agency Problems and Moral Hazards ........................................................... 48
      1. Bargaining in the Shadow of Financing: the effects of secondary markets in legal
         claims ............................................................................... 48
      2. The Fragmentation of the attorney-client-funder relationship .......................... 53
V.   IMPLICATION FOR REFORM: REGULATION OF LITIGATION FINANCE ............................ 56
   A. Eliminating the champerty restriction as it relates to third party litigation funding ..... 58
   B. Reforming the attorney – client – funder relationship ..................................... 59
   C. Court supervision ........................................................................... 61
   D. The funding contract: Contract Design and Consumer Protection .............................. 62
      1. Contract design ...................................................................... 63
      2. Consumer protection; the insurance analogy and; finance regulation ................... 66
VI.  CONCLUSIONS ................................................................................. 68

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

## I.   INTRODUCTION

Imagine that a woman wants to bring a claim for sexual harassment against her powerful and wealthy former employer but can neither afford counsel nor find an attorney willing to take the case on contingency.  A private funder provides the necessary financing for her to pursue her claim.  Further suppose that the employer in question is a former governor, now the sitting President of the United States, that the investor is a wealthy supporter of the President's political opposition, and that the case starts a chain reaction that could have brought an end to the President's term in office. [1]

Now imagine a group of indigent villagers in Angola, whose village has been subject to a negligent and lethal chemical spill at the hands of the agents of a U.S.-based multinational corporation the cover-up of which involves spying on, intimidating and even murdering locals, being able to seek redress through an expensive, protracted and complex Alien Tort Claims Act[2] claim filed in a U.S. court and funded by an investment company.

Imagine also a corporation that is facing a bet-the-company class action lawsuit which it is convinced is a strike-suit (i.e., non-meritorious but prohibitively expensive to defend)[3] being able to pay a premium and in return transfer the risk of an uncertain jury verdict to a third party, thus enabling itself to continue its smooth operation generating profits for its shareholders and jobs for its employees.

 Contemplate, if you will an oil company funding a developing country's claim in a boundary dispute over territory rich with petroleum which is being arbitrated in an international arbitration—a confidential, and therefore non-transparent process t o which even the citizens of

---

[1] This is, of course, the Paula Jones versus Bill Clinton case.  *Clinton v. Jones*, 520 U.S. 681 (U.S. 1997); *Jones v. Clinton*, 72 F.3d 1354 (8th Cir. Ark. 1996).  On the funding and possible instigation of the claim by a right-wing businessman see, http://www.time.com/time/community/transcripts/chattr040198.html.  I thank Henry Hansmann for bringing this example to my attention.
[2] Alien Tort Claims Act, 28 USCS § 1350 (2009).
[3] *See* Christine Hurt, *The Undercivilization of Corporate Law*, 33 J. CORP. L. 361, 367 (2007).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

the countries whose boundaries are in dispute have no access.  Further envision that the

developing country has no funds of its own and would otherwise be unable to mount a competent

defense of its claim to the territory.

Finally, suppose that the China Investment Corporation (CIC; China's Sovereign Wealth

Fund) funds a litigation against an American "national champion" company in a sensitive

industry such as military technology.  In the process of conducting due diligence preceding its

investment in the litigation, as well as in connection with its ongoing monitoring of the litigation

it now has a legal stake in, CIC obtains highly confidential documents containing proprietary

information regarding sensitive technologies from the American defendant corporation.

What do all of these scenarios—some uplifting, some forbidding —have in common?

The answer is:  they would all be made possible by a group of practices that are coming to be

known as third party litigation funding (variously referred to as 'claim transfer' or 'litigation

finance').  Litigation funding, still in its infancy but steadily growing, is one of the most

significant developments in civil litigation today.[4]  It represents a potential sea change in the

character and policy implications of litigation in the United States.  Litigation funding affects

numerous areas of the law including corporate law (securities, anti-trust, and all manner of

corporate defense), intellectual property, torts law, environmental law, employment law, human

rights and international law.  Taking into account the industry's ascendance overseas and its

foothold in the U.S. it behooves us to examine the effects third party litigation funding will have

on the American legal system.

Litigation finance in the U.S. is in its infancy, however.  On the one hand, economic

forces are propelling its expansion while, on the other, prohibitive regulation bars its usage in

most states.  The economic forces, discussed in more detail below, include competitive pressures

---

[4] Identified by the RAND Institute for Civil Justice and the UCLA School of Law as one of the "biggest and most influential trends in civil justice."  See, THIRD PARTY LITIGATION FUNDING AND CLAIM TRANSFER EVENT PROGRAM DETAILS, (2009) *available at* http://www.rand.org/events/2009/06/02/email_invitation.html (last visited Feb. 16, 2010).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

on U.S.-based international law firms by non-U.S. based international law firms that can avail themselves of such funding; the effects of the recent global recession; and the convergence of a number of longstanding trends relating to law firm finance.  The outdated ethics regulation, predominantly in the form of the doctrine of champerty—the prohibition on dividing litigation proceeds between a party and a non-party who supports the legal action—and the prohibition on fee-splitting with non-lawyers, casts serious doubt on the legality of the practice in most, if not all, states.[5]

As the examples above illustrate, and this article will explain, that effect will differ depending on a combination of who is doing the funding, who is receiving the funding and the subject matter of the disputes involved.  The examples are also evocative of the fact, identified and analyzed in this article, that litigation funding may do more than just the obvious i.e., facilitate access to justice.  By aligning structurally weak social players who make infrequent use of the courts—"one shotters" —with powerful funders who make repeated use of the court system—"repeat players"—litigation funding may alter the bargaining dynamics between the litigating parties in favor of disempowered parties.  It may thereby enable the litigation process to serve as a redistributive tool by society's "have-nots" as opposed to an (unwittingly, perhaps) guardian of the *status quo* in favor of society's "haves."[6]  In other words, it may allow these traditionally-disempowered parties to "play for rules" – to affect the content of legal rules determined by the courts.  As the article will further argue, these beneficial effects could be offset by two factors:  (1) the development of secondary markets in legal claims and; (2) the

---

[5] *See* section III below for a discussion of the state of the law of champerty and fee-splitting.
[6] *See* IN LITIGATION – DO THE "HAVES" STILL COME OUT AHEAD? (Herbert M. Kritzer & Susan Silbey eds., 2003) (an anniversary volume dedicated to one of the most oft-cited law review articles of all times, Marc Galanter's *Why The "Haves" Come Out Ahead: Speculations on The Limits of Legal Change*, 9 LAW & SOC'Y REV. 95 (1974) discussed *infra* notes 88 - 92.  Following Galanter, the term "redistributive" is used herein to mean systemically equalizing party's ability to affect rule change via litigation.  "Rule change" means a change of a rule of law via judicial determination.  For example, a judicial determination that a certain tort requires reasonable care, not strict liability, or that the burden of proof for a certain defense lies with one party not another constitutes rule change. Parties that are able to play for rules have enhanced ability to strengthen their long-term interests.

DRAFT.  *Forthcoming*, **Minnesota Law Review** Vol 95.

fragmentation of the attorney-client-funder relationship, caused by rules of professional

responsibility, into two separate relationships:  attorney – client, and client – funder.  Both

factors offset the potential beneficial affects by creating moral hazards and agency problems.

Those offsetting factors, however, can be managed by a sufficiently nuanced regulatory scheme,

the outline of which the article will proffer.

      The article describes the empirical reality of institutional investing in litigation in the

U.S.; addresses the prospect of securitization of legal claims and; discusses third party funding of

international arbitration.  It also applies a bargaining analysis to the debate on the desirability of

any type of litigation finance or lending.[7]

      Part II of the article will provide the background necessary to place the new industry in

context, including a description of the first and second wave of litigation funding, current market

forces driving the development of the latter industry, the accelerating effects of the global

recession that began in 2007, and a discussion of litigation funding in the foreign jurisdictions

that permit it – predominantly Australia and the U.K.

---

[7] The literature on litigation lending and funding includes:  Susan Lorde Martin, *Litigation Financing*:  *Another Subprime Industry That Has a Place in the United States Market*, 53 VILL. L. REV. 83 (2008); Susan Lorde Martin, *Litigation Financing Industry:  The Wild West of Finance Should Be Tamed Not Outlawed*, 10 FORDHAM J. CORP. & FIN. L. 55, 68 (2004); Susan Lorde Martin, Financing Litigation On-Line: Usury and Other Obstacles, 1 DEPAUL BUS. & COM. L.J. 85, (2002); Susan Lorde Martin, Financing Plaintiffs' Lawsuits: An Increasing Popular (and Legal) Business, 33 U. MICH. J.L. REFORM 57 (2000); Andrew Hananel & David Staubitz, *The Ethics of Law Loans in the Post-Rancman Era*, 17 GEO. J. LEGAL ETHICS 795, 798 (2004); Julia H. McLaughlin, *Litigation Funding: Charting a Legal and Ethical Course*, 31 VT. L. REV. 615 (2007); and Marial Rodak, *It's About Time:  A Systems Thinking Analysis of The Litigation Finance Industry And Its Effects on Settlement*, 155 U. PA. L. REV. 503 (2006); Vicki Waye & Vince Morabito, *The Dawning of the Age of the Litigation Entrepreneur* 28 CIVIL JUSTICE QUARTERLY 389 (2009).  Vicki Waye has also authored the pioneering book *Trading in Legal Claims: Law, Policy and Future Directions in Australia, UK & US* (Presidian 2008).  Jonathan Molot has written on the need to develop a market in corporate defense claims in *A Market in Litigation Risk*, 76 U. CHI. L. REV. 367 (2009).  And, John Coffee has a sub-section on litigation finance in his forthcoming article about aggregate litigation in Europe,  *Litigation Governance: Taking Accountability Seriously* (forthcoming 2010) (discussing how third party funding can fit in a "non-entrepreneurial model" of aggregate litigation (class action) in Europe).   [Works-in-progress forthcoming in 2010, 2011 include XXX].

There is also literature in Australia and the U.K. discussing litigation finance as it occurs in those jurisdictions.  *See*, *e.g.*, Lee Aitken, *Before the High Court:  'Litigation Lending' after Fostif:  An Advance in Consumer Protection, or a Licence to 'Bottomfeeders'?*, 28 SYDNEY L. REV. 171 (2006); John Peynser, *A Revolution by Degrees:  From Costs to Financing and the End of the Indemnity Principle*, 1 WEB J. OF CURRENT LEGAL ISSUES (2001) *available at* http://webjcli.ncl.ac.uk/2001/issue1/peysner1.html (last visited Feb. 16, 2010).  However, the applicability of the Australian and English experience and especially the policy considerations for and against litigation finance, is limited for reasons discussed *infra* note 17.

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

Part III will explore the doctrinal landscape that controls and limits litigation funding in the U.S. namely, the law of champerty and the prohibition on attorneys sharing fees with non-attorneys. Together, these comprise a prohibition on litigation funding. A particular emphasis will be given to the policy rationales underlying these prohibitions. In addition, and by way of contrast to the prohibition on litigation funding, this section will explore some areas of law in which claim transfer and litigation funding are allowed, albeit with certain conditions and limitations. These are, first and foremost, the areas of contingent fees and insurance law but also, secondarily, areas such as *qui tam* laws, the law of assignment, and bankruptcy. The section will conclude by showing that the blanket prohibition of champerty and fee-splitting contributes to the very type of systemic inequities it was intended to avoid.

Next, the article will show how litigation funding can reduce those systemic inequities, though not without attendant dangers. To set the stage, Part IV will open with a taxonomy of the dimensions of litigation relevant to the consideration of the effects of third-party funding – the types of clients, claims, and funders. Using a bargaining perspective—that draws on game theory, behavioral economics and portfolio theory to explain why firms and individuals make the decisions they do in competitive and cooperative situations and how those decisions affect others[8]— the remainder of Part IV will then argue that litigation funding can (i) level the playing field by strengthening the bargaining position of "have nots" and increasing their ability to play for rule change while limiting (to an extent) the ability of the "haves" to do so; (ii) create agency problems and moral hazards that vary greatly depending on the client/claim/funder combination in play. Therefore, any attempt to capture the equalizing benefits of third-party financing of

---

[8] The article draws in particular on Robert H. Mnookin & Lewis Kornhauser, "Bargaining in the Shadow of the Law: The Case of Divorce," *The Yale Law Journal*, 88 Dispute Resolution 950 (1979) (particularly their notion of "private ordering"- the effects of legal rules on bargaining outside the courts. (In our case, the legal rules in question or the ethical prohibition on litigation finance)); Christine Jolls, Cass R. Sunstein and Richard Thaler, "A Behavioral Approach to Law and Economics," 50 *Stanford Law Review* 1471 (1998) Colin F. Camerer, BEHAVORIAL GAME THEORY (2003); Russell B. Korobkin and Thomas S. Ulen, "Law and Behavioral Science: Removing the Rationality Assumption from Law and Economics," 88 California Law Review 1051 (2000). See also, Richard A. Posner, FRONTIERS OF LEGAL THEORY 252-288 (2001) (critiquing behavioral law and economics).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

litigation must rest on a nuanced regulatory scheme sensitive to the distinct requirements of different taxonomical combinations.

Part IV will then provide a five-pronged regulatory framework, with concrete examples, that harnesses the positive potential of litigation funding while addressing the problems it might create if left unchecked.  The five prongs are:  (1) Eliminating the champerty prohibition, at least as it relates to litigation funding;  (2) Reforming the attorney-client-funder relationship, including by (i) extending some of the protections and duties of the attorney–client relationship to the funder-client relationship; (ii)  limiting the prohibition on fee-sharing to allow attorneys to contract directly with the funders and; (iii) allowing and encouraging fee structures that align the three parties' interests; (3) Applying consumer protection and contract design principles to funding agreements; (4)  Requiring court supervision over the attorney-client-funder relationship and; (5) Tailoring securities regulation to legal claims-backed securities.

The article is aimed at two main audiences.  One, consists of legislators, regulators and the Bench all of whom will, no doubt, be called on in the coming years to decide on the legality and parameters of the practices comprising third party litigation funding.  The second, consists of parties who are contemplating entering such funding agreements and the attorneys who represent them.  This audience will benefit from the elucidation of the issues they should consider when drafting such agreements.

## II.   THE RISE OF LITIGATION FINANCE[9]

This section defines the term "third party litigation funding," as used herein, and provides the key characteristics of the industry it refers to.  It distinguishes litigation finance from similar and overlapping practices, such as litigation lending, by identifying its distinctive features including the key feature that distinguishes it from analogous practices such as contingency

---

[9] This section is informed by seven not-for-attribution background interviews with executives of litigation funding firms as well as personal experience serving as counsel in international arbitrations involving litigation funding.

fees—the industry's ability and tendency to develop secondary markets in legal claims.  The

section also explains the origins of the industry in the U.K. and Australia, touching on key legal

developments that rendered the practice permissible, with certain restrictions, in those

jurisdictions.  It then describes how those changes overseas, coupled with the ongoing recession,

are creating market forces that drive the penetration of litigation funding into the U.S.  All these,

set the stage for the normative discussion of the desirable legal regime for litigation funding in

subsequent sections.

### A.      *Litigation Finance Defined*

 Third party litigation funding is "a group of funding methods that rely on funding from

the insurance markets or capital markets instead of, or in addition to, a litigant's own funds."[10]

In other words, it is the provision of funds by companies who have no other connection with the

litigation.  When provided to plaintiffs, third party funding promotes access to justice by

enabling plaintiffs who have meritorious cases to bring litigation they would otherwise be unable

to bring and to avoid premature settlements at a discount due to exhaustion of funds.  When

provided to defendants, it allows corporations who can afford to litigate but who do not want to

incur any of the costs or risks associated with litigation to shift the costs and hedge the risks.

The typical funding arrangement has been described by one of the major international

law firms as one whereby "a specialist funding company or a hedge fund pays your legal fees on

an interim basis.  If you win, you pay a contingency fee out of the damages, usually expressed as

a percentage of the damages up to an agreed cap.  A typical contingency fee would be between

20% and 50% of the damages, with a cap of 3-4 times the legal costs advanced by the funder."[11]

---

[10] ANDREW KELTIE & LIZ WILLIAMS, DEMAND FOR THIRD PARTY LITIGATION FUNDING RISES AS SUPPLY BECOMES VOLATILE, *available at* http://www.bakernet.com/NR/rdonlyres/427586D3-6891-4FC2-B926-B0181DB75595/0/third_party_litigation_funding_ca_oct08.pdf (last visited Feb. 16, 2010).
[11] *Id.*

Importantly, the client contracts directly with the funder in these agreements.  However, informal

agreements between the funder and the attorney are at times involved.[12]

The new industry, referred to herein as "second wave litigation funding," is populated by

institutional investors including some very prominent and sophisticated firms such as the leading

Swiss bank, Credit Suisse, and the German insurance giant, Allianz.[13]  It was preceded, however,

by approximately a decade in which smaller, less reputable firms launched litigation lending

businesses, a practice referred to herein as "first wave litigation funding."  These were often

relatively small operations set up by former contingency fee lawyers who recognized the demand

for such lending services and oftentimes engaged in predatory lending.  As such, first-wave

litigation funding has been regarded by some as a form of sub-prime lending.[14]

Whereas traditionally it was individual plaintiffs who resorted to third-party funding,

often in personal injury cases, the recent trend is aimed at very different markets:  corporate

litigants, including corporate *defendants*, classes (in the class action cases) and individual

plaintiffs in non-personal injury cases. There is a particular push for litigation funding in

international arbitration where, at times, the funded party may be a sovereign.[15]  In international

---

[12] Jonathan Wheeler & Felicity Potter, *Welcome to the Party*, 158 NEW L.J. 1491 (2008) ("The funder is also likely to demand, as much as anything as a sign of faith in the merits of the case on the part of the claimant's lawyers, that the claimant's solicitors enter into a discounted conditional fee agreement whereby the solicitors charge perhaps 70% of their usual costs but are entitled to an uplift in the event of success.").

[13] *Litigation Funding Starting to Pay Off*, SECURITIES DOCKET,  *available at* http://www.securitiesdocket.com/2009/05/05/litigation-funding-starting-to-pay-off/ (last visited Feb. 16, 2010); Michael Herman, *Fear of Third Party Litigation Funding is Groundless: Litigation Funds Such as that of Allianz Could Actually Reduce Spurious Lawsuits*,  TIMES ONLINE, October 25, 2007, *available at* http://business.timesonline.co.uk/tol/business/law/article2738493.ece (last visited Feb. 16, 2010).

[14] *See* Martin, *Litigation Financing Industry: The Wild West of Finance Should Be Tamed Not Outlawed*, *supra* note 7, (discussing *inter alia* the *Rancman* case in which the plaintiff received litigation financing with interest rates of 280%) and;  Rodak, *supra* note 7 at 514.

[15] *See* Telis Demos, *Cashing in on Litigation:  A New Crop of Funds Invests in an Asset Class that has Nothing to do with the Markets: Lawsuits*, FORTUNE, May 11, 2009 at 20.  ("Juridica gives money to Fortune 500-size companies or their lawyers in the early stages of corporate lawsuits in exchange for a share of the payout if the plaintiffs win or settle");  Claire Ruckin, *U.K. Third-Party Litigation Funding Rules in Final Stages*, LAW.COM, July 31, 2008,  *available at*  http://www.law.com/jsp/article.jsp?id=1202423414109 (last visited Feb. 16, 2010) ("Although this funding method has been traditionally popular on the claimant's side, a handful of major companies are now trying to defend high-stakes litigation with third-party funding"); Herman, *supra* note 13 ("A closer look at the litigation funds operating in the London market… reveals that they are seeking to invest in commercial rather than personal disputes."); GILLIAN LEMAIRE, COSTS IN INTERNATIONAL COMMERCIAL ARBITRATION: THE CASE FOR PREDICTABILITY (2009), *available at* http://www.cdr-

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

arbitrations, the reason for this expansion is partly a *de facto* absence of professional regulations that enables funders and attorneys to operate outside of the disciplinary reach of Bar associations. On the defense side there is a market gap as contingency fee arrangements are inapplicable to defendants who need to transfer not only the cost of legal fees and litigation expenses, as do plaintiffs, but also of judgments and settlements.[16]  So, while attorney funding and third party funding of individual and class claims are precedented, funding of corporate defendants and international arbitrations are brand new phenomena.

### B.   Global Economic Market Forces Propelling the Rise of Litigation Finance

#### 1.   Competitive Pressures from litigation funding in foreign jurisdictions

The pressures driving the emergence of a new market in legal claims and defenses in the U.S., despite a hostile regulatory environment, can only be understood in a global context.  A few foreign jurisdiction, predominantly Australia and the U.K., have in the past fifteen years taken progressive strides, loosening or doing away with longstanding champerty restrictions and developing markets for third-party funding.  There is also the beginning of a discourse on allowing the same in Europe.[17]

---

news.com/index.php?option=com_content&view=article&id=481:costs-in-international-commercial-arbitration-the-case-for-predictability&catid=109:articles&Itemid=216) (last visited Feb. 16, 2010) ("Specialist litigation funds, frequently institutional investors, have become more common in certain countries and although investment is made more frequently in litigation, it is now becoming increasingly common in international arbitration cases.  Indeed, some third party funders are now believed to target international arbitrations for investment.").

[16] On the lack of *de facto* regulation of lawyers engaged in cross-border litigation *see* Maya Steinitz, *Internationalized Pro Bono and a New Global Role for Lawyers in the 21st Century: Lessons from Nation-Building in Southern Sudan*, 12 YALE HUM. RTS. & DEV. L.J. 205 (2009).  On the market gap in litigation defense finance *see*, Molot, *supra* note 7, at 377.

[17] The developments in the UK and in Australia must be viewed in light of the fact that both jurisdictions are governed by the so-called "British rule" which requires the losing party to pay the winner's attorney fees.  Conversely, the "American rule" requires that each party bear its own fees. This means access to justice is more limited in "British rule" jurisdictions as the rule leads to much less litigation including less meritorious litigation. *See* John F. Vargo, *The American Rule On Attorney Fee Allocation:  The Injured Person's Access to Justice*, 42 AM. U. L. REV. 1567, 1635-1636 (1993).  Also, in both Australia and the UK the legal availability of contingency fees is much more limited, and takes the form of a conditional fee—under contingent fees, the attorney gets a share of the judgment; under conditional fees, the lawyer gets an upscale premium if the case is won which is unrelated to the adjudicated amount—further restricting access to justice as compared with the U.S.  *See* Winand Emons & Nuno Garoupa, *U.S.-Style Contingent Fees and U.K.-style Conditional Fees: Agency Problems and the Supply of Legal*

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

In Australia, where third party litigation funding was initially permitted in the bankruptcy context and later on gained acceptance in civil litigation generally, litigation funding has been a feature of litigation for more than a decade. Australian courts, like courts in the rest of the common law world, have historically prohibited litigation funding.[18] But "[t]he Australian courts have demonstrated in their decisions and in obiter commentary that public policy is changing, and that it is no longer taboo for a party who provides funding for a case, to have a legitimate commercial interest in the outcome."[19] Similarly, Australian legislatures have begun to adopt a liberal stance on litigation funding relaxing champerty restrictions by legislative action.[20]

In joint landmark cases on this issue in Australia, *Campbells Cash and Carry Pty Ltd v. Fostif Pty Ltd* and *Mobil Oil Australia Pty Ltd v. Trendlen Pty Ltd*,[21] the Australian High Court permitted third-party funding—with the funder having broad powers to control the litigation. *Fostif* involved a litigation funder which sought to fund a litigation allowing small tobacco retailers to recover license fees from wholesalers. The third-party funder actively searched for and propositioned potential plaintiffs in the case. Importantly, the funding agreement permitted the funder to conduct "representative proceedings," choose the attorney—who regarded the funder as its client—and settle with the defendants for 75% of the amount claimed. Per the

---

*Services*, 27 MANAGE. DECIS. ECON., 379 (2006). On the European discourse generally *see*, CHRISTOPHER J. S. HODGES, THE REFORM OF CLASS AND REPRESENTATIVE ACTIONS IN EUROPEAN LEGAL SYSTEMS: A NEW FRAMEWORK FOR COLLECTIVE REDRESS IN EUROPE (2008); *see also*, Coffee, *Litigation Governance*, *supra* note 7 (suggesting a "non-entrepreneurial model" of aggregate litigation for Europe where the American entrepreneurial model, including the contingent fee and the "American rule" regarding costs, has long been resisted).
[18] *See* Aitken, *'Litigation Lending' after Fostif*, *supra* note 7.
[19] Civil Justice Council, *Improved Access To Justice – Funding Options & Proportionate Costs, The Future Funding Of Litigation – Alternative Funding Structures, A Series of Recommendations to the Lord Chancellor to Improve Access to Justice through the Development of Improved Funding Structures* at 54, June 2007, *available at* www.civiljusticecouncil.gov.uk/.../future_funding_litigation_paper_v117_final.pdf (hereinafter CJC Report).
[20] *Id.*
[21] Campbells Cash and Carry Pty Ltd v. Fostif Pty Ltd (2006) 226 C.L.R. 256; Mobil Oil Australia Pty Ltd v. Trendlen Pty Ltd (2006) 229 A.L.R. 51. Both cases involved the attempted recovery of payments of license fees (*Fostif* for tobacco and *Trendlen* for petroleum) and the High Court considered the appeals jointly.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

agreement, the funder paid all associated costs and was to receive 33% of any recovered amount

as well as cost awards.

Recognizing the various concerns in question, the court stressed the value provided by

the access to funding, and the funder's need to have some measure of control over the litigation

while stating that court supervision, ethics rules, and rules governing representative proceedings

mitigated the traditional dangers posed by third-party funding.[22]   The court, in a nod to freedom

of contract concerns, also noted that it was hesitant to interfere with funding agreements "when

entered into by persons of full age and capacity untainted by infirmity."[23]   The *Fostif* case

provided much needed certainty to the status of litigation funding in Australia and, as recently as

October 2009, the Australian High Court has interpreted its decision in *Fostif* as a ban on any

general rule prohibiting the funding of litigation for reward.[24]

Following closely in the footsteps of Australia is the U.K.  It too took legislative steps to

amend champerty laws.  The Criminal Law Act of 1967 abolished criminal and civil liability for

champerty, but the legislation did not "affect any rule of law as to the cases in which a contract is

to be treated as contrary to public policy or otherwise illegal."[25]   English courts embraced the

legislative changes to champerty law in a progressive manner, and readily admitted that, because

---

[22] "The solution to [the] problem [of the high cost of litigation] (if there is one) does not lie in treating actions financially supported by third parties differently from other actions.  And if there is a particular aspect of the problem that is to be observed principally in actions where a plaintiff represents others, that is a problem to be solved, in the first instance, *through the procedures that are employed in that kind of action*. It is *not to be solved by identifying some general rule of public policy* that a defendant may invoke to prevent determination of the claims that are made against that defendant."  Campbells Cash and Carry (2006) 226 C.L.R. 256 at para. 95 (emphasis added).

[23] Campbells Cash and Carry (2006) 226 C.L.R. 256 at para. 95.

[24] *See* Jeffery & Katauskas Pty Ltd v. SST Consulting Pty Ltd; Jeffery & Katauskas Pty Ltd v. Rickard Constructions Pty Ltd (2009) HCA 43 (addressing the issue of indemnity for costs by litigation funders).

[25] Criminal Law Act, 1967, c. 58, § 14.  Despite Australia's progressive attitude towards litigation funding, it must be noted that a recent, and controversial, Federal Court ruling has led to considerable confusion regarding the legality of this practice.  On October 20, 2009, the Federal Court ruled in Brookfield Multiplex Limited v. International Litigation Funding Partners Pte Ltd ((2009) FCAFC 147) that litigation funding was regulated by the Corporations Act of 2001.  Pursuant to the Act, private litigation funders would be required to hold an Australian Financial Services license before offering funding services.   This ruling has served to create a significant logjam, as its implications threaten numerous ongoing litigations and affect the availability of funding for future cases as well.  The High Court is expected to take up the issue in the future.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

public policy changes over time, champerty law must evolve to reflect these changing views.[26]

The qualified limitation of champerty restrictions permitted British courts to act with a great deal

of discretion, but left observers and potential funders of litigation with some uncertainty.

The most dramatic legal development for the litigation funding industry came in 2005 in

the form of a decision by the English Court of Appeals in *Arkin v. Borchard Lines Ltd & Ors*.[27]

In *Arkin*, the Court of Appeal held that third party funding is acceptable and even desirable as a

way of increasing access to justice provided, however, that the funder does not control the

management of the litigation:

> The approach that we are about to commend will not be appropriate in the case of
> a funding agreement that falls foul of the policy considerations that render an
> agreement champertous…. Our approach is designed to cater for the commercial
> funder who is financing part of the costs of the litigation in a manner which
> facilitates access to justice and which is not otherwise objectionable. Such
> funding will leave the claimant as the party primarily interested in the result of the
> litigation and the party in control of the conduct of the litigation.[28]

Consequently, U.K.-based international law firms began either utilizing litigation funding

or seriously considering doing so, thereby creating competitive pressures on their US-based

competitors.  As of March 2008, "[e]ight out of ten of London's top law firms [were] already

using or assessing external funding for litigation and arbitration cases… marking a dramatic

move of third-party funding into mainstream practice… even [the U.S.-based firm] Skadden

[was] getting into the action, reportedly using third-party funding in an arbitration case."[29]

---

[26] *See* Factortame Ltd v. Secretary of State for the Environment, Transport and the Regions (No.2), (2003) Q.B. 381, 389.
[27] (2005) EWCA Civ 655.
[28] *Id.*
[29] Ashby Jones, *Third-Party Litigation Funding Stepping up in the U.K.*, WALL ST. J. (March 20, 2008) (internal quotations omitted).

In sum, these advancements have chipped away at the doctrine of champerty, at least as it pertains to third party funding, and created a global environment in which some jurisdictions enable litigants, including multinational litigants who can comparison-shop among international law firms, to make use of litigation finance.

### 2.   *Creation of a secondary market in legal claims*

The rise of the litigation funding industry i.e., of a primary market in legal claims, had an additional effect besides competitive pressures on global law firms.  The last couple of years have also ushered in a secondary market in legal claims.  Predominantly, this secondary market takes the form of litigation funding firms going public – selling shares to the public and listing on stock exchanges.[30]  But it is possible that in the foreseeable future we will also be witnessing the creation of a new form of securities—legal claims-backed securities.  Reportedly, some tort litigation lenders are already in the practice of aggregating the claims they acquire and selling shares of the composite funds i.e., are engaged in a rudimentary form of securitization.[31]  Further support of the proposition that securitization of this new asset class, namely legal claims and defenses, may be forthcoming in the near future can be gleaned from the fact that the first wave of litigation funding also generated a spattering of similar secondary trading in legal claims.  A few law suits were syndicated during the 1980s, with some instances of syndication ending up in litigation.[32]  And, there is one case in which shares in future judgments have been traded on

---

[30] Australia's IMF fund is traded on the Australian stock exchange with a portfolio of litigation investments valued at 1 billion Australian dollars as per early 2007.  A second Australian firm has very recently done an initial public offering and in the U.K. Juridica and the Burford Group are listed on the AIM stock exchange.  *See*, Martin, *Litigation Financing: Another Subprime Industry*, *supra* note 7 (discussing IMF); Binham, *Juridica Attracts Investment as the First Specialist Litigation Fund to Float in UK,* THE LAWYER, January 14, 2008, at 4 ("Juridica's IPO on AIM at the end of 2007 raised £80m, which will be invested in claims"); and *Burford Capital Raises £80m in New Listing*, http://www.silobreaker.com/burford-capital-raises-80m-in-new-listing-5_2262672370269421568 (last visited Feb. 16, 2010).
[31] *See*, Hananel & Staubitz, *The Ethics of Law Loans in the Post-Rancman Era*, *supra* note 7.
[32] *See* Deborah L. Rhode & David Luban, LEGAL ETHICS 698 (3rd ed. 2001); Kim Horner, *Judgment-Buying Venture Broadens Its Territory*, S.F. RECORDER, Aug. 13, 1996 and; James Wooton, *Litigation Bonds Are a Risky Investment*, WALL ST. J., March 14, 2001, at A22.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

Nasdaq.[33]   The existence of a secondary market in litigation claims, which is poised to grow, is

the key feature distinguishing not only the second wave of litigation funding from the first but

also, as we shall see, third party funding from attorney funding of litigation (the contingent fee).

### 3.   *Effects of the global recession on the rising demand for litigation funding*

The global context fueling demand for third party litigation funding also includes the

global economic crisis.  Companies are increasingly cautious about expending the costs of

litigation.  The crisis has also given rise to an increased volume of legal disputes regarding the

legality of numerous practices that caused the crisis.  Otherwise stated, recessions, including the

current one, produce more claimants who possess less funding, or at least less appetite, to bear

litigation costs.

In addition, in the aftermath of the crisis institutional investors are looking for new types

of investments, untainted by some of the problems which led to the crisis, or that at least can be

marketed as such to their own investors.  Legal claims—a new asset class—provide just that.

Moreover, legal claims are an asset class which is not cyclically correlated with bonds and

equities.  In fact, litigation, for these very reasons, is often viewed by large firms—and now by

investors—as a counter-cyclical practice; litigation departments are maintained by corporate law

firms to a large extent for diversification purposes.[34]

---

[33] "Several savings and loan institutions involved in the Winstar litigation are selling shares in possible judgments on the Nasdaq stock exchange… In the past, other banks had established trusts for shareholders, assigning them contingent rights in litigation… [but] this was rare, and you couldn't buy or sell these rights."  Margaret Cronin Fisk, *Winstar Litigants Bet on Future Damages Awards*, Nat'l L.J., Jan. 11, 1999, at A19.  Interviews with executives in litigation investing firms also confirm that securitization is being considered.  The report on the Winstar litigation gives a peek at how courtroom developments and judges' decisions may effect the value of stock linked to litigation: "The price of the [] shares rose in late October after Congress passed the 1999 federal budget, approving funds to pay the [] claims.  But in mid-November, when U.S. Claims Court Judge Robert H. Hodges ruled that Cal Fed would not be able to recover damages under its "expectations" theory, the price of on Cal Fed litigation stock dropped 25%, while the other declined 20%."  *Id.*
[34] *See* Keltie & Williams, *supra* note 7; Binham, *supra* note 30 ("commercial litigation is poised to take off if the economy takes a nosedive.  As Fields said: "our business model is fairly recession-proof.'").

The global recession is also accelerating the ascendance of "alternative fee structures" as an alternative to the billable hour.[35]  Litigation funding represents one such alternative modality. Instead of costly legal bills based on hours worked, clients can shift the costs entirely onto investors.  And law firms face the prospect of easier collection from funders, whose very investment consists of paying the firms' bills, rather than a struggle to collect the fees owed them from clients reeling from the recession.

The "incorporation movement"—changes in the laws of some jurisdictions which allow investment in law firms—is another development that is part of the environment in which major law firms that in the past would not have considered "brokering" litigation funding for their clients are increasingly doing so or considering doing so.[36]  Like clients' increasing resistance to the billable hour, this development creates pressure on attorneys' traditional pricing models. Finally, another related feature of contemporary law firm finance that may come to affect the trend is the fact that law firms can establish separate legal entities that function exclusively as funding firms and direct funding business to that particular law firm.[37]

* * *

These economic forces and the burgeoning international litigation finance industry are met with legal barriers in the form of restrictive ethical rules limit both the industry's growth globally and, in particular, its penetration into the U.S.  In addition, these prohibitions create

---

[35] *See* Jonathan Glater, *Billable Hours Giving Ground at Law Firms*, N.Y. TIMES, January 30, 2009 (discussing the likelihood of alternative billing).

[36] *See Investing in Law Firms*, THE ECONOMIST, Aug. 21, 2008.  The Canadian BridgePoint Financial Services firm funds both law firms, in Canada and the UK, and individual cases.  *See* Grania Langdon-Down, *Litigation Funding: An Overview of a Contentious Area of Growth*, LAW SOCIETY GAZETTE, May 21, 2009.

[37] This has been the solution to restrictions on other kinds of "multidisciplinary practices," defined as the practice of both law and a related discipline, such as accounting or private investigations, under one roof and prohibited by most states.  *See* Jay S. Zimmerman & Matthew J. Kelly, *From the Trenches and Towers:  MDPs After Enron/Anderson: MDPs May Be Dead After Enron/Andersen, But Subsidiary Businesses Thrive*, 29 LAW & SOC'Y INQUIRY 639 (2004) (discussing the barriers imposed by ABA Model Rule 5.4 - limiting a lawyer's ability to run a business with a non-lawyer – and the rise of subsidiary businesses of law firms); Stacy Brustin, *Legal Services Provision through Multidisciplinary Practice*, 73 U. COLO. L. REV. 787 (2002).  There is at least one reported instance of such a practice:  Richard Fields and Timothy Scrantom, are co-principals of both Juridica's investment arm and of the law firm of Fields & Scrantom, one of the firms to which Juridica will supply indirect investment in cases where plaintiffs either cannot have, or do not want, direct investment.  *See*, Binham, *supra* note 30.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

uncertainty which raises the costs of litigation finance i.e., the costs *clients* have to pay to secure

such funding.  The two main legal impediments to litigation funding are the doctrine of

champerty and the prohibition on attorney fee-sharing with non-lawyers.[38]  These will be

discussed in turn.

## III.    A PROHIBITION ON LITIGATION FINANCE:  HISTORICAL ANTECEDENTS AND CONTEMPORARY EFFECTS

This section describes the ethical standards and rules of professional responsibility which,

in most states, effectively prohibit third party funding and greatly limit the penetration of the

industry into the U.S. and which contribute to the very systemic inequalities they were designed

to prevent.  The primary barrier is the doctrine of maintenance and champerty.  A close second is

the prohibition on attorney fee-sharing with non attorneys, which prohibits funders from

contracting directly with attorneys.  The section places a special emphasis on examining the

policy considerations underlying these restrictions as ultimately it is the policy considerations

that should inform the debate on the desirable legal regime going forward.  As a contrast, the

section offers some examples of areas of law in which external funding and claim transfers are

permitted, with appropriate safeguards, due to overriding policy considerations.  These are meant

to provide an illustration of the fact that when there are compelling reasons to allow litigation

funding—considerations such as access to justice, private enforcement of law and equality-of-

---

[38] A secondary barrier is the prohibition on usury, which has largely been obliterated as courts that have had the opportunity to review challenges to a funding agreement as usurious have largely dismissed such challenges given that an element of usury is that a lender can require the borrower to return the loan whereas funding agreement are non-recourse agreements.  Another secondary barrier is the ethical prohibition on attorney solicitation, noted below. Generally, challenges to third party funding come to courts in one of two ways:  a financed party wins, refuses to pay, and either sues for rescission of the funding agreement or is sued by the funder for breach of contract, or the opposing party gets wind of the fact of third party funding and brings a judicial challenge to the legality of the arrangement.  Courts are generally asked to invalidate these agreements on two grounds, champerty and usury.  For a summary of recent cases challenging third party funding agreements, *see* Martin, *Litigation Financing: Another Subprime Industry*, *supra* note 7.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

arms[39]—our legal system has been known to adapt and change so as to allow such practices with the appropriate regulatory safeguards. The section concludes with an analysis of just such an overriding consideration – the low bargaining power of entire categories of litigants and their consequent inability to "play for rules" the way other, more powerful, actors, do. Namely, to develop the kind of legal regime advocated herein for the litigation finance industry.

### A.    *Maintenance and Champerty*

Champerty is defined as an "agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim" or, more pejoratively, as "an agreement between an officious intermeddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds."[40] It is a form of maintenance, whereby "assistance in prosecuting or defending a lawsuit [is] given to a litigant by someone who has no bona fide interest in the case."[41] Champerty is an ancient concept, with roots in Greek and Roman law, and deriving its name from the Old French "champart," which was a feudal-era land grant scheme.[42]

The New York Court of Errors' 1824 case *Thallhimer v. Brinckerhoff*[43] provides insight into the social context that necessitated the doctrine at a time when the administration of public justice in medieval England was weak and corrupt, and the laws were deeply flawed:

The English doctrines of maintenance and champerty arose from causes unique to English life. The [New York Court of Errors in *Thallhimer*] especially pointed to

---

[39] "Private law enforcement" is the enforcement of the law by private parties pursuing legal action for profit. John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 COLUM. L. REV. 669 (1986).
[40] BLACK'S LAW DICTIONARY 246 (8th ed. 2004).
[41] *Id.*
[42] *See* Ari Dobner, Comment, *Litigation for Sale*, 144 U. PA. L. REV. 1529, 1543 (1996) (reviewing the history and development of champerty law).
[43] 3 Cowen's Reports 623 (1824), as quoted in Bill Long, *Champerty and Contingent Fees III  available at* http://www.drbilllong.com/LegalHistoryII/ChampertyIII.html (last visited Feb. 16, 2010).

a statute from the 32nd year of Henry VIII, "to repress the practices of many who when they thought they had title or right to any land, for the furtherance of their pretended right, conveyed their interest in some part thereof to great persons, and with their countenance, did oppress the possessors"…   What had happened was that "small men" transferred their rights of action in property disputes to "great men" in order to get the great men's support at law.  Because the legal establishment was weak at the time, the great men could overwhelm the court, thus enabling the little man to get his land claim and the great men to get their share.  In other words, *champerty was a means by which great men increased their power at the expense of the courts of justice.*[44]

Interestingly, in modern American history, the doctrine of champerty has also played a role in social struggles.  Specifically, it has been used to stifle social progress:

> In the middle 1950's seven southern states suddenly rediscovered a need to reinvigorate and extend existing champerty, maintenance and solicitation rules.  The flurry of legislation came on the heels of the Supreme Court's decision in *Brown v. Board of Education* in which five civil rights organizations appeared as amicus curiae.  The two events were not unconnected.  The action of the legislatures was a vigorous political response to the success of these organizations before the courts.[45]

The modern policy rationale most often cited in support of the imposition of champerty restrictions includes a desire to discourage excessive, unnecessary, or speculative litigation –

---

[44] Bill Long, Champerty and Contingent Fees III, *supra* note 43 (emphasis added) (*quoting Thallimer*, *supra* note 43 at 643) (clarifying that where you have strong instruments of justice you do not need the doctrine; courts can oversee and disallow officious intermeddling when there is a risk that the judicial process will be perverted).

[45] Comment, *The South's Amended Barratry Laws: An Attempt to End Group Pressure Through the Courts*, 72 YALE L.J. 1613, 1613 (1963).  *See also*, *Constitutional Law:  First Amendment Limitations on State Regulation of the Legal Profession: Litigation as a Protected Form of Expression*, DUKE L.J. 545 (1963) (citing *NAACP v. Button*, 371 U.S. 415 (1963) for the proposition that litigation to enforce civil rights has been held by the Supreme Court to be a form of expression protected by the first and fourteenth amendments).  The Supreme Court's ruling on the right to sue as a First Amendment Right has been recently commented on in the context of litigation funding.  *See*, Jones, *supra* note 29.

For another critical perspective on what are perhaps the true underlying rationales for contemporary restrictions such as maintenance and solicitation, consider Galanter's view that the "cannons of ethics," and in particular prohibitions on solicitations and referral fees (of which fee-splitting arrangements are a type),  disparately impact lawyers in the "lower echelons" of the profession who typically represent small clients as compared with its impact on large firms, that represent powerful clients.  Galanter, *supra* note 6, text to notes 50-51 and authorities cited therein.

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

which is often associated with third parties seeking profit, rather than redress, through suits.[46]

Another rationale for the restriction is a desire to prevent unfair dealings, in which a party with a

dominant bargaining position is able to realize excessive profits when purchasing another party's

claim.[47]  Perhaps the best modern articulation of the concerns underlying the champerty doctrine

can be found in the dissenting opinion in the leading Australian case regarding third party

funding, *Fostif* in which the minority judges reasoned that:

> Institutions like [the funders], which are not solicitors and employ no lawyers with a
> practicing certificate, do not owe the same ethical duties.  No solicitor could ethically
> have conducted the advertising campaign which [the funders] got [the plaintiff] to
> conduct.  The basis on which [the funders] are proposing to charge is not lawfully
> available to solicitors.  Further, organisations like [the funders] play more shadowy roles
> than lawyers.  Their role is not revealed on the court file.  Their appearance is not
> announced in open court.  No doubt sanctions for contempt of court and abuse of process
> are available against them in the long run, but with much less speed and facility than is
> the case with legal practitioners.  In short, the court is in a position to supervise litigation
> conducted by persons who are parties to it; it is less easy to supervise litigation, one side
> of which is conducted by a party, while on the other side there are only nominal parties,
> the true controller of that side of the case being beyond the court's direct
> control.[48]

Today, while a minority of states have abandoned champerty, the majority of states retain

and enforce the prohibition with varying degree of zeal.[49]  Among the states still recognizing

champerty restrictions, Minnesota represents those states which continue to rigorously apply

them.  In the recent *Johnson v. Wright*, the Court of Appeals of Minnesota reviewed the common

law history of champerty in the state and, in conjunction with its core ruling, stated that "an

---

[46] *Id.* at notes 31, 75.
[47] *See* Saladini v. Righellis, 687 N.E.2d 1224, 1226 (Mass. 1997).
[48] *Fostif, supra* note 21, at para. 266.
[49] *See* Paul Bond, Comment, *Making Champerty Work: An Invitation to State Action*, 150 U. PA. L. REV. 1297 (2002)
(providing a review of the modern legal landscape of champerty law).

agreement in which [a party] had no interest otherwise, and when he is in no way related to the party he aids, is champertous and void as against public policy."[50]  The Court of Appeals also squarely addressed the move towards modernization or elimination of champerty law by other states.  Responding to the respondent's arguments regarding existing alternatives to champerty restrictions, the Court of Appeals wrote that "[a]lthough there are safeguards in place to alleviate the potential evils associated with champertous agreements, respondent fails to provide a compelling reason to completely abandon the doctrine. As an error correcting court, we do not presume to abandon the champerty doctrine simply because a few states have chosen to do so.").[51]

Other states also continue to apply champerty restrictions with little apparent modernization.  Delaware, for instance, maintains that, under common law, an agreement is champertous whenever an assignee has no interest, either legal or equitable, in an assigned cause of action prior to the assignment.[52]  Further, "[i]t is the duty of the court to dismiss a case in which the evidence discloses that the assignment of the cause of action sued upon was tainted with champerty."[53]

Conversely, New York represents those more progressive states which, while not abandoning the doctrine, have taken a cautious approach to its application.  New York state law prohibits the purchase of debt, a thing in action, or any claim or demand, among other things, "with the intent and for the purpose of bringing an action or proceeding thereon."[54]  Viewing champerty as, from its inception, a doctrine of more limited scope in the American legal system, New York courts have typically been hesitant to find that an action is champertous as a matter of

---

[50] *See* Johnson v. Wright, 682 N.W.2d 671, 680 (Minn. Ct. App. 2004).
[51] *Id.*
[52] *See* Hall v. State of Delaware, 655 A.2d 827, 830 (Del. Super. Ct. 1994).
[53] *Id.*
[54] New York Jud. Law § 489.(2009).

law.[55]   The Court of Appeals of New York established a "primary purpose" test for determining whether conduct is champertous.[56]   As stated by the Court of Appeals in *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, the primary purpose test is derived from a simple textual analysis of New York law and requires that an acquisition be made "for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding."[57]   In its application, the primary purpose test does not require a third party to make an acquisition for the sole purpose of litigation, but appears to require litigation to be a major or motivating factor.[58]

As mentioned, a minority of states such as Massachusetts and South Carolina have abandoned champerty altogether.  In *Saladini v. Righellis*, the Massachusetts Supreme Court declined to disallow an agreement despite explicitly stating that it was champertous.[59] Addressing the application of champerty restrictions under common law, the court stated "We also are no longer persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining positions.  There are now other devices that more effectively accomplish these ends."[60]   Similarly, in *Osprey, Inc. v. Cabana Limited Partnership*, the South Carolina Supreme Court abandoned champerty, stating that "[w]e abolish champerty as a defense because we believe it no longer is required to prevent the evils traditionally associated with the doctrine as it developed in medieval times."[61]

In sum, there appears to be a growing discontent with champerty restrictions in some quarters, but in most states champerty remains entrenched.  A second regulatory barrier which

---

[55] *See* Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d 726, 735 (N.Y. 2000) (citing Sprung v. Jaffe, 3 N.Y.2d 539 (N.Y. 1957)).
[56] *Bluebird Partners*, 94 N.Y.2d at 736.
[57] *Id.*
[58] *Id.*
[59] *See* Saladini v. Righellis, 687 N.E.2d 1224, 1226 (Mass. 1997).
[60] *Id.* at 1227.
[61] *See* Osprey, Inc. v. Cabana Limited Partnership, 532 S.E.2d 269, 278 (S.C. 2000).

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

has received virtually no attention in the context of litigation funding is the prohibition on fee

sharing, taken up in the next sub-section.

### B.        *The Prohibition on Fee-Sharing with Non-Lawyers*

A natural market solution to the lack of access to justice resulting from plaintiffs'

inability to finance meritorious litigations would

have been for contingent fee lawyers and the Plaintiffs Bar to go beyond attorneys'

funding of litigation, where the capital of the individual attorney or firm is used to finance the

litigation, towards lawyers seeking outside investors to fund their clients' litigations.  That would

have allowed such attorneys and firms to increase their capitalization and grow their firm,

diversify and spread the risk as does any business.

Lawyer compensation of non-lawyers for referrals, or otherwise sharing fees with non-

lawyers, is, however, universally understood to run afoul of several ethical and professional

standards and is widely prohibited.[62]   Rule 5.4 of the ABA Model Rules of Professional

Responsibility, states that "[a] lawyer or law firm shall not share legal fees with a non-lawyer."[63]

The rule has been widely adopted by states, with only few exceptions.  Therefore, since the

return on outside capital investment in any particular case (as opposed to investing in a law firm

as a whole) would come from the recovery and fees collected by the attorneys, such

capitalization is barred by the rules of professional responsibility prohibiting fee-sharing with

non lawyers.

---

[62] *See* John S. Dzienkowski & Robert J. Peroni, *Conflicts of Interest in Lawyer Referral Arrangements with Nonlawyer Professionals*, 21 GEO. J. LEGAL ETHICS 197, 206 (2008).

[63] Model Rules of Prof'l Conduct R. 5.4 (2003).  According to the ABA, the Model Rules have been adopted, in one form or another, in all states except California.  *See* ABA table of state adoption, http://www.abanet.org/cpr/mrpc/chron_states.html (last visited Feb. 16, 2010).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

As stated in the comments to Rule 5.4, this prohibition is intended to "protect the lawyer's professional independence of judgment."[64]  Regulators are also concerned by other client interests protected by the rules of ethics.  Fee-splitting is viewed as running the risk of granting non-lawyers control over the practice of law or potentially enabling lay persons to practice law without authorization.[65]  It is also feared that the prospect of receiving referral fees from lawyers would encourage non-lawyers to solicit prospective clients for practicing lawyers and thereby encourage the collusion of lawyers and laymen to violate attorney prohibitions on direct solicitation of clients.[66]

The prohibition on fee sharing is being avoided by the new institutional funders by contracting directly with the clients, not with their attorneys.[67]  The legality of this arrangement, generally, and of particular clauses involved, such as those allowing a funder to "monitor" the progress of a litigation and to discontinue funding mid-litigation (i.e., arguably, to control the litigation), have not yet been tested by the courts.[68]

As will be discussed below, in section IV, excluding the attorneys from having a direct relationship with the funders may not be the best way to ensure the clients' interests namely, those very interests that the champerty doctrine and the prohibition on fee-splitting seek to protect.  First, though, it is important to note that while litigation funding and any claim transfer involved are currently generally prohibited, both are allowed in other contexts.

---

[64] *See* Comments to Model Rules of Prof'l Conduct R. 5.4 (2003).

[65] *Id. See also* O'Hara v. Ahlgren, Blumenfeld & Kempster, 537 N.E.2d 730, 734 (Ill. 1989) ("fee-splitting agreements pose the possibility of control of clients' cases by laypersons"); Gassman v. State Bar, 553 P.2d 1147, 1151 (Cal. 1976) (noting that fee-splitting arrangements pose "serious danger to the best interests" of a lawyer's clients, and risk control of clients' matters by a layperson).

[66] *See O'Hara*, 537 N.E.2d at 734 ("fee-splitting arrangements promote solicitation of clients").  *See also* Model Rules of Professional Responsibility R. 7.3(a) (prohibiting direct solicitation of clients).

[67] Discussed by the presenters at the D.C. Bar program "Third Party Funding in Arbitration?" (June 30, 2009). Funding firms also appear to be partly mitigating the effects of the rule of prohibition by being "off shore," incorporating and listing overseas (though, operating in the U.S. as well).  The uncertainty as to whether courts will uphold litigation funding if challenged arguably contributes to the speculative nature of the investment and therefore to its price (both the price to the client and the price of publically traded shares of litigation funding firms).

[68] *See supra*, at note 38, for a discussion of the fact patterns and legal claims that have come before the courts.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

### C.    *Permissible litigation funding and claim transfer*

There are several instances where overriding considerations prevail over general policy concerns and litigation funding and claim transfer are permitted.  First and foremost, is the contingent fee:  A fee payable to the attorney only if the outcome of the representation is successful.  Contingency fees usually take the form of a percentage of a recovery, but do not necessarily have to be so.[69]  Since the contingent fee and its sibling, the class action, are key features of American civil litigation the literature arguing for and against them is vast and wide.[70] The following does not mean to be an exhaustive, or even representative, survey of the applicable critiques but only a discussion of the features, good and bad, most relevant to a comparison with third party litigation funding in which a funder similarly takes a contingent stake in the litigation in exchange for a share of the recovery.

One scholar has summarized the contentious debate surrounding contingency fees in the following manner:

> Contingency fees are praised as the average person's "key to the court-house" and attacked as the cause of excessive litigiousness, frivolous lawsuits, and greedy trial lawyers finding new ways to bring corporate America to its knees…  Trial lawyers are blamed for contributing to, if not causing, the supposed 'endless tide of litigation'…  They encourage the 'blame game,' whereby individuals do not take responsibility for their own lives but look to others for undue compensation and thereby increase insurance and other costs to everyone.   These lawyers continue to enrich themselves through windfall fees in cases such as tobacco litigation.   They engage in activities that contort the justice system to advance their own interests, contributing to excessive adversarialism.   And they take

---

[69] *See* HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS: CONTINGENCY FEE LEGAL PRACTICE IN THE UNITED STATES 10 (2004).

[70] *See infra* notes 71 - 72.  While generally rejected or greatly restricted abroad, the practice of entering into these contingency fee arrangements is unquestionably permissible in the U.S., with limited requirements on reasonableness and client disclosures.  *See* Model Rules of Prof'l Conduct R. 5.4, *supra* note 63.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

advantage of naïve injury victims, charging high fees to compensate for the risk they are undertaking when there is no doubt the victim will recover damages.[71]

The similarities between attorney funding and third party funding also extend to the host of agency problems that characterize the attorney–client relationship in contingency cases. Chief among the oft-cited concerns are conflicts of interest between attorneys and clients. Attorneys have an incentive to settle early for a relatively low, but certain, recovery rather than incur the costs of going to trial and risking no or lesser recovery. In addition, attorneys have an incentive to under-invest in a given representation as there are diminished returns in additional time investment beyond a certain point. Both problems are exacerbated by the fact that contingency lawyers make decisions across a "portfolio" of cases trading off a small gain in one case for a larger gain in another case achieved with the same time-investment and reputational costs.[72]

When the contingent fee is applied in the class action context, perhaps the most important context in which it operates and a key area of investment for litigation finance firms, additional problems arise. These include increased agency costs—including bonding, monitoring, and residual costs—which permit opportunistic behavior by attorneys; asymmetric stakes due to the

---

[71] *See* Kritzer, *supra* note 69 at 1-2 (internal references omitted) (reviewing the literature for and against contingency fees and class action reform).

[72] For agency problems in the contingent fee context, *see generally* Bruce L. Hay, *Contingent Fees and Agency Costs*, 25 J. LEGAL STUD. 503 (1996) (discussing the incentive to under-invest); Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. LEGAL STUD. 189 (1987) (discussing agency problems in settlement negations); Kritzer, *supra* note 69, (discussing contingent fee legal practice as portfolio management). Modern Portfolio Theory, argues that inventors should desire to balance and maximize an expected return and uncertainty of a *combination* of investments i.e., to mitigate avoidable risks though portfolio diversification. *See* HARRY MARKOWITZ, PORTFOLIO SELECTION: EFFICIENT DIVERSIFICATION OF INVESTMENTS (1959). Kritzer, applying Modern Portfolio Theory to contingency fee legal practice, but noting that contingency lawyers are rarely conscious of the applicability of the theory to their practice management, makes the counter-intuitive point that as managers of a portfolio, contingency fee lawyers *can afford to take on the risk of losing*, allowing the individual plaintiff to hold out for a better settlement or an adjudicated outcome. Whereas the client might be reluctant to *proceed* if required to bare all the costs of uncertainty, the lawyer is less concerned about the loss in any individual case and more concerned about outcomes across a portfolio of cases. *Id.* at 16. This is potentially true *a fortiori* in the case of litigation finance firms which, as professional *investment* firms, are likely to consciously apply Modern Portfolio Theory to their portfolio of investments.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

fact that defendants stand to lose more than do plaintiff lawyers and; cost differentials which tend to encourage strike suits.[73]

Because the similarities between attorney funding and third party funding are extensive, most of the discourse surrounding litigation funding is characterized by what some economists call an "attribute substitution": a cognitive bias whereby individuals who need to make a complex judgment – here, regarding the desirability of the novel phenomenon of litigation finance – substitute that complex judgment for a more easily calculated heuristic. In our case the easiest calculation is the desirability of contingency fees.[74] In other words, commentators simply apply their preconceived views of contingency fees to litigation finance.

But third party funding is different from attorney funding in several important ways. One, the funder is not providing a service for a fee but rather is investing in an asset. Second, the funder–client relationship is unlike the very unique, and uniquely-regulated, attorney-client relationship. In fact, one of the characteristics of third party funding is that the client is often *also* represented by an attorney who can help negotiate the funding agreement. Third, litigation funding benefits corporate America as much as it does the Plaintiffs Bar and its clientele. Litigation funders are likely to develop ongoing relationships with both sides of this great divide. Fourth, and perhaps most crucial, funders are likely to engage in secondary trading of the litigation stakes they purchase, attorneys are not. The importance of these differences will become apparent in the next section as the discussion turns to the influence of these unique characteristics on bargaining dynamics and, therefore, on the social function of litigation.

---

[73] *See* John C. Coffee, *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. Chi. L. Rev. 877, 882-883 (1987) (defining monitoring costs as the costs of monitoring the agent, in this case – the lawyer; bonding costs as the costs the agent incurs to advertise or guarantee the principal's fidelity and; residual costs as the cost of opportunistic behavior that is not cost-efficient to prevent).

[74] *See* Cass R. Sunstein, *Moral Heuristics*, 28 Behavioral and Brain Sciences 531 (2005) (arguing that attribute substitution is pervasive when people reason about moral, political or legal matters. Given a difficult, novel problem in these areas, people search for a more familiar, related problem and apply its solution as the solution to the harder problem).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

A second major departure from champerty and its underlying concerns is insurance law. Insurance law allows for insurance contracts that include subrogation clauses through which the insured gives the insurer the right to sue for injuries covered by the policy.[75]  Moreover, as discussed below, in section IV, insurance law is relevant not only as an example of departure from prohibition on claim transfer but also because defense transfer is functionally equivalent to so-called after-the-event insurance.  Insurance is the transfer of risk from one party to another, distributing the risk among a sizable group of participants; after-the-event insurance is insurance used to fund a litigation once a litigation is already anticipated or has commenced.  Finally, insurance provides a pertinent analogy because there is a secondary market in insurance contracts which are being securitized just as there is likely to be such a market in legal claims-backed securities.

Insurance is a cornerstone of modern economies:  "When uncertainty is present in economic activity, insurance is commonly found.  Indeed, Kenneth Arrow [the Nobel laureate] has identified a kind of *market failure* with the absence of markets to provide insurance against some uncertain events.  Arrow stated that 'the welfare case for insurance of all sorts is overwhelming.  It follows that the government should undertake insurance where the market, for whatever reason, has failed to emerge'."[76]

In order to overcome the agency problems and moral hazards inherent in the provision of insurance, insurers enter into complex contractual agreements with insureds.[77]  These agreements

---

[75] With the protections granted by subrogation, insurers are essentially able to "stand in the shoes" of an insured and assert the insured's rights against a third party, thus allowing them to recoup expenses paid to the insured. *See* Rhode, *supra* note 32 at 698.

[76] *See* Mark V. Pauly, *The Economics of Moral Hazard: Comment*, 58 Am. Econ. Rev. 531, 531 (1968) (emphasis added).

[77] Moral hazards, generally, are a type of agency problem in which one party, the agent, is responsible for the interests of another, the principal, but has an incentive to put its own interests first. The agent, who is insulated from risk may behave differently from the way it would behave if it would be fully exposed to the risk. *See* Kevin Dowd, *Moral Hazard and the Financial Crisis*, 29 CATO J. 141 (2008).  In the insurance context, moral hazard refers to "the tendency of insurance protection to alter an individual's motive to prevent loss.  This affects expenses for the insurer and therefore, ultimately, the cost of coverage for individuals." *See* Steven Shavell, *On Moral Hazard and Insurance*, 93 Q. J. Econ., 541, 541 (1979).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

create complex relationships among insurer, insured, and third parties as well as a host of associated rights and obligations, some unique to the insurance context. At the heart of the liability insurance arrangement is an insurer's promise to defend an insured against covered claims. Reciprocally, the insurer, a third-party, takes an interest in, and control over the litigation. This takeover of the litigation is not only permissible but is in fact facilitated by the applicable law. This common scenario introduces a third party into the traditional attorney-client relationship, with the insurer directly paying the attorney for representing the insured – opening the door to conflicts of interest between insurer and insured and between insurer and attorney, diminished client control, and independence of the attorney's judgment. For example, an insurance company may wish to accept a settlement offer and avoid the risk of litigation, while an insured may seek to litigate as a perceived means of vindicating himself or defending his reputation. [78]

Perhaps the most obvious, indeed – paradigmatic, case of permissible claim transfers to third parties is the everyday practice of assigning contractual rights to third parties under general contract law: unless prohibited by law or by provision of contract, parties are typically free to assign their contractual rights to others.[79] Whether an assignment entails the mere transfer of the right to receive payment from a purchaser or the large-scale assignment of rights and obligations pursuant to a merger and acquisition deal, the practice is fundamental to contract law and is, in fact, an aspect of the freedom of contract.

Another well-known example of sale and transfer of legal claims is debt collection. When a debtor fails to make payments on a debt his creditor may sell that debt to a third party, commonly known as a distressed-debt purchaser.[80] Importantly, if the debt purchaser so chooses

---

[78] *See* John F. Dobbyn, INSURANCE LAW 916 (4th ed. 2003) (providing a thorough discussion of insurance defenses and conflicts of interest).
[79] *See* ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 47 (1964) (discussing the assignable nature of contracts).
[80] *See* Richard M. Hynes, *Broke But Not Bankrupt: Consumer Debt Collection in State Courts,* 60 FLA. L. REV. 1, 8-9 (2008) (providing an overview of the debt collection process).

he may seek a *judgment* in court.[81]  This is similar to the interest in a judgment that a litigation funder obtains.  Similar to the selling of claims as part of the debt collection process, by virtue of federal legislation, claims against bankrupt entities may also be sold to third parties as part of the court-supervised bankruptcy process.[82]  This practice is somewhat speculative and is generally engaged in by specialized institutional investors.[83]

Somewhat less well-known are *qui tam* actions that permit private parties—specifically, "whistleblowers" who report wrongdoing in government agencies—to bring suit on behalf of the government and to retain a portion of the award.  Statutory in nature, *qui tam* laws are typically viewed as state-mandated mechanisms of private enforcement against public wrongs in the public interest.  Like third party funding, *qui tam* laws create a partial assignment of legal interests—the *government's* legal interests—to private parties.[84]  As such, they are particularly analogous to third party funding of sovereigns in international arbitration.

Finally,  life settlements—which are the sale of an existing life insurance policy to a third-party—and the closely-related viatical settlements—which are the purchase of a terminally ill person's life insurance—are practices that permit insureds to collect an amount greater than the surrender value of the policy, but less than the face amount paid upon death.[85]  Purchasers of

---

[81] *Id.*

[82] Jonathan C. Lipson, *The Shadow Bankruptcy System*, 89 B.U. L. R. 1609, 1645 (2009) discussing 11 USCS § 105 which  grants bankruptcy courts broad discretion, which has been used to void transfers, and § 3001(e) of the Federal Rules of Bankruptcy Procedure that require proof of any transference of a claim to be filed with the court. Interestingly, commercial third party litigation funding in Australia, the pioneering jurisdiction, grew out of a 1995 statutory exception for insolvency practitioners.  *See* STANDING COMMITTEE OF THE ATTORNEYS-GENERAL, LITIGATION FUNDING IN AUSTRALIA, 4- 5 (2006).

[83] *See* Hon. Robert D. Drain & Elizabeth J. Schwartz, *Are Bankruptcy Claims Subject to the Federal Securities Laws?* 10 AM. BANKR. INST. L. REV. 569, 572 (2002).

[84] *See generally* Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765, 776 (2000) (providing an overview of *qui tam* legislation); U.S. ex rel. Eisenstein v. City of New York, New York, 129 S.Ct. 2230, 2236 (2009) (discussing *qui tam* actions under the False Claims Act).

[85] *See* Paula Dubberly, Associate Director, S.E.C. Division of Corporate Finance, Speech by S.E.C. Staff: Testimony Concerning "Recent Innovations in Securitization." Before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises of the United States House of Representatives Committee on Financial Services (2009) (providing background on life settlements and noting that life settlements have become so prevalent that there are now efforts to securitize them).  *See also* Miriam R. Albert, *Selling Death Short: The Regulatory and Policy Implications of Viatical Settlements*, 61 ALB. L. REV. 1013 (1998) (relating the historical development of viatical settlements).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

life settlements—commercial investors—are responsible for paying the premiums due on the insurance and in return are provided a new type of investment in which the return is heavily dependent upon how long the insured lives.  As such, they give rise to a similar, or even heightened, knee-jerk reaction of distaste and disapproval as does third party funding of litigation.  The proponents of the practice, however, cite the ability afforded through it to the insured, often the very old or very sick, to cash in on their life insurance while still alive and use it to enhance their standard of care or standard of living.[86]

At the outer-edges, one can even regard litigation funded or undertaken by non-profits as a form of litigation funding.  Indeed, even the provision of pro bono services, which eliminates litigation costs and alters the power dynamics between attorneys and their clients and between the clients and opposing party, can be viewed in that way.[87]

To conclude, examples of areas of law in which reasons to allow claim transfer and litigation funding with the appropriate safeguards trump champerty concerns, abound.  In addition, foreign jurisdictions have found that the considerations underlying the champerty doctrine and similar barriers on litigation funding are either outdated or outweighed by the increased access to justice such funding can provide.  They have thus moved away from prohibition to regulation.  The next section (i) suggests another, compelling reason to move from prohibition to regulation of litigation funding – its equalizing effects on litigants' bargaining power and ability to affect rule-change and; (ii) provides a bargaining analysis that reveals moral hazards and agency problems that would need to be considered under a regime of regulation.  Before doing so, the following sub-section first describes the structural limitation on one shotters ability to play for rule change that the current prohibition contributes to.

---

[86] *See* Albert, *supra* note 85, at 1015 (detailing the benefits offered by viatical settlements).

[87] *See* Steinitz, *supra* note 16 (regarding pro bono services and the attorney-client relationship).  For a discussion of how problems of control and agenda setting affect impact litigation, i.e., litigation by non-profit organizations, *see* Ann Southworth, *Business Planning for the Destitute? Lawyers as Facilitators in Civil Rights and Poverty Practice*, 1996 WIS. L. REV. 1121 (1996).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

### D.      Systemic effects of the prohibition on litigation finance

As we have seen, prohibitions on agreements to acquire an interest in litigation, were originally intended to stem corruption in the judicial process and maintain the integrity of the practice of law.  Concerns regarding the integrity of the profession included fears that third parties could effectively control litigation, that attorneys or clients could share confidential information with the third party – raising both ethical and practical concerns, and that disagreement could arise among the parties and impose conflicting duties on attorneys.  The prohibitions were also thought to limit frivolous lawsuits and to better align the interests of the representing attorney with those of the client.

But while the prohibitions were meant to protect clients from abuse at the hands of third parties with greater bargaining power and to safeguard the courts from being overrun by "Great Men," they have, in fact, helped to achieve the opposite:  the exclusion of "have-nots" from full use of the court system while today's "Great Men," society's "haves," overrun the courts. Virtually all of the literature arguing in favor of permitting litigation funding does so on the basis that it will reverse the exclusion of "have nots" from the courthouse.  This article will focus on an overlooked aspect of litigation finance:  its potential to significantly reduce the Great Men's grip on the courts.

That such a grip exists can be seen most clearly in Marc Galanter's classical account of why society's "haves" come out ahead in litigation.[88]  Galanter famously argued that "the basic architecture of the legal system creates and limits the possibilities of using the system as a means of redistributive (that is, systematically equalizing) change."[89]  In so doing, Galanter created a typology of litigants and showed how the outcome of litigation is affected by the type of litigants involved.  He identified two types:  The first are "one shotters,"—claimants who have only

---

[88] *See* Galanter, *supra* note 6.
[89] *Id*. at 95.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

occasional recourse to the courts.  These are usually smaller players, and the stakes represented by the outcomes of their cases may be high relative to their total worth.  Their cases are either too large, relative to the one shotter's size, or too small, relative to the cost of litigation, to be managed routinely and rationally.  The second type are the "repeat players" who are engaged in many similar litigations over time, have had and anticipate repeated litigation, have low stakes in the outcome of any one case, and have the resources to pursue their long-term interests.

> The repeat player has the following structural advantages over the one shotter:

> [Repeat player] have advance intelligence; they are able to structure the next transaction and build a record… [Repeat players] develop expertise and have ready access to specialists.  They enjoy economies of scale and have low start-up costs for any case. Repeat Players have opportunities to develop facilitative informal relations with institutional incumbents… [The repeat player's] interest is in his "bargaining reputation"… Repeat players can play the odds.  The larger the matter at issue looms for the one shotter, the more likely he is to adopt a minimax strategy (minimize the probability of maximum loss).  Assuming that the stakes are relatively smaller for repeat players, they can adopt strategies calculated to maximize gain over a long series of cases, even where this involves the risk of maximum loss in some cases.  Repeat player*s can play for rules as well as immediate gains*… [a repeat player] may be willing to trade off tangible gain in any one case for rule gain… We would expect repeat players to "settle" cases where they expect unfavorable rule outcomes… one shotters should be willing to trade off the possibility of making "good law" for tangible gain.[90]

Given these structural advantages, argues Galanter, neither litigation nor rule change proves effective from a redistributive perspective; one shotters do not get to create rule change through litigation.  This diminished ability to fully participate in society comes in addition to the familiar problem of lack of funding and "litigation fatigue," depleted monetary and emotional resources needed to pursue lengthy litigation, which leads one shotters to settle meritorious cases at a discount or to refrain from bringing them altogether.[91]  *Only change at the level of*

---

[90] *Id.* at 98-103 (emphasis added).
[91] *See* Mnookin & Kornhauser, *supra* note 8; *see also* Marc Galanter & Mia Cahill, *Most Cases Settle: Judicial Promotion and Regulation of Settlements*, 46 STAN. L. REV. 1339, 1349.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

*parties* is likely to generate change at other levels including, importantly, the level of rule-change.[92]

In short, from a bargaining perspective repeat players can exhibit strategic bargaining behavior - a highly rational form of bargaining.  Conversely, one shotters are more susceptible both to rationally discount settlements and to the constraints of bounded rationality affected by heuristics and biases.[93]  For example, due to loss aversion, they are likely to overvalue potential (litigation) losses over potential gains (from litigation) leading them to settle early or to refrain from bringing suits.  In addition, one shotters are likely to overweight extreme but unlikely events (like a catastrophic judgment) and to underweight average events.[94]  Lowering the potential for loss, via a risk transfer mechanism, allows funded parties to peruse a more aggressive and more rational bargaining stance then they otherwise would employ and to avoid unnecessary discounts.

---

[92] *See* Galanter, *supra* note 6, at 150.  Apparently, this is also true 35 years later.  *See* Kritzer & Silbey *supra* note 6.

[93] These are cognitive devises used to reduce the complexities of judgment and decision making under uncertainty. *See generally*, GILOVICH ET. AL, HEURISTICS AND BIASES (2002) (describing the core idea of the heuristics and biases paradigm as the idea that judgment under uncertainty is often based on a limited number of simplifying heuristics rather than on formal and extensive algorithmic processes.  Heuristics and biases typically yield accurate judgments but can give rise to systemic errors).  On endowment effects and loss aversion *see*, Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, in CHOICES, VALUES, AND FRAMES 159 (Daniel Kahneman & Amos Tversky, eds.) (2000).  For the view that firms are risk-neutral while individuals are risk-averse as well as for a critique of the utility of behavioral economics to legal analysis *see,* Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 YALE L .J. 541, nn. 16 -18 (2003) (noting that "corporate executives have attended business school… it is a function of business education to teach people to make optimizing (rather than cognitively erroneous) decisions"; that "the view that organizations composed of experts make better decisions than individual subjects is coming to be accepted in the psychological community" and; that "when persons are required to function in markets rather than to perform individuals tasks, the persons reach equilibria that are consistent with individually optimizing behavior… Repeat play of the same game often converges to equilibrium no matter what subjects are thinking.") (internal quotations and citations omitted).

[94] *See* Richard Thaler, Toward A Positive Theory of Consumer Choice, 1 JOURNAL OF ECONOMIC BEHAVIOR AND ORGANIZATION 39 (1980).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

## IV.   LITIGATION FINANCING CHANGING THE GAME:  WHEN LITIGATION CEASES TO BE EXPENSIVE AND UNCERTAIN

### A.      *A Note on Taxonomy*

The current discourse on litigation funding in its entirety debates the merits and demerits of litigation funding *en mass*, as if there is one type of funding in question.  (This is probably due to the attribute substitution of litigation finance and contingency fees).  But to understand how litigation funding may alter the systemic inequities described above one must employ a nuanced analysis that treats litigation not monolithically but as a combination of the type of *claim*; the type of *funder*; and the type of *client*.  These three factors can be further broken down in the following manner.  The type of claim funded includes specifically, (i) defense or plaintiff's claim; (ii) the area of law; and (iii) the kind of process i.e., litigation or arbitration (either domestic or international).  The types of funders possible are: commercial funders, be they institutional or individual, investing for profit; political funders (e.g., donor governments in international arbitration); and public funders (e.g., non-government organizations ("NGO's")).[95]  Finally, the type of client in question can be an individual plaintiff, a class (represented by counsel); a corporation or; a sovereign.  Any analysis of whether and under what conditions litigation funding should be allowed will be well served by first classifying the type of litigation in question based on these three factors.

Within this breakdown, particularly significant is the classification of litigation funding into two overarching categories – defense funding and claim funding.  Indeed**,** the fact that unlike other changes at the level of parties, predominantly class actions, litigation funding can be used by both plaintiffs *and defendants* to improve their ability to bargain is one of third party funding's distinctive features.  Among other things, this makes it more politically viable than class action reform or other contemplated reforms.  But litigation funding functions very

---

[95] This article focuses only on the first category, commercial funders.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

differently on each side of the divide.  Claim funding functions as a form of *finance* whereas defense funding functions as a form of *insurance*.

For example, readers' intuition regarding the desirability of the litigation funding described in the examples in the opening of the article probably depends on the funder in question:  China's Sovereign Wealth fund, an oil company, a wealthy and politically-motivated individual or an investment company.  It probably similarly depends on the funded party:  the government of a developing country, a large corporation or indigent villagers in Angola.  Finally, intuitions are probably influenced by the subject matter of the litigation:  proprietary information regarding sensitive American military technologies, national boundaries, securities class action, sexual harassment or environmental and human rights abuses.

### B.       *Parties' Ability to "Play for Rules"*

The rest of this section shows how litigation funding can correct the systemic inequalities described above – can achieve Galanter's change *at the level of the parties* – by analyzing its effects on bargaining dynamics, and ability to play for rule change, for different combination of claims and clients.  Relating the taxonomy above to Galanter's categories form Part III, individuals serving as plaintiffs are considered to be paradigmatic one-shotters, and corporations paradigmatic repeat players.  In addition, this article will introduce the notions of "modified one shotters" and "modified repeat players."  These concepts will be elaborated in detail in the following pages, but in summary, "modified one shotters" are parties which have low play repetition but nonetheless enjoy some of the benefits that usually come with repeat play. "Modified repeat players" are players who, while playing the litigation game repeatedly, nonetheless do not reap the full benefits that repeat play may afford.

These two concepts are important to the analysis because at the heart of the following argument is the idea that litigation funding has the potential to transform both one shotter "have

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

nots" and repeat player "haves" into modified repeat players, thus leveling the playing field.  In a nutshell, by compounding the bargaining power of one shotters and modified one shotters, such as individuals and sovereigns, while decreasing the bargaining power of repeat players such as corporations, who must cede some of it to the funders, litigation funding would, in essence, transform all types of parties into different types of modified repeat players.  Thereby, potentially increasing one shotters and modified one shotters ability to play for rules more than substantive legislative reform would.  However, the potential equalizing effect of litigation funding is hampered by two factors: (i) the emergence of secondary markets in legal claims and; (ii) the fragmentation of the triangular attorney-client-funder relationships.  Both of these factors introduce agency problems and moral hazards that undercut the full equalizing potential of litigation funding.  These concepts are illustrated by the following figure, which shows the parties to a funded litigation, in the context of the (potentially) limiting factors noted above:



DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

The following sub-sections describe the transformation of one shotters, modified one shotters and repeat players into different forms of modified repeat players, with its potential leveling effect, as well as the attendant agency problems and moral hazards.

### 1.   *Individual, Class, and Sovereign Plaintiffs as Modified Repeat Players*

Litigation financiers are investing in the claims, or defenses, of four types of parties. First, they seek to invest in claims and defenses of corporations which are the paradigmatic repeat players.  Second, they seek to invest in claims of individual plaintiffs who are the paradigmatic one shotters.  Third, they seek to invest in the claims of classes.  Classes aggregate one shotters, individuals, who via the aggregation and through attorney funding transform into modified one shotters.  As discussed below, the class' distinctive features, including the alignment with a plantiffs firm which is itself a repeat player, gives these individuals some, but not all, of the bargaining advantages of repeat play.  Finally, litigation funders may invest in claims of sovereigns in international arbitration.  Sovereigns, whose distinctive features are also discussed below, can also be thought of as modified one shotters as they enjoy some extra-legal leverage afforded them by their special role and heft.  The following paragraphs expound on the effects that third party funders may have on the ability of these four types of litigants to play for rules given each type's unique characteristics.  Where applicable, the effects of the area of law in question and of the process are also discussed.

One shotters', i.e. individual plaintiffs', bargaining positions will be most radically transformed by litigation funding as plaintiffs are transformed from one shotters to modified repeater players.  By allying themselves with funders, who are repeat players, these plaintiffs will now reap the benefits of economy of scale, accumulated expertise and, to some degree,

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

ability to play for rules all, in addition to gaining access to justice.[96]  They will no longer have to

adopt a minimax strategy.  To the extant that a funder has informal ties with institutional

incumbents the individual defendants will now be able to reap the benefits.  Finally, the

individual plaintiff will now will now have the resource to engage in *signaling* to its opponents

including by transmitting promises, threats and bluffs – all of which enhance her bargaining

position.  In fact, an institutional commercial funder's willingness to fund a litigation, if known

to the opposing party, may itself function as a signal to the opposing party regarding the strength

of the claim – a signal that a professional funder has evaluated the case and has concluded it is

strong enough for the funder to risk its money on.[97]  Such a signal can strengthen the funded

party's bargaining position and enhance the chances of an early, and high, settlement.  This, in

turn, may create positive externalities as cases get settled, and taken off courts' dockets, early.

Classes, already modified one shotters by virtue of their alliance with plaintiff firms, will

continue reaping the rewards of increased access to justice, economy of scale, advanced

intelligence and expertise.  They will also continue trading those off for diminished control and

sharing the interest in rule change with that of a funder (now an investment firm rather than, or in

addition to, a plaintiff's firm).[98]  The two biggest changes that third party funding, as opposed to

attorney funding, introduces into the class action context are the effects of secondary markets in

legal claims, discussed below, and the fact that classes may now find themselves up against

funded defendants i.e., defendants that have transferred the risk of litigation but also some of

their control over settlement and their ability to play for rules.

---

[96] Individuals, sovereigns from the developing world, and some classes—especially in very complex and therefore very expensive cases that the Plaintiffs Bar cannot absorb—will gain the largest increase in access to justice.  On the Plaintiffs Bar capped ability to fund very large and complex cases, *see* Marc Galanter, *Anyone Can Fall Down A Manhole: Contingency And Its Discontents*, 47 DEPAUL L. REV. 457 (1998).

[97] On signaling, and other forms of transmission of information in litigation *see* Mnookin & Kornhauser, *supra* note 8; *see also*, Camerer, *supra* note 8.

[98] The Australian experience shows that investment firms do not necessarily compete with the Plaintiffs Bar.  Rather, investors tend to fund litigation through established plaintiffs firms.  This causes a repeat play amongst funders and attorneys which further complicates the client's bargaining position within the triangular relationship.  Source: not-for-attribution interview with executive at investment firm (November, 2009).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

There is also a conceptual difference between attorney funding and third party funding that courts and regulators should consider:  while third party funders may reap outsized rewards on their investments – up to 50% of very large judgments – these cannot be viewed, from a moral standpoint, as "windfall fees" as they are viewed in the attorney funding context. Attorneys provide legal services for their fees whereas investors invest.  The intuition underlying, for example, the "lodestar standard," according to which a law firm's return should be a function of the time spent on the case,[99] does not have an equivalent in the pure investment realm where returns on an investment are not, *per se*, capped.

Sovereigns, like individuals, have low rates of play repetition.[100]  They are therefore less likely to play for rules.  However, like repeater players, they may exhibit strategic behavior— like settlement avoidance even with "bad" fact patterns and vice versa—due to considerations other than a pure cost/benefit analysis of a single arbitration.  Therefore, sovereigns can be considered modified repeat players.  With the exception of the most developed nations they do not have in-house expertise in international arbitration, sovereigns may or may not be sophisticated players[101] and, in many cases, a single arbitration is likely to be very high-stakes

---

[99] *See* Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973) established the lodestar standard courts use to assess reasonability of attorney's fees in class actions and bankruptcy cases.  It consists of multiplying counsel's reasonable hours times reasonable hourly rate times an adjustment factor.
[100] The outlier example is Argentina, which has been party to far more arbitrations than any other state, acting as the respondent in 46 investment arbitrations in the wake of its economic financial crisis in the early 2000s.  *See* Lisa E. Sachs & Karl P. Sauvant, *BITs, DTTs, and FDI Flows: An Overview*, in THE EFFECT OF TREATIES ON FOREIGN DIRECT INVESTMENT: BILATERAL INVESTMENT TREATIES, DOUBLE TAXATION TREATIES, AND INVESTMENT FLOWS xxxviii-xxxix (Karl P. Sauvant & Lisa E. Sachs eds., 2009).  More characteristic are the following examples from the international investment arbitration context:  Mexico is a far second to Argentina having been a respondent in 11 cases, and all but five other countries have been party to three or fewer disputes.  *See* Clint Peinhardt & Todd Allee, *The International Centre for the Settlement of Investment Disputes: A Multilateral Organization Enhancing a Bilateral Treaty Regime*  (2006) (paper presented at the Annual Meeting of the Midwest Political Science Association), *available at* http://www.utdallas.edu/cwp052000/mpsa.peinhardt-allee.pdf (last visited Feb. 16, 2010).
[101] First world sovereigns and third world sovereigns deserve separate treatment.  First world sovereigns are more sophisticated, have more access and capacity to use in-house and out-side expertise, are more likely to play for rules and, critically, can structure transactions in advance based on their knowledge of the arbitration game.  However, for the sake of simplicity, I group them together for the purposes of the analysis herein and leave the task of further discussion of the disparate impact of arbitration financing on these two types of sovereigns and of litigation funding of international arbitration and adjudication to a separate article.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

i.e., too large to manage routinely and rationally.[102]   But sovereigns are not similar to individuals

in all ways.   They may have and use extra-legal negotiating leverage—power to expropriate,

regulate, withdraw from the treaty regime underlying the arbitration body, use diplomacy or

resort to arms. [103]   Sovereigns are relatively likely to have the advantage of the possessor of the

good in question.   And, like other repeat players they may have domestic and international public

opinion considerations, being accountable to their constituencies and susceptible to international

pressures.

As in the cases of individual plaintiffs and very large class actions, sovereigns in the

developing world stand to gain the most significant increase in access to justice through litigation

funding.   Currently, most financing of sovereign claims or defenses stands to be in the context of

international commercial and investment arbitration.   For example, sovereigns may choose to use

such funding to enforce their rights under cross-border contracts to which they are a party.[104]

Other than the lack of funds, or inability to justify to their impoverished constituencies spending

---

[102] Examples of the very high-stakes in international arbitration and adjudication include: arbitrating a boundary straddling territory rich in natural resources, as in the Abiye arbitration (which was funded by donor governments' donations via the Financial Assistance Fund of the Permanent Court of Arbitration); arbitrating an economic policy that may influence an entire section of the domestic economy, such as Brazil's highly politicized challenge to the U.S.'s practice of subsidizing cotton farmers, or litigating the legality of security measures taken by an occupying force as in the case of the ICJ advisory opinion addressing the legality of the security wall constructed by Israel in the Occupied Palestinian Territory. *See, respectively*, The Government of Sudan v. Sudan People's Liberation Movement/Army (Abyei Arbitration) (Perm. Ct. Arb. 2009) *available at* http://www.pca-cpa.org/showpage.asp?pag_id=1306; Appellate Body Report, United States - Subsidies on Upland Cotton, WT/DS267/AB/R (March 3, 2005); Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, 2004 ICJ 131 (July 9).

[103] For example, discontented with the outcome of investment arbitrations it was involved in, Bolivia has withdrawn from the ICSID regime.  *See* ICSID News Release, *Bolivia submits a Notice under Article 71 of the ICSID Convention,* May 16, 2007, *available at* www.worldbank.org/icsid. Bolivia also attempted to convince other Latin American countries to join in denunciating the ICSID Convention, *see* C. Tietje, K. Nowrot, and C. Wackernagel, *Once and Forever? The Legal Effects of a Denunciation of ICSID* (2008), *available at* http://www.wirtschaftsrecht.uni-halle.de/Heft74.pdf.  Bolivia was followed by Ecuador who also withdrew from ICSID. *See Ecuador: Press Release, International Centre for Settlement of Investment Disputes, Ecuador's Notification Under Article 25(4) of the ICSID Convention* (Dec. 5, 2007), http://icsid.worldbank.org (last visited Feb. 16, 2010).  *See also* Ibironke T. Odumosu, *The Law and Politics of Engaging Resistance in Investment Dispute Settlement*, 26 PENN ST. INT'L L. REV. 251 (2007) (noting the range of extra-legal considerations, including colonial-era gunboat threats and the ever present influence of politics).

[104] For example, some governments in the developing world may have claims against pharmaceutical companies for IP rights in, and royalties from, commercial medicines developed from research in that country; extractive industries for rents and royalties; and, for breach of infrastructure development contracts. Here, in particular, the entrepreneurial model, wherein funders seek out potential cases, may provide a useful tool to governments in the developing world that may not have the capacity to identify and pursue their claims. Source:  not-for-attribution interview with legal advisor to governments in the developing world (Feb. 2010).

high-end Western rates on lawyers from the developing world, the greatest challenge facing

governments in the developing world is a lack of capacity – both a lack of capacity among local

lawyers to carry on the kind of specialized litigation that takes place in international arbitrations

and a lack of capacity to reach out to, vet and retain Western-based lawyers who possess such

specialized skills.[105]  Litigation funding, especially by funds specializing in international

arbitrations, may be able to bridge these gaps.  Similarly, international arbitration is

characterized by the very small number of private institutions which administer the vast majority

of arbitrations.  Funders are therefore likely to create informal ties with these institutions from

which their clients may benefit.  Given the highly centralized and exclusive nature of the

international arbitration Bar, as in the case of classes, agency problems between the client, on the

one hand, and the funders and attorney on the other, may pose particular challenges as the

funder-attorneys relationships are likely to often become a repeat–play relationship.

      In addition, a particular challenge posed by this type of litigant is the fact that sovereigns,

at least according to Liberal-democratic conceptions of governments, represent their citizenry.

One implication is that the subject matters of the disputes they are involved in may be ones in

which the public interest is heightened.  For example, they may involve natural resources; future

generation funds; national boundaries; the legality of domestic trade, investment, environment

policies and regulations and; national security.[106]  These are also subject matters in which a

single cases, e.g. on the legality of domestic regulation of foreign investments under international

investment treaties, may effect rule change.  Whether the sovereign in question is litigating a

pure commercial dispute or a public law dispute, both international commercial arbitration and

---

[105] *See generally* Yves Deszlay & Bryant G. Garth, Dealing in Virtue 1996 (discussing the hyper-specialization in international arbitration; the monopoly of Western, especially Anglo-American lawyers, over the practice and the highly exclusive nature of the international arbitration Bar);  *See also* Steinitz, *supra* note 16 (discussing the capacity challenges, the Western lawyer–developing sovereign relationship, and the professional responsibility deficit in cross-border litigation).
[106] See examples *supra* note 102.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

public international law arbitration are notorious for their lack of transparency.[107]  In comparison,

sovereigns involved in cross-border (or domestic) litigation, as opposed to international

arbitration, may present somewhat less of a public policy challenge since proceedings are public.

In sum, investing in public international arbitrations, commercial international arbitrations and

cross-border litigations may each call for different analyses by arbitrators and judges requested

to rule on disputes emanating from funding arrangements as well as by regulators and the parties

themselves.[108]  And all three differ from domestic litigation as discussed above.

As the foregoing paragraphs demonstrate, the potential for increased one shotters and

modified one shotters influence on rule change offered by litigation finance is manifold.  First,

litigation finance can afford one shotters and modified one shotters the ability to overcome

"litigation fatigue," as well as some of the other benefits of repeat play, all of which are

necessary (though not necessarily sufficient) conditions to play for rules.   So, for example, in

situations where a single case can change rules for the modified one shotter, as is the case in

some international arbitrations, the newfound ability to play for rule change due to the mere

introduction of litigation finance is obvious.

More generally, however, litigation offers many instances where rule change is achieved

even if settlement occurs because rule change can occur during *pre-trial* proceedings such as

motions to dismiss, motions for summary judgment and appeals of interim decisions.  Such pre-

trial stages can be expensive to pursue.  A one shotter may therefore either settle prior to

---

[107] All commercial international arbitration is, by definition, confidential.  *See, e.g.*, the rules of the leading international commercial arbitration institution:  INTERNATIONAL COURT OF ARBITRATION, INTERNAL RULES OF THE INTERNATIONAL COURT OF ARBITRATION, ART. I, CONFIDENTIAL CHARACTER OF THE WORK OF THE INTERNATIONAL COURT OF ARBITRATION, *available at* http://www.iccwbo.org/court/arbitration/id4093/index.html (stating that sessions and documents relating to cases are confidential).  Investment arbitrations are slightly more transparent. *See* ICSID CONVENTION, REGULATION, AND RULES, ART. 48(5) ("The Centre shall not publish the award without the consent of the parties.").

[108] Phoenix Action, Ltd. v. The Czech Republic, ICSID Case No. ARB/06/5 (2009) raised a similar issue to claim transfer in a funded international arbitration.  In *Phoenix*, the arbitrators were called on to decide the significance of the fact that the ownership over all assets of a company was transferred to another, shell company formed in another country for the sole purpose of enabling the new entity to have standing to initiate a claim on behalf of the original company and to do so under the ICSID Convention and ICSID jurisdiction.  The arbitrators ruled that the attempt was an abuse of process.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

exhausting such steps or proceed to trial without the strategic advantages that pursuing them may provide. Namely, even a tendency to settle does not necessarily preclude rule-change.

Moreover, contrary to the intuition of some, third party funders may not always be incentivized to settle early. In fact, their interest in proceeding to trial for the sake of rule change may be *stronger* than the interest of any given one shotter as the latter, by definition, exits the game after one round whereas specialized funds that invest, repeatedly and sequentially, in cases brought by one shotters and modified one shotters will develop an interest in playing for rules that benefit that client pool and may therefore hold off on settlement and proceed to trial. This may occur especially in early cases, in cases involving novel factual scenarios or following a legislative change that can benefit from judicial interpretation. Modern Portfolio Theory provides the explanation for this seeming paradox:

> [The implication of a portfolio perspective is] the need to understand the relationship among cases in the portfolio; in portfolio theory this is the issue of "correlation." While researchers have occasionally observed that contingency fee lawyers may approach cases as packages for settlement [] little has been done to thoroughly develop the implications of sets of cases. Marc Galanter [] considered what he called "case congregations" – sets of substantively related cases… which create incentives for [funders] to invest heavily in early cases to facilitate later cases…
>
> [Moreover, t]here are at least two ways in which cases interrelated. The first is similar to Glanater's case congregation notion: cases may be substantively similar. Lawyers can use what they learn in handling one type of case to their advantage in another case… A second way cases may be related is reputationally. That is, a [funder] may rely upon a reputation developed in one case to create expectations on the part of the defendant. The reputation may concern any of a variety of things. The [funder] may be known as someone who is a hard bargainer. The [funder] may be known for thoroughly preparing cases. The [funder] may be known as someone who is very selective in the cases accepted for representation… Reputation is important for a second reason as well… a

[funder's] reputation is central for attracting clients, either directly or through referrals. Thus, a [funder] may choose to do something in a particular case, such as go to trial, if the [funder] believes such an action will enhance his or her reputation in a way that will attract future clients. Alternatively, a [funder] might accept work that is not highly remunerative, but that attracts substantial publicity… for the reputational gains.[109]

### 2. *Corporate Defendants as Modified Repeat Players*

Finally, one must consider how defendants'—in addition to plaintiffs'—positions, in particular ability to play for rules, may change. Corporate defense is the only form of defense-side funding currently carried out or contemplated by the litigation funding industry.[110] Defense funding is the functional equivalent of after-the-event insurance: it takes the form of allowing a company to pay the expected value of a law suit plus a premium to protect it against a higher-than-expected loss. Litigation finance therefore addresses a market failure: "Insurance companies do not sell after-the-event insurance policies for lawsuits that already have been filed and there isn't a market in which litigants can trade away litigation risk."[111] Such "insurance" allows companies to (1) hedge against the loss involved in an unfavorable award; (2) minimize and, just as importantly, *predict* litigation costs; and, therefore (3) eliminate the effects that having uncertain litigation on the company's books has on its ability to engage in major transactions.[112]

From a bargaining perspective, such "after-the-event insurance" can transform corporate defendants, the paradigmatic repeater players, into modified repeater players as they transfer the

---

[109] Kritzer, *supra* note 69, at 13-14 (internal citations omitted).

[110] "[O]utside this context [] transaction costs and adverse selection problems are likely to loom too large" for defense-side risk transfer. Molot, *supra* note 7 at 376-7.

[111] *Id.* at 367. Namely, because the event has already occurred the primary cost, for the underlying harm, is not transferred, it is the cost of litigation that is transferred as well as the risk of a larger-than-expected award.

[112] "[t]he uncertainty surrounding a significant potential liability may increase a company's cost of capital by depressing its stock price or increasing the interest rate it must pay on its debt. Where litigation risk interferes with an equity investment, a debt refinancing, or a merger or acquisition, the tertiary costs of litigation can dwarf the primary costs. In those instances, a *system of risk pooling would do more to reduce the costs of litigation than radical procedural reform ever could hope to achieve.*" *Id.* at 374-5 (emphasis added).

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

defense of their litigations to funders.  While still enjoying economies of scale, advanced

intelligence and ability to structure the next transaction and access to specialists, corporations'

diminished control over the litigation and over settlement means that their ability to strategically

transmit information, to control their bargaining reputation, to maximize gain over long series of

cases and, importantly, to play for rule change are diminished as some of that control is ceded to

funders whose interests may diverge from that of the corporate defendant.  In other words, the

social function of litigation changes structurally via litigation funding not only by increasing one

shotter plaintiffs ability to affect rule change via the courts but also by corporate defendant's

diminished ability to do so.[113]

      However, corporate defense transfer and its effects on corporate bargaining power has its

social draw-backs.  Perhaps the most significant social drawback is the moral hazard it creates in

the form of diminished deterrence and lessened incentives to prevent harmful activities.  In

addition, depending on how the risk transfer is structured and how much of it the corporate

defendant retains, the corporate defendant would have less of an incentive to participate in a

vigorous defense of its case.  This moral hazard would be transferred onto the funder's own

investors if and when legal claims and defenses are securitized (see below).  Lastly, any

redistributive advantages that may be achieved by transferring funds from corporate defendants

to other social actors via punitively high jury awards is eliminated when corporate defendants

can transfer litigation risk.[114]  Thus, litigation financing affords quasi-immunity to corporations

or, more precisely, to "corporate citizens," as a social actors, as the threat of large scale litigation

---

[113] Though, there is no symmetry here - a corporation still has the wherewithal to retain the litigation as it always has if it chooses to retain the ability to play for rules, whereas for one shotters third party finance, with its diminished control, may be the only option to seek any form of redress.  However, the value of any given defense for rule change may only come to light after control over it has been transferred to the funder e.g., because the potential for rule change has become apparent from facts revealed in the discovery process or because the law has changed post-transfer.

[114] On how litigation and taxes can function as substitute mechanisms for redistribution, *see* Louis Kaplow and Steven Shavell, *Why the Legal System is Less Efficient Than the Income Tax in Redistributing Income*, 23 J. LEGAL STUD. 667 (1994).

is thereby diminished.  One implication is that legislatures and judges may wish to treat

corporate defense transfer differently depending on the areas of law, e.g., allow corporate

defendants risk transfer for business disputes but not for environmental or human rights disputes,

in order to avoid such quasi-immunity.

The foregoing sub-section demonstrated how litigation funding can change the

bargaining dynamics between types of litigating parties for the better.  The following sub-

sections identify how this potential may be undercut by agency problems and moral hazards

created by secondary markets in legal claims and the fragmentation of the attorney-client-funder

relationship.

### C.      *Agency Problems and Moral Hazards*

#### 1.   *Bargaining in the Shadow of Financing:  the effects of secondary markets in legal claims*[115]

One of the immediate benefit of using the taxonomy as a prism is that it highlights the

way in which litigation funding by different types of funders may have different effects on

bargaining dynamics between litigating parties and, consequently, on different types of litigants'

ability to play for rules.  This is perhaps nowhere more stark than in relation to institutional

investors.  Unlike any of the other types of funders (importantly, unlike plaintiff firms, with

which they are conflated, and unlike individuals funding for commercial gain, the original targets

of the champerty doctrine)—institutional investors may sell their investments in secondary

markets.  They may do so directly, by bundling and securitizing legal claims, or indirectly by

selling shares in the investment firm itself.  Parties may thus find themselves "bargaining in the

shadow of financing."

---

[115] This topic will be fully treated in a separate article. The purpose here is to introduce the notion that a key difference between third party funding and other forms of funding is that the former may, and does, create a secondary market in legal claims.

Secondary markets in legal claims have benefits.  They can increase liquidity, lower the risk for funders, and therefore lower the cost of finance for clients.  Bargaining in the shadow of financing may also increase efficiency—institutional investors are in the process of developing due diligence protocols, standards and statistics that assist in evaluating individual claims and in making investment decisions across "portfolios" of cases, making litigation financing more streamlined and efficient.

But "the shadow of financing" may further alter bargaining dynamics by introducing additional moral hazards, externalities and agency problems.  First, regulators, judges and parties should consider the effects of indirect trading; trading in shares of public litigation investment firms.  Perhaps the biggest risk this form of trading poses to the client's bargaining position is that funders have fiduciary duties to the shareholders.  Unlike attorneys, they do not have such duties towards the clients.  Towards those, they only have contractual obligations.  Therefore, at least in theory, if a publically traded funder has to decide between settling early for a low amount in order to realize gains in a given quarter for their shareholders versus sticking with a litigation for the benefit of a client to the detriment of shareholders, they are currently under an imperative to prioritize the interests of the shareholders.  This conflict of interests may lead funders to pressure client to settle early.  An additional complication created by this form of trading is that it imposes disclosure duties on the funder.  These duties could conflict with the desire of a party to keep certain information confidential, for strategic bargaining purposes, and could further undermine the attorney-client privilege.[116]

Second, one should consider the effects of direct trading; the prospect of trading in legal claims-backed securities.  This practice is not yet in existence but, as discussed above, precursors

---

[116] Consider this real-life example:  "Juridica will target commercial litigations and international arbitrations for investment.  But international arbitration is notoriously secretive:  how to square that with AIM's [a London stock exchange] disclosure rules.  For that reason Travers Smith head of corporate finance Spencer Summerfield, who led the advice to the company on its float, admitted that Juridica's 'was the hardest IPO I've ever had to do.'"  *See* Binham, *supra* note 30.

of such a practice already exist.  In addition, given the significant difficulty of valuing any individual claim, i.e. valuing the potential recovery in any given litigation, especially in cases involving juries, institutional investment in litigation finance may only be viable if those financing, be they attorneys or third-parties, can put together a large and diverse enough pool of cases – a "portfolio."[117]  Once assets are pooled, securitizing and selling them off is a logical next step to consider.

Trading in legal claims-backed securities can create moral hazards relating to both the funder–client relationship and to the funder–investors relationship.  On the funder-client side, depending on the subject-matter of the litigation—e.g., a pure business dispute versus a personal injury or a divorce—the original "owners" of the litigation, unlike owners of homes or cars, may have a diminished interest in the asset underlying the security and a diminished incentive to cooperate and invest in the prosecution of their claims or defenses once the litigation ceases to be expensive and uncertain for them.

On the funder-investor side, as legal claims are commodified and ownership in them becomes freely transferable as part of an "originate-and-distribute" model there is a risk of an asset bubble of the kind recently witnessed, especially with novel assets like sub-prime

---

[117] See Kritzer's application of portfolio theory to contingency fee firms and its extension to funding firms herein.  Kritzer, *supra* note 69.  While securitization is probably not imminent in the current market, which is suffering from a rare lack of liquidity and where the rating agencies are unlikely to want to rate novel, hard-to-price securities, the difficulties valuing legal claims-backed securities do not seem without parallel, or insurmountable in the long-run.  On the current crisis in structured finance, and in particular on the breakdown of the rating agencies' credibility, *see* John C. Coffee, Congressional Testimony before the United States Senate Committee on Banking, Housing and Urban Affairs (March 10, 2009).

In addition to the fact that plaintiffs firms—which, as discussed above, can be viewed as portfolios of litigations, have proven themselves to be highly lucrative enterprises one can also draw parallels with other types of assets.  The difficulties in valuing legal claims and defenses render them an asset more similar to diamonds and art than to houses and cars.  But it is asset classes of the former kind that some investors are showing an interest in because of, not despite of, the recent financial crisis.  *Cf.* William MacNamara, *Moves to Mine Gem Potential*, FINANCIAL TIMES (November 20, 2009), *available at* http://www.ft.com/cms/s/0/b29fa9f4-d608-11de-b80f-00144feabdc0.html (on a recent, post-crisis push to create a diamond investment market in light of investors recent interest in alternative asset classes and despite the lack of transparency and liquidity in the diamond market and the fact that diamonds are "terrifically difficult to value").  As Victor Goldberg pointed out to me, litigations as an asset class are also similar to start-up companies and films in which venture capital firms invest because in all of these cases the investors are investing in an asset which value depends on the *effort* put into them by the original owner *after* the investment has been made.

mortgages. Such a bubble may be formed in a legal claims and defenses market since the clients and the "originators," the funders, will cease to internalize the risk of faulty due diligence of legal claims, of poor legal judgment, or of unzealous representation – externalizing instead the risks onto those holding the securities. As the recent financial crisis has demonstrated, when converging with other forms of risky securities, this can have deleterious effects on the economy as a whole.[118] A bubble in the market for legal claims is also one scenario that does raise a significant risk of non-meritorious claims flooding the courts, yet another externality on society as a whole. Finally, trading in legal claims-backed securities may add an additional layer of disclosure requirements on the funding firms, worsening the complications such requirements create for the client's bargaining power, as discussed above.

Plaintiffs' diminished control over their settlement negotiations, which may be exacerbated by secondary trading, and the obligation to maximize the bottom line for shareholders, reveal an under-examined problem with litigation funding and claim transfer: the problem of *commodifying* legal claims. If legal claims are bought and sold, they become a pure commodity, which can simply be assigned a dollar value, have no intrinsic value other than their dollar value, and can theoretically be exchanged for any, similarly-valued, commodity. While the literature is silent on what underlies some's "distaste"[119] of the notion that legal claims can be bought and sold it may be argue that the underlying sentiment is often resistance to this reduction of legal claims, particularly of non-business legal claims.

And, indeed, there is a unique, possibly socially-undesirable element to the commodification of legal claims—that the result of commoditizing legal claims is to purely monetize all legal recovery, thereby dramatically affecting choice of remedies. Non-monetary remedies, such as injunctions, declaratory relief, and specific performance, become unattractive

---

[118] *See* Dowd, *supra* note 77.

[119] "Detractors [of third party litigation funding] base their suspicion on two main arguments: First, that there is something distasteful, some say unethical, about a third-party that has no involvement in a legal dispute being allowed to profit from it…" *See* Herman, *supra* note 13.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

– a plaintiff no longer necessarily has an interest in pursuing them, or may be pressured by the funder to trade a socially-desirable remedy such as injunction or clean-up in favor of the less socially beneficial remedy of a monetary award.  By acknowledging that the effects of litigation funding are different in different areas of law, the taxonomy allows for a nuanced consideration of the effects of commodification in different possible scenarios.  Legislatures and courts should decide which litigation subject matters should, as a matter of public policy, be subject to such commodifying ownership transfers and which should not.

U.S. torts law provides an example of the difficulty commodification poses.  The U.S., singularly,[120] allows the award of punitive damages—a quasi-criminal sanction—for certain torts. This is a manifestation of the *public interest* in prosecuting such claims not only in order for plaintiffs to get damages for an injury but also to deter socially undesirable behaviors and economic activities such as pollution or the knowing distribution of damaged or hazardous goods. Conversely, personal injury cases, while underpinned by a bodily injury, are cases where as a society we have long accepted the notion of placing a dollar value on the economic aspect of the bodily harm.  Securities class actions are similarly straightforward in that the dollar value lost to the investor is the primary underlying harm.  But more complex are anti-trust class actions where the public has an interest in preventing anti-competitive behavior.

To further complicate matters, certain areas of law, especially in large, complex cases, involve *bundled* interests—monetary and non-monetary—underlying the legal claim.  The solution, therefore, lies in courts unbundling the underlying interests and ensuring non-commodification of the underlying interests that as a society we wish not to commoditize.  This can be done, as discussed in the next section, by requiring court supervision or other safety measures be implemented in the settlements stage.  It may also require, as discussed below,

---

[120] *See* George P. Fletcher & Steve Sheppard, AMERICAN LAW IN A GLOBAL CONTEXT 488 (2005) (on the uniquely American remedy of punitive damages for torts).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

imposing certain fiduciary duties on the funder.  Of course, this may mean that a plaintiff who seeks both monetary and non-monetary remedies may have to allow for a large percentage of the monetary recovery to be paid to the funder.

A second problem that arises and may offset the potential positive effects of litigation finance is the fragmentation of the triangular attorney-client-funder relationship into two, or even three, separate relationships: attorney – client, funder – client and in some cases attorney – funder.

### 2.    *The Fragmentation of the attorney-client-funder relationship*

The complexity of the client-funder relationship has been the focus of much the discussion of litigation funding.[121]  For example, commentators have noted that the introduction of a funder into the equation complicates a client's ability to communicate with her attorney and may diminish the attorney's ability to exercise professional judgment.  The fragmentation of the attorney-client-funder relationship, however, also stands to dilute the potential equalizing effects litigation funding might have as amongst the litigating parties and therefore on one shotters' and modified one shotters' ability to affect rule change.

First and foremost is the question of client control and its effects on rule change.  Beyond paying a monetary price, litigation finance clients, especially one shotters and modified one shotters, will pay a price in the form of diminished control over their case starting with control over choice of attorney and ending with control over settlement.  (Repeat player clients, who may have an ongoing relationship with funders, may have more control than one shotters and modified one shotters, at least at the front end of any given case i.e., especially over choice of attorney).

---

[121] *See supra* note 7.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

The argument against litigation funding based on client's diminished control is, in essence, one of separation of ownership and control:  the client is the owner of his or her own case but the funder, like the attorney-funder in contingency cases, may now exert control over the course of the litigation.[122]  This is, however, a conceptual confusion, caused by the tendency to treat third party funding as virtually identical to attorney funding - a case in which the party with the purse strings exerts *undue* control.  But unlike the case of attorney funding, with litigation funding and claim transfer the client relinquishs full or partial *ownership* over its claim. (In fact, arguably, the attorney and client are now both agents of the funder who co-owns part or the entire claim.)  The law should acknowledge that the client relinquishes or should relinquish partial control over the litigation as it transfers partial *ownership* thereof.  This, of course, should be factored into the pricing of the finance in favor of the client.

Even if one were to posit that something less than ownership is transferred, the case has already been powerfully made that even in the case of attorney funding we must acknowledge and accept that "entrepreneurial lawyering"—where the funder may seek out potential plaintiffs, take a pecuniary interest in the outcome, and act as private enforcer of the law[123]—involves diminished client control.  The case is doubly true for third party funding which involves a commercial investor's funding i.e., which is entrepreneurial *par excellence*.

Beyond concerns relating to control, and directly effecting the funded parties' bargaining position, is the fact that the fragmentation creates conflicts between an attorney's interests to maximize fees and those of the financier to do the same.  These divergent interests may lead one to want to settle early but the other to proceed to trial (depending on the role the case may have in their respective "portfolio" of cases and on the short term interest of the principals – partners

---

[122] *See generally* Aitken, *supra* note 7 (discussing the interest of Australian courts in funder control over litigants); Julia H. McLaughlin, *supra* note 7 (noting instances in which usurpation of client control has been a concern).

[123] *See* Coffee, *The Regulation of Entrepreneurial Litigation*, *supra* note 74 (coining the term "entrepreneurial litigation"); *see also* Coffee, *Understanding the Plaintiff's Attorney*, *supra* note 39 (discussing opportunism and entrepreneurial attorneys).

and shareholders, respectively).  Similarly, if the attorney and funder are prohibited from directly negotiating a split of the contingency, and the attorney does not receive a percentage of the recovery but rather receives a flat fee or an hourly fee, a moral hazard emerges whereby the attorney has a lowered incentive to properly vet a case as they transfer all risk to the funder. (This moral hazard can increase if claims are then securitized and further distributed, as discussed above).  Similarly, both attorneys and funders—savvy, repeat players—have an interest in creating and preserving reputational gains but this interest may pull them in different directions in any given litigation and may not be aligned with the client's interest in, say, resolving a litigation and moving on with her life.

Conflicts of interest are not the only complication.  Client communication with the financier—who is likely to insist on such communications as a means of monitoring its investment—breaks the attorney-client privilege.  But a lack of such communication creates information asymmetries between the attorney and the funder and lowers funders ability to supervise the attorney's work – supervision which may be beneficial for the client.  More broadly, the potential to have an "agents-watching-agent" benefit, i.e. of having the attorneys monitor the funders and vice-versa to the benefit of the client, is significantly reduced.[124]

When the financed party is a class, a corporation, or when the process in question is international arbitration, agency problems between the client, on the one hand, and the funder and attorney on the other, may pose particular challenges.  In all three cases, the relevant Bars, the class action Bar, the defense Bar and the international arbitration Bar, respectively, are populated by a finite set of repeat players.  The funder-attorney relationships in these instances are likely to often become a repeat–play relationships.  Consequently, in addition to enhancing

---

[124] Developed in the context of institutional shareholders monitoring of corporate managers, the concept of "agents watching agents" involves situations where the self-interests of one set of agents involves monitoring other agents, who have a different set of self-interest which, in turn, may conflict with the interests of the principals.  *See* Bernard S. Black, *Agents watching Agents: The promise of Institutional Investor Voice*, 39 UCLA L. REV. 811, 850 and Coffee, *Litigation Governance*, *supra* note 7 ("A structure in which the class has both a class counsel and a separate litigation funder is inherently one in which "agents are watching agents.").

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

conflicts of interests between the client and both its agents here, too, the "agents-watching-agent" potential may be missed.

* * *

In sum, litigation funding offers the potential of systemic benefits for litigants and for the civil justice system as a whole.  But it is not a panacea of social justice or economic efficiency.  The fragmentation of the attorney-client-funder relationship, with its consequent agency problems and moral hazards, diminishes the potential benefits litigation funding may entail from a bargaining perspective.  Those complications should be the focus of regulatory efforts.  The same is true of the concerns arising from the prospect of secondary markets as well as of those concerns underlying champerty that are valid and relevant to the contemporary economic landscape and to litigation finance as it affects the different types of litigations set out by the taxonomy above.  Regulators, legislators, the Bench and parties negotiating funding contracts should take into account the above-described agency problems and moral hazards as they play out in the different categories of litigations, as they come up with devices to efficiently manage litigation finance.  The next section offers a conceptual framework to develop such regulatory measures and contract devices.

## V.   IMPLICATION FOR REFORM:  REGULATION OF LITIGATION FINANCE

As we have seen, a hard and fast prohibition is undesirable and unnecessary.  In other areas of the law where similar considerations and concerns arise, mechanisms have been developed to ameliorate them and to allow the similar practices.  In the case of litigation funding, the risks involved are overwhelmed by two major benefits:  One, is the increased access to justice; the other, is that litigation finance can transform one shotters and  modified one shotters into modified repeat players thus more closely aligning the bargaining power of different categories of litigants and giving previously excluded categories a chance to play for rule change.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

That, however, does not mean that litigation finance should be left unchecked.  Litigation

funding transforms fundamental socio-economic relationships – between clients, attorneys, and

the investing public – in ways that this article only beings to outline and that will only be more

fully known as the industry matures and expands, as challenges to it are brought to courts to

opine on, and as more scholars put their heads together to contemplate this watershed

development.

The following reform recommendations, therefore, are not intended to be an exhaustive

list.  Rather, they are intended as a five-pronged conceptual framework for regulation aimed at

maximizing the benefits and minimizing the difficulties inherent in litigation funding.  It must be

noted that while the suggested measures can go a long way towards strengthening the client's

legal and bargaining positions vis-a-vis the funder, and providing the client with redress in case a

funder breaches its duties (redress which is not cost-free), they will not *eliminate* the underlying

problems.  In other words, it must be acknowledged that the third-party funder/client relationship,

like the attorney-funder/client relationship, creates a form of entrepreneurial litigation where the

social benefit of allowing the relationship, with all of its shortcoming, outweighs the costs.

The five prongs are:  (1) Eliminating the champerty prohibition, at least as it relates to

litigation funding;  (2) Reforming the attorney-client-funder relationship, including by (i)

extending some of the protections and duties of the attorney–client relationship to the funder-

client relationship; (ii)  limiting the prohibition on fee-sharing to allow attorneys to contract

directly with the funders and**;** (iii) allowing and encouraging fee structures that align the three

parties' interests; (3) Applying consumer protection and contract design principles to funding

agreements; (4)  Requiring court supervision over the attorney-client-funder arrangements and;

(5) Tailoring securities regulation to legal claims-backed securities.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

### A.   *Eliminating the champerty restriction as it relates to third party litigation funding*

We have seen that the policy grounds for the champerty prohibition, applied to the litigation finance context, include a desire to discourage frivolous litigation; fear of unfair dealing by "Great Men"; fear of permitting lay persons to engage in the unauthorized practice of law; fear that funding arrangements will harm the clients by creating conflicts of interest and will threaten the independence of lawyer's professional judgment; fear that attorneys or clients could share confidential information with the third party, and, finally, concerns that third parties could effectively control litigation.

Some of these concerns, like the fear of a deluge of non-meritorious claims are, at the very least, greatly exaggerated.  Litigation finance does not eliminate litigation costs, it *shifts* them to the funder (and as secondary market in legal claims and litigation cost develop it also distributes them).  A commercial funder needs to make a rational economic decision to invest in a claim.  It would not do so if the claim does not have merit and is unlikely to succeed.[125]  Other concerns such as certain moral hazards and conflicts of interests are better addressed and mitigated by other means, such as those discussed below, as in other areas of law where they are tolerated if other considerations outweigh them.  The immediate conclusion from the analysis in Part IV is, similarly, that elimination of the champerty prohibition, at least as it relates to the litigation funding context, will increase access to justice and equal participation in the judicial process.  A modernization of champerty laws can be achieved via legislative means, as has been the case in Australia and the U.K., but can also be achieved by judicial, doctrinal development as has been the trend in some states.

---

[125] Baker & McKennzie lawyers report that "as a rule of thumb, claims must… have a likelihood of success of at least 65%."  *See*, Keltie & Williams, *supra* note 10.  This is an example, however, of the utility of a taxonomy because non-commercial funders such as NGOs and governments may have non-economic incentives to financially back a suit as in the Clinton case, *supra* note 1.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

### B.        *Reforming the attorney – client – funder relationship*

The first and possibly most radical conceptual recommendation is that some of the protections and duties of the attorney–client relationship be expanded to encompass funders. Coupled with transparency requirements pertaining to the funder-attorney relationship (discussed below), this measure will help minimize conflicts of interest between both agents and the client, reduce information asymmetries between the attorneys and the funder, and protect the client's ability to communicate freely with her attorney.  Perhaps most critically, this element can most contribute to strengthening client's position vis-a-vis the funder, minimizing the conflicts of interest and moral hazards discussed in section IV and enhancing client control over the litigation. For example, a fiduciary duty on the part of the funder toward the client can improve the client's position vis-a-vis the funder's shareholders where the funder has to navigate potentially competing interests.  Funder's fiduciary duties can also increase client's bargaining position regarding non-monetary remedies, diminishing the problem of commodification.

The protections afforded the attorney-client relationship most applicable are the attorney-client privilege and the protection of the attorney work product.  If these are extended to communication between either the attorney or the client and the funder, one of the key impediments, discussed above, to effective third party funding will be removed.  This may also lower the cost of financing to clients as funders will have more information about their investment and therefore more certainty as to its value.  This extension can be achieved doctrinally, either by extending the common interest doctrine or by viewing both the client and the funder as co-clients, in the same manner as these solutions have been devised and applied in the insurance context.[126]

---

[126] Under the common interest doctrine, "the sharing of privileged information that otherwise would constitute a waiver does not relinquish the protections of the privilege, so long as the parties maintain the confidentiality of the shared information… Under the co-client model if the clients want to keep their

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

With the privileges come the obligations:  funders should be deemed fiduciaries of the client.  Fiduciary duties—especially those applied to attorneys, namely, the duty of loyalty and the duty of zeal as they have developed in the jurisprudence—should therefore be applied to funders.[127]  This should go a long way towards addressing conflicts of interest between the funder and the client and enabling a higher measure of client control.  For example, once a funder is viewed as a fiduciary of the client, who must take into account the best interest of the client, the funder will have to consider whether non-monetary remedies better serve the client than do mere monetary damages.[128]  Similarly, when considering settlement offers, funders will have to take into account the interests of the client and not only their own.  Funders will have to disclose potential conflicts that may arise, e.g., across their portfolio of investments, and will have to seek informed consent for conflicts; certain categories of conflicts will be deemed unwaivalbe just as they are in the attorney-client relationship.[129]

A closely related recommendation is to allow and encourage fee structures that align the interests of both the funder and the attorney with those of the client's.  For example, hybrid fees can be devised that include either a reduced hourly rate or a flat fee for the attorney's services, on the one hand, and a performance bonus or a reduced percentage of the recovery, on the other.[130]  Such an arrangement will incentivize lawyers to invest in the litigation, will reduce the rush-to-settle and enhance the attoney's position, as a party with a contingent interest, vis-à-vis

---

separate communications with their lawyer confidential from one another, they must expressly so agree." Douglas R. Richmond, *The Attorney-Client Privilege and Associated Confidentiality Concerns in the Post-Enron Era*, 110 PENN ST. L. REV. 381, 414-4145.  On how similar solutions operate in the insurance context, s*ee* Stephen L. Pepper, *Applying the Fundamentals of Lawyers' Ethics to Insurance Defense Practice*, 4 CONN. INS. L.J. 27 (1998).

[127] For a review of the attorney's duties of loyalty and zeal, *see* Eli Wald, *Loyalty In Limbo:  The Peculiar Case of Attorneys' Loyalty to Clients*, 40 ST. MARY'S L.J. 909 (2009).

[128] See, by way of comparison, the discussion of insurer's obligation to defend which, in certain circumstances, applies even if an action does not entail an obligation to pay proceeds (below, sub-section V(e)).

[129] *See* Model Rules of Prof'l Conduct R. 1.7 (2003) (discussing when a lawyer can and cannot represent a potential client due to conflicts of interest).

[130] Coffee suggests that "[t]he conventional wisdom about large contingent fees is that they can motivate the attorney to settle prematurely… but if the attorney were paid on a non-contingent basis, it would have little, if any, incentive to settle early… hence the attorney's self-interest would counterbalance those of the litigation funder." Coffee, *Litigation Governance*, *supra* note 7.

the funder.  This, in turn, will help preserve the attorney's independent professional judgment, and create counter-leverage to the funder's bargaining position.

In order for these recommendations to work, attorneys should be allowed to contract directly with funders.  Attorneys and funders should both be required to fully disclose this arrangement to the client.  Reformers can also require that leave of the court be granted to funders and attorneys wishing to enter into such fee-sharing arrangements (see below).  This will require loosening the prohibition on fee-splitting in the litigation finance context or liberalizing the rules on multidisciplinary practices.[131]

## C.    *Court supervision*

Court supervision similar to that required in the class action context[132] should also be considered.  In addition to court supervision of any attorney-funder fee agreement, such supervision may also encompass the financing agreement between the funder and the client.  For example, legislators may require that leave of the court be obtained before entering such an agreement.  Court review may include setting a cap on the proportion of the award that funders and attorneys, individually and in the cumulative, can claim as well as consideration of the incentives set by any fee-splitting arrangements.  Courts can also scrutinize and approve the terms of settlements.[133]

---

[131] *See supra* note 37 for a discussion of multidisciplinary practice.

[132] *See* FED. R. CIV. P. 23.  *See also* Jean R. Sternlight, *As Mandatory Binding Arbitration Meets the Class Action, Will the Class Action Survive?*, 42 WM. AND MARY L. REV. 1 (discussing FRCP 23, which provides the basis for court supervisory powers over class actions:  "Rule 23 builds protective measures directly into its provisions, not only by requiring the court to certify the class, but also by allowing the court to divide a class into subclasses where appropriate, to mandate notice to class members, to mandate notice to class members, to mandate opportunities be afforded for directly participating in the action, and to approve or disapprove any settlement that is reached in a class action.").

[133] Judicial review of fees and settlements is quite common.  Courts may review contingency fees, class actions settlements, and bankruptcy fees.  *See generally* Jonathan R. Macey, *Judicial Review of Class Action Settlements*, 1 J. LEGAL ANALYSIS 167 (2009); *See also* Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973), *vacated*, 540 F.2d 102 (3d Cir. 1976) (establishing the "lodestar standard").  Bankruptcy law, in particular, grants courts broad supervisory powers.  *See, e.g.*, N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) (noting the extensive powers provided by 11 U.S.C. 105(a) which

Courts may also wish to scrutinize, *ex ante* or when a challenge is raised, the terms of the funder/client and funder/attorney contracts as a whole.[134]  Legislators or courts can develop criteria against which judges can assess whether a funding arrangement is contrary to public policy.   Such considerations may include the following:  the type of client, process and area of law in question (as discussed in the taxonomy, above);  whether there is a fee-splitting agreement between the funder and attorney and if so what kind of incentive structure it sets up; whether the attorney was chosen by the client or by the funder; the sophistication of the client and whether she was assisted by counsel in her negotiation of the funding agreement; whether adequate disclosures were made to the client by the funder and the attorney; whether the client is in a position to make informed decisions regarding the conduct of proceedings and; whether independent advice is reasonably available to the client.[135]

**D.**     ***The funding contract:  Contract Design and Consumer Protection***

First, it should be noted that the current prohibition on litigation funding is a serious limitation on the freedom of contract.  However, the particular problems posed by the funder-client relationship, coupled with the public interest in the effects the industry might have on the judicial system as a whole and on the economy as a whole, means that litigation funding

---

provides federal bankruptcy courts the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

[134] *See, e.g.,* Sternlight, *supra* note 132 (discussing the breadth of court supervision in class action cases).  Compare also with the Australian bankruptcy scheme which, as noted before, gave rise to the entire field of third party funding:  "Currently, liquidators are obliged to obtain court approval for litigation funding contracts, if the matter may be resolved more than 3 months after the agreement is entered into.  This means that effectively all litigation funding agreements made by liquidators are vetted by the courts... Greater transparency might also lead to improved competition in the legal services and litigation funding markets, perhaps resulting in lower pricing."  STANDING COMMITTEE OF THE ATTORNEYS-GENERAL, *supra* note 82 at 12.

[135] Some of these recommendations are based on the factual scenarios that have come up in Australian jurisprudence as discussed in the Australian Attorneys-General report, STANDING COMMITTEE OF THE ATTORNEYS-GENERAL, *supra* note 82 at 11.  Australia has seen more than twenty challenges to funding arrangements.  None of the challenged contracts have been struck down though some cases were stayed until the funder and the attorney have revised the contracts.  *Id.*

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

contracts should be subject to the same analysis and protections afforded in other areas where consumer protection is heightened.

As noted before, the funding contract can be viewed either as a financing agreement, on the plaintiff side, or as similar to an insurance agreement, on the defense side.  Regulators, legislators and the bench are therefore advised to draw on the paradigms of both (retail) finance contract design and regulation and on insurance contract design and regulation when addressing litigation funding.  Parties and the attorneys representing them are also advised to take into consideration contract design theory when negotiating such agreements.[136]

### 1.  *Contract design*

Given the similarities between the concerns governing insurance agreements and funding agreements, one can adapt the measures developed in the former context to the latter context. The following paragraphs provide some examples.

Insurance contracts typically include moral hazard clauses aimed at preventing fraud and collusion against the insurer by allowing the insurer to deny coverage in such circumstances. These include, for example, record-keeping clauses which require insureds to keep records that insurers can later inspect to evaluate a claim.  Similar obligations can be contractually imposed on litigants seeking funding.  This will disincentivize misrepresentations and better align the interests of the client and the funder even after the risk transfer has occurred.

---

[136] Contract design theory is beyond the scope of this article but for an example of how such theory can be used to illuminate which contract features are likely to reduce the risk of agency problems and moral hazards, and ensuing asset bubbles, by taking into consideration the contracting parties' imperfect rationality, *see* Oren Bar-Gill, *The Law, Economics and Psychology of Subprime Mortgage Contracts*, 94 CORNELL L. REV. 1074 (2009).  The theory takes into account insights from behavioral economics pertinent to contract negotiations such as loss aversion and the endowment effect.  In this context, loss aversion means that since litigation costs are out-of-pocket costs, i.e. are viewed as losses, whereas the potential recovery is foregone gains, clients may be predisposed to overpay for litigation funding.  The "endowment effect" refers to people's tendency to value a good or service more once they have a right to it i.e., once it is part of their "endowment."  Introducing litigation finance and claim transfer, which takes the value of the claim out of the claimant's endowment (transforming it instead into an opportunity cost), is likely to unduly lower the client's valuation of it.  On loss aversion and the endowment effect *see supra* note 93.

Similarly, co-payment, co-insurance arrangements and deductibles are used as protection against moral hazards ensuring that the insured has an interest in remaining actively involved in its defense.[137]  Similar risk-sharing arrangements relating to unfavorable awards can be devised as between a funder and a corporate defendant.

In order to deal with conflicts of interest, insurance law also recognizes certain defenses for insurers such as the defense of concealment which places an affirmative duty on insureds to disclose all material facts; the defenses of representations and warranties which cover express or implied statements made by the insured and relied on by the insurer and; limitations and exceptions to coverage.[138]  Courts can draw on these doctrines by way of analogy when engaged in contract interpretation of a funding agreement.

The insurer's corresponding duties include an obligation to defend any action brought against the insured on any cause of action that falls within the policy coverage, even when the action may not entail an obligation to pay proceeds.  In order to be able to effectively defend, insurance law imposes on an insured the duty to cooperate with the insurer which includes the duty to attend depositions, hearing and trial; assisting in settlement negotiations and in obtaining evidence – all making the duty easily applicable to the funder-client context where, without such a duty, a moral hazard may arise in the form of the client having a diminished interest in participating in the prosecution/defense of his case.[139]  Importantly, the insurer's responsibility for the defense also affords it the right to control the litigation - though insurer's generally permit private counsel of the insured to participate in an advisory capacity and often employ outside

---

[137] *See* Thomas A. Smith, *Institutions and Entrepreneurs in American Corporate Finance*, 85 CAL. L. REV. 1 (1997). "[Defendant] could choose to pay the 'expected value' of its lawsuit plus a premium to protect against a higher-than-expected loss. After making such a payment, the litigant would still retain at least some of the risk, so as to align incentives and ensure its cooperation going forward. But the risk of protracted, expensive litigation and of a devastating judgment would no longer be concentrated with the single defendant."  Molot, *supra* note 7, at 375.
[138] For a discussion in the context of health insurance, *see* William M. Sage, *Managed Care's Crimea: Medical Necessity, Therapeutic Benefit, and the Goals of Administrative Process in Health Insurance*, 53 DUKE L.J. 597 (2003).
[139] *See* Dobbyn *supra* note 78 at 172, 286-306, 317.

counsel who have obligation to the client though paid by the insurance company.  The insurer

may also negotiate and control settlement.[140]

Imposition of fiduciary duties of sorts, suggested above to *inter alia* ameliorate concerns

such as the commodification problem and the funder's obligations to its shareholders, are also

familiar to insurance law.  Courts frequently impose on insurers a duty of acting with reasonable

care in performing their obligation to defend.  Courts have also devised a bad faith cause of

action particular to insurance contracts aimed at addressing the particular conflicts of interest

inherent when settlement negotiations are conducted—similar to such conflicts in the funding

context—in particular when the insured has an interest to settle for the maximum amount

covered by the policy whereas the insurer has an interest to go to trial and possibly get an award

for a lower sum at the risk of getting an award for a sum higher than the policy limits.[141]

In certain, relatively limited, circumstances, insurance law imposes on the insurer a duty

to hire for the insured independent counsel.[142]  Some litigation funders are incorporating similar

provisions which provide for an independent counselor to advise the client regarding settlement

offers.[143]

---

[140] *Id.* at 355-366.

[141] The doctrine was developed in particular in the context of conflicts-of-interest in relation to settlement negotiations in the seminal cases of Brown v. Guarantee Insurance Company, 155 Cal. App. 2d, 679 (Cal. Ct. App. 1957) and Crisci v. Security Insurance Company, 66 Cal. 2d 425 (Cal. 1967) (going as far as suggesting, in dicta, a *strict liability* standard whereby an insurer would be held strictly liable for failure to accept *any* offer of settlement no matter how strong the defense reasoning that it is always in the interest of the insured to have the action settled within the policy limits).  The cause of action is derived from the contracts principle of an implied covenant of good faith and fair dealing but in most jurisdictions in the insurance context it is considered a tort.  Dobbyn, *supra* note 78 at 399.

[142] The lead case on conflicts of interests in the triangular relationship between insurer-insured-attorney is San Diego Federal Credit Union v. Cumis Ins. Society, Inc., 162 Cal. App. 3d 358 (Cal. Ct. App. 1984) (holding that where the insured and the insurer have conflicting interests the insurer must pay the reasonable cost for hiring independent counsel by the insured).

[143] Not-for-attribution interview with executive at litigation finance firm (November, 2009).

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

## 2. *Consumer protection:  the insurance analogy and finance regulation*

Any reform of consumer protection laws in the U.S. in the wake of the financial crisis, especially with regards to financial products, should be designed so as to encompass this new corner of the finance industry.  As noted, insurance regulation and financial regulation are, respectively, indirectly and directly applicable.  And both include consumer protection obligations, such as the following, which can be incorporated in the regulation of litigation funding.

First, are capitalization requirements:  obligations with regard to the issuer/insurer—and by implication, a litigation funder's—financial status.  These are often coupled with reporting requirements—requiring the filing of annual (and quarterly, in the case of issuers) statements with regulators.  Second, are disclosure requirements and informed consent:  duties to disclose to the client the risks and benefits of the arrangements including fees and commissions and all other significant features of the proposed agreements.  Disclosure requirements can also encompass funder's possible conflicts of interest, funder's financial ability to provide the funding pledged, whether or not funder intends to securitize or otherwise sell its rights in a funded litigation, and any agreement between the funder and the attorney.  Third, are standard form requirements which may include developing and making available model financing contracts and provisions.[144]

Of course, in relation to the secondary market in legal claims, if securitization of legal claims-backed securities are developed and sold to the public, the existing protections of securities law will become applicable.  These protections involve detailed registration, reporting

---

[144] *See, e.g.*, Larry Cata Backer, *From Moral Obligation to International Law:  Disclosure Systems, Markets, and the Regulation of Multinational Corporations*, 39 GEO. J. INT'L L. 591, 630 (2008) ("Regimes of financial reporting and disclosure are basic to the regulatory regimes of virtually every state."). *See also* Truth In Lending Act, 15 U.S.C. 1601 *et seq.* (detailing federally-mandated disclosure requirements for lending agreements).  And *see,* STANDING COMMITTEE OF THE ATTORNEYS-GENERAL, *supra* note 82 at 8 on the imposition of disclosure duties capitalization requirements on litigation funders.

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

and disclosure requirements including information about the issuing entity and all material characteristics of the asset pool and selection criteria.[145]

The discussion of how to best regulate a secondary market in legal claims would benefit from the discourse on the reform of securities regulation in light of the recent financial crisis. Measures contemplated as part of the current discourse on legal reform of the securities industry and aimed at curtailing the moral hazard involved in the "originate-and-distribute" model can be imposed on issuers of legal claims-backed securities whether or not they are adopted more widely. Such measures may include the re-introduction of tighter standards for due diligence conducted by independent due diligence firms; requiring issuers, in our case, litigation finance firms, to hold on to an adequate portion of the subordinated tranche of legal claims-backed securities (representing the riskiest assets) and; denying the ability to hedge risk on the subordinated tranche.[146] The attention being paid to models of valuation and rating could help defuse the tension between the disclosure requirements imposed by securities regulation and the confidentiality requirements in international arbitration and the difficulty in valuing and, therefore, of rating such securities.

Finally, since the attorneys involved in the triangular attorney-client-funder relationship must at any rate conduct due diligence of the legal claims, and since their role is already understood to diverge from the pure attorney-as-advocate role, one can contemplate structuring

---

[145] The regulatory regime governing asset-backed securities is framed by Regulation AB, 17 C.F.R. § 229.1100 *et seq*. (2010) ("Asset-Backed Securities") and Rule 144 promulgated under Section 5 of the Securities Exchange Act of 1933. For a helpful discussion thereof *see*, Vinod Kothari, SECURITIZATION: THE FINANCIAL INSTRUMENT OF THE FUTURE 854 – 876 (2005). As noted, legal claims-based securities will be addressed in more detail in a separate article but one can envision that an issuer of legal claims-backed securities would have to include details such as the projected value of the legal claim or defense, which court and judge are hearing the case, whether there it is a right to, or an ongoing, jury trial and who are the attorneys and law firms involved. One can envision great difficulties projecting with accuracy material facts such as projected date at which the legal action would be settled or disposed of (including all appeals) and whether any third-party interveners or counter-claims are expected.

[146] For a discussion of the desirability of such reform measures generally, *see* Coffee, Congressional Testimony, *supra* note 117 at 51 – 67.

that role so as to utilize the attorneys as gatekeepers, monitoring the financier in its capacity as issuer and dissuading it from reckless practices.[147]

## VI.   CONCLUSIONS

Reflecting back on the examples in the opening of this article, we can now see how moving from prohibition of litigation funding to its regulation can be beneficial both to litigating parties and to society as a whole.  It enables reaping the benefits of enhanced access to justice and private enforcement of the law while minimizing the concerning side-effects of allowing a third party to fund litigation.  The first example illustrated the notion that individuals plaintiffs with (potentially) meritorious claims that they nonetheless cannot afford to prosecute may – with third party support – go up against even the most powerful of defendants, the President of the United States.  It also illustrated the need for regulatory mechanisms – such as court supervision of funded litigations – to prevent abuse and subversion of the court system for political ends.

The next example envisioned villagers suffering environmental harms and human rights abuses by a U.S.-based multination corporation.  Physically remote, poor, and living within a compromised legal system, the Angolan villagers would have little chance of vindicating their rights against the corporation that injured them.  With litigation funding, however, the villagers and other plaintiffs like them would not only gain access to U.S. courts, but would  be able to litigate without having to settle at a discount.  In the process they would promote not only private enforcement of environmental and human rights standards but also engage in rule change in areas where the funder may have a similar, or even greater, incentive than the plaintiffs to play for rules.  Regulations imposing, among other things, a form of fiduciary duty on the funder, towards the plaintiffs, would limit the chances that the latter's interested were steamrolled.

---

[147]  *See* John C. Coffee, GATEKEEPERS: THE ROLE OF THE PROFESSIONS AND CORPORATE GOVERNANCE 192 (2006) (arguing at the wake of the corporate scandals of the early 2000's that *corporate* attorneys can and should serve as "gatekeepers," not only as advocates, to assist in structurally preventing corporate fraud); Molot, *supra* note 7 (advocating that the attorney in the litigation finance context be viewed as a *broker* of litigation finance services).

DRAFT. *Forthcoming*, **Minnesota Law Review** Vol 95.

The third example involved a corporation purchasing "after-the-event insurance" against a major class action allowing it to continue its operations, raise capital and engage in major transactions while the litigation is ongoing.  Under the suggested regime a primary market for such "insurance" will be available and secondary markets might even lower the price of such insurance.  Moral hazards that this type of "insurance" may create will be minimized through the devices detailed in the previous section and also due to the fact that the company will be operating in a landscape in which its opposing parties may now be more formidable given their own access to funding.

Next, the reader was invited to imagine an oil company funding a developing country's defense of a boundary dispute.  Without such funding, it is possible that the sovereign would find itself unable to mount a sophisticated defense of a serious – albeit peaceful – threat to its physical integrity.  The concerns – among them, a potential conflict of interest between an oil company concerned with securing its fields and a country concerned with the much larger issues of it borders – conjured up by such a scenario can be addressed through the reporting and licensing requirements suggested above as well as the suggested disclosure rules, all of which will help shed light on such a relationship allowing for public scrutiny.  Similarly, a regulated, transparent, and competitive litigation finance industry would provide the sovereign in question with alternative funding sources.  The sovereign would now be able to comparison-shop for the best available financing terms, both in terms of strings attached and in terms of price.  The developing nation would still gain access to sophisticated counsel and reap the rewards of rule change, in the form of boundary delineation, without having to cede control to an entity that is not a party to the litigation but that may have an interest in its subject matter.

The final example invoked the specter of China's Sovereign Wealth Fund gleaning, as a litigation funder, proprietary information retained by an American company regarding sensitive technologies.  Applying a nuanced analysis based on the taxonomy would allow us to determine

DRAFT. *Forthcoming,* **Minnesota Law Review** Vol 95.

that a narrowly defined, subject matter-specific prohibition relating to national security may be an appropriate response that does not hamper the ability to retain litigation finance for matters that are not of national security concern.   Or, funding may be permitted with restrictions on abuse of the discovery process, currently imposed on attorneys, extended to the funders if the attorney-client-funder relationship.

All of this is not to idealize litigation finance.  The elaborate regulatory regime envisioned in Section V, the cautionary note to parties and their attorneys regarding the need for careful contract design, and the analogies to the insurance and finance industries – heavily regulated industries – are meant to acknowledge the complexities involved in moving away from a prohibition responsibly.  It has been, however, the aim of this article to suggest that litigation finance is an industry whose time has come.  Third party financing of litigation will increase access to justice and encourage private enforcement of the law.   It will eliminate a market failure plaguing corporate America – the inability of corporations to efficiently manage the risk of litigation.  Most importantly, however, litigation funding will reduce systemic inequalities in our legal system by altering the bargaining positions of individual, class, and sovereign plaintiffs, and corporate defendants, in a way that will increase the equality of arms in any given litigation and make it more likely that more kinds of litigants will be able to play for rules.  This is the coveted *change at the level of parties* which scholars of litigation equality have long advocated for and being, unlike other suggested large-scale reforms on that level, more politically viable benefiting, as it does, both plaintiffs and defendants.  Whose claim is it anyway?  With careful management, any meritorious claim irrespective of the social position of the party in question.