# EXHIBIT E

Daniel L. Abrams (DA 7258)
2 Pennsylvania Plaza
Suite 1910
New York, New York 10121
(212) 292-5663
Attorney For Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 06 Civ. 11512 (DLC)

RSM PRODUCTION CORPORATION,
JACK J. GRYNBERG, and
GRYNBERG PETROLEUM COMPANY,

Plaintiffs,

v.

MIKHAIL FRIDMAN, LEN BLAVATNIK,
LEV KORCHAGIN,LEV MODEL,
GLOBAL PETROLEUM GROUP, LTD.,
TNK-BP LIMITED, LORD JOHN BROWNE,
BP, p.l.c. and JOHN DOES 1-5

Defendants.

---

## SECOND AMENDED COMPLAINT

---

Plaintiffs, RSM Production Corporation ("RSM"), Jack J. Grynberg

individually, and Jack J. Grynberg d/b/a Grynberg Petroleum Company (collectively

"Grynberg"), and file their Amended Complaint against the Defendants Mikhail

1

Fridman, Len Blavatnik, Lev Korchagin, Lev Model, Global Petroleum Group, TNK-

BP, Lord John Browne and BP, p.l.c. and for grounds allege:

## PARTIES

1.      Plaintiff RSM Production Corporation is a corporation incorporated in

the State of Texas, whose address was 5000 S. Quebec Street, Suite 500, Denver,

Colorado 80237, and later 5299 DTC Boulevard, Suite 500, Greenwood Village,

Colorado 80111.  Plaintiff Jack J. Grynberg is a resident and citizen of the State of

Colorado, whose address is c/o Grynberg Petroleum Company, 5299 DTC Boulevard,

Suite 500, Greenwood Village, Colorado 80111.

2.      Defendant Mikhail Fridman is Chairman of the Board of Directors of

TNK-BP.  Fridman at relevant times has been President of the Russian Jewish

Congress and its principal donor.  TNK-BP is a Russian oil company, established

in September 2003 as a result of the merger of Russian companies TNK (Tyumen

Oil Co.) and SIDANCO with the majority of BP's Russian oil assets.  The company

is 50% owned by BP (British Petroleum Company, p.l.c.) and 50% by a group

of prominent Russian investors: Alfa Group, Access Industries and Renova (AAR).

Defendant Fridman is Chairman of the Board of Directors of the Alfa Group

Consortium, and Chairman of the Board of Directors of Alfa-Bank, which has offices

at 540 Madison Avenue, 30th floor, in New York, New York 10022.  Upon

information and belief Defendant Fridman, with no knowledge of the Caribbean

geology and geophysics, is acting both individually and as an agent for TNK-BP and

BP, which has vast oil and natural gas production, liquefied natural gas (LNG) operations exploration development and vast production across the border in offshore Trinidad and Tobago.  BP is a giant British international and U.S. domestic integrated oil and energy company.  BP is incorporated in the United Kingdom (England).

3.      Defendant Len Blavatnik is a member of the Board of Directors of TNK-BP.  TNK-BP is a Russian oil company, established in September 2003 as a result of the merger of Russian companies TNK (Tyumen Oil Co.) and SIDANCO with the majority of BP's Russian oil assets.  The company is 50% owned by BP and 50% by a group of prominent Russian investors: Alfa Group, Access Industries and Renova (AAR).  Upon information and belief Defendant Blavatnik maintains a residence in New York at 2 East 63rd Street, 10021, and conducts business affairs through his company Access Industries, at 730 5th Avenue, New York, New York, 10019.  Upon information and belief Defendant Blavatnik, with no knowledge of the Caribbean geology and geophysics, is acting both individually and as an agent for TNK-BP and BP, which has vast oil and natural gas production, liquefied natural gas (LNG) operations development across the border in offshore Trinidad and Tobago.  BP is a giant British international and U.S. domestic integrated oil and energy company.  Blavatnik is a member of the board of directors of the American Jewish Congress.

4.     Defendant Lev Korchagin is an attorney in Russia and the legal and business advisor for, and conspirator with, the Defendants in their tortious activities against the Plaintiffs.  Defendant Korchagin has called Grynberg in 2005 on the phone several times at the Grynberg offices in Colorado.  Defendant Korchagin's business mailing address in Moscow is 123182, Moscow, Russia, Ulitsa Aviatsionnaya, 24, Building 1 Lawyers Bureau "ICA".  Defendant Korchagin's telephone number is +011-7 495 755-8666.  Defendant Korchagin is on the Board of Directors of Global Petroleum Group. Ltd., with a mailing address of P.O. Box 346, St. George's, Grenada.

5.     Gregory Bowen is not named as a Defendant herein, but he is a key co-conspirator in as much as he was a recipient of bribe monies provided directly, and in some cases indirectly, from the other Defendants.

6.     Defendant Lev Model is a former and possibly present Russian National who, on information and belief, is presently in New York.  He has on information and belief split his time in recent years between Grenada, New York, New Jersey and Ireland.  Mr. Model is a Director of Global Petroleum Group, Ltd. His address in Grenada is Westerhall, St. David's, Grenada.  On Information and belief, Mr. Model is the Chairman of Global Petroleum Group, Ltd.

7.     Defendant Global Petroleum Group, Ltd. is a Grenadian Company founded in 2003 by defendants Model and Korchagin as well as Eduaro Vasilev, who on information and belief is a Russian.  The formation was approximately four

months after the official creation of TNK-BP. The primary purpose of Global

Petroleum Group is to facilitate the payment of monies to Grenadian officials as

well as to the Government of Grenada, and to act as a front for defendants

Blavatnik, Fridman, TNK-BP, and BP. Global Petroleum Group's mailing address

is P.O. Box 346, St. George's, Grenada.

8.   Defendant TNK-BP Limited ("TNK-BP") is a company organized under

the laws of the British Virgin Islands. TNK-BP is a joint venture in which BP owns

50%, Fridman's Alfa Group owns 25% and Blavatnik's Access Industries together

with a large Russian conglomerate called Renova owns the other 25%. TNK-BP was

created in 2003, and ownership of TNK International, Ltd., formerly OAO Tyumen

Oil Company (collectively, "TNK") was transferred to TNK-BP at that time.

9.   Defendant Lord John Browne is a British resident and national. He

was Group Chief Executive of BP, p.l.c. until he stepped down on May 1, 2007.

10.   Defendant BP, p.l.c. ("BP") is the free world's second largest oil and

energy company and is a company organized under the laws of the  United

Kingdom. BP does business in the United States as BP Corporation North America,

Inc., and maintains an investor relations office at 535 Madison Avenue, 22nd Floor,

New York, New York 10022.

11.   Defendants John Doe 1-5 are individuals or entities which are

affiliated with some or all of the named Defendants, and which, upon further

investigation or discovery, may be added as defendants for their role in the scheme

described herein.  These defendants may include Peter Sutherland, who is
Chairman of BP.

## BACKGROUND INFORMATION

12.     RSM and the nation of Grenada signed an exclusive Petroleum
Agreement in July 1996.  The Petroleum Agreement was to have resulted in an oil
and natural gas exploration, development and production license being issued as a
matter of routine by Grenada to RSM.  Grynberg worked, and works, on behalf of
RSM in efforts to explore, discover and develop oil and natural gas reserves in
offshore Grenada, for the benefit of the people of Grenada, the United States of
America, as well as the free world.

13.     Jack J. Grynberg is 75 years old.  He is president and co-owner of
Grynberg Petroleum Company.  Grynberg is a citizen of the United States and a
resident of the State of Colorado.  He is a graduate and a trustee emeritus of the
Colorado School of Mines.  Grynberg has been actively involved in oil and natural
gas research, exploration, development and production for more than fifty (50) years
and is responsible for numerous oil and natural gas field discoveries and extensions
in the United States and overseas.  He is a Registered Professional Engineer in good
standing in the States of Colorado, South Dakota, Oklahoma and Texas, is a
member of many professional and trade associations, author of numerous
publications and holder of a U.S. patent for the application of laser beams for the
continuous detection and identification of hydrocarbons in the mud stream coming

6

out of a bore hole while drilling. He was appointed by President Ford and reappointed by President Carter to the Committee on Nuclear and Alternate Energy of the National Academy of Sciences. He was appointed by President Clinton to participate in the presidential mission to Russia in March 1994 headed by the late Secretary of Commerce Ron Brown representing the United States oil and gas industry. He has been a speaker at the 5th, 6th and 7th United Nations sponsored conference on African Oil, Gas and Finance, where he represented the United States at the 7th conference. For the past several years he has been a speaker at oil and natural gas international conferences in London, England, Cape Town, South Africa, Rio de Janeiro, Brazil, Houston, Texas, Barcelona, Spain, Lille, France and Hamburg, Germany. A copy of H.R. 435, a proposed Congressional bill Mr. Grynberg has championed, related press releases and Mr. Grynberg's resume is attached hereto as Exhibit A.

14.     In late January 1999, Mr. Grynberg made a presentation to Robin Morris, Esq. the General Counsel of BPX (British Petroleum Exploration Company, which at relevant times was a wholly-owned exploration, development and production subsidiary of BP, with Defendant John Browne at the time serving as the Chief Executive Officer of BPX) in Denver, Colorado, on the giant oil and natural gas potential of offshore Grenada.. Mr. Grynberg gave Mr. Morris extremely valuable confidential, exclusive, geologic, geophysical and economic information of the vast oil and natural gas potential of offshore Grenada, with the understanding

7

that Mr. Morris was going to take this information with him to London, and present

it and give it directly to John Browne.  Mr. Morris later informed Mr. Grynberg that

he in fact presented the information and gave it to John Browne.  Mr. Grynberg

provided this information as part of his efforts to perform RSM's side of the contract

with Grenada, and to maximize the value of Grenada's vast offshore hydrocarbon

(oil and natural gas) reserves.  Grynberg offered BPX an invitation to join RSM in

its giant exploration, development and production project in offshore Grenada.  This

followed a strained relationship between Grynberg and BP, the tension of which

had recently eased, causing Grynberg to believe he could again trust and do

business with BP and John Browne, as he had done before, going back to 1973.  To

this date Grynberg has natural gas production with BP in the USA.  BP had

resources that could assist RSM in implementing the project, and was active in

offshore Northeastern Venezuela and Trinidad and Tobago to the south, which are

areas neighboring Grenada both geographically and geologically.  BPX kept the

copies of the paper and computer information for approximately a month and, on

information and belief, made copies of the valuable confidential  information.  BPX

turned down the opportunity a few months later, but apparently is now trying to

capitalize on its previously-acquired knowledge.

15.    In September 1996, in Grenada, Gregory Bowen, who is Deputy Prime

Minister in charge of Grenada's Energy affairs, advised Jack Grynberg that he

expected significant bribe payments from RSM and Grynberg in order for RSM and

Grynberg to do business in Grenada.   After the refusal of RSM and Grynberg to pay

bribes to Bowen, Bowen obstructed, harassed and intimidated RSM and Grynberg

in their efforts to explore, develop and produce Grenada's oil and natural gas

resources, including, but not, limited to: rescinding the Special Envoy to Venezuela

status of Jack Grynberg, which he was using to attempt to resolve boundary

disputes between Grenada and Venezuela, refusing to participate in a case in the

International Court of Justice between Grenada and Trinidad and Tobago to resolve

the undetermined boundaries, filed at great expense by RSM, which boundaries

Grynberg successfully resolved with Trinidad and Tobago, to the benefit of

Grenada, granting illegal permission to other parties to perform seismic work on

exclusive license area of the Plaintiffs, and taking no steps to preserve Grenada's

United Nations seismic data after Grynberg offered to preserve and reprocess the

data at no cost to the Grenadian government, with a copy to be delivered free of

charge to Grenada.   That Seismic data, which was stored in an open garage in

Barbados, is now destroyed due to humidity.   RSM also spent over $170,000 to

litigate in Federal District Court against Petroleos de Venezuela (PDVSA), the

Venezuelan government oil company to prevent PDVSA from trespassing in a

manner which violated RSM's Grenadian offshore exclusive exploration and

development contract.   RSM at its own expense has utilized its technical, scientific

and economic knowledge to resolve boundary disputes in spite of obstacles created

by Gregory Bowen.   RSM is additionally incurring the large costs of an arbitration

9

with Grenada before the International Centre for Settlement of Investment
Disputes (ICSID) of the World Bank in London, England, to remove these artificial,
bogus and fraudulent obstacles created by Bowen.

16.     Defendants have conspired to interfere with the existing Petroleum
Agreement between RSM and Grenada and the issuance of the oil and natural gas
exploration, development and production license by Grenada to RSM, pursuant to
an active, valid and exclusive contract agreement, with the issuance being a mere
formality. Defendants, each in their own way, are attempting and have attempted
to profit from the vast potential for exploration, development and production of
Grenada's oil and natural gas, in total disregard and in contempt for Plaintiffs'
contractual rights, pursuant to the existing exclusive RSM Petroleum Agreement.
These efforts are in direct violation of the Foreign Corrupt Practices Act and the
1997 Organisation for Economic Cooperation and Development ("OECD")
Convention on Bribery of Foreign Public Officials in International Business
Transactions. These actions are also in contravention of Transparency
International's ongoing efforts to lead a global coalition against corruption.

## BACKGROUND BEFORE THE SCHEME

17.     In 2003, TNK-BP was formed. This reflected a joint venture between
BP on the one hand and several Russian oil companies owned or controlled by
defendants Blavatnik and Fridman on the other hand. It also represented the

10

coming together of entities which had previously had several well-publicized conflicts with one another.

18.     By way of brief background, BP had an approximately $200 million investment, representing a 10% stake in a Russian Oil Company named the Siberian Far Eastern Oil Company ("Sidanco").   TNK. stripped the assets of this company, engendering well-documented animosity between Lord John Browne, BP's C.E.O. at the time, and Fridman who effectively controlled TNK.  On November 15, 1999, TNK acquired a Sidanco subsidiary, Chernogorneft, in what BP maintained was a rigged bankruptcy auction, for about $176m, or a tenth of what Russian analysts estimated to be the value of that company.  This happened despite a letter-writing campaign initiated by BP, who asked then-British Prime Minister Tony Blair to write Russian President Vladimir Putin, complaining that "BP fears that what is and could be a healthy and profitable company will be manipulated into bankruptcy and collapse."

19.     BP was not the only western investor being burned.  As Sidanco was apparently being looted with the assistance of TNK, Blavatnik and Fridman, TPT Ltd., which was a group of American and international investors including the George Soros Funds and Harvard University's endowment, with interests in Sidanco, hired the law firm of Latham & Watkins and brought suit in New York against, *inter alia*, Blavatnik and companies owned by Blavatnik and Fridman. See TPT Ltd. v. Blavatnik 99/605295 (NY. County, Exhibit B hereto).

20.     The TPT complaint alleged, *inter alia*, Sidanco is being victimized by "one of the most bizarre and brazen acts of corporate theft in recent memory." The complaint detailed how defendants bought and used corrupt judges, corrupt regional officials, and a corrupt bankruptcy trustee to obtain two of Sidanco's most valuable assets at bargain basement prices.

21.     As was known by BP at the time, Blavatnik and Fridman had a reputation for corrupt business practices. A 1999 Washington Post article observed:

> ...Political connections are crucial in Russia's new capitalism, so Blavatnik and his partners placed local Siberian politicians – including the governor of the Tyumen region -- on their company's board.

Exh. B at ¶ 11.

22.     The TPT Complaint also alleged that TNK, at the time largely owned and controlled by Fridman, had improper relationships with many judges, and noted that the Russian press was "replete" with stories concerning the improper relationship between TNK and these judges. Exh. B at ¶ 31. The TPT Complaint further documented numerous press reports of TNK allegedly resorting to violence when judges or other local officials did not cooperate. Exh. B at ¶¶ 32-33. According to one Russian press report:

> one of the (Russian) judges was beaten "unmercifully" in the street after she was "imprudent" enough to support an adversary of TNK in court proceedings.

Exh. B at ¶ 32.

23.    On information and belief, prior to the TNK-BP joint venture, TNK and/or its affiliates engaged in criminal and corrupt practices in obtaining other major Russian oil assets, including Niznevartovsk Nefte Gaz, Kondpetroleum, and Yugraneft.  And in February of 2002, a victimized company named Norex Petroleum brought suit in this District against, *inter alia*, Blavatnik, Blavatnik's Access Industries, and Fridman's Alfa Group.  This complaint implicates Blavatnik, Fridman's company, and TNK in no less than five separate Russian criminal bribery scandals.  It concludes that TNK and the other Defendants were essentially bribing their way to control of a substantial portion of the Russian oil industry.  Moreover, Norex alleges that both TNK and Fridman's Alfa Group were major players in the well-known criminal "Oil-For-Food" scandal involving post-Gulf War Iraq and Saddam Hussein.  The Complaint was Amended after the TNK-BP merger to, *inter alia*, name TNK-BP, BP and Lord John Browne as Defendants.  The Amended Complaint filed by Norex Petroleum is attached hereto as Exhibit C.  It alleges not only bribery, but resort to physical threats to obtain the valuable assets of the Russian oil company Yugraneft.  Id. at 29-32.

24.    BP and Lord John Browne were no doubt aware of TNK's extensive reputation for bribery and corruption at the time BP agreed to join forces with TNK.  And BP has its own history of corruption.  BP, led by Lord John Browne at all relevant times until earlier this year, has recently been alleged by one of its own former top executives to have bribed Azeri (i.e., Azerbaijan) officials in the early-

13

1990's to secure giant petroleum rights in the Offshore Caspian Sea. An article detailing the scheme and related misconduct is attached hereto as Exhibit D. Mr. Browne has also recently been found to have committed a criminal contempt of court for lying to a UK High Court Judge during an attempt to cover up a newspaper story concerning claims of wrongdoing by a former boyfriend. Thus, while BP had been burned by TNK's criminal corruption in the past, it had no moral qualms about doing business with the likes of TNK, Fridman and/or Blavatnik. On information and belief, BP entered into a joint venture with TNK so that they could profit from TNK's corrupt and criminal business practices. Thus, despite having been a victim of TNK's corruption and criminality, and an outspoken critic of that corruption, BP agreed to become a 50% partner and joint venturer with TNK. The collaborative efforts started in 2002, when BP and TNK settled their differences, pursuant to which TNK allowed BP to share in the spoils of their corruption and criminal activity. To settle the dispute, TNK transferred assets to BP-managed Sidanco, assets which on information and belief were previously stolen from Chernogorneft and Kondpetroleum, for the benefit of BP but to the detriment of other defrauded western investors.

## THE SCHEME BEGINS

25. In December of 2003, just months after the creation of the TNK-BP joint venture, Lev Model formally created a Grenadian company called Global Petroleum Group. The incorporation documents were prepared by a Grenadian

attorney with close ties to Prime Minister Mitchell and the ruling party.  Other

directors of Global Petroleum Group include Defendant Lev Korchagin and Eduaro

Vasilev, who on information and belief is a Russian national.

26.    On information and belief, Mr. Model is the same "Lev Model" that is a

convicted criminal.  Back in 1991, when Mr. Model was a resident of Englewood

Cliffs, New Jersey, he stole at least $1.2 million from a Soviet oil company.  A New

York Times article describing the theft and the resulting guilty plea is attached

hereto as Exhibit E.  In a nutshell, Model was given millions of dollars by a Soviet

oil company, and was supposed to provide household appliances for the company to

sell to its workers.  Instead, Model stole and pocketed most of the money.

27.    Mr. Model served 28 months in federal prison.  On information and

belief, his enormous and brazen theft from a Russian oil company made him a well-

known thief in Russian petroleum circles.  And this is the individual who

defendants Fridman, Blavatnik, and TNK-BP selected to lead their efforts in

Grenada, to organize Global Petroleum Group and to transfer millions of dollars to

Grenadian officials in criminal violation of the Foreign Corrupt Practices Act and

the 1997 OECD Convention on Bribery of Foreign Public Officials in International

Business Transactions.

28.    On information and belief, Model and Global Petroleum Group serve as

fronts for Fridman's, Blavatnik's, BP's and TNK-BP's efforts to bribe Grenadian

officials, and thereby acquire rights to explore, develop and produce the Grenadian

offshore areas believed to contain very promising vast.recoverable reserves of petroleum hydrocarbons.  From at least the time of the August 2003 creation of TNK-BP, on information and belief, Fridman, Blavatnik and TNK-BP were all aware of RSM's exclusive contract with the Government of Grenada.  And BP and Lord John Browne were aware of RSM's contract with Grenada at all times subsequent to Mr. Grynberg's January 1999 disclosure of the same to BP, and Mr. Morris' subsequent sharing of the information with Lord John Browne.  Indeed, BP and Browne personally possessed RSM's confidential, proprietary and exclusive geologic, geophysical and economic information on the giant oil and natural gas potential of offshore Grenada.  Nevertheless, on information and belief, BP and Browne have used this information, and have acted on it by conspiring to bribe Grenadian officials in clear violation of the US Foreign Corrupt Practices Act and Act and the 1997 OECD Convention on Bribery of Foreign Public Officials in International Business Transactions.  Defendants have consequently interfered with RSM's contract and economic relationship with Grenada.

## THE SCHEME IS IMPLEMENTED

29.    Within months after the formation of Global Petroleum Group, in 2003 Grenada took active steps to get out of its exclusive contract with RSM. RSM and Grenada were previously honoring their 1996 contract.  This despite a *force majeure* period necessitated by boundary disputes.  By letter dated July 18,

1996, RSM provided notice to the Government of Grenada, which was accepted, and agreed to, by Grenada through the countersignature of the then Minister of State, Ministry of Finance, Senator Patrick Bubb.  In the nearly eight (8) years that followed, both Grenada and RSM worked on resolving the necessary boundary issues, in spite of many uncalled for obstacles created by Gregory Bowen personally, and directed at RSM.

30.    In reliance upon Grenada's contractual promise that an exploration license would be issued upon RSM's application, RSM made substantial multi-million dollar investments during this eight-year period in acquiring new, and reprocessing older, seismic and geophysical exploration data and other subsurface geologic data obtained from Venezuelan (and other) sources by RSM pertaining to all the offshore waters of Grenada.

31.    By preliminary letter dated January 12, 2004, RSM wrote to the Prime Minister of Grenada, advising him that RSM believed that sufficient progress had been made to allow it to proceed and that it was in the process of revoking the *force majeure.*

32.    By letter dated February 19, 2004, the Honorable Gregory Bowen, Grenada's Minister for Agriculture, Lands, Forestry, Fisheries, Public Utilities and the Marketing and National Importing Board, wrote to RSM, advising it that the January 12th letter had been passed to his legal department for advice on the agreement and the effect of the *force majeure.*  RSM delivered its application

17

for an oil and natural gas exploration license to the Permanent Secretary of the
Ministry of Finance on April 14, 2004, after a four (4) day holiday, in compliance
with the contract.

33.    RSM, not having received any communication from Grenada of
any type since Mr. Bowen's letter of February 29, 2004, sent its agent, David
Myrick, Jr., to meet personally with government officials at a Caribbean conference
in Tobago, an island of Trinidad and Tobago near the island of Grenada.  On April
20, 2004, Mr. Myrick met with Minister Bowen, who expressed his frivolous
concerns that the exploration license application did not contain audited financial
statements and that a corporate surety bond had not been provided to cover the cost
of the first exploration well.  Minister Bowen's comments did not indicate a rejection
of the application, but rather concerns over certain portions of its contents relating
to financial assurance.  None of these financial terms urged by Bowen were required
by the exclusive contract between Grenada and RSM, and Minister Bowen's request
was both frivolous and a typical harassment.  This exclusive contract was freely
negotiated with the Prime Minister of Grenada, who utilized strong advice from
experts in the Oil and Gas offices of the Commonwealth Advisory Service in London,
Great Britain.

34.    By letter dated April 27, 2004, Minister Bowen advised RSM for
the first time of his position that the RSM exploration license application had been
untimely filed.

35.    By letter dated May 4, 2004, RSM explained to Minster Bowen its computation of the arbitrary 90-day application period and requested guidance as to how the dispute might amicably be settled.

36.    By letter dated May 21, 2004, Minister Bowen stated that the Government of Grenada was not in agreement with RSM.

37.    By letter dated June 16, 2004, RSM again sought an amicable resolution of the dispute.

38.    By letter dated July 1, 2004, Minister Bowen rebuffed RSM's efforts to resolve these issues, indicating that all future correspondence would be from Grenada's legal team.

39.    From July 1, 2004 to August 31, 2004, no correspondence or other communications were received by RSM from Grenada's legal team or any other representative of Grenada.

40.    RSM filed a Request for Arbitration with the International Centre For Settlement Of Investment Disputes ("ICSID"), on or about August 31, 2004. The Arbitration between RSM and Grenada is now pending with ICSID, at great expense to RSM, with Grenada's legal expenses, on information and belief, being covered entirely by the Defendants. Indeed, Grenada first took its ICSID case against RSM to the law firm of DLA Piper Rudnik Gray Cary, a law firm with close ties to Blavatnik and BP. Blavatnik has at relevant times served as the Vice Chair of the Keenan Council, and the board members have included Theodore C. Jonas of

the DLA Piper firm, James C. Langdon, Jr., who is an Akin Gump attorney who has represented Fridman, and Richard Herold of BP.

## GRENADA'S REPUTATION FOR CORRUPTION

41.    Prior to the formation of either Global Petroleum Group or TNK-BP, the government of Grenada, which has existed in largely its present form under the rule of Prime Minister Mitchell since 1995, had a well-known reputation for criminal bribery and corruption.  It also had a reputation for consorting with known felons.

42.    One example is Prime Minister Mitchell's relationship with Viktor Kozeny a/k/a "the Pirate of Prague."  Kozeny is a fraudster and mega-thief who has been implicated in numerous securities fraud and bribery scandals involving Eastern Europe and the former Soviet Union.  Mitchell named Kozeny "Honorary Counsul" from Grenada to the Bahamas, where Kozeny was fighting off extradition attempts on the part of the United States and United Kingdom. Mitchell is reported to have taken many rides on Kozeny's private jet.  Mitchell also received much negative press for allowing Kozeny to buy the car Mitchell rides to official government functions.  Kozeny threw expensive parties for Grenadian officials on his yacht and on information and belief secured a diplomatic Grenadian passport which, pursuant to international law, may have complicated the United States' and United Kingdom's efforts to have Kozeny extradited.  On information

20

and belief, Mr. Kozeny has been released on bail from a Bahamian Prison pending appeal of an order that he be extradited to the United States to face corruption charges in New York related to accusations that he paid millions of dollars of bribes to Azeri (Azerbaijan) officials as part of a failed effort to gain control of the state-run oil company (SOCAR), which he never did. It is expected that Kozeny will be extradited to the United States soon.

43.     Another example involves convicted securities fraudster Eric Resteiner. According to Timothy Bass, who was Mr. Resteiner's security director at relevant times, Bass videotaped a meeting in June of 2000 whereby Mr. Mitchell accepted, and Mr. Resteiner provided, $500,000 in $100 bills to Mr. Mitchell. In exchange, Mr. Resteiner was reportedly provided Grenadian citizenship and was named Ambassador At Large from Grenada. Mr. Bass has also testified to another exchange of $500,000 from Resteiner to Mitchell that was not videotaped. A copy of the transcript of Mr. Bass's pertinent testimony is attached hereto as Exhibit F. Mr. Resteiner confirmed the existence of the bribery videotape in his request for leniency prior to being sentenced, on May 16, 2007, to 87 months in a Federal Prison. See Exhibit G.

44.     Ironically enough, it was another of Mr. Mitchell's foreign "honorary" ambassadors which led to RSM's discovery of the criminal scheme to interfere with its exclusive contract.

21

## RSM DISCOVERS THE ILLEGAL SCHEME

45.     At the early stages of the still-pending RSM/Grenada arbitration, two individuals reached out to Jack Grynberg in an effort to settle the dispute.  One is Defendant Lev Korchagin, who called Mr. Grynberg on several occasions in or around August of 2005.  Than, later in 2005 and early 2006, Mr. Michael Melnicke, a New York business person who is Grenada's "Ambassador-At-Large" reached out to Mr. Grynberg.  Melnicke also serves with Blavatnik as a Director of the American Jewish Congress.

46.     Around August 2005 Grynberg received an unsolicited call from a Lev Korchagin, from Moscow, Russia. Mr. Korchagin represented himself as being an attorney as well as the Director of Global Petroleum, a Grenadian oil & gas company.  Mr. Korchagin suggested that he and Grynberg meet in London, England, to resolve any problems RSM has in Grenada, which he, and the people he represents could be instrumental in resolving.  When Grynberg inquired as to why he would not come to the U.S. if he is willing to go all the way to London, Mr. Korchagin explained that he needed to have a "neutral" site and not a location which is subject to American jurisdiction.  Korchagin further explained that if his group could participate as a partner in RSM's offshore Grenada license, his group would work everything out.  Mr. Korchagin assured Mr. Grynberg of a positive outcome because he claimed that his group "owns" the Government of Grenada.  At which point Grynberg sensed a violation of the U.S. Foreign Corrupt Practices Act,

and told Korchagin to "have a good day," and that he had no interest in meeting him in London or anywhere else.

47.     Thereafter, Mr. Melnicke called Mr. Grynberg to discuss brokering a deal between RSM and Grenada.  There were many conversations between Grynberg and Melnicke, as well as correspondences from Melnicke to Grynberg, covering the contractual dispute between RSM in Grenada, and spanning late 2005 and early 2006.

48.     Melnicke represented himself to be an American ambassador to Grenada, a representation that Grynberg later discovered was false.  Instead, much like Kozeny and Resteiner, Melnicke was an "Ambassador At Large" of Grenada, appointed by Prime Minister Mitchell.

49.     Melnicke offered to be a peacemaker who could resolve the dispute between Grenada and RSM.  He asked that, as compensation for his efforts, he receive a substantial overriding royalty based on the amount of oil and natural gas that was ultimately produced pursuant to the exclusive RSM/Grenada contract. Melnicke had a Colorado attorney named Barry Specter draft several revisions of a proposed contract for RSM to sign.  Drafts of the agreements prepared by Melnicke's Counsel are attached hereto as Exhibit H.  RSM refused to sign any of these agreements in light of the apparent Foreign Corrupt Practices Act implications and potential violations.

50.    In the course of trying to negotiate this agreement, Melnicke revealed to Grynberg in early 2006 that Blavatnik and Fridman had bribed Gregory Bowen so that their group could develop the vast petroleum reserves believed to exist in the offshore Grenadian territory.  Melnicke further revealed that Blavatnik and Fridman had promised additional bribes to Grenadian government officials in the future, and had promised to pay all of Grenada's legal fees in connection with the arbitration between RSM and Grenada.  According to Melnicke, at least one of the meetings designed to discuss the scheme occurred in New York, with Blavatnik, Fridman and Bowen all in attendance.  Melnicke also told Grynberg that he had arranged a fundraiser in New York for Prime Minister Mitchell's re-election effort.

51.    On October 31, 2006, plaintiffs herein brought this case.

**FACTS LEARNED SINCE THE FILING OF THE INITIAL COMPLAINT**

52.    On June 21, 2007, Gregory Bowen provided testimony in the arbitration pending between RSM and Grenada in London, England.  For the first time, a Grenadian official gave testimony under oath concerning the organizational structure of the Global Petroleum Group.  RSM now understands what it had already suspected, which is that Global Petroleum Group is a front group for multiple large companies, including on information and belief TNK-BP and BP. According to Mr. Bowen, Global Petroleum Group is affiliated with a company that is "one of the biggest....seismic scientific investment company and that they did work in the US and the UK and (sic) China."  He further noted that the "group" of

companies was active "nearly all over the world," including the Middle East and

Russia.  On information and belief, given the small number of companies that could

fit this profile, BP's knowledge of the Grenadian opportunity, plus Blavatnik's and

Fridman's apparent involvement, Mr. Bowen was alluding to defendants BP and

TNK-BP and perhaps affiliated entities.

    53.    In June and July of 2007, minutes of certain official Grenadian

Government proceedings were made public.  These proceedings in conjunction with

other documentation show that Global Petroleum Group has invested over $4

million (and quite possibly much more) into the legal defense of the Government of

Grenada in the arbitration against RSM.  A check showing a wire transfer payment

of $1,899.975 dated May 25, 2006 is attached hereto as Exhibit I.  On information

and belief, Defendants decided to document these payments since they were for the

benefit of the government and would need to be accounted for, but there are also

substantial other payments that went directly to Bowen and other Grenadian

officials.

    54.    Additional documentation discovered after the filing of the

initial complaint indicate that there is an agreement between Global Petroleum

Group and Grenada covering legal expenses to be employed against RSM, and that

Lev Model purported to *personally* advance the first $2.5 million in October of 2005

of money to cover Grenada's legal expenses.  This led to RSM's investigation of Mr.

Model and uncovering of his apparent criminal conviction and a separate civil

judgment.  On information and belief, based in part on garnishment proceedings involving Mr. Model in New Jersey, Mr. Model had no ability to pay this money personally, but was acting as a front person for Defendants Blavatnik, Fridman, TNK-BP and BP.

55.   Thus Plaintiffs claim against Defendants, for conspiracy and intentional tortious interference with a significant and excellent prospective business advantage, which will in addition supply the badly needed oil and natural gas demand of the United States and enhance the National Security of the United States of America.

## JURISDICTION AND VENUE

56.   Subject matter jurisdiction is appropriate in this action pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship.

57.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## FIRST CAUSE OF ACTION – INTENTIONAL TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGES

58.   Plaintiffs fully incorporate paragraphs 1-57 above, and claim against Defendants for damages for intentional tortious and illegal interference with prospective business advantages.

59.   The Defendants have conspired to finance Grenada's legal defense of the non-issuance of the exclusive oil and natural gas exploration, development and production license to RSM, and have persuaded Grenada to not issue such an oil and natural gas license to RSM as required by an exclusive

26

existing contract, for highly technical, insignificant and flimsy reasons. The issuance of the license was originally intended to be, and should be, a mere formality. There is nothing to the contrary in Grenada law, nor in the contract.

60.     The Defendants have conspired to tortiously interfere with the issuance of an oil and natural gas exploration, development and production license by Grenada to Plaintiffs. The Defendants are financing Grenada's defense in ICSID and are supporting a corrupt Grenada Minister who solicited a bribe from Grynberg, which was refused, and thereby have illegally interfered with a vast and very significant prospective business advantage of the Plaintiffs, as well as of Grenada, its People and the United States, which badly needs nearby oil and natural gas supplies independent of the turbulent Middle East in a world with diminishing oil and natural gas supplies and reserves. Minister Bowen informed Jack J. Grynberg in September 1996, in Grenada that the Minister expected significant bribes from RSM and Jack J. Grynberg in order for RSM to do business in Grenada. Minister Bowen stated that his Ministry salary was too small for he and his family to live on. The People of Grenada have suffered greatly after its devastating hurricane of 2004, and are entitled to the fruits of its natural resources, which is being delayed unnecessarily and sabotaged by the actions of these Defendants. Each individual Defendant are and were at all relevant times actually aware of the exclusive contract and economic relationship between RSM and Grenada.

27

61.    The Defendants have intentionally, improperly, illegally and tortiously interfered with Plaintiffs' ongoing, transparent and active business relationship with Grenada, and Plaintiffs' prospective business advantages arising out of the issuance of an oil and natural gas exploration, development and production license by Grenada to Plaintiffs, as required by the exclusive July 1996 contract.  On information and belief, the wrongful conduct has included criminal violations of the US Foreign Corrupt Practices Act, the 1997 OECD Convention on Bribery of Foreign Public Officials in International Business Transactions, and the US Travel Act.  Moreover, as alleged herein on information and belief, BP and Browne have misappropriated and stolen Plaintiffs' proprietary, confidential and very valuable geologic, geophysical and economic information concerning offshore Grenada in furtherance of the scheme to substitute Defendants' group for RSM as the exclusive oil and natural gas exploration development and production group in the offshore Grenadian territory.

62.    The Defendants' criminal and tortious actions have prevented Plaintiffs from developing oil and natural gas reserves in Grenadian offshore territory, resulting in enormous damage, the precise amount of which will be determined at trial but is believed to be no less (and possibly considerably more) then $500 million.  On information and belief, each individual and corporate Defendant, in its own way is an integral part of the deliberate scheme to interfere with RSM's exclusive contract and economic relationship with Grenada, and

therefore a cause-in-fact and proximate cause of Plaintiffs' damages.  If Defendants had not interfered with RSM's contract and business expectancy by bribing Bowen, promising more bribes in the future, and funding Grenada's legal defense in the ICSID case, Grenada (a very poor country that all would agree should be developing its awesome offshore petroleum potential) would not be fighting tooth-and-nail to worm out of its contractual obligations with RSM in favor of Defendants' group. Each Defendant herein is jointly and severally liable for all damages.

## SECOND CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT

63.     Plaintiffs repeat and re-allege paragraphs 1 through 62 as if fully set forth herein.

64.     RSM and Grenada have and at relevant times had a valid and enforceable exclusive contract.

65.     Through the criminal actions alleged herein, Defendants intentionally, illegally, tortiously, criminally and without justification interfered with RSM's exclusive contract with Grenada.

66.     The Defendants' actions have prevented Plaintiffs from developing the giant oil and natural gas potential and recoverable reserves in the Grenadian offshore territory, for the benefit of the people of Grenada, the USA and the free world, resulting in enormous damage, the precise amount of which will be determined at trial but is believed to be no less (and possibly considerably more)

then $500 million.  On information and belief, each individual and corporate

Defendant, in its own way, has been a cause-in-fact and a proximate cause of

Plaintiffs' damages, because each defendant is n integral part of the deliberate

scheme to interfere with RSM's exclusive contract with Grenada.  Each Defendant

herein is jointly and severally liable for all damages.

**THIRD CAUSE OF ACTION – CIVIL CONSPIRACY**

      67.    Plaintiffs repeat and reallege paragraphs 1 through 66 as if

fully set forth herein.

      68.    Each of the defendants herein were participants with each other

and quite possibly additional not-yet-known individuals or entities, in an illegal,

criminal conspiracy.  The common purpose of this conspiracy was to divert

extremely valuable American petroleum rights that rightfully belong to RSM, a

Texas Corporation, to the Global Petroleum Group, which is essentially a front

group for defendants Blavatnik, Fridman, TNK-BP, and BP.

      69.    Each defendant understood this common purpose.

      70.    Unlawful overt acts included, on information and belief (1)

repeated instances of criminal bribery in violation of the Foreign Corrupt Practices

Act, and (2) violations of the Travel Act in which certain defendants (including

apparent convicted felon Lev Model) traveled from the United States and elsewhere

to Grenada to provide significant illegal bribe monies.

71.     As a proximate result of the civil conspiracy alleged herein, RSM has been damaged in an amount to be determined at trial, but believed to be no less (and possibly considerably more) than $500 million.  Each Defendant herein is jointly and severally liable for all damages.

WHEREFORE, Plaintiffs claim for judgment against Defendants, jointly and severally such that each is potentially liable to Plaintiffs for the entire damage award, for damages in excess of five hundred million dollars ($500,000,000.00), for costs, expenses, attorney fees, plus punitive damages, interest, and for such further and other relief as may be ordered by this Court.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE BY A DULY CONSTITUTED JURY.

Date:  October 2, 2007

Respectfully submitted,

**Daniel L. Abrams**
Digitally signed by Daniel L. Abrams
DN: cn=Daniel L. Abrams, o=Law Office Of Daniel L. Abrams, PLLC, ou, email=Dan@lawyerquality.com, c=US
Date: 2007.10.02 08:26:41 -04'00'

Daniel L. Abrams
Law Office of Daniel L. Abrams, PLLC
2 Penn Plaza, Suite 1910
New York, NY 10121
Phone:  (212) 292-5663
Fax:  (646) 536-8905
Dan@LawyerQuality.com
Attorneys for Plaintiffs

Roger Jatko, Esq.
Samuel Yahn, Esq.
Grynberg Petroleum Company
Prentice Point, Suite 500
5299 DTC Boulevard
Greenwood Village, CO 80111-3321
Telephone:  (303) 850-7490
Facsimile:  (303) 850-7498
Counsel To Plaintiffs

32

Aldine ™ Enviro-Tab ™

Mixed
Sources Cert no SW-COC-1542 ©1996 FSC

JUL-19-2007  11:02                                                    P.02
                                                              Page 1 of 8
H. R. 435 (Introduced-in-House)

110TH CONGRESS
1ST SESSION

# H. R. 435

To provide for a study by the National Academy of Engineering regarding improving the accuracy of collection of royalties on production of oil, condensate, and natural gas under leases of Federal lands and Indian lands, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 12, 2007

Mrs. MALONEY of New York (for herself, Mr. HINCHEY, and Mr. GRIJALVA) introduced the following bill; which was referred to the Committee on Natural Resources

---

# A BILL

To provide for a study by the National Academy of Engineering regarding improving the accuracy of collection of royalties on production of oil, condensate, and natural gas under leases of Federal lands and Indian lands, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Study of Ways to Improve the Accuracy of the Collection of Federal Oil, Condensate, and Natural Gas Royalties Act of 2007".

### SEC. 2. STUDY OF ACTIONS TO IMPROVE THE ACCURACY OF COLLECTION OF FEDERAL OIL, CONDENSATE, AND NATURAL GAS ROYALTIES.

The Secretary of the Interior shall seek to enter into an arrangement with the National Academy of Engineering under which the Academy, by not later than six months after the date of the enactment of this Act, shall study and report to the Secretary regarding whether the accuracy of collection of royalties on production of oil, condensate, and natural gas under leases of Federal lands (in eluding submerged and deep water lands) and Indian lands would be improved by any of the following:

(1) Requiring the installation of digital meters, calibrated at least monthly to an absolute zero value, for all lands from which natural gas (including condensate) is produced under such leases.

H.R. 435 (Introduced-in-House)

(2) Requiring that—

(A) the size of every orifice plate on each natural gas well operated under such leases be inspected at least quarterly by the Secretary; and

(B) chipped orifice plates and wrong-sized orifice plates be replaced immediately after those inspections and reported to the Secretary for retroactive volume measurement corrections and royalty payments with interest of 8 percent compounded monthly.

(3) Requiring that any plug valves that are in natural gas gathering lines be removed and replaced with ball valves.

(4) Requiring that—

(A) all meter runs should be opened for inspection by the Secretary and the producer at all times; and

(B) any welding or closing of the meter runs leading to the orifice plates should be prohibited unless authorized by the Secretary.

(5) Requiring the installation of straightening vanes approximately 10 feet before natural gas enters each orifice meter, including each master meter and each sales meter.

(6) Requiring that all master meters be inspected and the results of such inspections be made available to the Secretary and the producers immediately.

(7) Requiring that—

(A) all sampling of natural gas for heating content analysis be performed monthly upstream of each natural gas meter, including upstream of each master meter;

(B) records of such sampling and heating content analysis be maintained by the purchaser and made available to the Secretary and to the producer monthly;

(C) probes for such upstream sampling be installed upstream within three feet of each natural gas meter;

(D) any oil and natural gas lease for which heat content analysis is falsified shall be subject to cancellation;

(E) natural gas sampling probes be located—

(i) upstream of the natural gas meter at all times;

(ii) within a few feet of the natural gas meter; and

JUL-19-2007  11:02                                        P.04
                                                          Page 3 of 8

H. R. 435 (Introduced-in-House)

(iii) after the natural gas goes through a Welker or Y-Z vanishing chamber; and

(F) temperature probes and testing probes be located between the natural gas sampling probe and the orifice of the natural gas meter.

(8) (A) Reinstating the requirement to file Federal Energy Regulatory Commission (FERC) Form 16 in April and September of each year for every natural gas pipeline, including each intrastate pipelines, in addition to the filing of FERC Form 2.

(B) Requiring—

(i) use of such FERC Form 2 to create FERC Form 16 data for the years beginning April and September, respectively, 1992, and for each year thereafter; and

(ii) filing with the Federal Energy Regulatory Commission a FERC Form 16 for April and September that is completed with such data back to April 1992.

(9) Requiring that administrative jurisdiction over all natural gas gathering lines, interstate pipelines, and intrastate piplines revert immediately to the Federal Energy Regulatory Commission.

(10) Prohibiting the dilution of natural gas with inert nitrogen or inert carbon dioxide gas for royalty determination, sale, or resale at any point.

(11) Requiring that both the measurement of the volume of natural gas and the heating content analyses be reported only on the basis of 14.73 PSI and 60 degrees Fahrenheit, regardless of the elevation above sea level of such volume measurement and heating content analysis, for both purchases and sales of natural gas.

(12) Prohibiting the construction of bypass pipes that go around the natural gas meter, and imposing criminal penalties for any such construction or subsequent removal including, but not limited to, automatic cancellation of the lease.

(13) Requiring that all natural gas sold to consumers have a minimum BTU content of 960 at an atmospheric pressure of 14.73 PSI and be at a temperature of 60 degrees Fahrenheit, as required by the State of Wyoming Public Utilities Commission.

(14) Requiring that all natural gas sold in the USA will be on a MMBTU basis with the BTU content adjusted for elevation above sea level in higher altitudes. Thus all natural gas meters must correct for BTU content in higher elevations (altitudes).

(15) Issuance by the Secretary of rules for the measurement at the wellhead of the standard volume of natural gas produced, based on independent industry standards such as those suggested by the American Society of Testing Materials (ASTM).

H. R. 435 (Introduced-in-House)

(16) Requiring use of the fundamental orifice meter mass flow equation, as revised in 1990, for calculating the standard volume of natural gas produced.

(17) Requiring the use of Fpv in standard volume measurement computations as described in the 1992 American Gas Association Report No. 8 entitled Compressibility Factor of Natural Gas and Other Related Hydrocarbon Gases.

(18) Requiring that gathering lines must be constructed so as to have as few angles and turns as possible, with a maximum of three angles, before they connect with the natural gas meter.

(19) Requiring that for purposes of reporting the royalty value of natural gas, condensate, oil, and associated natural gases, such royalty value must be based upon the natural gas' condensate's, oil's, and associated natural gases' arm's length, independent market value, as reported in independent, respected market reports such as Platts or Bloombergs, and not based upon industry controlled posted prices, such as Koch's.

(20) Requiring that royalties be paid on all the condensate recovered through purging gathering lines and pipelines with a cone-shaped device to push out condensate (popularly referred to as a pig) and on condensate recovered from separators, dehydrators, and processing plants.

(21) Requiring that all royalty deductions for dehydration, treating, natural gas gathering, compression, transportation, marketing, removal of impurities such as carbon dioxide ($CO_2$), nitrogen ($N_2$), hydrogen sulphide ($H_2S$), mercaptain (HS), helium (He), and other similar charges on natural gas, condensate, and oil produced under such leases that are now in existence be eliminated.

(22) Requiring that at all times—

(A) the quantity, quality, and value obtained for natural gas liquids (condensate) be reported to the Secretary; and

(B) such reported value be based on fair independent arm's length market value.

(23) Issuance by the Secretary of regulations that prohibit venting or flaring (or both) of natural gas in cases for which technology exists to reasonably prevent it, strict enforcement of such prohibitions, and cancellation of leases for violations.

(24) Requiring lessees to pay full royalties on any natural gas that is vented, flared, or otherwise avoidably lost.

(25) (A) Requiring payment of royalties on carbon dioxide at the wellhead used for tertiary oil recovery from depleted oil fields on the basis of 5 percent of the West Texas Intermediate crude oil fair market price to be used for one MCF (1,000 cubic feet) of carbon dioxide gas.

H. R. 435 (Introduced-in-House)

(B) Requiring that—

(i) carbon dioxide used for edible purposes should be subjected to a royalty per thousand cubic feet (MCF) on the basis of the sales price at the downstream delivery point without deducting for removal of impurities, processing, transportation, and marketing costs;

(ii) such price to apply with respect to gaseous forms, liquid forms, and solid (dry ice) forms of carbon dioxide converted to equivalent MCF; and

(iii) such royalty to apply with respect to both a direct producer of carbon dioxide and purchases of carbon dioxide from another person that is either affiliated or not affiliated with the purchaser.

(26) Requiring that—

(A) all carbon dioxide produced from Federal and Indian leases be analyzed for carcinogenic benzene; and

(B) benzene produced with such carbon dioxide must be filtered out and removed safely as necessary to prevent harm to the environment subjected to such benzene content, in order to create a maximum permissible level (MPL) of 5 parts per billion.

(27) Requiring that—

(A) royalties be paid on the fair market value of nitrogen extracted from such leases that is used industrially for well stimulation, helium recovery, or other uses; and

(B) royalties be paid on the fair market value of ultimately processed helium recovered from such leases.

(28) Allowing only 5 percent of the value of the elemental sulfur recovered during processing of hydrogen sulfide gas from such leases to be deducted for processing costs in determining royalty payments.

(29) Requiring that all heating content analysis of natural gas be conducted to a minimum level of $C_{15}$.

(30) Eliminating artificial conversion from dry BTU to wet BTU, and requiring that natural gas be analyzed and royalties paid for at all times on the basis of dry BTU only.

(31) Requiring that natural gas sampling be performed at all times with a floating piston cylinder container at the same pressure intake as the pressure of the natural gas gathering line.

H.R. 435 (Introduced-in-House)

(32) Requiring use of natural gas filters with a minimum of 10 microns, and preferably 15 microns, both in the intake to natural gas sampling containers and in the exit from the natural gas sampling containers into the chromatograph.

(33) Mandate the use of a Quad Unit for both portable and stationary chromatographs in order to correct for the presence of nitrogen and oxygen, if any, in certain natural gas streams.

(34) Require the calibration of all chromatograph equipment every three months and the use of only American Gas Association-approved standard comparison containers for such calibration.

(35) Requiring that natural gas stored during the summer period and marketed during the winter period—

   (A) be sold on the basis of the purchase price minus a maximum of $0.50 per MMBTU storage charges; or

   (B) be subject to payment of royalties on the basis of winter sales price minus $0.50 per MMBTU.

(36) Requiring payment of royalties on any such natural gas stored on Federal or Indian lands on the basis of corresponding storage charges for the use of Federal or Indian lands, respectively, for such storage service.

(37) Imposing penalties for the intentional nonpayment of royalties for natural gas liquids recovered—

   (A) from purging of natural gas gathering lines and natural gas pipelines; or

   (B) from field separators, dehydrators, and processing plants,

including cancellation of oil and natural gas leases and criminal penalties.

(38) Requiring that the separator, dehydrator, and natural gas meter be located within 100 feet of each natural gas wellhead.

(39) Requiring that BTU heating content analysis be performed when the natural gas is at a temperature of 140 to 150 degrees Fahrenheit at all times, as required by the American Gas Association (AGA) regulations.

(40) Requiring that heating content analysis and volume measurements are identical at the sales point to what they are at the purchase point, after allowing for a small volume for leakage in old pipes, but with no allowance for heating content discrepancy.

(41) Requiring that all natural gas produced under such leases be at all times sold to public, industrial, storage, and private customers only on a MMBTU basis of MCF

JUL-19-2007  11:04                                                          P.08

H.R. 435 (Introduced-in-House)                                    Page 7 of 8

(1000 CF) x MBTU (1000 BTU).

(42) Verification by the Secretary that the specific gravity of natural gas produced under such leases, as measured at the meter run, corresponds to the heating content analysis data for such natural gas, in accordance with the Natural Gas Processors Association Publication 2145-71(1), entitled "Physical Constants Of Paraffin Hydrocarbons And Other Components Of Natural Gas", and reporting of all discrepancies immediately.

(43) Prohibiting all deductions on royalty payments for marketing of natural gas, condensate, and oil by an affiliate or agent.

(44) Requiring that all standards of the American Petroleum Institute, the American Gas Association, the Gas Processors Association, and the American Society of Testing Materials, Minerals Management Service Order No. 5, and all other Minerals Management Service orders be faithfully observed and applied, and willful misconduct of such standards and orders be subject to oil and gas lease cancellation.

(45) Requiring that all oil and condensate produced from Federal and Indian lands must be stored and measured in cylindrical tanks, and prohibiting any distortion, such as squeezing or bending of a storage tank, that hinders the true and honest measurement of volume of condensate and oil.

## SEC. 3. REVIEW OF ROYALTY PAYMENTS.

The Secretary of the Interior, subject to the availability of appropriations, shall award a contract under which the contractor shall—

(1) compare royalty payments made under Federal oil and gas lease provisions for covered lands against data supplied to the Federal Energy Regulatory Commission;

(2) make such comparison retroactive to June 1, 1974, by integrating existing natural gas analog charts or digital meter results (or both) for each natural gas meter and multiplying the corresponding standard volume results by heating content analysis obtained from corresponding specific gravity measurement relationship;

(3) determine whether the correct production standard volume and total heating content analysis was used to calculate such payments; and

(4) determine whether such payments were adequate under the terms of such oil and gas leases, by among other procedures comparing the reported royalty values with respected published market price reports, such as Platts or Bloombergs.

## SEC. 4. DEFINITIONS.

In this Act: